UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2002 OCT 31   A 9 59

U.S. DISTRICT
DISTRICT OF MASS.

)
SECURITIES AND EXCHANGE COMMISSION,   )
)
Plaintiff,   )
)
v.   )   Civil Action No. 00-30170-FHF
)
ROBERT C. SEARS,   )
)
Defendant,   )
)
and   )
)
LAST MINUTE CONCESSIONS INC.,   )
JAMES W. CASAGRANDE,   )
COLD SPRING GOLF COURSE INC. and   )
COLD SPRING DEVELOPMENT INC.,   )
)
Relief Defendants.   )
)

**DOCKETED**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT
## AGAINST RELIEF DEFENDANTS

Plaintiff Securities and Exchange Commission ("Commission") submits this

memorandum in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil

Procedure, for summary judgment against relief defendants Last Minute Concessions Inc.

("LMC"), James W. Casagrande ("Casagrande"), Cold Spring Golf Course Inc. ("CSG"), and

Cold Spring Development Inc. ("CSD").[1]

---

[1] A default judgment against defendant Robert C. Sears ("Sears") was entered on
September 10, 2002. Summary judgment against the relief defendants will dispose of the
Commission's remaining claims in this action.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2002 OCT 31  A 9 59

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 00-30170-FHF |
| | ) |
| ROBERT C. SEARS, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| LAST MINUTE CONCESSIONS INC., | ) |
| JAMES W. CASAGRANDE, | ) |
| COLD SPRING GOLF COURSE INC. and | ) |
| COLD SPRING DEVELOPMENT INC., | ) |
| | ) |
| Relief Defendants. | ) |

**DOCKETED**

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS
### IN SUPPORT OF ITS
### MOTION FOR SUMMARY JUDGMENT
### <u>AGAINST RELIEF DEFENDANTS</u>

Pursuant to Local Rule 56.1, plaintiff Securities and Exchange Commission

("Commission") hereby submits this statement of undisputed facts in support of its motion for

summary judgment against relief defendants Last Minute Concessions Inc. ("LMC"), James W.

Casagrande ("Casagrande"), Cold Spring Golf Course Inc. ("CSG"), and Cold Spring

Development Inc. ("CSD").[1]

---

[1] The facts set forth below are based upon: (i) the Answer of James Casagrande to
Amended Complaint ("Casagrande Answer"); (ii) the Answer of Last Minute Concessions, Inc.
to Amended Complaint ("LMC Answer"); (iii) the Answer of Relief Defendants Cold Spring

## A.  **Background**

1.    Sears operated an investment advisory business and income tax preparation business in Northampton, Massachusetts. [LMC Dep., pp.16, 171.]

2.    Casagrande worked as a golf professional and also did business was a tax preparer in office space in Northampton, Massachusetts, that he shared with Sears. [Casagrande Answer, ¶11; LMC Dep., pp.7, 26-27.]

3.    LMC is a Massachusetts corporation organized by Sears and Casagrande in 1992, with its principal place of business in Northampton, Massachusetts.  Between 1992 and 1998, LMC operated a food and beverage concession at the Westover Golf Course.  [LMC Answer, ¶10; LMC Dep., pp.8-10, 38-41.]  Casagrande testified that, at some point in 1999, Sears surrendered his interest in LMC to Casagrande, who was thereafter the sole officer, director and employee of LMC.  [LMC Dep., pp.8-10.]

4.    CSG and CSD are Massachusetts corporations organized in January 1999 for the purpose of building a golf course and condominium project near Belchertown, Massachusetts. [CSG/CSD Answer, ¶¶12-13, 15.]

---

Golf Course, Inc. and Cold Spring Development, Inc. ("CSG/CSD Answer"); (iv) the transcript of the deposition of Casagrande ("Casagrande Dep."), a copy of which is attached hereto as **Exhibit A**; (v) the transcript of the deposition of LMC pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure ("LMC Dep.") for which Casagrande was the deponent, a copy of which is attached hereto as **Exhibit B**; (vi) deposition exhibits 9, 10 and 11 ("Dep. Ex."), copies of which are attached hereto as **Exhibit C**; (vii) sworn declarations from clients of defendant Robert C. Sears ("Sears"), including Ann M. Arnold, Paul D. Engel, Thomas Futter, Celeste P. Helterline, Roy A. Johnson, Marcia McGovern, Robert McLaughlin, Stephen McQueeney, Lyn Reale, Virginia Senders, Josephine Shaw, and Nan C. Wallace; and (viii) the Declaration of Frank C. Huntington, Esq.

**B.     Sears Was Responsible for Raising $2 Million to**
**        Fund LMC's Investment in the Cold Spring Project**

5.     In the spring of 1999, Casagrande introduced Sears to the principals of CSG and

CSD, who were seeking investors for the Cold Spring project. [CSG/CSD Answer, ¶15; LMC

Dep., pp.74-75, 96.]

6.     In June 1999, LMC entered into written agreements with CSG and CSD whereby

LMC was to acquire a 51% interest in CSG for $1,725,00 and a 16% interest in CSD for

$275,000, and Sears and Casagrande were to become directors of both companies. [CSG/CSD

Answer, ¶16; Casagrande Answer, ¶16; LMC Dep., pp.55-59; Dep. Exs. 9-10.]

7.     When LMC entered into the agreements with CSG and CSD, LMC and

Casagrande did not have the $2 million that would be required under those agreements. Sears

and Casagrande told the principals of CSG and CSD that Sears would raise the $2 million from

outside investors so that LMC could satisfy its obligations to CSG and CSD under the

agreements. [Casagrande Dep., pp.141-142, 150-151; LMC Dep., pp.15, 72, 77-78, 81-83.] As

Casagrande put it, "He [Sears] was the one who was supposed to be raising the money." [LMC

Dep., p.72.]

8.     In January 2000, CSG received the final permit necessary to allow construction to

begin, thereby triggering LMC's obligation to pay $2 million under the agreements with CSG

and CSD. [CSG/CSD Answer, ¶17.]

**C.     Sears Fraudulently Obtained Nearly**
**$2.3 Million from His Clients**

9.      On February 22, 2000, Sears caused $500,000 to be transferred from the account

of his client Marc Thomas Futter, age 81, at Charles Schwab & Co. ("Schwab") to LMC. Futter

intended to invest in the golf course project, but Sears did not disclose to Futter the material fact

that he had an interest in the project. On March 29, 2000, Sears forged Futter's name on a letter

telling Schwab to transfer an additional $50,000 from Futter's account to LMC. Futter had not

authorized this transfer. On May 10, 2000, Sears caused an additional $250,000 to be transferred

from Futter's account at Fidelity Investments to LMC. Sears did not disclose to Futter the

material fact that the funds were being transferred to an entity in which he had an interest.

[Futter Decl., ¶¶5-9.]

10.     On March 15 and April 5, 2000, Sears forged the name of his clients Stephen and

Claire McQueeney on two letters telling Schwab to transfer a total of $80,000 from their account

to LMC. The McQueeneys had not agreed to lend money to LMC and had not authorized the

transfers to LMC. [McQueeney Decl., ¶¶4-6.]

11.     On March 29 and April 5, 2000, Sears forged the name of his client Lyn Reale,

age 65, on two letters telling Schwab to transfer a total of $90,000 from her account to LMC.

Reale had not agreed to lend money to LMC and had not authorized the transfers to LMC.

[Reale Decl., ¶¶4-9.]

12.     On March 29, 2000, Sears forged the names of his clients Marcia McGovern and

her elderly mother Virginia Sanborn on a letter telling Schwab to transfer $150,000 from their

account to LMC. McGovern and Sanborn had not agreed to lend money to LMC and had not

4

authorized the transfer to LMC. Indeed, several months earlier, McGovern had specifically rejected Sears' proposal that her mother invest in the golf course project. [McGovern Decl., ¶¶6-11.]

13.     On March 29 and April 5, 2000, Sears forged the names of his clients John and Nan Wallace on two letters telling Schwab to transfer a total of $55,000 from their account to LMC. The Wallaces had not agreed to lend money to LMC and had not authorized the transfers to LMC. [Wallace Decl., ¶¶4-12.]

14.     Between March 29 and June 1, 2000, Sears forged the names of his clients Celeste and Mark Helterline on seven letters telling Schwab to transfer a total of $146,985 from four accounts in the names of the Helterlines and their children to LMC. The Helterlines had not agreed to lend money to LMC and had not authorized the transfers to LMC. [Helterline Decl., ¶¶5-11.]

15.     On March 28, 2000, Sears forged the name of his client Virginia Senders, age 79, on a Schwab margin account agreement. The next day, he caused Senders' account to incur a margin loan of $120,000. On March 31, Sears caused the loan proceeds to be transferred to LMC. The margin account opening, the margin loan, and the wire transfer all took place without Senders' knowledge or consent. [Senders Decl., ¶¶5-9.]

16.     On March 29, 2000, Sears forged the name of his client Josephine Shaw, age 84, on a letter telling Prudential Securities to transfer $225,000 from her account to LMC. The next day, Sears obtained Shaw's signature on a letter authorizing the transfer, but he did not disclose to Shaw the material fact that the funds would be transferred to an entity in which he had an interest. [Shaw Decl., ¶¶4-6.]

17.     On June 1, 2000, Sears forged the names of his clients Robert McLaughlin, age 67, and his wife Eleanor McLaughlin on a letter telling Schwab to transfer $75,000 from their account to LMC. The McLaughlins had not agreed to lend money to LMC and had not authorized the transfer to LMC. [McLaughlin Decl., ¶¶5-7.]

18.     On June 1, 2000, Sears forged the name of his client Ann Arnold on a letter telling Schwab to transfer $20,000 from her account to LMC. Arnold had not agreed to lend money to LMC and had not authorized the transfer to LMC. [Arnold Decl., ¶¶4-14.]

19.     Between June 1 and July 21, 2000, Sears forged the name of his client Roy Johnson on several letters telling Schwab to transfer a total of $502,000 from several accounts in the name of Johnson, his wife Jeannie, and their children to LMC. Some of the funds for these transfers had been generated by Sears' unauthorized sale of General Electric stock donated by Johnson's father to his grandchildren. Johnson had not agreed to lend money to LMC and had not authorized the transfers to LMC. [Johnson Decl., ¶¶4-19.]

20.     On June 22, 2000, Sears forged the names of his clients Paul and Deborah Engel on a letter telling Schwab to transfer $30,000 from their account to LMC. The Engels had not agreed to lend money to LMC and had not authorized the transfers to LMC. [Engel Decl., ¶¶5-16.]

## D.     The Money from Sears' Clients Went to LMC

21.     The money from Sears' clients was deposited into an account at BankBoston (later Fleet Bank) which Casagrande opened for LMC. [LMC Dep., pp.49, 182.]

22.     Deposition Exhibit 11 is a report which Casagrande prepared using data from the LMC account statements that he had entered into his computer. [LMC Dep., pp.180-181.]

Deposition Exhibit 11 reflects the following deposits of funds from Sears' clients (as identified in paragraphs 9-20 above):

| Date | Amount | Description on Exhibit 11 |
|------|--------|---------------------------|
| 2/22/00 | 500,000 | Marc Futter |
| 3/15/00 | 75,000 | Steve McQueeney |
| 3/29/00 | 50,000 | Marc Futter |
| | 75,000 | Lyn Reale |
| | 150,000 | Virginia Sanborn/ Maria Mc... [sic] |
| 3/30/00 | 50,000 | John Wallace |
| | 24,985 | Celeste Helterline |
| | 25,000 | Celeste Helterline |
| | 25,000 | Mark Helterline |
| 3/31/00 | 120,000 | Virginia Senders |
| | 225,000 | Josephine Shaw |
| 4/6/00 | 5,000 | John Wallace |
| | 5,000 | Steve McQueeney |
| | 12,000 | Celeste Helterline |
| | 15,000 | Lyn Reale |
| 5/10/00 | 250,000 | unknown [Marc Futter] |
| 6/1/00 | 75,000 | Robert McLaughlin |
| 6/2/00 | 10,000 | Celeste Helterline |
| | 20,000 | Mark Helterline |
| | 20,083 | Ann Arnold |
| | 30,000 | Celeste Helterline |
| 6/6/00 | 70,000 | Roy Johnson |
| 6/22/00 | 30,000 | Paul Engel |
| | 100,000 | Roy Johnson |
| 7/12/00 | 62,500 | Roy Johnson |

| _Date_ | _Amount_ | _Description on Exhibit 11_ |
|--------|----------|-----------------------------|
| 7/14/00 | 90,000 | Roy Johnson |
| | 90,000 | Roy Johnson |
| | 90,000 | Roy Johnson |
| | **$2,294,485** | |

23.     During the spring and summer of 2000, Casagrande called Sears repeatedly to ask

when LMC would be receiving any additional funds, because the Cold Spring project needed the

money to pay its bills.  Sears assured Casagrande that additional funds would be received shortly

and that he would come up with the full $2 million.  [LMC Dep. pp.184-185, 191.]

24.     Casagrande and the principals of CSG and CSD were aware that Sears was

obtaining the money from his advisory clients, but they did not ask Sears how he was raising the

money and they did nothing to make sure that what Sears was telling investors about the Cold

Spring project was accurate.  [Casagrande Dep., pp.143-144; LMC Dep., pp.169-170, 194, 210.]

**E.      The Money from Sears' Clients Was Paid to CSG and CSD**
**or Was Used to Pay the Cold Spring Project's Expenses**

25.     The LMC account at BankBoston was used to make payments either directly to

CSG and CSD or to pay expenses of the Cold Spring project on their behalf.  Casagrande was

responsible for deciding which expenses of CSG or CSD would be paid from the LMC account.

[LMC Dep., pp.60-62.]

26.     The payments made from the LMC account appear on Deposition Exhibit 11.

Most of the withdrawals from the LMC account reflected on Deposition Exhibit 11 were checks

payable to CSG or CSD or checks or wire transfers to entities that had supplied goods or services

to the Cold Spring project.   [LMC Dep., pp.60, 64-69, 140 & Dep. Ex. 11.]

8

27.     The three principals of CSG and CSD were aware that Casagrande was using the

LMC account at BankBoston to pay expenses of the Cold Spring project. [LMC Dep., p.65.]

28.     LMC satisfied its obligation to pay $2 million to CSG and CSD through the

payments from its account at BankBoston to CSG and CSD or to pay expenses of the Cold

Spring project. [LMC Dep., pp.60-62, 151-152.]


Respectfully submitted,

JUAN MARCEL MARCELINO
DISTRICT ADMINISTRATOR


By:     _Frank C Huntington_____

Frank C. Huntington (Mass. Bar No. 544045)
Senior Trial Counsel

Ellen E. Bober (Mass. Bar No. 567598)
Enforcement Attorney

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 424-5900  ext. 201 (Huntington)
                ext. 608 (Bober)
(617) 424-5940 (fax)

Dated:   October 30, 2002

## CERTIFICATE OF SERVICE

I, Frank C. Huntington, certify that on October 30, 2002, a copy of the foregoing Plaintiff's Statement of Undisputed Facts in Support of its Motion for Summary Judgment against Relief Defendants was sent by first-class mail to counsel of record as follows:

*Attorney for Defendant Robert Sears (limited appearance)*

Irving D. Labovitz, Esq.
One Financial Plaza
1350 Main Street, 15th Floor
Springfield, MA  01103
(413) 733-0600
(413) 732-5828  (fax)

*Attorney for Relief Defendants*
*James Casagrande and Last Minute Concessions, Inc.*

Thomas Lesser, Esq.
Lesser, Newman, Souweine & Nasser, LLP
39 Main St., Suite I
Northampton, MA  01060-3132
(413) 584-7331
(413) 586-7076  (fax)

*Attorneys for Relief Defendants*
*Cold Spring Golf Course, Inc. and Cold Spring Development, Inc.*

John A. Houlihan, Esq.
Robert D. Laurie, Esq.
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444
(617) 439-4170  (fax)

*Frank C Huntington*
Frank C. Huntington

10

## In The Matter Of:

*Charles Schwab & Co., Inc. v.*
*Sears, et al.*

---

*30(b)(6) Depo of James Casagrande*
*August 29, 2001*

*vol. 1*
*pp. 1-219*

---

*RECEIVED*
*SEP 17 2001*
*SECURITIES AND EXCHANGE COMMISSION*
*BOSTON DISTRICT OFFICE*

*Jones, Fritz & Sheehan*
*A LegaLink Company*
*210 South Street*
*11th Floor*
*Boston, MA  02111*
*(617) 542-0039   or   (800) 822-3376*

*Original File 0829CASA.TXT, 219 Pages*
*Min-U-Script® File ID: 1524431109*

**Word Index included with this Min-U-Script®**

Charles Schwab & Co., Inc. v.          Vol. 1          30(b)(6) Depo of James Casagrande
Sears, et al.          Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 14 of 142          August 29, 2001
pp. 1-219

Page 3

| | |
|---|---|
| [1] | Volume: I |
| [2] | Pages: 1-219 |
| [3] | Exhibits: 25-31 |
| [4] | COMMONWEALTH OF MASSACHUSETTS |
| [5] | SUFFOLK, ss.     SUPERIOR COURT DEPT. OF |
| [6] | THE TRIAL COURT |
| [7] | C.A. NO. 00-3807-E |
| [8] | |
| [9] | CHARLES SCHWAB & CO., INC., |
| [10] | Plaintiff, |
| [11] | vs. |
| [12] | ROBERT C. SEARS; LAST MINUTE CONCESSIONS, INC.; |
| [13] | COLD SPRING GOLF COURSE, INC.; JAMES CASAGRANDE; |
| [14] | GERALD HERSH and SEARS, CASAGRANDE & HERSH, |
| [15] | Defendants |
| [16] | PRUDENTIAL SECURITIES INCORPORATED, |
| [17] | Trustee and Reach and Apply |
| [18] | Defendant, |
| [19] | and |
| [20] | FLEET NATIONAL BANK and FLORENCE SAVINGS |
| [21] | BANK, |
| [22] | Trustee Defendants. |
| [23] | |
| [24] | AND |

Page 3

| | |
|---|---|
| [1] | APPEARANCES: |
| [2] | BINGHAM DANA LLP |
| [3] | (By John R. Snyder, Esquire) |
| [4] | 150 Federal Street |
| [5] | Boston, Massachusetts 02110 |
| [6] | 617-951-8000 |
| [7] | On behalf of Charles Schwab |
| [8] | |
| [9] | LESSER, NEWMAN, SOUWEINE & NASSER, LLP |
| [10] | (By Thomas Lesser, Esquire) |
| [11] | 39 Main Street, Suite I |
| [12] | Northampton, Massachusetts 01060-3132 |
| [13] | 413-584-7331 |
| [14] | On behalf of James Casagrande and Last |
| [15] | Minute Concessions, Inc. |
| [16] | |
| [17] | UNITED STATES SECURITIES AND EXCHANGE |
| [18] | COMMISSION |
| [19] | (By Frank C. Huntington, Esquire) |
| [20] | 73 Tremont Street, Suite 600 |
| [21] | Boston, Massachusetts 02108 |
| [22] | 617-424-5900 |
| [23] | On behalf of the Securities and Exchange |
| [24] | Commission |

Page 2

| | |
|---|---|
| [1] | UNITED STATES DISTRICT COURT |
| [2] | DISTRICT OF MASSACHUSETTS |
| [3] | |
| [4] | |
| [5] | SECURITIES AND EXCHANGE COMMISSION, |
| [6] | Plaintiff |
| [7] | vs.     C.A. NO. 00-30170-FHF |
| [8] | ROBERT C. SEARS, |
| [9] | Defendant, |
| [10] | and |
| [11] | LAST MINUTE CONCESSIONS INC., JAMES W. |
| [12] | CASAGRANDE, COLD SPRING GOLF COURSE INC., |
| [13] | and COLD SPRING DEVELOPMENT INC., |
| [14] | Relief Defendants. |
| [15] | |
| [16] | 30(b)(6) DEPOSITION OF JAMES CASAGRANDE |
| [17] | Wednesday, August 29, 2001 |
| [18] | 9:35 a.m. |
| [19] | BINGHAM DANA LLP |
| [20] | 150 Federal Street |
| [21] | Boston, Massachusetts 02110 |
| [22] | |
| [23] | |
| [24] | Before: Karen D. Quigley, RPR/RMR |

Page 4

| | |
|---|---|
| [1] | APPEARANCES(cont'd): |
| [2] | |
| [3] | EDWARDS & ANGELL, LLP |
| [4] | (By Robert D. Laurie, Esquire) |
| [5] | 101 Federal Street |
| [6] | Boston, Massachusetts 02110-1800 |
| [7] | 617-439-4444 |
| [8] | On behalf of Cold Spring Development |
| [9] | |
| [10] | |
| [11] | |
| [12] | |
| [13] | |
| [14] | |
| [15] | |
| [16] | |
| [17] | |
| [18] | |
| [19] | |
| [20] | |
| [21] | |
| [22] | |
| [23] | |
| [24] | |

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 15 of 142

vol. 1
pp. 1-219

Charles Schwab & Co., Inc: v.
Sears, et al.

---

**Page 5**

[1]              INDEX
[2]
      DEPOSITION OF:              PAGE
      JAMES CASAGRANDE
[5]   BY MR. SNYDER          6, 199, 217
[6]   BY MR. HUNTINGTON       159, 211
[7]   BY MR. LAURIE          196, 215
[8]
[9]           EXHIBITS
[10] NO.                        PAGE
[11] 25    Answer to Amended Complaint    31
[12] 26    Last Minute Concession's Answers to
[13]       Plaintiff's First Set of
[14]       Interrogatories          31
[15] 27    Typed Note             94
[16] 28    Promissory Note dated 3-29-00   112
[17] 29    Promissory Note        112
[18] 30    Financial Agreement    112
[19] 31    Stock Certificate      199
[20]
[21] Afternoon Session          131
[22]
[23] * Original exhibits retained by Mr. Snyder.
[24]

---

**Page 6**

**PROCEEDINGS**

[2]
[3]    JAMES CASAGRANDE,
[4]
[5] a witness called for examination by counsel for
[6] Charles Schwab, being first duly sworn, was examined
[7] and testified as follows:
[8]
[9]         **DIRECT EXAMINATION**
[10]         **BY MR. SNYDER:**
[11]    **Q:** Mr. Casagrande, am I pronouncing
[12] your name correctly?
[13]    **A:** Perfect.
[14]    **Q:** Okay. I will today be asking you a
[15] series of questions and what I ask is that you
[16] before answering be sure that you have heard and
[17] understood my question; okay?
[18]    **A:** Okay.
[19]    **Q:** And you will also need to answer
[20] audibly for the benefit of the court reporter. She
[21] has a hard time if you just shake your head or say
[22] uh-hmm, uh-huh, that's difficult for her to take
[23] down. If you answer, I'm going to assume in that is
[24] reading the record of the deposition I will assume

---

**Page 7**

[1] that you did hear and understood the question; okay?
[2]    **A:** Okay.
[3]    **Q:** If at any time you want to take a
[4] break, we can accommodate that. All I ask is that
[5] if there's a pending question, I get an answer to my
[6] question; okay?
[7]    **A:** Okay.
[8]    **Q:** And finally do you have any physical
[9] or medical condition that would impair your ability
[10] to answer my question today fully and accurately?
[11]    **A:** No.
[12]    **Q:** And are you taking any medication
[13] that would impair your ability to answer my
[14] questions fully and accurately?
[15]    **A:** No.
[16]    **Q:** Would you state your full name then
[17] for the record.
[18]    **A:** James William Casagrande.
[19]    **Q:** And your residence address is 52
[20] Amherst Road, Pelham, Mass. 01002?
[21]    **A:** That's correct.
[22]    **Q:** Do you have any other residential
[23] address or vacation home?
[24]    **A:** No.

---

**Page 8**

[1]    **Q:** And social security number
[2] 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?
[3]    **A:** That's right.
[4]    **Q:** What is your date of birth?
[5]    **A:** June 1, 1959.
[6]    **Q:** I'm sorry, '59?
[7]    **A:** Yes.
[8]    **Q:** And you are here today as the witness
[9] designated by Last Minute Concessions, Inc. to
[10] testify on its behalf in response to a notice of
[11] deposition sent out by my office; is that your
[12] understanding?
[13]    **A:** That's right.
[14]    **Q:** And you are the treasurer and clerk
[15] of Last Minute Concessions?
[16]    **A:** I'm everything; president, treasurer,
[17] clerk.
[18]    **Q:** Are you a director?
[19]    **A:** Director. I'm the only person in it.
[20]    **Q:** All right. And since when were you
[21] first elected or appointed as treasurer and clerk?
[22]    **A:** I'd have to guess I'd say around 1992
[23] maybe.
[24]    **Q:** Was it at the time that the

---

Charles Schwab & Co., Inc. v. James Casagrande
Sears, et al.

Case 3:00-cv-00170-MAP    Document 41    Filed 10/31/02    Page 16 of 142
pp. 1-219

August 29, 2001

[1] corporation Last Minute Concessions, Inc. was
[2] formed?
[3]    A: That's correct.
[4]    Q: And were you also at that time at the
[5] time of the formation of the company appointed or
[6] elected as a director?
[7]    A: That's correct.
[8]    Q: And I think you just mentioned that
[9] you are also the president of Last Minute
[10] Concessions?
[11]    A: That's right.
[12]    Q: When did you become the president of
[13] Last Minute Concessions?
[14]    A: I'd say approximately a year ago,
[15] year, in that realm, about a year ago.
[16]    Q: And how did that come about?
[17] Describe the circumstances of your becoming
[18] president.
[19]    A: Well, there were two individuals that
[20] were in the corporation when it was initially
[21] formed, myself and Bob Sears, and when I, or Last
[22] Minute Concessions I should say, got involved with
[23] the golf course development, that's when that
[24] occurred.

[1]    Q: That's when you became president?
[2]    A: Yes, because Bob Sears was he left
[3] the corporation.
[4]    Q: And when you say he left the
[5] corporation, how did he go about leaving the
[6] corporation? What in fact did he do to leave the
[7] corporation?
[8]    A: Assigned his stock over to myself.
[9]    Q: And is there any —
[10]    A: If that's what you mean.
[11]    Q: Is there a document whereby Mr. Sears
[12] assigned his Last Minute Concessions stock to you?
[13]    A: Should be.
[14]    Q: Where is that document?
[15]    A: I don't know.
[16]    Q: Who keeps the records — that is, the
[17] corporate records — of Last Minute Concessions,
[18] Inc.?
[19]    A: Currently I think I have everything
[20] although I haven't gone through. There's boxes of
[21] it.
[22]    Q: Sorry, there are boxes of documents?
[23]    A: Yes, you know.
[24]    Q: And you — for how long have you had

[1] those boxes of documents?
[2]    A: Approximately the same time.
[3] Approximately a year, maybe a little less.
[4]    Q: Now, let me go back to that point
[5] just so we can fix in time what we're talking
[6] about. You said that this happened — that is,
[7] Sears assigning his stock — when Last Minute
[8] Concessions got involved with the golf course. What
[9] do you mean by got involved with the golf course?
[10] What are you referring to?
[11]    A: I guess — what do I mean by it?
[12] When I knew that the golf course was actually going
[13] to happen, we'll say when we finally looked like we
[14] were going to get our permits and whatnot, that's
[15] when that happened.
[16]    Q: Okay. And when was that? You say
[17] about a year ago. It's now August of year 2001.
[18] Was that August of year 2000 that it looked like the
[19] golf course was going to get its permits?
[20]    A: No, it was before that actually. It
[21] probably — I think we got our permits — I think
[22] our final permit was either the very end of January
[23] or the very beginning of February of 2000 so that
[24] conceivably it could have happened at around that

[1] time.
[2]    Q: Well, I'm just asking for your best
[3] recollection. Was it about the time of the final
[4] permit that Mr. Sears assigned his Last Minute
[5] Concessions stock to you?
[6]    A: That's what I assume, yes.
[7]    Q: Well, let me be clear. As we go
[8] through the questions today, I don't want you, and I
[9] don't think anyone in the room here wants you, to
[10] guess or assume anything. If you recall, tell me
[11] what you recall. If you don't recall, just tell me.
[12]    A: Okay. I don't recall for sure.
[13]    Q: Okay. But your recollection is that
[14] Mr. Sears assigned at whenever this was assigned his
[15] Last Minute Concessions stock to you; is that right?
[16]    A: That's correct.
[17]    Q: When you say assigned, did he sell
[18] it? Did you give him any consideration for that?
[19]    A: No.
[20]    Q: Did he do it gratis — that is, for
[21] no consideration, no payment on your part?
[22]    A: Correct.
[23]    Q: What was it to your understanding
[24] that motivated Mr. Sears to assign to you his Last

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 17 of 142

Charles Schwab, & Co., Inc. v.
Sears, et al.

vol. 1
pp. 1-219

---

**Page 13**

[1] Minute Concessions stock free?

[2] A: Well, should I give you the history of the —

[4] Q: I'm looking to understand why it was

[5] that Mr. Sears donated his Last Minute Concessions

[6] stock to you?

[7] A: Well, Last Minute Concessions was

[8] originally formed just to run a concession at

[9] another golf course, a restaurant/bar. He and I

[10] were equal shareholders in that corporation. We did

[11] that for about six years but we left the corporation

[12] open saying well, maybe there's something somewhere

[13] down the line that we'd use it for. This golf

[14] course project, Cold Spring, came up and Bob Sears

[15] saw and I saw it, looked like a good project, but

[16] his quote was you don't need me in on the project.

[17] If I'm in on it, it's like you hitting a double.

[18] If, you know, if he's out, you know, it's your

[19] chance to hit a home run, you know, and you'll be

[20] set, you know, because he didn't really need the

[21] money and that was -- I mean we're good friends and

[22] I kind of thought that was pretty nice. I think

[23] that answers your question.

[24] Q: Okay. So as of the time that

---

**Page 14**

[1] Mr. Sears donated his Last Minute Concessions stock

[2] to you, he said to you in words or substance that

[3] you don't need me on the project; is that right?

[4] A: That's right.

[5] Q: And so as of this time was it

[6] contemplated that Mr. Sears was going to have any

[7] involvement or association with the Cold Spring

[8] project?

[9] A: No, other than he was going to be a

[10] director just to because he was going to raise money

[11] for me to get involved in the project. He was

[12] going — or I should say Last Minute Concessions to

[13] get involved in the project to be correct. He

[14] wanted to be a director in those corporations just

[15] to protect those investors but no monetary return or

[16] anything like that.

[17] Q: He was to be a director of Cold

[18] Spring Golf Course, Inc.; is that right?

[19] A: Yes, just to have a vote.

[20] Q: And also to be a director of Cold

[21] Spring Development, Inc.?

[22] A: Yes.

[23] Q: And it was also contemplated at this

[24] time whenever this was that he donated his stock to

---

**Page 15**

[1] you that he would be raising money for Last Minute

[2] Concessions for Last Minute Concessions to use in

[3] connection with the golf course project; is that

[4] right?

[5] A: Yes.

[6] Q: And that money that he was to raise

[7] was that the $2 million that Last Minute Concessions

[8] was to provide pursuant to some agreements that had

[9] been signed in June of 1999?

[10] A: That's correct.

[11] Q: Okay. As of the time that Mr. Sears

[12] donated his stock to you, his Last Minute

[13] Concessions stock, how much of that $2 million did

[14] you and Mr. Sears contemplate that Mr. Sears would

[15] raise?

[16] A: All of it.

[17] Q: Okay. Was it your understanding as

[18] of this time that this transfer of stock was made

[19] that you would not be raising any of that $2

[20] million?

[21] A: That's correct.

[22] Q: And you said that something else that

[23] Mr. Sears indicated to you at the time that this

[24] Last Minute Concessions stock transfer was made was

---

**Page 16**

[1] that he didn't need the money; is that right?

[2] A: That's correct.

[3] Q: Okay. What did you understand at

[4] that time to be Mr. Sears' sources of income?

[5] A: Well, I know he was a financial

[6] advisor and I know he did income taxes. I think he

[7] owned a rental property on Block Island. Other than

[8] that his own investments which I don't really have

[9] any knowledge but...

[10] Q: What was the nature of the Block

[11] Island investment property?

[12] A: A single-family home.

[13] Q: Is that the home that he lived in at

[14] least part of the year on Block Island?

[15] A: No, I think he has another just

[16] rental property.

[17] Q: All right. And were you aware at

[18] this time that Mr. Sears indicated that he didn't

[19] need the money any other assets that he owned or

[20] controlled other than what you've told us already,

[21] his Block Island investment property?

[22] A: Well, I mean other than I always

[23] assumed that he was, I don't know if well off is the

[24] right term, but relatively well off and I don't know

---

Charles Schwab & Co., Inc. Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 18 of 142   30(b)(6) Depo of James Casagrande
Sears, et al.
Vol. 1
pp. 1-219
August 29, 2001

Page 17

[1] what his wealth was.
[2]    Q: What was the basis for your
[3] assumption that he was well off?
[4]    A: He just seemed to live a pretty good
[5] life. He'd go out and vacation often and I don't
[6] know; living on Block Island I guess.
[7]    Q: At the time that Mr. Sears gave you
[8] his Last Minute Concessions stock, did he also
[9] resign as president of Last Minute Concessions?
[10]    A: I believe so, yes.
[11]    Q: And is that resignation documented
[12] anywhere? Did he sign a resignation letter for
[13] example?
[14]    A: It should be. I mean I guess I don't
[15] know. I don't want to speculate, but it was always
[16] something that we knew he was going to do.
[17]    Q: All right. You mentioned that you
[18] presently have custody of the Last Minute
[19] Concessions corporate records; is that right?
[20]    A: I do, yes.
[21]    Q: Where are those documents
[22] physically? Where are they?
[23]    A: Well, if they are in entirety, they
[24] are at 17 Hawley Street, Northampton, Mass. That's

Page 18

[1] where I do income taxes out of.
[2]    Q: That is a business address that you
[3] do business at?
[4]    A: That's right.
[5]    Q: When you said if they are in their
[6] entirety, what did you mean by that?
[7]    A: Since '92 to we'll say today I don't
[8] know if there's something. I haven't gone through
[9] them but I'm sure that, you know, whatever we have
[10] is there. I think they've been seen by pretty much
[11] everybody.
[12]    Q: When you say seen by pretty much
[13] everybody, what do you mean?
[14]    A: Yourselves. I think those were all,
[15] you know, the checks, check registers, incorporation
[16] documentation, that type of stuff. I think, I mean
[17] I know, that I made copies of a bunch of stuff so...
[18]    Q: So as far as you know all those
[19] things you just listed, checks, check registers,
[20] corporation documents, those are all in the records
[21] of Last Minute Concessions that are at 17 Hawley
[22] Street?
[23]    A: That's right.
[24]    Q: And at some point individuals from

Page 19

[1] the SEC or some other government entity went through
[2] those documents; is that right?
[3]    A: To my knowledge, yes.
[4]    Q: Has any attorney representing you
[5] been through those documents?
[6]    A: Yes.
[7]    Q: Okay. Do you know whether those
[8] documents were reviewed in connection with any
[9] document request in this case?
[10]    A: I believe so. I'm pretty sure.
[11]    Q: Did you review any of those documents
[12] in connection with responding to any document
[13] request in this case?
[14]    A: Yes.
[15]    Q: Okay. And did you to the best of
[16] your ability pull out any documents that were
[17] responsive to that document request in this case?
[18]    A: Yes.
[19]    Q: All right. I want to be clear.
[20] There are two cases, and I suppose we ought to state
[21] this for the record.
[22]    MR. SNYDER: I think it's clear by
[23] the correspondence between and among counsel we are
[24] today engaged in taking the deposition of Last

Page 20

[1] Minute Concessions, Inc. to be followed by a
[2] deposition of Mr. Casagrande in his individual
[3] capacity for a civil action brought by my client
[4] Charles Schwab and Co., Inc. against Mr. Sears,
[5] Mr. Casagrande and others and also a deposition in a
[6] case brought by the Securities and Exchange
[7] Commission against Mr. Sears and others.
[8]    Q: Do you understand the distinction
[9] between the case brought by my client and the case
[10] brought by the SEC?
[11]    A: I know there are two separate cases.
[12] I don't know what, you know, necessarily is the
[13] legal difference of the two, but yes, I know there's
[14] two different cases, yes.
[15]    Q: All right. It's not picked up on the
[16] record but I think you're generally pointing when
[17] you're talking about the SEC case to Mr. Huntington
[18] who's seated to my left?
[19]    A: Yes, I've seen his name on some
[20] documents.
[21]    Q: All right. Did Mr. Sears at the time
[22] that he gave you his Last Minute Concessions stock
[23] also resign as a director of Last Minute
[24] Concessions?

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP    Document 44    Filed 10/31/02    Page 19 of 142

Vol. 1
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

**Page 21**

[1] **A:** Again, you know, that should have
[2] been done, yes.
[3] **Q:** Well, my question isn't whether or
[4] not it should have been done. Was it done? Did he
[5] do it?
[6] **A:** I don't know. I'm not Bob Sears.
[7] **Q:** All right. But you are now the
[8] president of Last Minute Concessions and the sole
[9] director of Last Minute Concessions; is that
[10] correct?
[11] **A:** That's correct.
[12] **Q:** Are there any other directors of Last
[13] Minute Concessions?
[14] **A:** No.
[15] **Q:** Have there ever been any directors of
[16] Last Minute Concessions other than yourself and
[17] Mr. Sears?
[18] **A:** No.
[19] **Q:** Let me go back a minute because I
[20] think you gave me sort of the same kind of response
[21] in response to my question as to whether Mr. Sears
[22] resigned as president of Last Minute Concessions.
[23] Do you know whether Mr. Sears has ever resigned as
[24] president of Last Minute Concessions?

**Page 22**

[1] **A:** Without saying I assume so. I'd
[2] have to say not to my knowledge but —
[3] **MR. LESSER:** I think he's being
[4] confused by oral and written resignations in
[5] response to —
[6] **Q:** Whether in writing or verbally?
[7] **A:** Oh, verbally, yes, absolutely
[8] verbally. I thought you were saying written.
[9] Verbally he has given up his stock, he's resigned,
[10] all of the above.
[11] **Q:** Whether he's done any of those
[12] things in writing — that is, assigned to you his
[13] stock, resigned as president, resigned as
[14] director — you don't know the answer to that?
[15] **A:** That's correct.
[16] **Q:** And do you know whether his
[17] resignation as director or president is recorded in
[18] any other document even if not a letter of
[19] resignation?
[20] **A:** Again I don't know that answer.
[21] **Q:** And how about his donation of his
[22] stock to you, is that recorded in any document?
[23] **A:** Again I don't know.
[24] **Q:** Now, you have been a shareholder of

**Page 23**

[1] Last Minute Concessions since the company was
[2] formed; is that right?
[3] **A:** That's correct.
[4] **Q:** And have there ever been any
[5] shareholders other than yourself and Mr. Sears?
[6] **A:** No.
[7] **Q:** And was Mr. Sears the president of
[8] Last Minute Concessions from the time of its
[9] formation until his resignation sometime last year?
[10] **A:** Yes.
[11] **Q:** And was Mr. Sears a director of Last
[12] Minute Concessions from the time of its formation
[13] until the time of his resignation sometime last
[14] year?
[15] **A:** Yes.
[16] **Q:** Has Last Minute Concessions ever had
[17] any officers other than yourself and Mr. Sears?
[18] **A:** No.
[19] **Q:** Does Mr. Sears know that you are
[20] here today testifying on behalf of Last Minute
[21] Concessions?
[22] **A:** Yes, I think I told him I was coming
[23] down here, yes.
[24] **Q:** When did you last speak with

**Page 24**

[1] Mr. Sears?
[2] **A:** I believe it was yesterday.
[3] **Q:** Okay. And in the course of that
[4] conversation, did you discuss the fact that your
[5] deposition was being taken today and Last Minute
[6] Concessions' deposition was being taken?
[7] **A:** Well, I don't know if I got specific,
[8] but I think that's when I did mention that I was
[9] coming down to Boston to do a deposition.
[10] **Q:** Had you discussed that with Mr. Sears
[11] before — that is, that you would be testifying at a
[12] deposition on behalf of Last Minute Concessions?
[13] **A:** No, I don't think so.
[14] **Q:** Okay. Where did this discussion take
[15] place?
[16] **A:** I was sitting on a dump truck out on
[17] the golf course site on my cell phone, and I think
[18] Bob was at our shared office space. I think he
[19] called me if I remember right.
[20] **Q:** When you say you were sitting at the
[21] golf course site, you're talking about the Cold
[22] Spring Golf Course site in Belchertown?
[23] **A:** Yes.
[24] **Q:** And Mr. Sears to your knowledge was

Charles Schwab, et al. vs. James Casagrande
Sears, et al.

Case 3:00-cv-30170-MAP    Document 41    Filed 10/31/02    Page 20 of 142    30(b)(6) Dep. of James Casagrande
pp. 1-219
August 29, 2001

---

Page 25

[1] at 17 Hawley Street?

[2]   A: That's correct.

[3]   Q: And what did you say and what did he

[4] say concerning the deposition of Last Minute

[5] Concessions?

[6]   A: He didn't really say anything. I

[7] just said — it was just kind of a general

[8] conversation. Hi, I'm back from Block Island and,

[9] you know, how's things going? We're all trying to

[10] move forward and hopefully get something resolved

[11] and that was it. And then I mentioned that I

[12] thought I was coming down here this morning and kind

[13] of that was the end. I don't think it was a minute

[14] conversation because in the truck it's pretty loud

[15] inside the truck so...

[16]   Q: What was going on in the truck at the

[17] time you were talking to Mr. Sears?

[18]   A: Well, I was getting loaded. We were

[19] working on site. I'm trying to help Bob Grenier

[20] keep the site stable and so forth.

[21]   Q: So you were driving the dump truck?

[22]   A: That's right.

[23]   Q: And in the course of this

[24] conversation did you mention or did Mr. Sears

---

Page 26

[1] acknowledge that you would be testifying on behalf

[2] of the company Last Minute Concessions?

[3]   A: No.

[4]   Q: Is Mr. Sears to your knowledge aware

[5] that the deposition of Last Minute Concessions has

[6] been noticed and is taking place?

[7]   A: Yes, I would assume so since I told

[8] him I was coming down here.

[9]   Q: Okay. How often in the last three

[10] months would you say you've spoken with Mr. Sears?

[11] A daily basis?

[12]   A: No. Probably I would say on average

[13] one or two days a week and, you know, I might talk

[14] to him one or more times in those days but generally

[15] maybe once a day maybe. It's just when he comes off

[16] the island to Northampton, that's probably it unless

[17] something happens to come up which lately hasn't.

[18]   Q: You mentioned the shared office

[19] space. That's the office space at 17 Hawley Street?

[20]   A: That's right.

[21]   Q: And Mr. Sears has office space at

[22] that address?

[23]   A: That's right.

[24]   Q: And you also have office space at

---

Page 27

[1] that address?

[2]   A: Yes.

[3]   Q: And does Mr. Hersh also have office

[4] space at that address?

[5]   A: Yes, he does.

[6]   Q: And for how long has anyone else have

[7] office — well, let me ask you to do this. Can you

[8] describe for me the layout of the office?

[9]   A: Sure. Near the entranceway there's

[10] a, I don't know if cubicle is the right word, but a

[11] space that Bob Sears has. The next space down or

[12] area down is like a little miniature waiting area if

[13] you will and then it has a phone, our phones and

[14] secretarial area and then my office area is the next

[15] down and Gerry Hersh's is the farthest down near

[16] where our men's and ladies' rooms are.

[17]   Q: Okay. So is it fair to say that

[18] these three office areas, Sears, Casagrande and

[19] Hersh, are adjoining and on a single hallway; is

[20] that — I think that's what I heard?

[21]   A: Yes, I wouldn't call them separate

[22] rooms. They're just kind of boxed in, you know, by

[23] dividers if you will. They're wooden but —

[24]   Q: More in the nature of cubicles than

---

Page 28

[1] separate rooms?

[2]   A: Correct.

[3]   Q: For instance your space or Mr. Sears'

[4] space doesn't have walls that go from ceiling to

[5] floor?

[6]   A: That's right. It's probably roughly

[7] the dividers are roughly the height of the ceiling

[8] in here.

[9]   Q: And for how long have you three

[10] shared this office space?

[11]   A: Well, since the day we bought it

[12] which I don't know. Off the top of my head I'm not

[13] sure what that's been. It's been maybe six years.

[14] I don't know.

[15]   Q: And has anyone else ever been in that

[16] space sharing space with you three?

[17]   A: No.

[18]   Q: And do any of you employ

[19] administrative secretarial staff who are housed in

[20] that space?

[21]   A: I think Bob Sears is the one. I know

[22] I don't. I don't know if Gerry or it's Bob. I

[23] think Bob has the secretary.

[24]   Q: There is a secretary you're seeing?

---

[1] **A:** Oh, yes.

[2] **Q:** In the space?

[3] **A:** Yes, and an office manager if you

[4] call it that. That's what I think Bob Sears calls

[5] her.

[6] **Q:** Is that the same —

[7] **A:** Two different people. They're

[8] both —

[9] **Q:** Let me get names here. Who is the

[10] secretary? What's her name or his name?

[11] **A:** Well, it's Brenda. I don't honestly

[12] know her last name.

[13] **Q:** And for how long has Brenda been

[14] employed in that office space?

[15] **A:** A year and a half approximately.

[16] **Q:** All right. And then there's a

[17] separate person who is an office manager?

[18] **A:** That's what I believe Bob calls her,

[19] yes.

[20] **Q:** And what is her name?

[21] **A:** Tara Warner; T-A-R-A I believe.

[22] **Q:** Okay. And for how long has

[23] Ms. Warner been employed in this office space?

[24] **A:** I think the six years that we've

[1] owned that space.

[2] **Q:** And who hired Ms. Warner?

[3] **A:** Bob Sears.

[4] **Q:** Who hired Brenda?

[5] **A:** Bob Sears I believe.

[6] **Q:** Does Ms. Warner perform services for

[7] the three of you?

[8] **A:** No.

[9] **Q:** Who does she perform services for?

[10] **A:** Just Bob.

[11] **Q:** And how about Brenda, who does she

[12] perform services for?

[13] **A:** Well, I guess you would say all of us

[14] if answering the phone is considered a service,

[15] sometimes makes copies but generally speaking that's

[16] about it.

[17] **Q:** When Brenda answers the phone, what

[18] does she say?

[19] **A:** I'm not actually sure. I'm not

[20] actually sure.

[21] **Q:** Does she say something like Sears,

[22] Casagrande and Hersh or offices of Sears, Casagrande

[23] and Hersh?

[24] **MR. LESSER:** Object. You can

[1] answer if you know.

[2] **A:** I don't know.

[3] **Q:** In the last year or so how much time

[4] would you say you spent on average in the offices at

[5] 17 Hawley Street why don't we say per week? What's

[6] your average amount of time?

[7] **A:** It depends I guess the time of year.

[8] Tax season we'll say from mid-January to mid-April

[9] an ungodly amount, 80 hours maybe a week, 70 hours.

[10] It's something — maybe it's less because I have a

[11] very young daughter. I've been trying to get home

[12] to see her, but a lot of hours, put it that way,

[13] during tax time. After tax time like this time of

[14] year virtually none. If I go there once a month,

[15] that would probably be an average.

[16] **Q:** Okay. Now, you signed in this

[17] case —

[18] **MR. SNYDER:** Off the record.

[19] (Off the record.)

[20] (Documents marked for

[21] identification as Exhibit

[22] Nos. 25 and 26.)

[23] **Q:** Mr. Casagrande, let me show you, I

[24] guess you're already looking at, what we've marked

[1] as Exhibit 25 and if you'll look at the last page,

[2] is that your signature?

[3] **A:** Yes.

[4] **Q:** Okay. And you signed this on behalf

[5] of yourself and Last Minute Concessions; correct?

[6] **A:** Yes.

[7] **Q:** Does Mr. Sears know that you signed

[8] this document on behalf of Last Minute Concessions?

[9] **A:** I don't know that — I would say that

[10] I don't know. I don't know if he did.

[11] **Q:** Okay. Let me show you Exhibit 26

[12] which is Last Minute Concessions' responses to

[13] interrogatories, and if you'd look at the last page

[14] before there are two tabs there, Exhibit A and

[15] Exhibit B, the last page before the tabs, is that

[16] your signature?

[17] **A:** Yes.

[18] **Q:** And you signed this on behalf of Last

[19] Minute Concessions; correct?

[20] **A:** I guess so, yes, I did.

[21] **Q:** And is Mr. Sears aware that you have

[22] signed these interrogatory responses on behalf of

[23] Last Minute Concessions?

[24] **A:** I'm not sure.

Charles Schwab & Co., Inc. v.
Sears, et al.
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 22 of 142
vol. 1
pp. 1-219
30(b)(6) Depo of James Casagrande
August 29, 2001

Page 33

[1]    Q: Have you or anyone on your behalf
[2] ever discussed either of these documents with
[3] Mr. Sears or his attorney?
[4]    A: No.
[5]    Q: Have copies of these documents been
[6] provided to Mr. Sears to your knowledge?
[7]    A: No.
[8]    Q: Was Mr. Sears consulted or his input
[9] sought with respect to the content of the answer,
[10] Exhibit 25?
[11]    A: No.
[12]    Q: Was Mr. Sears consulted or his input
[13] sought with respect to the content of the responses
[14] in Exhibit 26?
[15]    A: No.
[16]    Q: Was Mr. Sears consulted or his input
[17] sought with respect to Last Minute Concessions'
[18] response to Schwab's document request in this
[19] action?
[20]    A: No.
[21]    Q: Has Mr. Sears been asked to your
[22] knowledge whether he has any documents as described
[23] in that document request to Last Minute Concessions?
[24]    A: Has he been asked? I'm unaware.

Page 34

[1]    Q: Do you know whether Mr. Sears
[2] provided any documents in connection with that
[3] document request?
[4]    A: For Last Minute Concessions? Is
[5] that —
[6]    Q: Correct, yes.
[7]    A: I don't believe so.
[8]    Q: Okay. Has Last Minute Concessions
[9] been a party to any lawsuit or arbitration other
[10] than this case and the case brought by the SEC?
[11]    A: No.
[12]    Q: Now, what, Mr. Casagrande, have you
[13] done to prepare for this deposition today?
[14]    A: Other than this stuff, nothing.
[15]    Q: When you say this stuff...
[16]    A: The documentation, the answers that
[17] I'd given.
[18]    Q: Did you review those, in other words,
[19] the answer and the interrogatory responses, in
[20] preparation for the deposition today?
[21]    A: I guess, yes. I mean not recently.
[22] It was back whenever this was done.
[23]    Q: Okay. But in preparation for — at
[24] that time you were reviewing them in connection with

Page 35

[1] your signing them; correct?
[2]    A: Mm-hmm.
[3]    Q: And their preparation; is that right?
[4]    A: That's correct.
[5]    Q: And have you reviewed them since they
[6] were signed and provided?
[7]    A: No.
[8]    Q: Did you do anything to prepare for
[9] your deposition?
[10]    A: No.
[11]    Q: Did you talk to anybody about it
[12] other than the conversation with Mr. Sears that you
[13] mentioned?
[14]    MR. LESSER: And his attorney?
[15]    MR. SNYDER: Well, this is a yes
[16] or no answer to this question.
[17]    A: I guess I'd have to say yes.
[18]    Q: Did you speak with Mr. Lesser?
[19]    A: Yes.
[20]    Q: Did you speak with anyone else?
[21]    A: I think I probably mentioned it to my
[22] wife.
[23]    Q: Okay. Anyone else?
[24]    A: No.

Page 36

[1]    Q: Did you look at any documents to
[2] prepare for this deposition?
[3]    A: No, not...
[4]    Q: Have you seen any deposition
[5] transcripts from this case?
[6]    A: I did, yes.
[7]    Q: Whose deposition transcript have you
[8] seen?
[9]    A: Well, I saw Ed Waszkelewicz's.
[10]    Q: And was a copy of that transcript
[11] provided to you or your attorney?
[12]    A: I think —
[13]    MR. LESSER: If you know.
[14]    THE WITNESS: If I know?
[15]    MR. LESSER: You personally. The
[16] question is whether you personally.
[17]    Q: Do you know whether a transcript has
[18] been provided to either you or Mr. Lesser?
[19]    A: No, I don't.
[20]    Q: Okay. What was the occasion for you
[21] to see Mr. Waszkelewicz's deposition transcript?
[22]    A: All I saw were notes from it.
[23]    Q: Whose notes?
[24]    A: Pertaining to it.

**Page 37**

[1]    MR. LESSER: For the record they
[2] were my notes provided to him.
     MR. SNYDER: Why don't we let the
[4] witness answer.
[5]    Q: Whose notes were they? Don't tell me
[6] what they say. Whose were they?
[7]    A: Tom's.
[8]    Q: Okay. Have you seen any other
[9] deposition transcript or notes concerning deposition
[10] transcript?
[11]    A: No.
[12]    Q: Have you seen any deposition
[13] transcript from the SEC's action lawsuit?
[14]    A: No.
[15]    Q: Have you seen any notes of any
[16] deposition transcript from the SEC's lawsuit?
[17]    A: No.
[18]    Q: If I tell you that Last Minute
[19] Concessions was formed in February, 1992, does that
[20] sound about right?
[21]    A: Yes, that sounds about the right time
[22] frame, yes.
[23]    Q: All right. And who was the person
[24] who went about getting the company formed?

**Page 38**

[1]    A: The lawyer. I forget his name. I'm
[2] not sure who the lawyer was who did it.
[3]    Q: Was that a lawyer that was retained
[4] by you or by Mr. Sears?
[5]    A: It was by Last Minute Concessions.
[6]    Q: Okay. How did you come to use this
[7] particular lawyer?
[8]    A: I think Bob knew him. I'm not sure
[9] in what basis he knew him.
[10]    Q: And as I understand what you're
[11] saying, you don't remember the name of this lawyer?
[12]    A: Not off the top of my head.
[13]    Q: Where does this lawyer have offices?
[14]    A: I don't know. In the Northampton
[15] area.
[16]    Q: And for what purpose was Last Minute
[17] Concessions formed?
[18]    A: To operate a food and beverage
[19] concession at the golf course where I was the golf
[20] professional.
[21]    Q: That's the Westover Golf Course?
[22]    A: That's right.
[23]    Q: And prior to the formation of the
[24] company had you been operating the food and beverage

**Page 39**

[1] concession at Westover?
[2]    A: No.
[3]    Q: Who had been operating the food and
[4] beverage concession at Westover prior to Last Minute
[5] Concessions?
[6]    A: I don't know if there was a
[7] corporation. I can tell you a gentleman's name.
[8] Jack Alves.
[9]    Q: A-L-V-E-S?
[10]    A: Yes, I believe so.
[11]    Q: And just describe for me the
[12] circumstances in which this food and beverage
[13] concession went from Mr. Alves to Last Minute
[14] Concessions. What brought about that change?
[15]    A: It's a town-run golf course that has
[16] a three-year contract with the concessionaires and
[17] the concessionaire's contract was coming up and in
[18] my opinion was severely hurting my business as the
[19] golf pro because of the job that was being done, and
[20] I figured even if I broke even at the concession,
[21] I'd make more money at being a golf pro so that's
[22] why we decided to try and it's a bid, it's a sealed
[23] bid but we ended up getting the bid.
[24]    Q: Prior to the formation of the company

**Page 40**

[1] with the name Last Minute Concessions, had there
[2] been a business that was doing business under the
[3] name Last Minute Concessions?
[4]    A: No.
[5]    Q: And you explained to us a moment ago
[6] your interest in getting the food and beverage
[7] concession. What was Mr. Sears' interest in this?
[8]    A: Interest meaning?
[9]    Q: Why was he — why did he become a
[10] principal in Last Minute Concessions?
[11]    A: Well, we both thought we could make a
[12] little bit of money at it. I guess that would be
[13] his interest.
[14]    Q: Okay. But why in particular
[15] Mr. Sears? Why did he get involved?
[16]    A: He's a good friend of mine. I
[17] trusted him.
[18]    Q: Okay. So you saw this opportunity,
[19] thought that it would perhaps be profitable but in
[20] any event beneficial to you in your position as golf
[21] pro and asked Mr. Sears to go in this venture with
[22] you?
[23]    A: Right.
[24]    Q: Okay. Has Last Minute Concessions

Charles Schwab & Co., Inc. v. Sears, et al.
Case 3:00-cv-30170-MAP   Document 141   Filed 10/31/03   Page 24 of 142
30 (b) (6) Depo. of James Casagrande
pp. 1-219
August 29, 2001

Page 41

[1] been engaged in any business other than this
[2] Westover Golf Course food and beverage concession
[3] and the Cold Spring project?
[4] A: No.
[5] Q: Was the food and beverage concession
[6] at Westover profitable or unprofitable?
[7] A: About break-even. Really no profits
[8] or very minuscule if there were any.
[9] Q: When did — strike that. Did Last
[10] Minute Concessions at some point cease running the
[11] food and beverage concession at Westover?
[12] A: Yes.
[13] Q: Why?
[14] A: We ran it for six years and at the
[15] end of that second three-year bid, it was apparent
[16] that Cold Spring was actually going to happen and we
[17] didn't want to get tied up at a place where I wasn't
[18] going to be a golf pro anymore.
[19] Q: Okay. And that was in?
[20] A: I'm guessing '98.
[21] Q: 1998? That concession contract was
[22] obtained at about the time that Last Minute
[23] Concessions was formed; is that right?
[24] A: Yes.

Page 42

[1] Q: So running six years from roughly
[2] February of 1992 that brings us to 1998; right?
[3] A: Yes.
[4] Q: In 1998 did you and Mr. Sears have
[5] any involvement or contact with the Cold Spring Golf
[6] Course project?
[7] A: I believe, I don't know the exact
[8] time, but at some point in '98, yes, that's when I
[9] did meet all of those people.
[10] Q: Okay. Come back to that in a
[11] moment. Who was your principal contact at the
[12] Westover Golf Course for the food and beverage
[13] concession?
[14] A: — Principal contact? I don't
[15] understand.
[16] Q: Well, who did you deal with at the
[17] Westover Golf Course in that connection? I'm
[18] separating now your role as golf pro from your role
[19] as Last Minute Concessions running this food and
[20] beverage concession.
[21] A: The same people. It's a town-owned
[22] golf course that was — there is a golf commission
[23] that I guess really oversees both operations.
[24] Q: Okay. And who were the members of

Page 43

[1] that golf commission during that six-year period
[2] that you ran the concession?
[3] A: There was seven of them and they
[4] changed on a pretty irregular basis, but I might be
[5] able to come up with some names.
[6] Q: Were there any members of that
[7] commission that you dealt with on a frequent basis?
[8] A: We'd have — there's Westover Golf
[9] Course golf commission meetings the first and third
[10] I think it was Tuesday of every month year-round so
[11] you'd be dealing with the entire commission.
[12] Q: Did you have any contact with members
[13] of the commission other than on those bimonthly
[14] meetings?
[15] A: Sure. Once in a while somebody would
[16] come to play.
[17] Q: Other than that?
[18] A: No.
[19] Q: Okay.
[20] A: Not really.
[21] Q: What was Mr. Sears' role or function,
[22] if any, with respect to this food and beverage
[23] concession?
[24] A: He paid the bills and did the

Page 44

[1] payroll.
[2] Q: Anything else?
[3] A: No.
[4] Q: And was that true during the entire
[5] six-year period of the concession?
[6] A: Yes.
[7] Q: Well, during the time of the
[8] concession then, Last Minute Concessions had
[9] employees I take it?
[10] A: Yes.
[11] Q: And these were people who were
[12] running the food and beverage concession at —
[13] A: That's correct.
[14] Q: — at the golf course. Since the
[15] time in 1998 that Last Minute Concessions ceased
[16] running that concession, has it had any employees?
[17] A: No.
[18] Q: Has Last Minute Concessions ever had
[19] any managerial or supervisory employees?
[20] A: No.
[21] Q: Were you —
[22] A: Well, me I guess overseeing but no
[23] salary or anything like that if that's what you
[24] mean.

30(b)(6) Depo of James Casagrande
August 29, 2001

vol. 1
Case 3:00-cv-30170-MAP  Document 44  Filed 10/31/02  Page 25 of 142
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

**Page 45**

[1] Q: Okay. You were overseeing what was
[2] going on with the food and beverage concession;
[3] correct?
[4] A: That's right.
[5] Q: But you weren't paid a salary for
[6] that?
[7] A: No.
[8] Q: As has Mr. Sears ever been a
[9] salaried employee of Last Minute Concessions?
[10] A: No.
[11] Q: Has anyone other than yourself ever
[12] been responsible for maintaining Last Minute
[13] Concessions' corporate books and records?
[14] A: Yes.
[15] Q: Who?
[16] A: Bob Sears.
[17] Q: And when was that?
[18] A: The entire time prior to me. Those
[19] six years that Last Minute Concessions did the food
[20] and beverage concession.
[21] Q: All right. Then at the time that
[22] Mr. Sears donated his Last Minute Concessions stock
[23] to you and resigned as director and president, did
[24] he then turn over to you at that time the Last

**Page 46**

[1] Minute Concessions books and records?
[2] A: I guess I don't know if it was the
[3] exact time but in that relatively near. I mean...
[4] Q: That hadn't happened months before
[5] that time; is that what you're saying?
[6] A: That's right.
[7] Q: And it didn't happen months after
[8] that time?
[9] A: I don't think so, no.
[10] Q: Who has been responsible for filing
[11] Last Minute Concessions' annual reports with the
[12] Massachusetts Secretary of State's office? Is that
[13] something that you've ever had any involvement with?
[14] A: I did the very last one.
[15] Q: When was that?
[16] A: This past — I think it was just
[17] before March or in March possibly.
[18] Q: Of 2001?
[19] A: That's right.
[20] Q: Okay. And is that — when you say
[21] you did that report, is that something that you
[22] prepared yourself or is that something that you
[23] instructed counsel or someone else to do?
[24] A: No, I think I prepared it myself. As

**Page 47**

[1] a matter of fact, I think it was sent back to me
[2] because I forgot to sign it.
[3] Q: All right. And did you then sign it
[4] and send it back?
[5] A: Yes.
[6] Q: And your best recollection of when
[7] that happened was in March of this year?
[8] A: Yes.
[9] Q: The prior annual reports then were
[10] taken care of by Mr. Sears; is that right?
[11] A: I assumed they were, yes.
[12] Q: Have you ever seen any of Last Minute
[13] Concessions' annual reports other than the one you
[14] filed this year?
[15] A: I'm sure I have. Specifically
[16] nothing comes to mind, but I'm sure I have, yes.
[17] Q: And why do you say that? Why are you
[18] sure of that?
[19] A: I'm bound to have come across it, you
[20] know, looking at some documentation or...
[21] Q: Okay. In the corporate records of
[22] the company?
[23] A: Yes. I mean it's nothing that I
[24] certainly dwelled upon.

**Page 48**

[1] Q: All right. So then prior to the time
[2] that Mr. Sears turned the company's books and
[3] records over to you, had anyone other than Mr. Sears
[4] been responsible for maintaining those books and
[5] records?
[6] A: No.
[7] Q: Has Last Minute Concessions ever had
[8] a bank account other than at BankBoston now Fleet?
[9] A: I don't believe so. My only question
[10] would be — actually, yes, Ludlow Savings Bank I
[11] think we had one at.
[12] Q: When was that?
[13] A: When we were operating the concession
[14] at the Westover Golf Course.
[15] Q: And who had signatory authority on
[16] that account?
[17] A: Myself and Bob Sears if I can
[18] remember correctly.
[19] Q: And during the time that Last Minute
[20] Concessions was running the food and beverage
[21] concession at Westover, who maintained, kept the
[22] check register and the checks?
[23] A: Bob Sears.
[24] Q: Okay. Did you — you mentioned that

Page 49

[1] he paid bills and payroll. Did you ever during that
[2] time of the food and beverage concession ever write
[3] any checks on the LMC account?
[4]   A: Not that I can remember doing, no.
[5]   Q: When was the BankBoston account
[6] opened? Was that during the time that Last Minute
[7] Concessions was running the Westover concession or
[8] after?
[9]   A: No, it was after.
[10]   Q: And for what purpose was the
[11] BankBoston account opened?
[12]   A: For having a vehicle to have the
[13] investors' money come in to Last Minute Concessions.
[14]   Q: And who had signature authority on
[15] that account?
[16]   A: Just myself I believe.
[17]   Q: Did Mr. Sears ever have signature
[18] authority on that account?
[19]   A: I don't believe so.
[20]   Q: He wrote checks on the account,
[21] didn't he?
[22]   A: I don't think he did; not that I can
[23] remember.
[24]   Q: I'll show you what we previously

Page 50

[1] marked in this case as Exhibit 23 and if you look at
[2] blue sheets and you come toward the end, the second
[3] to the last blue sheet, it's 2-C.
[4]   MR. LESSER: 2-C what?
[5]   MR. SNYDER: 2-C and I'll give
[6] you —
[7]   MR. LESSER: The numbered page?
[8]   MR. SNYDER: — the numbered page
[9] in a minute.
[10]   Q: 2-C-9.
[11]   A: Mm-hmm.
[12]   Q: Are you there?
[13]   A: Yes.
[14]   Q: You see the first check — there's a
[15] series of checks, five, that are photocopied there
[16] and those are — first, those are checks drawn on
[17] the account of Last Minute Concessions at
[18] BankBoston; correct?
[19]   A: Mm-hmm.
[20]   Q: And the first check at the top number
[21] 1006 is signed by Bob Sears; right?
[22]   A: Yes, it is.
[23]   Q: And the third check number 1004 is
[24] signed by Bob Sears; correct?

Page 51

[1]   A: Yes, it is.
[2]   Q: Now, during year 2000 did you have
[3] custody of the check register and checks for this
[4] account?
[5]   A: Yes, for — yes.
[6]   Q: Okay. So if Mr. Sears to write these
[7] checks he would have had to come to you and request
[8] access to the checkbook; is that right?
[9]   A: Yes, he would have.
[10]   Q: Okay. Do you recall ever receiving
[11] any word from BankBoston or Fleet that a check was
[12] being returned because it was signed by an
[13] unauthorized person — that is, Mr. Sears?
[14]   A: No, I don't remember that.
[15]   Q: Now, account statements for this
[16] account were sent to the 17 Hawley Street offices;
[17] correct?
[18]   A: That's right.
[19]   Q: And do you know whether that
[20] continued to be the case after August of 2000?
[21]   A: It still currently does.
[22]   Q: You're still receiving a monthly
[23] statement at 17 Hawley Street for this Last Minute
[24] Concessions account?

Page 52

[1]   A: That's correct.
[2]   Q: Okay. And when it comes in to the 17
[3] Hawley Street offices, is it directed to you?
[4]   A: Yes.
[5]   Q: Who takes care of the distribution of
[6] the mail?
[7]   A: Brenda.
[8]   Q: All right. And to your understanding
[9] does she have instructions that Last Minute
[10] Concessions account statements are to be sent to
[11] you?
[12]   A: Yes, she knows that, yes.
[13]   Q: How does she know that?
[14]   A: I've told her.
[15]   Q: Do you know why it was that Mr. Sears
[16] wrote those two checks on the Last Minute
[17] Concessions account?
[18]   A: Well, one looks — the 456 I'm
[19] assuming is the corporate excise tax for probably
[20] the prior year and the other one he had loaned —
[21] I'd have to look back in all the records, but he had
[22] loaned money into the project because we were short
[23] money and that's his repayment. He personally
[24] loaned money into the project.

30(b)(6) Depo of James Casagrande
vol. 1
Charles Schwab & Co., Inc. - v.
August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 27 of 142
pp. 1-219   Sears, et al.

Page 53

[1] **Q:** When you say he loaned money into the
[2] project, what do you mean by ---
    **A:** Cold Spring Golf Course.
[4] **Q:** But how did that work? Did he write
[5] out a check to Cold Spring Golf Course?
[6] **A:** I don't think it would have been made
[7] out to Cold Spring Golf Course.
[8] **Q:** Was it deposited to the Last Minute
[9] Concessions account?
[10] **A:** It would have either been there or
[11] the Cold Spring Development account because at the
[12] time I think that's the only two accounts we had.
[13] **Q:** Was the loan that Mr. Sears made to
[14] the project in the amount of $21,000?
[15] **A:** I believe so, yes.
[16] **Q:** Let me ask you this. If I was
[17] looking — this is the money going back to
[18] Mr. Sears. If I was looking to find the money
[19] coming from Mr. Sears, where would I look?
[20] **A:** In the deposit slips for one of those
[21] accounts. It wasn't a wire transfer, I know that.
[22] **Q:** You don't think it was a wire
[23] transfer?
[24] **A:** I know it wasn't.

Page 54

[1] **Q:** So we'd be looking for a check from
[2] Mr. Sears in the amount of the $21,000?
[3] **A:** Or a deposit, yes. I assume a check,
[4] yes.
[5] **Q:** Okay. And to your recollection was
[6] there any documentation of this loan; by that I mean
[7] a promissory note?
[8] **A:** No.
[9] **Q:** A loan agreement or anything of that
[10] sort?
[11] **A:** No.
[12] **Q:** Was there any discussion with any of
[13] the principals of the project other than yourself
[14] about this loan?
[15] **A:** I don't believe so. Again I'm not
[16] sure where that check went, you know, so I guess I
[17] can't answer that.
[18] **Q:** When you say you're not sure, what do
[19] you mean?
[20] **A:** Well, I'm not sure if the original
[21] deposit by Bob Sears was in Last Minute Concessions'
[22] account or Cold Spring Development's account so I
[23] mean if it was in Cold Spring Development's account,
[24] sure they would have known some money was coming in.

Page 55

[1] **Q:** Would they have known that it was a
[2] loan? Let me strike that question.
[3] Did they know that it was a loan?
[4] Did any of the principals --- that is, Marchand,
[5] Waszkelewicz, Kramer --- know at the time that
[6] Mr. Sears had loaned $21,000 to the project?
[7] **MR. LESSER:** I object to the
[8] form. You can answer if you can.
[9] **A:** I guess I'd have to answer I don't
[10] know the answer to that question. You kind of have
[11] me a little bit off. I don't know where that
[12] deposit went so I can't really answer it.
[13] **Q:** The checks that were written on the
[14] Last Minute Concessions' Fleet or I guess it was at
[15] the time BankBoston, the checks that were written on
[16] the Last Minute Concessions BankBoston Cold Spring
[17] account, were they all to or for the benefit of Cold
[18] Spring Golf Course, Inc. or Cold Spring Development,
[19] Inc.?
[20] **A:** Yes.
[21] **Q:** And did those checks all --- well, let
[22] me back up a second here.
[23] Let me show you what we previously
[24] marked as Exhibits 9 and 10 and ask you if you

Page 56

[1] recognize those documents?
[2] **A:** Yes.
[3] **MR. LESSER:** Before getting to
[4] this area, can we take a short break?
[5] **MR. SNYDER:** Sure.
[6] (A short break was taken.)
[7] **BY MR. SNYDER:**
[8] **Q:** You have Exhibits 9 and 10 in front
[9] of you. I think you told us that you recognize
[10] them. My next question was going to be are those
[11] the agreements whereby Last Minute Concessions was
[12] to acquire stock in Cold Spring Golf Course, Inc.
[13] and Cold Spring Development, Inc.?
[14] **A:** Yes.
[15] **Q:** And if you look at the last page of
[16] both exhibits, is the last page — signature on both
[17] pages your signature?
[18] **A:** Yes.
[19] **Q:** And did you sign those? You see
[20] they're both dated June, 1999?
[21] **A:** Yes.
[22] **Q:** Did you sign them sometime in June,
[23] 1999?
[24] **A:** Yes, I did.

Page 57

[1] **Q:** All right. And did you have the
[2] agreement of Robert Sears at that time that you
[3] could sign those agreements on behalf of Last Minute
[4] Concessions?
[5] **A:** I didn't need it.
[6] **Q:** Why was it that you didn't need it?
[7] **A:** Because he wasn't a part of Last
[8] Minute Concessions.
[9] **Q:** Okay. As of June of 1999 had
[10] Mr. Sears donated his stock in Last Minute
[11] Concessions to you and resigned as president and
[12] director?
[13] **A:** That was my understanding.
[14] **Q:** Okay. That was — the reason I'm
[15] asking is that places it I think quite a bit more
[16] than — when we first started talking about those
[17] events, you described it as about a year ago. That
[18] would place it more than two years ago; correct?
[19] **A:** Yes, that's correct.
[20] **Q:** Okay. So as of the time that Last
[21] Minute Concessions entered into these agreements
[22] Exhibits 9 and 10, it is your recollection that
[23] Mr. Sears had already donated to you his Last Minute
[24] Concessions stock and resigned as president and

Page 58

[1] director?
[2] **A:** That's correct.
[3] **Q:** Okay. The payments that were made
[4] out of the Last Minute Concessions BankBoston
[5] account, were those payments made pursuant to these
[6] agreements?
[7] **MR. LESSER:** Object to the form.
[8] **A:** I guess I don't understand.
[9] **Q:** Well, let me break it down a little
[10] bit then. You see that Exhibit 10 provides for the
[11] payment of $275,000 by Last Minute Concessions?
[12] **A:** Right.
[13] **Q:** In return for which Last Minute
[14] Concessions is to receive shares comprising a 16
[15] percent ownership position in Cold Spring Golf
[16] Development it's called?
[17] **A:** Right.
[18] **Q:** Did you understand Cold Spring Golf
[19] Development to be the same as Cold Spring
[20] Development, Inc.?
[21] **A:** Yes.
[22] **Q:** That is the company that was involved
[23] in developing the condominium portion of this
[24] project?

Page 59

[1] **A:** That was its intention, yes.
[2] **Q:** And Exhibit 9 provides for the
[3] payment of $1,725,000; correct?
[4] **A:** That's right.
[5] **Q:** In return for which Last Minute
[6] Concessions is to receive a 51 percent ownership
[7] position in Cold Spring Golf Course, Inc.; correct?
[8] **A:** Correct.
[9] **Q:** So that's a total taken as those two
[10] numbers in total of $2 million?
[11] **A:** That's right.
[12] **Q:** And were the payments that were made
[13] out of the Last Minute Concessions BankBoston
[14] account made pursuant to that payment obligation,
[15] those payment obligations under those agreements?
[16] **A:** I know two million came in. Was
[17] there one check for that exact amount and one check
[18] for the other amount, no, they weren't done that
[19] way.
[20] **Q:** We know that. We know — let's
[21] see...
[22] (The witness confers with his
[23] counsel off the record.)
[24] **Q:** Let me show you what we marked as

Page 60

[1] Exhibit 11. That's a document which has at the top
[2] of the heading register report; do you see that?
[3] **A:** Yes.
[4] **Q:** Is that a document that you prepared
[5] by the way?
[6] **A:** Yes, it is.
[7] **Q:** And that document sets forth the
[8] money in and the money out by the Last Minute
[9] Concessions BankBoston account; right?
[10] **A:** That's right.
[11] **Q:** And the money that was paid out of
[12] that account was all shall we say to be credited
[13] against the amounts to be paid pursuant to the
[14] agreements?
[15] **A:** That's correct.
[16] **Q:** Nine and ten correct?
[17] **A:** That's correct.
[18] **Q:** Okay. And so as you say there was
[19] not a check in the amount of $275,000 written or
[20] wire transfer by Last Minute Concessions; correct?
[21] **A:** That's correct.
[22] **Q:** That amount was paid in a series of
[23] payments as set forth in Exhibit 11; correct?
[24] **A:** Yes.

30(b)(6) Depo of James Casagrande     vol. 1     Charles Schwab & Co., Inc. v.
August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 29 of 142 Sears, et al.
pp. 1-219

Page 61

[1]    **Q:** And that $1,725,000 payment or amount
[2] set forth in Exhibit 9 was paid again also in a
[3] series of payments out of the Last Minute
[4] Concessions account; correct?
[5]    **A:** That's correct.
[6]    **Q:** And some of those payments went
[7] directly to Cold Spring Golf Course, its bank
[8] account, and some of the payments went to suppliers
[9] and vendors for the project; correct?
[10]    **A:** That's correct.
[11]    **Q:** How did you and Mr. Sears determine
[12] the payees and the amounts to be paid out of the
[13] Last Minute Concessions account?
[14]    **MR. LESSER:** Object to the form.
[15]    **Q:** Why don't you keep that Exhibit 11 in
[16] front of you.
[17]    **A:** How did we determine the payees?
[18]    **Q:** Correct.
[19]    **A:** Well, Bob Sears had nothing to do
[20] with who I paid. It was what was due; buy the land,
[21] pay the bill, whatever.
[22]    **Q:** And how did you determine what was to
[23] be paid?
[24]    **A:** What was eminent; you know, like what

Page 62

[1] we needed to close on the property I wrote a check
[2] for the land. We had company XYZ that was screaming
[3] for some money, I wrote a check to company XYZ.
[4]    **Q:** And you knew at the time if the
[5] company was screaming for the money because you were
[6] employed by Cold Spring Golf Course and working at
[7] the site; correct?
[8]    **A:** Correct.
[9]    **Q:** And this began sometime early in
[10] year 2000 that you became employed at the site?
[11]    **A:** When I was working on the site, yes.
[12] I don't know if I'd use the term employee.
[13]    **Q:** Were you not an employee of Cold
[14] Spring Golf Course, Inc.?
[15]    **A:** I was supposed to be, yes.
[16]    **Q:** Well, is there a difference between
[17] you were supposed to be and whether you actually
[18] were an employee? Strike that question.
[19]    Were you ever actually an employee of
[20] Cold Spring Golf Course, Inc.?
[21]    **A:** Yes.
[22]    **Q:** Okay. And that actually is something
[23] that's provided for in Exhibit 9, right, that you
[24] were going to become an employee?

Page 63

[1]    **A:** Yes.
[2]    **Q:** If I can show you what we previously
[3] marked as Exhibit 20, is that a document that you
[4] prepared?
[5]    **A:** Yes.
[6]    **Q:** And that document has a date of
[7] 3-23-01 and a heading at the top it says QuickZoom
[8] report; right?
[9]    **A:** That's right.
[10]    **Q:** And does that document set forth
[11] payments that were made to you as payroll payments
[12] to you as an employee?
[13]    **A:** Yes.
[14]    **Q:** So you were working at the site and
[15] in that capacity learned that amounts that were
[16] payable in connection with the golf course project;
[17] correct?
[18]    **A:** Correct.
[19]    **Q:** And then you saw to payment of at
[20] least some of those amounts out of the Last Minute
[21] Concessions account; correct?
[22]    **A:** Last Minute Concessions account?
[23] No.
[24]    **Q:** You did not see to payment of any

Page 64

[1] amounts on behalf of the golf course project out of
[2] the Last Minute Concessions account?
[3]    **A:** No, these should all be out of the
[4] golf course account.
[5]    **Q:** Let's refer now to Exhibit 11 which
[6] is your register record of funds in and out of the
[7] Last Minute Concessions BankBoston account; correct?
[8]    **A:** That's correct.
[9]    **Q:** And if you look at — let's just take
[10] an example here. This will be easier. The first
[11] check February 23, 1001 is the number of the check
[12] payable to cash, category land, amount $440,022.12.
[13] Is that a check that was cut out of the Last Minute
[14] Concessions account to pay for an item?
[15]    **A:** Yes.
[16]    **Q:** For the benefit of the golf course
[17] project?
[18]    **A:** Yes.
[19]    **Q:** And if you went down through all the
[20] rest of these checks, is it not also the case that
[21] all the checks that are listed here were payable
[22] either to the Cold Spring Golf Course account or to
[23] some entity that had provided goods or services in
[24] connection with the golf course project?

Charles Schwab & Co. Inc. v.
Sears, et al.
Case 3:00-cv-30170-MAP    Document 42    Filed 10/31/02    Page 30 of 142
Vol. 1
pp. 1-215
30(b)(6) Depo of James Casagrande
August 29, 2001

Page 65

[1] A: That's correct.

[2] Q: Okay. And you determined that these

[3] amounts were payable in connection with the golf

[4] course project in your capacity as an employee of

[5] the golf course; correct?

[6] A: That's correct.

[7] Q: Okay. And as an employee of Cold

[8] Spring Golf Course, did you have contact on a

[9] regular basis with any of the Cold Spring Golf

[10] Course shareholders — that is, Mr. Waszkelewicz,

[11] Kramer or Marchand?

[12] A: Yes.

[13] Q: And did any of these gentlemen know

[14] that expenses of the golf course project were being

[15] paid out of the Last Minute Concessions account?

[16] A: Yes.

[17] Q: Okay. Did any of those gentlemen

[18] ever give you any instruction or guidance as to

[19] which expenses should be paid out of the Last Minute

[20] Concessions account and which should be paid out of

[21] the Cold Spring Golf Course account?

[22] A: No.

[23] Q: Is that something that you determined

[24] in your sole discretion?

Page 66

[1] A: It was more out of necessity.

[2] Q: All right. Tell me about that. How

[3] did you determine whether to pay a particular bill

[4] out of the Cold Spring Golf Course account or out of

[5] the Last Minute Concessions account?

[6] A: Well, if we had the money, I would

[7] write it out of the development account or golf

[8] course account, but if we were waiting on a wire

[9] transfer and had no money to pay a bill, the minute

[10] a wire transfer came in instead of making the person

[11] that we were going to write the check to wait longer

[12] for those funds to clear in a different account, we

[13] would write it out of the Last Minute Concessions

[14] account.

[15] Q: Did you provide any documentation to

[16] the Cold Spring Golf Course principals showing that

[17] these payments had been made out of the Last Minute

[18] Concessions account?

[19] A: Sure.

[20] Q: Okay. What did you provide to them?

[21] A: Most of the times Ed Waszkelewicz was

[22] right there when I was writing the check.

[23] Q: Okay. Did you ever provide any kind

[24] of a report or summary to Waszkelewicz or any of the

Page 67

[1] other principals that showed who had been paid and

[2] how much out of the Last Minute Concessions account?

[3] A: I'm unaware if I did or not.

[4] Q: And there were also what you

[5] talked about wire transfers coming in to the Last

[6] Minute Concessions account; there were also wire

[7] transfers that went out of the Last Minute

[8] Concessions account; correct?

[9] A: I think there may have been one if I

[10] remember right.

[11] Q: Let's take a look at Exhibit 11 which

[12] you have in front of you there. It's easier for me

[13] to look at Exhibit 23. I'm sorry.

[14] I want to refer to rather than wire

[15] transfers, they were bank checks. There were checks

[16] that were written by you and by Mr. Sears on this

[17] account then there were also cashiers checks or bank

[18] checks that were purchased with funds from the Last

[19] Minute Concessions account; correct?

[20] A: Sure.

[21] Q: If you look at the last section, let

[22] me just open it up quickly, of Exhibit 23, pages

[23] that are numbered 2-D-1 through 2-D-3, those are

[24] copies of the cashiers checks that were purchased

Page 68

[1] with funds from the Last Minute Concessions account;

[2] correct?

[3] A: That's correct.

[4] Q: And were — strike that. Who

[5] authorized these bank checks?

[6] A: I believe I went and got every one of

[7] them.

[8] Q: Did Mr. Sears to your knowledge

[9] authorize any of those bank checks?

[10] A: No.

[11] Q: And how did you go about doing that?

[12] Describe to me the mechanics. Did you go to the

[13] bank and write out a request? Did you do it by

[14] phone?

[15] A: No. I think I went to the bank on

[16] every one of these.

[17] Q: You filled out the paperwork there at

[18] the bank and obtained the check?

[19] A: Mm-hmm.

[20] Q: You need to say yes or no.

[21] A: Yes.

[22] Q: Well, how did you determine whether

[23] a particular payment would be made by bank check as

[24] opposed to a check that you or Mr. Sears would

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 31 of 142
Vol. 1
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

---

**Page 69**

[1] write?

[2] A: I don't know. We tried on the larger

[3] amounts to do bank checks and assure people that we

[4] were giving the money to that it was good because we

[5] had some bank — some checks rather that ended up

[6] not, being insufficient funds.

[7] Q: Did you have a bank officer contact

[8] at BankBoston that you dealt with in arranging for

[9] these cashiers checks?

[10] A: Not really.

[11] Q: Did you have a bank officer contact

[12] at BankBoston for any other purpose in connection

[13] with the Last Minute Concessions account?

[14] A: No.

[15] Q: Now, did these payments — were these

[16] payments also credited against the $2 million to be

[17] paid pursuant to the agreements Exhibits 9 and 10?

[18] A: Yes.

[19] Q: And were these payments all to or for

[20] the benefit of Cold Spring Golf Course or Cold

[21] Spring Development?

[22] A: Yes.

[23] Q: And did you determine the payees and

[24] the amounts of these checks in the same fashion as

---

**Page 70**

[1] you determined the payees and the amounts of the

[2] checks that you wrote?

[3] A: Yes.

[4] Q: That is in your capacity as an

[5] employee of the golf course on the site?

[6] A: Yes.

[7] Q: Who has custody today of the records,

[8] that is, the bank statements, the checks and any

[9] other records that you have with respect to this

[10] Last Minute Concessions BankBoston account?

[11] A: I think I have everything.

[12] Q: Okay. Now, in the — let me just ask

[13] you to follow up on Exhibit 11. You told me you

[14] prepared it. To your knowledge is it accurate?

[15] A: It should be.

[16] Q: And for what purpose did you prepare

[17] that document?

[18] A: I'm not sure if it was SEC's or at

[19] your request.

[20] Q: What did you understand the request

[21] to be that that document was responding to?

[22] A: Any documents relating to the LMC

[23] bank account.

[24] Q: All right. And in preparing that

---

**Page 71**

[1] document you tried to be as accurate as you could?

[2] A: Yes.

[3] Q: Do you have any reason to believe

[4] that it is not accurate?

[5] A: No, other than one thing didn't make

[6] the printer at the bottom of the first page.

[7] Q: It's a cut off of the copy; is that

[8] what you're saying?

[9] A: Yes, but it should be accurate.

[10] Q: Now, in the spring of 2000 funds

[11] started to come in to the Last Minute Concessions

[12] BankBoston account; right?

[13] A: Mm-hmm.

[14] Q: You need to say yes or no.

[15] A: Yes.

[16] Q: And you were aware at the time that

[17] those funds were coming in; correct?

[18] A: Yes.

[19] Q: What was your understanding as to the

[20] source of those funds?

[21] A: Well, until they came in, actually

[22] even when they came in, I didn't even know

[23] necessarily what the source of the funds were.

[24] Q: Did anyone who was acting on behalf

---

**Page 72**

[1] of Last Minute Concessions know the source of those

[2] funds?

[3] A: No.

[4] Q: Did you ever ask?

[5] A: Acting on behalf I guess I would have

[6] to say yes to that.

[7] Q: Who?

[8] A: Well, Bob Sears. He was the one who

[9] was supposed to be raising the money.

[10] Q: All right. And when you say

[11] Mr. Sears was supposed to be raising the money, how

[12] did that responsibility fall on Mr. Sears?

[13] A: When I was initially involved to be

[14] involved with the golf course, there was a $2

[15] million number that I was going to need to come up

[16] with, and I don't have any money or the ability to

[17] find that kind of money and I knew that's what he

[18] does for a living, investment type things.

[19] Q: And when you were asked to come up

[20] with $2 million, was that before Last Minute

[21] Concessions or Mr. Sears was involved with the

[22] project?

[23] A: I'm not following.

[24] Q: Let me ask you a more general

---

Page 73

[1] question. How did Last Minute Concessions come to
[2] be involved with the golf course project at Cold
[3] Spring?
[4]    A: That was the vehicle through which
[5] the $2 million was going to come in and be
[6] reinvested into the golf course and condo project.
[7]    Q: And why was it felt that there should
[8] be — strike that.
[9]     Why was it decided that there should
[10] be a vehicle through which the funds should come in
[11] to the golf course project?
[12]    A: Just another level of, you know, in
[13] my mind anyway, another level of safety, you know,
[14] when you have a liquor license or whatever. I guess
[15] that's the way I looked at it. So that any shares
[16] were there a corporation —
[17]    Q: I'm sorry, I didn't understand the
[18] connection to a liquor license?
[19]    A: Well, just if somebody ended up
[20] getting, you know, hurt or hopefully that would
[21] never have happened. You know, in today's world
[22] people sue so I just thought it was another level of
[23] protection for those shares.
[24]    Q: So was it your idea to get Last

Page 74

[1] Minute Concessions involved as the vehicle through
[2] which this money would go to Cold Spring Golf
[3] Course?
[4]    A: Basically, yes.
[5]    Q: And tell me how those discussions and
[6] negotiations went. I think you started us at the
[7] point where someone had approached you about getting
[8] involved and put a $2 million price tag on it; is
[9] that correct?
[10]    A: Yes. Mark Kramer, actually all
[11] three, Mark Kramer, John Marchand and Ed
[12] Waszkelewicz happened to play golf one day up at
[13] Westover Golf Course. I was the golf pro there. I
[14] knew Mark Kramer because he was a former golf
[15] commissioner and I half-heartedly but was serious in
[16] the comment said to him are you guys looking for a
[17] golf pro yet and they said well, as a matter of
[18] fact, that's why we're here and they went out and
[19] played and they said we'd like to talk later. We
[20] talked later, they showed me the property and that's
[21] when they said we don't really want just a golf pro,
[22] we thought that perhaps you might have the access or
[23] the ability to have some money into the project
[24] because they needed more equity themselves and hence

Page 75

[1] that's where Bob Sears was asked to raise the money.
[2]    Q: Asked by you?
[3]    A: Yes.
[4]    Q: And did you make the introduction of
[5] Mr. Sears to Kramer, Waszkelewicz and Marchand?
[6]    A: Yes.
[7]    Q: How did that happen? Tell me how
[8] that occurred.
[9]    A: I think the first time we met was at
[10] my house, the five of us.
[11]    Q: Who set that meeting up?
[12]    A: I'm not sure; probably Mark Kramer.
[13]    Q: Okay. What happened at that meeting?
[14]    A: We just discussed the overall project
[15] and what we, you know, thought the project would
[16] be. They showed us some numbers, preliminary
[17] numbers, and projections that they had put together
[18] and that was basically the gist of it.
[19]    Q: What happened next?
[20]    A: Then Bob and I talked and we went
[21] over some numbers and projections and that's where
[22] he kind of made the comment that I think it was
[23] right after that meeting that, you know, this looks
[24] like a great project but, you know, if I'm involved

Page 76

[1] with you, he says it's like hitting a double; this
[2] is your chance to hit a home run like I said
[3] before. That's a pretty accurate quote I think.
[4] And then my concern was leaving a place that I had
[5] been at for 14 years and I wanted to make sure that
[6] I had control of the golf course because I had faith
[7] in myself running it, and I didn't know these guys
[8] and their business practices so I wanted to make
[9] sure that I controlled the golf course and kind of
[10] controlled my own destiny and that's when they came
[11] back to me with the different percentages of
[12] ownership.
[13]    Q: Okay. And then when you say they
[14] came a back to me, that's Marchand, Waszkelewicz and
[15] Kramer?
[16]    A: That's right.
[17]    Q: Did they prepare these agreements
[18] Exhibits 9 and 10?
[19]    A: One or more of them did, yes.
[20]    Q: And did you discuss either of these
[21] agreements with Mr. Sears?
[22]    A: Other than the ownership percentage,
[23] no, not really.
[24]    Q: What did you and Mr. Sears discuss

30(b)(6) Depo of James Casagrande     vol. 1     Charles Schwab & Co., Inc. v.

August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 33 of 142 Sears, et al.

pp. 1-219

Page 77

[1] about the ownership percentage?

[2]    A: Well, he was raising money for me to

[3] get involved with this and, you know, I wanted to

[4] make sure that I wasn't going to be held to repay

[5] these people so we just went through some

[6] projections based upon these percentages and it was

[7] felt that by both of us it would be beneficial for

[8] his investors and myself.

[9]    Q: What would be beneficial?

[10]    A: These agreements.

[11]    Q: You mentioned a moment ago the

[12] ownership percentages. What in particular about the

[13] ownership percentages was discussed?

[14]    A: Well, I had the control of the golf

[15] course with the 51 percent and that the 16 percent

[16] was projected to bring enough money back so that my

[17] initial $2 million investment was going to be pretty

[18] close to paid off once the condos were all sold.

[19]    Q: All right. Explain to me how that

[20] was going to work then. Let's take it step by

[21] step.

[22]    First you say Mr. Sears was raising

[23] money for you. You had an agreement with Mr. Sears

[24] that he would raise the $2 million for you?

Page 78

[1]    A: A verbal, yes.

[2]    Q: All right. And that that money would

[3] be paid into the Last Minute Concessions account

[4] basically for your benefit; is that fair?

[5]    A: Yes, that's fair.

[6]    Q: And then the idea was that it would

[7] be paid from the Last Minute Concessions account to

[8] or for the benefit of the golf course project;

[9] correct?

[10]    A: And condo project.

[11]    Q: Okay. And the condo project. And

[12] that those payments out of the Last Minute

[13] Concessions account would be basically in payment or

[14] in satisfaction of the payment obligations under

[15] those agreements Exhibit 9 and 10; right?

[16]    A: Basically, yes.

[17]    Q: All right. Tell me this. What was

[18] in it for Mr. Sears? He was going to be raising two

[19] million bucks; right?

[20]    A: Right.

[21]    Q: What was in it for him?

[22]    A: Nothing. We had talked about

[23] possibly, you know, I could run the payroll through

[24] the golf course through him or he could possibly

Page 79

[1] handle the books or something like that where he

[2] would generate some revenues but other than that,

[3] there wasn't any benefit to him.

[4]    Q: So how would he raise revenues by

[5] running the payroll? That would be —

[6]    A: He would bill me like a payroll

[7] service.

[8]    Q: I see. Was there ever any agreement

[9] that he would do that?

[10]    A: No.

[11]    Q: Was there ever any agreement that

[12] Mr. Sears would obtain any compensation of any kind

[13] for raising the $2 million?

[14]    A: No.

[15]    Q: Did Mr. Sears ever indicate to you

[16] why it was that he was interested in raising $2

[17] million for free?

[18]    A: Well, basically yes. He's a very

[19] close friend of mine. He was the best man at my

[20] wedding and godfather of my daughter and that was

[21] it.

[22]    Q: When you were discussing his raising

[23] this $2 million for you, was there any discussion of

[24] what the return would be or what the compensation

Page 80

[1] would be for the investors?

[2]    A: Yes.

[3]    Q: Tell me about that.

[4]    A: The projections that we had went

[5] anywhere from 8 percent to 12 percent and various

[6] time frames, five to ten years. We ran all kinds of

[7] numbers and on all of the numbers the numbers worked

[8] and we both felt comfortable. He felt comfortable

[9] with representing to his investors whatever it was,

[10] and I felt comfortable with the numbers that I was

[11] going to be able to repay these people.

[12]    Q: Let me take this one step at a time.

[13] You did some projections of basically expenses and

[14] amortization of debt and revenue; is that fair to

[15] say?

[16]    A: Yes.

[17]    Q: And based on those projections you

[18] thought that you would see a return of 8 to 12

[19] percent; correct?

[20]    A: I was hoping I would see a bigger

[21] return than that.

[22]    Q: Well, what did the projections show?

[23] You said a moment ago 8 to 12 percent. That's what

[24] I got —

Charles Schwab, et al. Case 3:00-cv-30170-MAP   Document 441   Filed 10/31/02   Page 34 of 142   30(b)(6) Depo. of James Casagrande
Sears, et al.
pp. 1-219
August 29, 2001

Page 81

[1] A: That was what was understood that I
[2] was going to pay the investors.
[3] Q: That what was understood?
[4] A: You asked what the return on that
[5] money would be.
[6] Q: All right. So these investors were
[7] going to be paid between 8 and 12 percent; is that
[8] what you're saying?
[9] A: Yes.
[10] Q: That was your understanding with
[11] Mr. Sears?
[12] A: Yes.
[13] Q: Mr. Sears was going to come up with
[14] two million bucks and the people who put up that
[15] money were going to be paid between 8 and 12 percent
[16] on that money?
[17] A: Correct.
[18] Q: Well, let me ask it. Was it ever
[19] your understanding that any of the $2 million was
[20] going to come from Mr. Sears' personal funds?
[21] A: Was it ever my understanding? No.
[22] Q: Okay. Your understanding then, say
[23] it the other way around, was the entire amount of
[24] the $2 million was going to come from investors

Page 82

[1] other than Mr. Sears?
[2] A: Correct.
[3] Q: And these investors as you discussed
[4] it and arranged it with Mr. Sears were to receive a
[5] return on their money 8 to 12 percent per annum, per
[6] year?
[7] A: It would accrue until the golf course
[8] was operational or condos started getting
[9] disbursements.
[10] Q: Well, let me just ask. What was —
[11] in your discussions with Mr. Sears what did you and
[12] he agree as to the terms on which these investors
[13] would be compensated?
[14] A: There were no details of anything
[15] ever nailed down. It was all generalizations.
[16] Q: Did you understand that Mr. Sears
[17] after he had had this discussion with you and he had
[18] agreed that he would raise $2 million for you, did
[19] you understand that he then went out and spoke to
[20] investors about putting up money about investing?
[21] A: Sure.
[22] Q: And what was your understanding as to
[23] what Mr. Sears was telling these people let's start
[24] with on the subject of what their return on their

Page 83

[1] investment would be?
[2] A: Just like I said, somewhere from 8 to
[3] 12 percent. I don't know what his conversations
[4] were.
[5] Q: Was it your understanding that these
[6] investors were being told that they were obtaining
[7] an equity interest — that is, a stock interest or
[8] debt?
[9] A: The equity interest in the company
[10] was going to be — well, we'll say Last Minute
[11] Concessions. I would owe or Last Minute Concessions
[12] would owe those investors.
[13] Q: Okay. So they would have debt from
[14] Last Minute Concessions?
[15] A: That's correct.
[16] Q: To your understanding none of these
[17] investors were to be told that they were going to
[18] have an equity interest in either Last Minute
[19] Concessions or Cold Spring Golf Course, Inc. or Cold
[20] Spring Development, Inc.; is that right?
[21] A: That's correct.
[22] Q: And what were they to be told —
[23] strike that.
[24] To your understanding was Mr. Sears

Page 84

[1] going to be telling these investors that they would
[2] receive interest in the range of 8 to 12 percent and
[3] the amount of interest to be paid would be
[4] determined at Last Minute Concessions' discretion?
[5] That's a long question.
[6] You gave me a range. I'm an
[7] investor. Mr. Sears comes to me. It was your
[8] understanding that he was going to tell them I'm
[9] going to get 8 percent or going to get 12 percent or
[10] you are going to get somewhere in between there
[11] depending on what Mr. Casagrande and I decide; which
[12] was it?
[13] A: No, it definitely wasn't an arbitrary
[14] number but what the number was, I don't know. I
[15] never saw anything. My assumption is take the
[16] middle of the road, 10 percent.
[17] Q: Your understanding was that
[18] Mr. Sears could go out to these investors, tell them
[19] they could obtain — basically they could loan
[20] money to Last Minute Concessions and that he could
[21] then set the interest rate that they would obtain so
[22] long as it was between 8 and 12 percent; is that
[23] fair?
[24] MR. LESSER: Object.

30(b)(6) Depo of James Casagrande   vol. 1        Charles Schwab & Co., Inc. v.
August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 35 of 142
pp. 1-219                                          Sears, et al.

**Page 85**

[1] A: Well, not that Bob Sears would set
[2] it, no. It was — my assumption would be if I was
[3] Bob Sears and you were the investor, you two were
[4] talking about the investment and solidify everything
[5] and that's it. I don't know. It certainly wasn't
[6] an arbitrary number.
[7] Q: Wait a minute. He's raising this
[8] money for you; right?
[9] A: For Last Minute Concessions, yes.
[10] Q: And Last Minute Concessions is you?
[11] A: That's correct.
[12] Q: As of June of '99 Last Minute
[13] Concessions is James Casagrande; right?
[14] A: That's correct.
[15] Q: And you the person of Last Minute
[16] Concessions are going to have to repay this money;
[17] correct?
[18] A: That's correct.
[19] Q: With interest; correct?
[20] A: Absolutely.
[21] Q: So what is your understanding when
[22] the money starts coming in as to how much interest
[23] you're going to have to pay?
[24] A: It was going to be from 8 to 12

**Page 86**

[1] percent.
[2] Q: And who was going to determine
[3] whether it was 8 or 12 or 10?
[4] A: Bob Sears and his investors during
[5] their negotiation process or whatever the process he
[6] went through.
[7] Q: So Mr. Sears had discretion from you,
[8] authority from you to negotiate with these investors
[9] to pay them interest as long as he was in the range
[10] of 8 to 12 percent; was that your understanding with
[11] Mr. Sears?
[12] A: Yes, basically, yes.
[13] Q: Was any of this ever put in writing,
[14] any of this agreement that you had with Mr. Sears
[15] about raising $2 million was any of it ever put in
[16] writing?
[17] A: No.
[18] Q: Did you ever ask that it be put in
[19] writing?
[20] A: An agreement for me and Bob Sears to
[21] raise the money? No.
[22] Q: Did he ever ask that it be put in
[23] writing?
[24] A: No.

**Page 87**

[1] Q: Let me move on to another term. Bob
[2] Sears is raising $2 million from investors. What is
[3] your understanding as to what Mr. Sears could tell
[4] these people as to when their money would be repaid?
[5] A: It was my understanding that nothing
[6] would be repaid until there were revenues basically;
[7] the golf course is open and/or condos are being sold
[8] so in other words, there are some type of
[9] disbursements that are coming through Last Minute
[10] Concessions.
[11] Q: But you mentioned the condos a couple
[12] times. The agreement did not provide for Last
[13] Minute Concessions to get a controlling interest of
[14] Cold Spring Development; right?
[15] A: That's correct.
[16] Q: Was it your understanding that Last
[17] Minute Concessions was going to be obtaining
[18] controlling interest in Cold Spring Development in
[19] some other fashion?
[20] A: No.
[21] Q: Was it your understanding that Last
[22] Minute Concessions would receive some return on the
[23] sale of these condos in the nature of a dividend
[24] from Cold Spring Development?

**Page 88**

[1] A: 16 percent, yes.
[2] Q: Well, you had a 16 percent ownership
[3] interest; right?
[4] A: Yes, 16 percent of whatever the
[5] revenues ended up.
[6] Q: 16 percent of whatever the net profit
[7] turned out to be on the sale of the condos; is that
[8] what you are saying?
[9] A: That's correct.
[10] Q: So your understanding with Bob Sears
[11] was that the investors were not to be given a set
[12] date on which they would be repaid; is that right?
[13] A: I would say that's fair.
[14] Q: Your understanding with Bob Sears was
[15] that investors would be repaid as and when the
[16] revenue — strike that.
[17] Your understanding with Bob Sears was
[18] that the investors would be paid as and when
[19] dividends from Cold Spring Golf Course or Cold
[20] Spring Development paid to Last Minute Concessions
[21] allowed repayment to be made?
[22] A: Yes.
[23] Q: What was your understanding with
[24] Mr. Sears as to whether the investors would be given

Charles Schwab & Co., Inc. v. Jones,   Case 3:00-cv-00170-MAP   Document 41   Filed 10/31/02   Vol. I, Depo. of James Casagrande
Sears, et al.                                                            pp. 1-219                            Page 36 of 142
                                                                                                              August 29, 2001

Page 89

[1] any security, any collateral for repayment?
[2]    A: No real specifics. I always assumed
[3] that probably the stock, you know, Last Minute
[4] Concessions stock.
[5]    Q: That —
[6]    A: In other words, just to protect the
[7] investors if monies came into Last Minute
[8] Concessions, that if they didn't have that stock,
[9] you know, Jim would spend the money on something
[10] else instead of repaying them. Obviously the money
[11] if there's revenues that come into Last Minute
[12] Concessions would be paid out to the investors.
[13]    Q: And the investors' security to make
[14] sure that that repayment occurred could be Last
[15] Minute Concessions stock? In other words, Mr. Sears
[16] could if he wished pledge Last Minute Concessions
[17] stock as security for repayment to those investors?
[18]    A: Sure. I wouldn't have had a problem
[19] with that.
[20]    Q: Did you and Mr. Sears ever discuss
[21] that?
[22]    A: We might have. Probably.
[23]    Q: Did you and Mr. Sears in making this
[24] arrangement for him to raise $2 million for you

Page 90

[1] discuss any other terms that could be offered to
[2] investors other than those that we've just covered?
[3]    A: No, I don't think so.
[4]    Q: Did you ever see any document that
[5] referred to any terms that an investor had been
[6] offered by Mr. Sears?
[7]    A: No.
[8]    Q: Did you ever see any document that
[9] recorded an investor's investment or the terms of
[10] that investment?
[11]    A: No, other than a wire transfer, you
[12] know, from the bank, but I'm sure that's not what
[13] you're referring to.
[14]    Q: You received notice and notices from
[15] BankBoston on multiple wire transfers into the Last
[16] Minute Concessions account; correct?
[17]    A: Yes.
[18]    Q: And did you see on any of these wire
[19] transfers names of any investors or people who were
[20] transferring the money?
[21]    A: Later on, yes. I didn't really pay
[22] attention to any of it when it was coming in.
[23]    Q: When you say later on, when was that?
[24]    A: Kind of when the lawsuits started I

Page 91

[1] guess.
[2]    Q: Okay. If you have Exhibit 23, I'd
[3] ask you to flip to pages that have the numbers and
[4] letters 2-B, number two and the letter B, and it's
[5] one through seven.
[6]    A: Yes.
[7]    Q: These are what are called advices of
[8] credit. They are notifications of receipt of wire
[9] transfers into the Last Minute Concessions Bank of
[10] Boston account; correct?
[11]    A: That's correct.
[12]    Q: And these were sent to 17 Hawley
[13] Street at or about the time the wire transfers were
[14] received; right?
[15]    A: I'm sure they were, yes.
[16]    Q: So if I could ask you to keep that in
[17] front of you, the first one on 2-B-1 has a date of
[18] what's called a value date of March 29, 2000.
[19]    A: Hang on one second.
[20]    Q: Okay. Actually if I could ask you
[21] to — they're arranged not quite chronologically.
[22] If you look at the last one, the last one on the
[23] bottom of the page has a value date of February 22,
[24] 2000.

Page 92

[1]    A: That's right.
[2]    Q: And do you have any reason to believe
[3] that you did not receive these wire transfer advices
[4] at or about the time of the value dates that are
[5] listed on the advices?
[6]    A: No, I have no reason to believe that.
[7]    Q: Okay. And you'll see that each of
[8] these advices contains next to the letters O-R-G
[9] which I believe standards for originator or
[10] something along those lines, name of individual or
[11] in some cases individuals?
[12]    A: Mm-hmm.
[13]    Q: You need to say yes or no.
[14]    A: Yes, I'm sorry.
[15]    Q: And did you at any time ask Mr. Sears
[16] who these individuals were?
[17]    A: No.
[18]    Q: And did you at any time speak with
[19] any of these individuals, and let me just list the
[20] names here so you don't have to go through. Did
[21] you — let me ask you this question generally.
[22]    Do you have any knowledge of anyone
[23] other than Mr. Sears communicating with Roy or
[24] Jeannie Johnson?

30(b)(6) Depo of James Casagrande
August 29, 2001
vol. 1
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 37 of 142
pp. 1-219
Charles Schwab & Co., Inc.   v.
Sears, et al.

Page 93

[1] A: Well, I tried calling them one time
[2] when they expressed concern and that was at the
[3] request of Bob Sears, but I actually never talked to
[4] anyone.
[5] Q: And when Mr. Sears requested that you
[6] speak to Roy or Jeannie Johnson, what did you say?
[7] A: Just to verify that, you know, that
[8] it is indeed a golf course and we received their
[9] money; basically just if they wanted to ask me any
[10] questions or something like that.
[11] Q: So Mr. Sears asked you to contact
[12] Roy or Jeannie Johnson and confirm that their funds
[13] had in fact been received in the Last Minute
[14] Concessions account; is that what you're saying?
[15] A: And that we are trying to build a
[16] golf course.
[17] Q: Did he say anything else to you at
[18] that time?
[19] A: No, not really.
[20] Q: Did he say why it was that Roy or
[21] Jeannie Johnson needed confirmation of either
[22] receipt of their funds or the fact that a golf
[23] course was being built?
[24] A: No.

Page 94

[1] Q: Did you ever speak with Roy or
[2] Jeannie Johnson?
[3] A: No.
[4] Q: Did you ever leave a message for Roy
[5] or Jeannie Johnson?
[6] A: Yes, I at the time that I tried
[7] calling their house.
[8] Q: And where did you get the phone
[9] number or numbers that you used?
[10] A: Bob Sears.
[11] Q: All right.
[12] MR. LESSER: John, could I just
[13] take a two-minute break?
[14] (A short break was taken.)
[15] (Document marked for
[16] identification as Exhibit No. 27.)
[17] BY MR. SNYDER:
[18] Q: Let me go back to something you said
[19] a little while ago just to ask a follow-up
[20] question. You mentioned that one of your interests
[21] in entering into these agreements Exhibit 9 and 10
[22] was that you'd be in a position of controlling the
[23] golf course. Is that -- do I have that right?
[24] A: Controlling interest I had, yes.

Page 95

[1] Q: All right. Because you wanted to
[2] control the golf course; that was your concern in
[3] terms of leaving Westover going into this new
[4] venture that you wanted to be in control at least of the
[5] golf course portion of that; is that correct?
[6] A: Correct.
[7] Q: And did you consider that when in the
[8] year 2000 you became an employee of Cold Spring Golf
[9] Course and were involved at the golf course that you
[10] were to some extent in control of what was going on
[11] there in terms of the construction progress?
[12] A: To some extent, sure.
[13] Q: You were at least one of the people
[14] who were in charge out there; is that right?
[15] A: Yes.
[16] Q: And would the other person have been
[17] Ed Waszkelewicz?
[18] A: Yes, him and I on a daily basis.
[19] Q: Was there anyone else?
[20] A: Not really. The other — Mark and
[21] John really weren't around.
[22] Q: And Mr. Sears was not in control of
[23] what was going on in terms of the golf course
[24] construction?

Page 96

[1] A: No.
[2] Q: Would you say that he was ever,
[3] Mr. Sears was ever, in a position of being in
[4] control as to either Cold Spring Golf Course or Cold
[5] Spring Development?
[6] A: No, not at all.
[7] Q: And when Waszkelewicz, Marchand and
[8] Kramer came to Westover that day and played a round
[9] of golf and talked to you about getting involved in
[10] the Cold Spring project, was there any discussion of
[11] getting Mr. Sears involved at that point?
[12] A: No.
[13] Q: Did any of these three gentlemen
[14] indicate to you at that time that they thought that
[15] you would have access to $2 million?
[16] A: Oh, no, no.
[17] Q: So when the subject of $2 million
[18] came up, was it clear or it was apparent to everyone
[19] that was in part of that discussion that that was
[20] going to have to involve bringing someone else in?
[21] A: Bringing someone to raise the money,
[22] yes.
[23] Q: Okay. Was there any discussion at
[24] that time of anyone who might fit that bill?

Charles Schwab & Co., Inc. v.
Sears, et al.

Case 3:00-cv-30170-MAP    Document 44    Filed 10/31/02    Page 38 of 142

30(b)(6) Depo. of James Casagrande
August 29, 2001

pp. 1-219

---

Page 97

[1] A: At Westover not on that day, no.
[2] Q: Was there any —
[3] A: Possibly at a later date.
[4] Q: Was there any mention of Mr. Sears'
[5] name at all at that first meeting?
[6] A: At the golf course I don't believe
[7] so. I'm not positive.
[8] Q: Okay. We were talking about your
[9] message for Mr. or Mrs. Johnson when we took a
[10] break. Do you remember that? I show you what we
[11] marked as Exhibit 27 and ask if that is a fair
[12] transcription of the message that you left for
[13] Mr. Johnson?
[14] A: It could be.
[15] Q: Do you have any reason to believe
[16] that it is not accurate in terms of what you left by
[17] way of a message for Mr. Johnson?
[18] A: I don't think so.
[19] Q: Have you ever seen this before?
[20] A: No.
[21] Q: Did you ever talk to or leave a
[22] message for any of the other investors — that is,
[23] people who had transferred funds to the Last Minute
[24] Concessions account?

Page 98

[1] A: Yes.
[2] Q: And who were those?
[3] A: Mark Futter; he came out to the
[4] site. He was one who put the money in first and I
[5] had known Mark just from being Bob's client. Bob
[6] called up and said he'd like to give Mark Futter
[7] kind of a tour of the property and show him what he
[8] had invested his at the time was a half a million
[9] dollars and Mark and Bob came up and I think myself
[10] and Ed and Mark and Bob both drove around the
[11] properties and so forth.
[12] Q: Sorry, that was a meeting at the site
[13] with Sears, Futter, Waszkelewicz?
[14] A: And myself. I believe Ed was there.
[15] I'm pretty positive he was.
[16] Q: Okay. And what was discussed?
[17] A: Just our plans for the golf course
[18] and the condo project and we drove around the
[19] property and showed him the views and, you know,
[20] where different holes were; you know, showed him
[21] some of the work that had been done, that type of
[22] thing.
[23] Q: Okay. Was there any discussion of
[24] Mr. Futter loaning money or advancing money,

Page 99

[1] transferring money to Last Minute Concessions or to
[2] the golf course project?
[3] A: Well, he already had at that point.
[4] Q: Okay. So I'm looking again at
[5] Exhibit 23, these wire transfer advices. There is
[6] the one that we looked at a moment ago with a value
[7] date February 22, 2000 in the amount of $500,000 and
[8] the transfer order as identified is Thomas Mark
[9] Futter so if I understand you correctly, this
[10] meeting with Mr. Futter at the site occurred
[11] sometime after February 22, 2000?
[12] A: That's right. Probably within a
[13] couple weeks I'm guessing. I don't really remember.
[14] Q: Was there any discussion of
[15] Mr. Futter transferring any more money to Last
[16] Minute Concessions or the golf course project in
[17] addition to that half a million dollars?
[18] A: Not that I was aware of, no.
[19] Q: So your understanding of this was
[20] that Mr. Futter was coming out to see what was going
[21] on at the site in connection with the project to
[22] which he had advanced half a million dollars?
[23] A: Correct.
[24] Q: Was there any discussion of the terms

Page 100

[1] in which he had advanced that money?
[2] A: No.
[3] Q: Any discussion of when he expected to
[4] be repaid?
[5] A: No.
[6] Q: Okay. Have you spoken with any other
[7] individual who transferred funds to the Last Minute
[8] Concessions account?
[9] A: I spoke with Mrs. Shaw but she's a
[10] client of mine, a tax client of mine.
[11] Q: Okay. Tell me when did you speak
[12] with Mrs. Shaw? Did you speak with her about the
[13] golf course project or her transferring funds to the
[14] Last Minute Concessions account?
[15] A: I believe she had already transferred
[16] funds at that point. I'm not really sure. It was a
[17] pretty brief discussion.
[18] Q: Did you talk with her about either
[19] the transfer or about the project?
[20] A: I don't know. I don't really
[21] remember. I would say probably the project, but I
[22] don't really remember.
[23] Q: Well, tell me what you do remember
[24] about this conversation with Mrs. Shaw.

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP    Document 44    Filed 10/31/02    Page 39 of 142

Charles Schwab & Co., Inc. v.
Sears, et al.

Vol. I
pp. 1-219

Page 101

[1] **A:** Well, we were building the golf
[2] course. I'm not sure if Mrs. Shaw's money had come
[3] in or not at the time that I talked with her, and
[4] Bob Sears asked me to — he couldn't find her.
[5] She's kind of a hard person to get ahold of and I
[6] went to her house and there's a little motel on the
[7] same spot and just kind of tracked her down and told
[8] her that basically that Bob Sears was looking for
[9] her and that was the end of I think the gist of the
[10] conversation I had with her and left. I know that
[11] they talked I'm pretty positive if my memory is
[12] right.
[13]    **Q:** They talked after the meeting you had
[14] with Mrs. Shaw?
[15]    **A:** On the phone, yes.
[16]    **Q:** I'm sorry, I didn't understand the
[17] connection between the motel?
[18]    **A:** That's just her house and motel are
[19] on the same property. It's just kind of trying to
[20] find where she is.
[21]    **Q:** All right. So if I understand this
[22] correctly, you went out to see Mrs. Shaw because Bob
[23] Sears had requested that you speak with her?
[24]    **A:** He needed to find her and he was on

Page 102

[1] Block Island and I obviously wasn't so I went to her
[2] property and then she talked to Bob on the phone
[3] and —
[4]    **Q:** Why did Mr. Sears need to find
[5] Mrs. Shaw?
[6]    **A:** I'm not sure. My assumption is she
[7] ended up I think giving the project some money so I
[8] assume it was about that although he handled all of
[9] her investments.
[10]    **Q:** Well, again let's not assume. Did
[11] Mr. Sears tell you why it was he needed to speak
[12] with her?
[13]    **A:** It was about her whether she had
[14] already put money in or was going to put money in,
[15] but it was about the project. Specifics I don't
[16] know what he said.
[17]    **Q:** All right. He indicated to you I
[18] guess some urgency about this because you actually
[19] went out to her house; right?
[20]    **A:** Yes.
[21]    **Q:** He indicated it was important that he
[22] speak with her sooner rather than later; is that
[23] fair to say?
[24]    **A:** Yes.

Page 103

[1]    **Q:** And but he didn't say to your
[2] recollection why it was that it was important?
[3]    **A:** No, just that it was about, you know,
[4] her I think it was through Prudential. It seems
[5] like that's where most of her money was invested and
[6] she needed to call them or something like that.
[7]    **Q:** Did Mr. Sears indicate that she
[8] needed to call Prudential in order to make the
[9] transfer to Last Minute Concessions happen?
[10]    **A:** That could have been, yes, or to
[11] verify why or something. I don't know.
[12]    **Q:** Did you say anything to Mrs. Shaw
[13] other than that Bob Sears was trying to reach her?
[14]    **A:** I don't believe so.
[15]    **Q:** You found her, you said that and
[16] turned around and left?
[17]    **A:** No, I stayed there while she got
[18] ahold of Bob Sears.
[19]    **Q:** Okay. She was on the phone with
[20] Mr. Sears?
[21]    **A:** Yes, I believe so.
[22]    **Q:** And did she indicate to you any
[23] reason why Mr. Sears would not have been able to
[24] reach her by phone?

Page 104

[1]    **A:** She's very hard to reach by phone.
[2] I'm very knowledgeable on that because I do her
[3] taxes.
[4]    **Q:** She doesn't answer her phone?
[5]    **A:** She's usually out and about on the
[6] motel. She's an older lady and runs the whole place
[7] by herself.
[8]    **Q:** Then when you were there when
[9] Mrs. Shaw called Mr. Sears, did you hear any of
[10] their conversation?
[11]    **A:** No, it was one sided and I don't
[12] really remember anything that she said.
[13]    **Q:** Have you spoken with any other person
[14] who transferred funds to the Last Minute Concessions
[15] account?
[16]    **A:** No.
[17]    **Q:** Has anyone else other than you or
[18] Mr. Sears to your knowledge spoken with anyone who
[19] transferred funds to the Last Minute Concessions
[20] account about that transfer or about the golf course
[21] project?
[22]    **A:** Not to my knowledge, no.
[23]    **Q:** Have you left a message for anyone
[24] who transferred funds to the Last Minute Concessions

Page 105

[1] account other than Mr. Johnson?
[2]    A: No, not that I remember.
[3]    Q: All right. If you take a look at
[4] Exhibit 27 for a moment, you see in the third line
[5] you refer to the issue with Bob Sears and the
[6] investments for the golf course; do you see that?
[7]    A: Mm-hmm.
[8]    Q: What was the issue with Bob Sears?
[9]    A: I don't know. He indicated that
[10] there was some issue or problem with Mr. Johnson and
[11] he didn't go into specifics, but he said it would be
[12] helpful if I called and I didn't see any reason not
[13] to so I did.
[14]    Q: And did you ever speak with
[15] Mr. Johnson or Mrs. Johnson?
[16]    A: No.
[17]    Q: Did you ever try to contact them
[18] again after this particular conversation?
[19]    A: I don't believe so.
[20]    Q: Let me just run through some other
[21] names of people who made transfer just so we make
[22] sure we've covered this.
[23]       Have you or anyone on behalf of Last
[24] Minute Concessions other than Mr. Sears ever spoken

Page 106

[1] with Lyn Reale?
[2]    A: No.
[3]    Q: Robert or Eleanor McLaughlin?
[4]    A: No.
[5]    Q: Marcia McGovern?
[6]    A: No, I know Marcia McGovern but no,
[7] I've never talked with her.
[8]    Q: How do you know Marcia McGovern?
[9]    A: She lives on Block Island.
[10]    Q: And how does — what's the
[11] connection there? How do you know her?
[12]    A: Just in passing.
[13]    Q: You've been to Block Island and met
[14] her?
[15]    A: Yes, she happened to be there out on
[16] the island. She lives there too. It's a pretty
[17] small island.
[18]    Q: Okay. So you've met Marcia McGovern
[19] on one or more occasions when you were on Block
[20] Island?
[21]    A: Once I think.
[22]    Q: All right. And were you on Block
[23] Island for the purposes of visiting with Mr. Sears
[24] and his family?

Page 107

[1]    A: Yes, a short vacation.
[2]    Q: Did you meet any other clients of
[3] Mr. Sears on Block Island?
[4]    A: Not that I'm aware of.
[5]    Q: Okay. Have you or anyone else on
[6] behalf of Last Minute Concessions other than
[7] Mr. Sears ever spoken with Virginia Sanborn?
[8]    A: That doesn't sound familiar, no.
[9]    Q: Paul or Deborah Engel?
[10]    A: No.
[11]    Q: Ann Arnold?
[12]    A: No.
[13]    Q: Stephen or Claire McQueeny?
[14]    A: I don't believe so.
[15]    Q: Virginia Sanders?
[16]    A: She's been in our office but I don't
[17] believe I've talked to her.
[18]    Q: You've met her at 17 Hawley Street?
[19]    A: Well, I think I've seen her. I don't
[20] know if that constitutes meeting but...
[21]    Q: You've seen her but were never
[22] introduced?
[23]    A: Yes, I don't believe I was.
[24]    Q: Celest or Mark Helterline, have you

Page 108

[1] or anyone else from Last Minute Concessions other
[2] than Mr. Sears spoken with Celeste or Mark
[3] Helterline?
[4]    A: The name sounds familiar but I don't
[5] believe I've spoken to them.
[6]    Q: Nan or John Wallace?
[7]    A: No.
[8]    Q: Have you or anyone from Last Minute
[9] Concessions other than Mr. Sears ever spoken with
[10] anyone affiliated with Coastal Investors?
[11]    A: No, no, I don't know who Coastal
[12] Investors are.
[13]    Q: That's not a name that's familiar to
[14] you?
[15]    A: It is familiar to me. That was who
[16] originally was told to me that was going to be the
[17] long-term investor or the investor or investment
[18] group for the golf course, golf course/condo
[19] project. Who that is I don't know.
[20]    Q: Well, what did you understand the
[21] relationship between Coastal Investors and
[22] Mr. Futter was?
[23]    A: I don't believe there was any. I
[24] didn't believe there was any.

**Page 109**

[1]  Q: Okay. Did you understand Mr. Futter
[2] to be an investor brought to the project by
[3] Mr. Sears?
[4]  A: Yes.
[5]  Q: And did you understand Mrs. Shaw to
[6] be an investor brought to the project by Mr. Sears?
[7]  A: Yes.
[8]  Q: And then you understood there was
[9] also this group referred to as Coastal Investors
[10] that was going to bring money to the project
[11] courtesy of Mr. Sears?
[12]  A: Yes.
[13]  Q: But you had no idea who the
[14] individuals were in Coastal Investors; is that
[15] right?
[16]  A: That's right.
[17]  Q: And you never spoke with anyone that
[18] you understood to be affiliated with Coastal
[19] Investors; is that right?
[20]  A: That's right.
[21]  Q: To your knowledge did anyone on
[22] behalf of Last Minute Concessions other than
[23] Mr. Sears ever speak with anyone affiliated with
[24] Coastal Investors?

**Page 110**

[1]  A: Not to my knowledge.
[2]  Q: Did you or anyone associated with
[3] Last Minute Concessions other than Mr. Sears ever
[4] speak with anyone affiliated with 2 Ocean Avenue
[5] LLC?
[6]  A: No, I don't know what that is.
[7]  Q: Have you ever heard the name 2 Ocean
[8] Avenue LLC?
[9]  A: I've heard Bob Sears mention that.
[10]  Q: Okay. What did Mr. Sears say about 2
[11] Ocean Avenue LLC?
[12]  A: Not much. It seems if my
[13] recollection is correct it's his LLC. I don't know
[14] where it is or what it is or where it is or I really
[15] don't have any information on that.
[16]  Q: When you say his LLC, do you mean his
[17] LLC in the sense that Last Minute Concessions was
[18] your company once Mr. Sears assigned his stock?
[19]  A: In the same respect you're saying
[20] as...
[21]  Q: Yes.
[22]  A: Yes, I guess it was a company that he
[23] had. I don't really know.
[24]  Q: Did you ever have any understanding

**Page 111**

[1] that 2 Ocean Avenue LLC had any involvement with the
[2] golf course project?
[3]  A: No, not to my knowledge.
[4]  Q: Did Last Minute Concessions ever
[5] issue any promissory note to any of the individuals
[6] who transferred funds to Last Minute Concessions'
[7] account?
[8]  A: Not that I'm aware of, no.
[9]  Q: Did Last Minute Concessions ever sign
[10] any loan agreement with respect to any of the funds
[11] that were transferred to Last Minute Concessions'
[12] account?
[13]  A: No.
[14]  Q: When you had your discussions with
[15] Mr. Sears and agreed upon this arrangement whereby
[16] he would raise the $2 million for you, to your
[17] understanding did he have authority to document the
[18] terms on which the investors were sending in their
[19] money?
[20]  A: It was my assumption he was handling
[21] all that.
[22]  Q: Okay.
[23]  (There was an interruption in the
[24] proceedings.)

**Page 112**

[1]  (Documents marked for
[2] identification as Exhibit
[3] Nos. 28, 29 and 30.)
[4]  **BY MR. SNYDER:**
[5]  Q: Let me show you, Mr. Casagrande,
[6] what we've previously marked as Exhibit 21 and ask
[7] you if you recognize that? That's a document that
[8] has a heading at the top preliminary financing
[9] agreement between Last Minute Concessions, Inc. and
[10] Coastal Investors LLC. Have you ever seen that
[11] document before?
[12]  A: If I did, I don't remember it.
[13]  Q: Did you ever have any knowledge of
[14] any financing agreement between Last Minute
[15] Concessions and Coastal Investors LLC?
[16]  A: The only thing that I knew is they
[17] were the name Coastal Investors, whomever that was,
[18] was going to be the original and only investor in
[19] the project that Bob Sears was going to raise for
[20] us. As far as who they are and seeing this
[21] document, I don't believe I have.
[22]  Q: Well, when did you first learn that
[23] Coastal Investors was not going to be the only
[24] investor?

Page 113

[1]  A: Well, through the permit process for
[2] the golf course took a lot longer than any of us
[3] originally thought, and it was my understanding
[4] that, you know, there were numerous times where we
[5] said that to Bob Sears it looks like we're going to
[6] get our permit any day, you know, tell whomever to
[7] get the money ready and that happened I think a
[8] number of times, and then when it actually did
[9] happen which was many months after when we thought
[10] it was, Coastal Investors, at least I was told,
[11] Coastal Investors was not interested in doing the
[12] deal for I don't know what reason but for whatever.
[13]  Q: All right. Let me make sure I
[14] understand this. The agreements Exhibits 9 and 10
[15] that you have in front of you provided that the
[16] money to be paid by Last Minute Concessions was to
[17] be paid within 30 days of final permitting; is that
[18] right?
[19]  A: That's right.
[20]  Q: So when you got to final permitting,
[21] Mr. Sears told you that he had contacted the Coastal
[22] Investors people about putting up their money;
[23] right?
[24]  A: Yes.

Page 114

[1]  Q: And what Mr. Sears told you was that
[2] the Coastal Investor people then said no, we are no
[3] longer interested?
[4]  A: I don't know if it was, you know, the
[5] 30 days prior to getting that or I don't know what
[6] the timing was on when Coastal backed out, but I
[7] know they backed out prior to us getting our final
[8] permits.
[9]  Q: Prior to getting the final permits.
[10] I misunderstood. I thought you said that when the
[11] final permits were obtained, then he asked for the
[12] money and they said no.
[13]  Let me just ask my question. What
[14] you're saying is it was sometime prior to the final
[15] permits that Mr. Sears told you that the Coastal
[16] Investors people were no longer interested?
[17]  A: That's the way I remember it, yes.
[18]  Q: Okay. And when that happened, did
[19] you and Mr. Sears have a discussion about whether
[20] there were alternative investors to supply the $2
[21] million?
[22]  A: Yes. He indicated to me that he
[23] should be able to find some short-term investors in
[24] the interim if he couldn't find long-term

Page 115

[1] immediately because, you know, it looked like it was
[2] imminent. What the time span was there I'm not
[3] really sure.
[4]  Q: When he was talking about short-term
[5] investors, did you have a discussion as to what that
[6] meant?
[7]  A: No.
[8]  Q: I think you mentioned earlier that
[9] your understanding was that Coastal Investors could
[10] be a long-term investor; is that right?
[11]  A: That's right.
[12]  Q: And by the term long term what did
[13] you mean?
[14]  A: Well, until basically until we
[15] started having money to get them paid back. What
[16] the again exact terms on any of the investors I
[17] don't have specifics.
[18]  Q: All right. Well, if I understand
[19] correctly from what you told us earlier that the
[20] idea was that the investors would be paid out of the
[21] dividends that Last Minute Concessions was going to
[22] receive as a stockholder in the two companies; is
[23] that right?
[24]  A: That's right.

Page 116

[1]  Q: And that as I now understand what
[2] you're saying, that was a long-term investor that
[3] was going to be paid in that fashion; is that right?
[4]  A: That was the only way that I assumed
[5] an investor was going to get paid back.
[6]  Q: But then when Coastal Investors
[7] pulled out, you had a discussion with Bob Sears
[8] about short-term investors; right?
[9]  A: Just that he was going to find some.
[10] If he couldn't find other long-term investors, he
[11] would find some interim people to basically keep
[12] money coming in.
[13]  Q: All right. But what was your
[14] understanding of Mr. Sears as to when these
[15] short-term or interim investors would be paid?
[16]  A: My only comment to Bob Sears was
[17] that, you know, I don't have the money to pay these
[18] people. They make it known that it's got to be once
[19] we get money coming in, meaning LMC has profits
[20] coming in. I personally didn't have any money to
[21] pay people back until that happened.
[22]  Q: All right. I'm just trying to
[23] understand when you use those terms short-term and
[24] interim investors, I'm just trying to understand

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 43 of 142

vol. 1
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al

Page 117

[1] what that meant and how they were different from
[2] long-term?
[3] A: I'm only using those terms because
[4] that's what was said to me by Bob Sears.
[5] Q: And my question to you was when Bob
[6] Sears used those terms, did you have any discussion
[7] as to what that meant?
[8] A: Specifics, no, other than expressing
[9] that there was no way for me to pay them back until
[10] monies and profits were there.
[11] Q: All right. And you understood at the
[12] time he was using these terms short-term and interim
[13] investors that these were people who were going to
[14] have to be paid back sooner than the payment plan
[15] that you had in mind for people who were going to be
[16] long-term investors; right?
[17] A: I assumed it would be different, yes.
[18] Possibly he said that short-term money was more
[19] expensive so I figured that instead of 8 or 10
[20] percent maybe it's going to be 11 or 12 percent,
[21] but, you know, I trusted Bob and I knew that
[22] whatever arrangements that he would line up I was
[23] going to be able to fulfill them because he knew
[24] where I stood.

Page 118

[1] Q: All right. And you understood that
[2] these short-term or interim investors were going to
[3] have to be or might well have to be paid before the
[4] dividend stream received by Last Minute Concessions
[5] would cover those payments?
[6] A: No, I didn't know that.
[7] Q: Well, who was your — Bob Sears is
[8] going out there getting two million bucks for you.
[9] He's now talking about getting two million bucks at
[10] least in part for short-term or interim investors.
[11] What was your understanding as to when these folks
[12] were going to have to be repaid, these short-term
[13] interim people?
[14] A: Specifics I don't know. I assumed,
[15] you know, short-term it's going to be quicker but he
[16] knew that I had no source of income to pay them
[17] other than the salary that I was going to get paid,
[18] and that certainly wouldn't cover any short-term
[19] investors so I don't know what his deal was. I
[20] don't know.
[21] Q: He knew that and you knew that;
[22] right?
[23] A: I know I did and I know he did, yes.
[24] Q: Was there ever any discussion with

Page 119

[1] Mr. Sears or anyone else associated with the golf
[2] course about any of these short-term or interim
[3] investors being repaid with funds obtained from
[4] other investors rather than with funds from the golf
[5] course?
[6] A: No.
[7] Q: With funds, dividends funds, from the
[8] golf course?
[9] A: No, not that I specifically
[10] remember.
[11] Q: How about you generally remember?
[12] Was there ever any discussion that we'll get this
[13] money in short-term or in interim basis and then
[14] we'll get more money from other people later on and
[15] pay off these short-term people?
[16] MR. LESSER: Just discussion with
[17] whom?
[18] MR. SNYDER: Anybody.
[19] A: Possibly. I don't know. Maybe that
[20] was thought of as an option. I really wasn't —
[21] unfortunately I wasn't very focused on what
[22] arrangements were or were not being made. I was so
[23] focused on getting this golf course built. I mean I
[24] spent all day every day there and I knew that that's

Page 120

[1] what my job was. I didn't concern myself
[2] unfortunately with any of the investment process.
[3] Q: The only thing I'm trying to
[4] understand, Mr. Casagrande, is Mr. Sears is raising
[5] this two million bucks for you; right?
[6] A: (The witness nods.)
[7] Q: And you know — you need to say yes
[8] or no.
[9] A: Yes.
[10] Q: And you know and he knows that you
[11] are going to have to repay it and I understand
[12] you're using the vehicle of Last Minute Concessions,
[13] but what you're telling us is that Last Minute
[14] Concessions was you; right?
[15] A: Yes.
[16] Q: So you were going to have to repay
[17] it?
[18] A: Yes.
[19] Q: And all I'm asking is when he's
[20] talking about getting short-term and interim
[21] investors, when did you understand that you were
[22] going to have to repay these folks?
[23] A: The date or is that what you're
[24] referring to? When?

**Page 121**

[1] **Q:** A date, an event, anything that was
[2] going to trigger your obligation to repay —
[3] **A:** I have no knowledge of any trigger.
[4] All I knew is that whatever monies anyone would put
[5] up I knew that I would repay them.
[6] **Q:** Did you —
[7] **A:** My assumption is Bob Sears had
[8] worked the deal that he knew that I could repay
[9] them.
[10] **Q:** Did you ever ask any questions of
[11] Mr. Sears to test the validity of your assumption in
[12] that regard?
[13] **A:** No, I had no reason to.
[14] **Q:** Did you ever ask Mr. Sears when you
[15] would have to repay any of this money?
[16] **A:** No, other than when we were talking
[17] once the course was operating and had revenues and
[18] condos were being sold. Other than that, no.
[19] **Q:** Let me ask you. You mentioned
[20] Mr. Futter and we looked at his transfer. He put
[21] half a million bucks in. His was the first transfer
[22] received into the Last Minute Concessions account.
[23] Did you ever have any discussion with Mr. Sears as
[24] to when Mr. Futter was expecting to be repaid?

**Page 122**

[1] **A:** I don't believe so, no.
[2] **Q:** And as I recall what you told us
[3] earlier about your meeting with Mr. Futter, you
[4] never discussed that with Mr. Futter either?
[5] **A:** No, I just showed Mark Futter around
[6] the golf course.
[7] **Q:** Did Last Minute Concessions ever
[8] enter into any preliminary financing agreement with
[9] Coastal Investors LLC?
[10] **A:** Not to my knowledge, no.
[11] **Q:** Did Last Minute Concessions ever
[12] enter into any sort of financing loan or investment
[13] agreement with Coastal Investors LLC?
[14] **A:** Again not to my knowledge.
[15] **Q:** Did you or anyone else acting on
[16] behalf of Last Minute Concessions ever do anything
[17] to verify whether in fact Coastal Investors LLC
[18] existed?
[19] **A:** Could you repeat that maybe.
[20] **Q:** Did you or anyone else acting on
[21] behalf of Last Minute Concessions ever do anything
[22] to verify whether or not Coastal Investors LLC
[23] existed?
[24] **A:** I assume Bob Sears did. Not to my

**Page 123**

[1] knowledge.
[2] **Q:** Okay. But that's an assumption on
[3] your part. Do you have any knowledge as to anyone
[4] including Mr. Sears doing that?
[5] **A:** No, I do not.
[6] **Q:** I take it from that that you've never
[7] seen any documentation that would confirm that
[8] Coastal Investors LLC existed?
[9] **A:** Not that I remember, no.
[10] **Q:** Okay. Let me show you what I've
[11] marked as Exhibits 28 and 29. Let's start with 28.
[12] And just for the record let me say it looks like
[13] I've got wrong numbers on mine.
[14]     Exhibit 28 is a promissory note in
[15] the amount of $75,000 dated March 29, 2000 and the
[16] third page of that — that's the first two pages of
[17] that exhibit. The third and fourth pages of that
[18] exhibit are a promissory note in the amount of
[19] $15,000 dated April 5, 2000. Have you ever seen
[20] either of those promissory notes before?
[21] **A:** I don't believe so, no.
[22] **Q:** Were you ever aware that a promissory
[23] note —
[24] **MR. HUNTINGTON:** Just for the

**Page 124**

[1] record who are the two notes payable to?
[2] **MR. SNYDER:** Payable to Lyn Reale,
[3] R-E-A-L-E, in both instances.
[4] **Q:** Were you ever aware that Last Minute
[5] Concessions had issued a promissory note to Lyn
[6] Reale in the amount of $75,000 or a promissory note
[7] in the amount of $15,000?
[8] **A:** Not really. I assumed Bob Sears was
[9] doing whatever he needed to do but...
[10] **Q:** Okay. Well, let me ask you this.
[11] Would it be inconsistent with your understanding
[12] with Mr. Sears concerning raising the $2 million
[13] dollars that these notes such as these be issued?
[14] **A:** Well, if I was putting up money, I
[15] would assume something is being issued, yes.
[16] **Q:** Okay. So it wouldn't be inconsistent
[17] with your understanding with Mr. Sears about the
[18] raising of two million for him to issue promissory
[19] notes such as these; is that right?
[20] **A:** That's correct.
[21] **Q:** Then let's look at Exhibit 29 which
[22] is a promissory note in the amount of $100,000, date
[23] appearing on the second page of July 1, 1999 payable
[24] to Marcia McGovern. Have you ever seen this

30(b)(6) Depo of James Casagrande   vol. 1
August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 45 of 142
pp. 1-219
Charles Schwab & Co., Inc.   v.
Sears, et al.

Page 125

[1] document before?

[2] **A:** No.

[3] **Q:** If you look over on the second and
[4] the third pages, there are signatures that appear
[5] there. Are those your signatures?

[6] **A:** No. My middle initial is W and it's
[7] definitely not my signature. It looks like a C for
[8] middle initial. I don't know. Definitely not my
[9] signature.

[10] **Q:** Would it have been inconsistent with
[11] your understanding with Mr. Sears for Mr. Sears to
[12] issue a promissory note such as Exhibit 29?

[13] **A:** If you're saying would it be — would
[14] I assume he's going to sign my name? No, I wouldn't
[15] assume that.

[16] **Q:** Other than the signature would this
[17] promissory note be inconsistent with your
[18] understanding of Mr. Sears?

[19] **A:** I didn't actually read it but I
[20] assumed there would be some type of note to someone
[21] who's giving money, yes.

[22] **Q:** Okay.

[23] **A:** But I didn't read the specifics of
[24] this.

Page 126

[1] **Q:** Well, let me — let's not read all
[2] the specifics, but let me just give you one
[3] highlight here. If you look on the third page, the
[4] text that's in bold, payments are due every three
[5] months beginning October 1, 1999 with automatic
[6] renewal of interest earned in that period. Do you
[7] see —

[8] **A:** I see what you're reading.

[9] **Q:** Would it be inconsistent with your
[10] understanding with Mr. Sears for him to issue a
[11] promissory note that provided for payments to be due
[12] beginning October 1, 1999?

[13] **A:** Well, no, I couldn't do that.

[14] **Q:** Okay. And you said on several
[15] occasions now that you did not have the financial
[16] resources to repay the $2 million; correct?

[17] **A:** That's correct; personally that's
[18] correct.

[19] **Q:** And is it also true that Last Minute
[20] Concessions did not have the financial resources to
[21] repay the $2 million other than through dividends
[22] that might be received from either Cold Spring Golf
[23] Course or Cold Spring Development?

[24] **A:** That's correct.

Page 127

[1] **Q:** Okay. Now, do you see — if I could
[2] ask you to look at Exhibit 28. Again the second
[3] paragraph there says unpaid principal and accrued
[4] interest shall be payable in full on December 31
[5] year 2000. The second note included in that exhibit
[6] has the same repayment date. Did any of the
[7] projections that you prepared with Mr. Sears —
[8] strike that.

[9] Did any of the projections that you
[10] prepared that you described earlier having to do
[11] with revenue and expenses and profit of the golf
[12] course project project dividends or project profits
[13] sufficient for dividends of $90,000 to be paid to
[14] Last Minute Concessions before December 31, 2000?

[15] **A:** No.

[16] **Q:** The projections in fact did not
[17] provide for any revenue in year 2000; right?

[18] **A:** I'm not sure on that. We projected
[19] the golf course to be open year 2000 so I guess we
[20] would have projected some revenues there, and we
[21] assumed we would be selling condos in the year 2000.

[22] **Q:** Okay. Would those projections have
[23] supported $90,000 in dividends to Last Minute
[24] Concessions by December 31, 2000?

Page 128

[1] **A:** They may have. It was pretty
[2] dependent upon condo sales because that was where
[3] the largest quicker money was going to come from.

[4] **Q:** When was it that you were projecting
[5] the golf course to start generating revenue?

[6] **A:** We figured the opening date would be
[7] July of 2000.

[8] **Q:** And in March of 2000 was that still
[9] your projected opening date?

[10] **A:** Wait. You know what, wait a minute,
[11] I'm sorry. I'm a year off on all of that.

[12] **Q:** I thought so.

[13] **A:** Yes. Would we have had any
[14] projections for December 31st of 2000 any projected
[15] revenues for either company, no, we would not have.

[16] **Q:** The projected opening date was June
[17] of 2001; correct?

[18] **A:** June, July of 2001, that's correct.
[19] I'm forgetting how long this has been going here.

[20] **Q:** All right. Let me show you Exhibit
[21] 30 which is a document that says at the top
[22] financial agreement Last Minute Concessions, Inc.
[23] and Coastal Investors d/b/a 2 Ocean Avenue LLC;
[24] okay. Have you ever seen this document before?

---

Page 129

[1] A: No.

[2] Q: Are you aware that Last Minute
[3] Concessions entered into any agreement with
[4] Coastal — I already asked you about Coastal
[5] Investors.

[6] Are you aware that Last Minute
[7] Concessions entered into any agreement with 2 Ocean
[8] Avenue LLC?

[9] A: No.

[10] Q: Are you aware that Cold Spring Golf
[11] Course, Inc. ever entered into any agreement with 2
[12] Ocean Avenue LLC?

[13] A: No.

[14] Q: Did you ever indicate to Mr. Sears
[15] that he should not issue promissory notes payable by
[16] Last Minute Concessions?

[17] A: No, the subject really didn't come
[18] up.

[19] Q: Okay. It was implicit or I think if
[20] you use the word assumed, it was assumed as part of
[21] your agreement, it was assumed on your part, that
[22] Mr. Sears would be issuing some kind of paper to
[23] these people who were putting up money to the Last
[24] Minute Concessions account; right?

---

Page 130

[1] A: Yes.

[2] Q: And it was not inconsistent with your
[3] expectation that paperwork would consist of
[4] promissory notes; right?

[5] A: Sure.

[6] Q: Your understanding was that this
[7] investment was going to take the form of debt;
[8] right?

[9] A: I was going to owe these people,
[10] yes.

[11] MR. LESSER: It's 12:30. It's
[12] been another hour. Can we take a two-minute break?

[13] MR. SNYDER: Why don't we break
[14] for lunch.

[15]

[16] (A lunch break was taken from 12:35 to 1:30.)

[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

Page 131

[1] AFTERNOON SESSION
[2] BY MR. SNYDER:

[3] Q: Mr. Casagrande, if I could ask you
[4] to look again at Exhibit 11, I just wanted to ask
[5] you a few more questions about that document. Let
[6] me get my copy here.

[7] You see on the first page check
[8] numbers 1007 and 1023, I believe the dates of March
[9] 20 and April 28, there are two payments $3,000 a
[10] piece for repayment of loan. This says balance of
[11] loan repaid on the last one and repayment of loan
[12] amount both payable to you. Could you tell us the
[13] circumstances of that loan?

[14] A: Sure. Back when I was working at
[15] Westover Golf Course prior to formally being a
[16] shareholder in either company, my three partners
[17] were short on money and I had some monies, you know,
[18] when I was working at Westover and loaned them two
[19] times $3,000 each, and this was just getting that
[20] repaid to them.

[21] Q: Repaid to you?

[22] A: To me, yes.

[23] Q: All right. Is there a reason that
[24] the payment was made out of the LMC checking account

---

Page 132

[1] rather than the Cold Spring Golf Course account?

[2] A: Well, no rhyme or reason just that
[3] that's where the money happened to be at the time.

[4] Q: Okay. And you referred to your three
[5] partners. Are you talking about Mr. Waszkelewicz,
[6] Mr. Marchand and Mr. Kramer?

[7] A: Yes.

[8] Q: And where would I find the
[9] corresponding payment in of the amount that you
[10] loaned to those three individuals?

[11] A: From my check registers from Westover
[12] Golf Course.

[13] Q: Okay. Where did the money get
[14] deposited? Where did that two times $3,000 get
[15] deposited?

[16] A: I think it was a Cold Spring
[17] Development account. That would — actually it had
[18] to be because that was the only account that they
[19] had.

[20] Q: When you say from your check register
[21] at Westover Golf Course, were those checks written
[22] on an account in the name of Westover Golf Course?

[23] A: D/b/a/, a d/b/a account; Jim
[24] Casagrande, Westover Golf Course.

---

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP    Document 44    Filed 10/31/02    Page 47 of 142

vol. 1
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

Page 133

[1]  Q: Okay. Did you do business as
[2] Westover Golf Course?
[3]  A: Yes.
[4]  Q: For how long did you do business as
[5] Westover Golf Course?
[6]  A: I was there 14 years.
[7]  Q: Okay. Also on the first page check
[8] number 1012 payable to cash. The description or
[9] memo is repay of J. Wildzumas GC. What does that
[10] mean?
[11]  A: The J. Wildzumas is John Wildzumas.
[12] The GC and then it goes on I think that's just
[13] probably golf course expenses. Maybe it probably
[14] didn't print the whole thing, but John Wildzumas is
[15] a friend of mine. We were short on money and we
[16] needed it badly, and I asked him if we could do a
[17] loan, you know, do a real short-term I was expecting
[18] two, three days because we were waiting on a wire
[19] transfer.
[20]  Q: Waiting on a wire transfer from whom?
[21]  A: I don't know who it was going to be
[22] from, but I knew there was — I mean certainly my $2
[23] million wasn't anywhere near in and I knew that more
[24] money was — LMC's $2 million still needed to come

Page 134

[1] in.
[2]  Q: Okay. When you asked for the
[3] short-term loan from Mr. Wildzumas — by the way how
[4] much was that loan? What was the amount of that
[5] loan?
[6]  A: $38,144.82.
[7]  Q: How did you arrive at that amount?
[8]  A: That was the whatever bill he paid.
[9]  Q: So he didn't make a payment to the
[10] golf course account, he just paid a bill on behalf
[11] of the golf course?
[12]  A: I'd have to look. I'm not sure off
[13] the top of my head.
[14]  Q: Do you know what bill he paid?
[15]  A: Not off the top of my head, no.
[16]  Q: Where would you look to find that
[17] out?
[18]  A: Either in the actual computer program
[19] it might give me something more detailed or in the
[20] bills or something like that.
[21]  Q: When you say the actual computer
[22] program, what are you referring to?
[23]  A: This register is in Quicken.
[24]  Q: Okay. On a personal computer?

Page 135

[1]  A: Yes.
[2]  Q: And where is that personal computer
[3] located?
[4]  A: Well, that's at my house.
[5]  Q: Okay. And so other than in the
[6] computer, the other alternative as to where we could
[7] find out what bill Mr. Wildzumas paid would be
[8] where?
[9]  A: I would have to look back through the
[10] bills. There would probably be a bill that exactly
[11] corresponds to that dollar amount.
[12]  Q: Mr. Wildzumas was not paid any
[13] interest on his loan?
[14]  A: No.
[15]  Q: You were not paid any interest on
[16] your loans?
[17]  A: No.
[18]  Q: Is there any documentation anywhere
[19] that records the fact that these loans were made or
[20] the obligation to repay them?
[21]  A: No, other than the check I wrote.
[22]  Q: Looking over to the next page, there
[23] are two entries with the date June 5, in the memo
[24] that say unknown $12,000 and $130,000.

Page 136

[1]  A: Mm-hmm.
[2]  Q: Those are money going out of the
[3] account; correct?
[4]  A: Mm-hmm.
[5]  Q: You need to say yes or no.
[6]  A: Yes.
[7]  Q: Do you today know what those payments
[8] were for or who they were to?
[9]  A: Yes. I think I'd have to look. If
[10] you can give me a second and look in this
[11] documentation.
[12]  Q: Okay. You're looking at Exhibit 23.
[13]  A: There were two bank checks that when
[14] I went to the bank, they made the pay to the order
[15] of the wrong person. Let me just find it. Yes. It
[16] was a bank check 2-D-2.
[17]  Q: Where?
[18]  A: It's on 2-D-2. If you look at the
[19] paid to the order of, it lists the dollar amount and
[20] then the payee I think was — I think that's the
[21] one, it was Four B Development. I think that's the
[22] one. I went to the bank, asked for two bank
[23] checks. One I believe was for Tom Jepson,
[24] J-E-P-S-O-N, and the other one was Four B

Charles Schwab & Co., Inc. vs. Sears, et al.

Case 3:00-cv-00170-MAP   Document 41   Filed 10/31/02   Page 48 of 142

30(b)(6) Depo. of James Casagrande
August 29, 2001

pp. 1-219

---

[1] Development and they either flip flopped. I'm
[2] trying to find it here.
[3]    **Q:** Oh, I see. I'm looking at Exhibit —
[4]    **A:** 2-D-1 and 2-D-2. There's one that
[5] says pay to the order of dollar number and then it's
[6] from Golf Irrigation Services, one of them, and the
[7] other one — the bank checks were useless basically
[8] so I had to go back to the bank, show them the
[9] checks because the people that were supposed to get
[10] the money couldn't even use them and then they
[11] reissued them. I think that's a correction. You'll
[12] see there's a number of — here it is.
[13]    If you look at June 2nd, you have the
[14] original Tom Jepson for $12,000 and Four B
[15] Development Golf Course billed out for the 130 and
[16] then there's a memo on 6-5 which is probably I'm
[17] guessing Monday because they were probably paid on
[18] Friday that the add back the same two dollar amounts
[19] and in the memo it says bank check was made out and
[20] the G didn't come out but made out wrong and then
[21] the same day they reissued the correct bank checks,
[22] and I just put as memo I just put unknown. I don't
[23] know why but it would be Tom Jepson and Four B
[24] Development again so it's just basically a

---

[1] correction of the banks issuance of two wrong bank
[2] checks, and I didn't — when they handed them to me,
[3] I didn't even check them out but they weren't of any
[4] use to anybody.
[5]    **Q:** All right. I think I followed that.
[6] I have one question. On the June 2 entry for Tom
[7] Jepson, that shows that check as a check that you
[8] wrote out, number 1033; right?
[9]    **A:** I don't know what that S stands for.
[10] I would say I think the ten — I'd have to look at
[11] the check but probably check number 1033 equates to
[12] the total of the two, and I'm not sure what that S
[13] stands for.
[14]    **Q:** I'll ask the next question. There's
[15] an S next to that check number and there's an S next
[16] down to 1048 further down the page. What did you
[17] mean to signify by using the letter S?
[18]    **A:** I don't think I signified it. I
[19] think the computer did. I'd have to...
[20]    **Q:** How about over on the first page next
[21] to check 1025 there's also an S?
[22]    **A:** I'd have to check. I don't know what
[23] the S means. I'd have to check in the program.
[24]    **Q:** I think I follow what you're saying

---

[1] but let me point out one other thing. If you're
[2] looking at Exhibit 23 and you look at page 2-C-5.
[3]    **A:** I'm sorry?
[4]    **MR. LESSER:** 2-C-5 on this
[5] exhibit.
[6]    **Q:** That would be further toward the
[7] beginning.
[8]    **A:** Okay.
[9]    **Q:** Check 1033 appears at the top of that
[10] page payable to cash in the amount of $142,000.
[11]    **A:** Mm-hmm.
[12]    **Q:** I don't see an entry that corresponds
[13] to that.
[14]    **A:** It's the sum of the two.
[15]    **Q:** Okay.
[16]    **A:** The 12,000 and the 130.
[17]    **Q:** Okay. I don't know whether I want to
[18] spend any more time on this or not, but now I'm
[19] confused. You got a check number 1033 in the amount
[20] of $142,000 payable to cash.
[21]    **A:** That was for the two bank checks.
[22]    **Q:** Okay.
[23]    **A:** It would have been — it's got to be
[24] what it is.

---

[1]    **Q:** I see. Okay. And then that got paid
[2] out wrong. Got it.
[3]    **A:** It got paid out wrong, yes.
[4]    **Q:** Okay. Last one. Check number 1052
[5] payable to Ed Waszkelewicz, then it says partial
[6] repayment of loan and then there's an amount there
[7] 28,000 and there's some handwriting next to that.
[8] Is that your handwriting?
[9]    **A:** No, that's Ed's.
[10]    **Q:** Do you know what that says?
[11]    **A:** I think it says Nowok land.
[12]    **Q:** Okay. Tell me about the loan that
[13] Mr. Waszkelewicz made.
[14]    **A:** Again we were short on money. Ed
[15] uses the figure I think of 78,000 that he put in at
[16] one time or another not all in one instance. As a
[17] matter of fact, I think somewhere in here there's a
[18] bounced check to Ed for $78,000. It may not show up
[19] on here because of — anyway I know that happened
[20] because I gave him the money and then they wire
[21] transfer — I gave him the check rather, the $78,000
[22] check. The money wire transfer didn't come in when
[23] it said it did. He went to deposit it, it bounced
[24] then he waited for quite some time afterwards and we

---

30(b)(6) Depo of James Casagrande   vol. 1
August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 49 of 142
pp. 1-219
Charles Schwab & Co., Inc. v.
Sears; et al.

Page 141

[1] at least got him 28 of that 78 back.

[2] **Q:** Okay. So Mr. Waszkelewicz had paid
[3] $78,000 toward the purchase of a parcel of land that
[4] was to be used for the golf course project?

[5] **A:** Numerous thing but that was 28 of it
[6] he denotes as that land parcel.

[7] **Q:** All right. So he had made various
[8] payments in the amount of $78,000 on behalf of the
[9] project and this was a repayment to him?

[10] **A:** Yes.

[11] **Q:** And is there any documentation
[12] anywhere as to his payment of the 78,000 or an
[13] obligation to repay any of that 78,000?

[14] **A:** Again it would only be through checks
[15] that he deposited, you know, into the account or
[16] bills that he paid; that would be it.

[17] **Q:** Do you know a Louis Gaffett,
[18] G-A-F-F-E-T-T?

[19] **A:** No.

[20] **Q:** Have you ever heard that name before?

[21] **A:** No.

[22] **Q:** Do you know a Frank Melicci,
[23] M-E-L-I-C-C-I?

[24] **A:** No.

Page 142

[1] **Q:** Have you ever heard the name Frank
[2] Melicci?

[3] **A:** No.

[4] **Q:** All right. Other than the
[5] discussions that Mr. Sears was having with potential
[6] investors, did anyone else on behalf of Last Minute
[7] Concessions have any discussions with anyone about
[8] investing or loaning funds?

[9] **A:** No.

[10] **Q:** Did anyone have any discussions on
[11] behalf of Last Minute Concessions with any bank or
[12] other financial institution about obtaining a loan
[13] for Last Minute Concessions?

[14] **A:** If you mean for the golf course that
[15] Last Minute Concessions is investing in, yes, I did.

[16] **Q:** Okay. You had discussions with a
[17] bank or banks about loaning funds for the golf
[18] course project?

[19] **A:** Correct.

[20] **Q:** Were those discussions about the bank
[21] loaning money to Last Minute Concessions?

[22] **A:** No.

[23] **Q:** Okay. We'll come back to that. So
[24] as I understand it, you never had any communication

Page 143

[1] with anyone about — excuse me — about loaning or
[2] investing funds in Last Minute Concessions; is that
[3] right?

[4] **A:** I never had any conversation with
[5] anyone on behalf of LMC about any loans, no, that's
[6] correct.

[7] **Q:** How about investing money in Last
[8] Minute Concessions?

[9] **A:** No.

[10] **Q:** When did Last Minute Concessions
[11] first learn that there was a question or an issue or
[12] a problem regarding any of the funds that had been
[13] transferred into Last Minute Concessions' account?

[14] **A:** I guess the first indication would
[15] have been Bob Sears' request to me to call I think
[16] it was Mr. Johnson his name was.

[17] **Q:** Okay. And what indication did you
[18] get at that time from Mr. Sears that there was a
[19] question or a problem regarding the funds transfer?

[20] **A:** He just asked if I could call him and
[21] clarify it and that indicates that something, but
[22] other than that it would be when we were served with
[23] the lawsuits.

[24] **Q:** That would be Schwab's lawsuit, paper

Page 144

[1] from Schwab's lawsuit?

[2] **A:** I think yours was first, yes. I'm
[3] not sure which one.

[4] **Q:** All right. And did you — how did
[5] you receive word of either Schwab's lawsuit or SEC's
[6] lawsuit, whichever one you heard of first? How did
[7] you first learn of those?

[8] **A:** I'm trying to think. I think my wife
[9] called me because it was — I'm not sure if this was
[10] the first one or not, but it sticks out in my head
[11] because she was served at our house on one of the
[12] two when it was on our wedding anniversary so that
[13] kind of definitely sticks out in my mind. I'm not
[14] sure if that was the first one, but that one went
[15] over the best.

[16] **Q:** All right. And when you learned that
[17] from your wife, what did you do?

[18] **A:** Panicked. I think I called Tom
[19] shortly after.

[20] **Q:** All right. And did you speak with
[21] Mr. Sears?

[22] **A:** Yes. I don't know if that was first
[23] but, yes, I spoke with him.

[24] **Q:** Where were you when your wife called

Page 145

[1] with this news?
[2]    A: At the golf course.
[3]    Q: All right. And were you still at the
[4] golf course when you spoke with Mr. Sears the first
[5] time about the lawsuit?
[6]    A: I'm not sure.
[7]    Q: Was it in person or by telephone that
[8] you spoke with Mr. Sears?
[9]    A: I'm not sure on that either.
[10]    Q: Tell me what did you say and what did
[11] he say?
[12]    A: I just asked him what is this all
[13] about, and he didn't really have any definite
[14] answers, you know, but he didn't have any answers at
[15] that time. It just seemed to be getting worse as
[16] time went on so...
[17]    Q: Let's just stick with this first
[18] conversation. What did he say? Would it be fair to
[19] say that you told him you had an irate call from
[20] your wife you'd been served with papers on some
[21] lawsuit and is that a fair statement of at least
[22] some of what you told him?
[23]    A: Yes.
[24]    Q: And what was his response?

Page 146

[1]    A: He's trying to — he's looking into
[2] what the problem is. He doesn't understand, you
[3] know. That was the gist of it but remembering
[4] specific conversation, I mean I must have talked to
[5] Bob Sears a hundred times or more.
[6]    Q: About the lawsuit? Have you talked
[7] with Mr. Sears a hundred times or more about the
[8] lawsuit?
[9]    A: It could be. You know, I don't know.
[10] I'm sure. It's over a year. I'm sure it's a number
[11] of times.
[12]    Q: What did Last Minute Concessions do?
[13] Other than your call to Mr. Sears what did Last
[14] Minute Concessions do on learning that there had
[15] been a lawsuit filed calling into question these
[16] funds that had transferred into the Last Minute
[17] Concessions account?
[18]    A: Hired counsel. I'm sure I discussed
[19] it with my other golf course and condo partners
[20] because they knew of it because they were also
[21] relief defendants or the corporations were relief
[22] defendants.
[23]    Q: Did you or anyone else on behalf of
[24] Last Minute Concessions speak to or attempt to speak

Page 147

[1] to any of the people who transferred funds to Last
[2] Minute Concessions' account?
[3]    A: No.
[4]    Q: Has Last Minute Concessions taken any
[5] action to try to reimburse any of the people who
[6] transferred funds to the LMC account?
[7]    A: We had no way to do that, no.
[8]    Q: Has anyone acting on behalf of Last
[9] Minute Concessions communicated with Len Axelrod of
[10] Orange, Connecticut?
[11]    A: I don't know that person, no.
[12]    Q: Has anyone acting on behalf of Last
[13] Minute Concessions communicated with a Pat Cunne,
[14] C-U-N-N-E, of Wallingford, Connecticut?
[15]    A: No, I don't know.
[16]    Q: Has anyone acting on behalf of Last
[17] Minute Concessions communicated with a Salvatore
[18] Ameceo from Ludlow, Massachusetts?
[19]    A: I think Salvatore, he is — I know
[20] Sal and I think at the time I talked with Sal it was
[21] Bob Sears was trying to — there were so many
[22] different ideas going around, but he was trying to
[23] reraise money to make these current investors whole,
[24] and I think Sal was a person who had indicated to me

Page 148

[1] that if there was anything he could do to help, you
[2] know, let him know and I think that's where that
[3] probably comes from because I was obviously I'm
[4] trying to, you know, help this go away too. Nobody
[5] wants this.
[6]    Q: Well, what did you and Mr. Ameceo
[7] discuss in terms of the golf course or Last Minute
[8] Concessions?
[9]    A: Just that there were some lawsuits,
[10] problems of which I don't fully understand. I knew
[11] according to Bob Sears that there was a, you know,
[12] possibility of if there was a reraising of funds,
[13] that somehow something could get worked out and, you
[14] know, he was willing to listen and that was about
[15] it. I mean nothing, no concrete, nothing concrete.
[16]    Q: Has Mr. Ameceo ever indicated to you
[17] that Robert Sears had approached him about investing
[18] in the golf course through Last Minute Concessions?
[19]    A: No.
[20]    Q: Has anyone acting on behalf of Last
[21] Minute Concessions communicated with Tim Walko?
[22]    A: He's my cousin.
[23]    Q: Okay. And does Mr. Walko have any
[24] connection with the golf course or Last Minute

Page 149

[1] Concessions?

[2] **A:** No.

[3] **Q:** To your knowledge has Mr. Walko been

[4] approached about investing in the golf course or

[5] loaning money to the golf course either directly or

[6] through Last Minute Concessions?

[7] **A:** Again it would be the same

[8] conversation that I had but Bob Sears had no

[9] conversation.

[10] **Q:** I'm sorry, Bob Sears had no...

[11] **A:** No conversation with Tim Walko.

[12] **Q:** So the conversation you had was what?

[13] **A:** Well, this is the predicament that

[14] has arose and, you know, the same thing as I thought

[15] that he might be a possibility to be a person that

[16] could help with the reraising of the original $2

[17] million.

[18] **Q:** By the reraising, you mean raising

[19] funds to repay the people who had transferred money

[20] into the Last Minute Concessions account?

[21] **A:** Correct.

[22] **Q:** Okay. Is that something that

[23] Mr. Walko has indicated any interest in doing?

[24] **A:** No, he doesn't have the money.

Page 150

[1] **Q:** Okay. How about Mr. Ameceo? Has he

[2] indicated any interest in participating in any

[3] reraising of the money as you said to pay back the

[4] people who transferred funds to Last Minute

[5] Concessions' account?

[6] **A:** He did at the time. You know, I

[7] don't know about now.

[8] **Q:** Okay. Has anyone acting on behalf of

[9] Last Minute Concessions communicated with Jack

[10] Holmes?

[11] **A:** Hulmes.

[12] **Q:** Hulmes?

[13] **A:** It's a U instead of an O. He again

[14] was a member — he was a person who had given money

[15] to Cold Spring Golf Course and he knew — he came to

[16] us, and us being myself and Ed, wanting to know if

[17] there was some way he could help out and, you know,

[18] he was another guy that we, you know, tried to talk

[19] to and see if he wanted to do something. He had

[20] indicated that he would be willing to help out too

[21] in some level.

[22] **Q:** Help out in connection with as you

[23] say reraising the funds?

[24] **A:** Correct.

Page 151

[1] **Q:** Okay. How about Harry or Joanne

[2] Corey? Did anyone acting on behalf of Last Minute

[3] Concessions communicate with them?

[4] **A:** They are Bob Sears' brother and

[5] sister, brother-in-law and sister so he has probably

[6] called them.

[7] **Q:** Do you know —

[8] **A:** I know them.

[9] **Q:** Do you know whether he, Mr. Sears,

[10] approached them about investing in the golf course

[11] through the Last Minute Concessions at any time?

[12] **A:** I think it was after all this

[13] happened. I believe.

[14] **Q:** After the lawsuit was filed?

[15] **A:** I believe so.

[16] **Q:** Okay.

[17] **MR. LESSER:** You can just testify

[18] as to what you know.

[19] **Q:** Now, let me show you again Exhibits

[20] 9 and 10; ask you if Last Minute Concessions has

[21] paid the subscription or purchase prices that are

[22] provided in those agreements?

[23] **A:** If both of those add up to $2

[24] million, which I'm sure they do, yes, Last Minute

Page 152

[1] Concessions has.

[2] **Q:** Okay. 1.725 million and 275,000 for

[3] a total of two million, Last Minute Concessions has

[4] paid those two subscription prices; correct?

[5] **A:** Correct.

[6] **Q:** And is Last Minute Concessions the

[7] owner of the numbers of shares of Cold Spring Golf

[8] Course, Inc. as set forth in Exhibit 9?

[9] **A:** Yes.

[10] **Q:** Okay. And is Last Minute Concessions

[11] the owner of the number of shares of Cold Spring

[12] Development, Inc. as set out in Exhibit 10 — that

[13] is, 205 shares?

[14] **A:** Yes.

[15] **Q:** Okay. Was there a transfer of shares

[16] in Cold Spring Golf Course, Inc. to Last Minute

[17] Concessions in addition to what is provided for in

[18] Exhibit 9?

[19] **A:** Could you repeat that.

[20] **Q:** Was there a transfer of Cold Spring

[21] Golf Course, Inc. stock to Last Minute Concessions

[22] in addition to what is provided for the 1,117 shares

[23] provided in Exhibit 9?

[24] **A:** I think transfer — I think I know

Charles Schwab & Co., Inc. v. Sears, et al.
Case 3:00-cv-30170-MAP   Document 141   Filed 10/31/02   30(b)(6) Dep. of James Casagrande
pp. 1-219
August 29, 2001

Page 153

[1] what you're talking about, but I think that was in
[2] my main alone not LMC. I'm not sure. If you could
[3] be more specific, maybe...
[4]    Q: All right. Let me show you a
[5] document. Let me show you what we marked as Exhibit
[6] 2 which appears to be a stock certificate for Cold
[7] Spring Golf Course, Inc. listing Last Minute
[8] Concessions, Inc. as the owner of 230 shares. The
[9] date is July 2, 1999. Is that the stock transfer
[10] that you were thinking of a moment ago?
[11]    A: Yes.
[12]    Q: Okay. And how did this stock
[13] certificate come to be issued to Last Minute
[14] Concessions?
[15]    A: That Mark Kramer sold some golf
[16] course stock and some condo stock. I was again only
[17] interested, I being Last Minute Concessions, was
[18] only interested in the golf course stock and Ed and
[19] John Marchand bought the condo shares.
[20]    Q: Okay. And what was the consideration
[21] paid for these 230 shares?
[22]    A: 87,500.
[23]    Q: Where did the 87,500 come from?
[24]    A: Bob Sears.

Page 154

[1]    Q: All right. And where — let me
[2] understand how this happened. Are these 230 shares
[3] part of the 1,117 shares provided for in Exhibit 9?
[4]    A: No.
[5]    Q: They're in addition to?
[6]    A: Correct.
[7]    Q: Okay. What was the arrangement
[8] between Last Minute Concessions and Mr. Sears with
[9] respect to that $87,500?
[10]    A: There wasn't one.
[11]    Q: Well, how was it that Mr. Sears came
[12] to provide $87,500?
[13]    A: He gave 87,500 to me which I
[14] deposited into the Westover Golf Course account as I
[15] was still there at the time, and I wrote a check out
[16] of the Westover Golf Course account and I believe,
[17] if I remember correctly, it was wrote out to Mark
[18] Kramer.
[19]    Q: Okay. And this was in late June,
[20] early July of 1999 —
[21]    A: Sounds right.
[22]    Q: — that this occurred then? This
[23] payment from Mr. Sears into your Westover golf club
[24] account occurred after Mr. Sears had given you his

Page 155

[1] Last Minute Concessions stock?
[2]    A: Unsure. I'm unsure.
[3]    Q: Well, let's see if we can understand
[4] how this fits together. The agreements that you
[5] have, 9 and 10 we discussed this morning, those are
[6] dated June, 1999. As I recall your testimony this
[7] morning, it was that as of the time those agreements
[8] were signed, Mr. Sears had assigned to you his Last
[9] Minute Concessions stock; is that correct?
[10]    A: That's correct.
[11]    Q: All right. So if this stock was
[12] purchased in let's say for sake of discussion maybe
[13] late June, the date on it is July 2, 1999, that was
[14] at a time in which Mr. Sears no longer owned Last
[15] Minute Concessions stock; is that correct?
[16]    A: That would be true.
[17]    Q: All right. And that was also then at
[18] a time in which Mr. Sears was neither president nor
[19] director of Last Minute Concessions?
[20]    A: Yes.
[21]    Q: Okay. Why did Mr. Sears advance to
[22] you $87,500? Was this a loan?
[23]    A: Yes.
[24]    Q: And are there any documents in

Page 156

[1] existence that record that loan?
[2]    A: Just the deposit and the check to
[3] Mark Kramer.
[4]    Q: Any document that records your
[5] obligation to repay this amount to Mr. Sears?
[6]    A: No.
[7]    Q: What were the terms of the loan? By
[8] that I mean — let's take them one at a time. Was
[9] there interest payable?
[10]    A: There was no documentation.
[11]    Q: Well, whether or not it was in a
[12] document, did you have an agreement with Mr. Sears
[13] as to whether or not you will pay interest on the
[14] $87,500?
[15]    A: Did I have an agreement, no.
[16]    Q: Did you have an agreement with
[17] Mr. Sears as to when you would repay the $87,500?
[18]    A: No.
[19]    Q: And I say you, was the loan to you
[20] James Casagrande individually or to Last Minute
[21] Concessions?
[22]    A: Again that's what I was — that's why
[23] I hesitated on your prior question, but according to
[24] the stock certificate, it says Last Minute

30(b)(6) Depo of James Casagrande
August 29, 2001

vol. 1
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 53 of 142
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

Page 157

[1] Concessions.

[2] However, that doesn't mean — we've
[3] done a lot of things that aren't — this may have
[4] been issued incorrectly but...

[5] Q: Well, for the moment I'm not focusing
[6] on whose name the stock certificate should be in but
[7] rather who the loan was to. Was the loan to you or
[8] to Last Minute Concessions, this $87,500?

[9] A: It was never discussed. It was an
[10] opportunity to buy and he gave the money to me
[11] without question, and I took it without question.
[12] We didn't talk about those things.

[13] Q: But you took it with the
[14] understanding that it was a loan; right?

[15] A: Mm-hmm.

[16] Q: You need to say yes or no.

[17] A: Yes.

[18] Q: To be repaid at some point?

[19] A: Yes.

[20] Q: When?

[21] A: When I had the money to do it.

[22] Q: Was there any understanding on your
[23] part or any discussion with Mr. Sears as to whether
[24] this loan would be repaid in a lump sum or

Page 158

[1] installments?

[2] A: No.

[3] Q: Has Mr. Sears — let me list what I
[4] can remember and you tell me if I'm wrong. Based on
[5] your testimony today as I understand it Mr. Sears
[6] loaned $21,000 to the golf course project; is that
[7] correct?

[8] A: I believe so.

[9] Q: You have an entry in Exhibit 11 that
[10] he is being repaid for a loan of 21,000. Do you
[11] have any doubt in your mind as to whether or not
[12] Mr. Sears in fact loaned $21,000 to the golf course
[13] project?

[14] A: I don't have doubt of it but I don't
[15] have the deposit slip or anything right in front of
[16] me, and I have no reason to doubt that he.

[17] Q: Okay. Is it possible that Mr. Sears
[18] in fact loaned more than 21,000 to the golf course?

[19] A: It could be possible.

[20] Q: And Mr. Sears loaned $87,500 to you
[21] or Last Minute Concessions to purchase 230
[22] shares; correct?

[23] A: That's correct.

[24] Q: Did Mr. Sears loan you or Last Minute

Page 159

[1] Concessions or the golf course project any amounts
[2] other than those two amounts we talked about?

[3] A: No.

[4] MR. SNYDER: I have no further
[5] questions in this deposition. I have some questions
[6] for Mr. Casagrande in his individual capacity. One
[7] of my colleagues, you may want to switch seats.

[8] MR. HUNTINGTON: I think I'm fine
[9] from here. If it doesn't work, I'll trade seats.

[10]

[11]                 CROSS-EXAMINATION
[12]              BY MR. HUNTINGTON:

[13] Q: Good afternoon, Mr. Casagrande. My
[14] name is Frank Huntington. I'm an attorney
[15] representing the Securities and Exchange
[16] Commission.

[17] As Mr. Snyder mentioned earlier, this
[18] deposition is also being taken in connection with
[19] our case in which you and Last Minute Concessions —

[20] (Off the record.)

[21]              BY MR. HUNTINGTON:

[22] Q: Mr. Casagrande, I have a few
[23] questions to ask you. I'll try not to repeat
[24] questions that Mr. Snyder did, but we'll see how it

Page 160

[1] goes.

[2] When you and Mr. Sears formed Last
[3] Minute Concessions, did you receive stock
[4] certificates for your interest in Last Minute
[5] Concessions?

[6] A: Yes.

[7] Q: You each got a certificate for 100
[8] shares; is that right?

[9] A: I'm not sure if it was for 100, but I
[10] remember seeing a stock certificate.

[11] Q: When Mr. Sears surrendered his stock
[12] in the company to you, did he do anything to endorse
[13] that stock certificate over to you?

[14] A: I don't know.

[15] Q: Do you know where his stock
[16] certificate is today?

[17] A: No.

[18] Q: Did he give it to you at any point?

[19] A: No.

[20] Q: Is it safe to say that if one looked
[21] at the books and records of Last Minute Concessions,
[22] there is nothing in writing that would reflect
[23] Mr. Sears' surrender of his stock interest to you?

[24] A: That I don't know. I know that I

Page 161

[1] didn't do it so I haven't looked at them recently so
[2] I don't know.
[3]    Q: Well, sitting here today you're not
[4] aware of any documents in your possession, documents
[5] of Last Minute Concessions in your possession, that
[6] would reflect Mr. Sears' surrender of his stock
[7] interest to you; is that right?
[8]    A: That's correct.
[9]    Q: Are you aware of anybody else who has
[10] any what would be considered books and records of
[11] Last Minute Concessions besides yourself?
[12]    A: No, shouldn't have.
[13]    Q: Other than copies you might have
[14] given your attorney; I don't need to ask you about
[15] those.
[16]    A: Right.
[17]    Q: So you can't think of anybody else
[18] who might have possession of a document reflecting
[19] Mr. Sears' transfer of his stock interest in Last
[20] Minute Concessions to you?
[21]    A: No.
[22]    Q: Is that correct?
[23]    A: That's correct.
[24]    Q: And is the same true for Mr. Sears'

Page 162

[1] resignation as an officer of the company?
[2]    A: That's correct.
[3]    Q: He never submitted a letter of
[4] resignation, did he?
[5]    A: Not to my knowledge.
[6]    Q: You've never seen one?
[7]    A: No.
[8]    Q: He never told you that he submitted
[9] one, did he?
[10]    A: Orally we talked about all of those
[11] things.
[12]    Q: Did that — strike that. Is the same
[13] true for his resignation as a director of the
[14] company? There's nothing in writing that reflects
[15] that; correct?
[16]    A: That I'm aware of, right.
[17]    Q: When you say that you discussed it
[18] with him, are you recalling a single conversation
[19] you had with him in which he said I'm giving up my
[20] stock, my position as president, my position as a
[21] director?
[22]    A: I'd say that happened numerous times.
[23]    Q: Do you recall the first time you
[24] talked about it with him?

Page 163

[1]    A: It was probably that night or day
[2] that he made the comment to me if we were in this
[3] together with Last Minute Concessions as it was when
[4] it was formed, it's like, you know, me hitting a
[5] double and as opposed to without him being involved
[6] and LMC it's like me hitting a home run. He doesn't
[7] need to be involved.
[8]    Q: Did he explain why he had that view
[9] that you were better off without him and Last Minute
[10] Concessions in terms of going forward with the Cold
[11] Spring project?
[12]    A: Just that there wasn't a need to have
[13] him. I was the person that knew how to run the golf
[14] course, and there wasn't really a need to have him
[15] be a partner.
[16]    Q: There wasn't in your opinion —
[17] strike that. In your view — strike that again. ·
[18] You didn't need Mr. Sears to run the
[19] golf course, did you?
[20]    A: That's correct.
[21]    Q: You thought you knew how to do that
[22] yourself; correct?
[23]    A: Yes.
[24]    Q: But isn't it correct that you did

Page 164

[1] need Mr. Sears to find the money?
[2]    A: Yes.
[3]    Q: As you testified earlier you
[4] certainly didn't have any access to $2 million on
[5] your own; right?
[6]    A: That's correct.
[7]    Q: At the time you started having these
[8] conversations with Mr. Sears, did you understand
[9] that he had access to as much as $2 million that
[10] there might be available for investing in this
[11] project?
[12]    A: Sure.
[13]    Q: Did he tell you that he thought he
[14] could raise that much money?
[15]    A: Yes.
[16]    Q: And did he tell you anything about
[17] what he wanted in exchange for raising that $2
[18] million?
[19]    A: No.
[20]    Q: In your conversations with him he
[21] said nothing about getting anything in return, is
[22] that right, in return for the $2 million that he
[23] said he could raise for you?
[24]    A: There was going to be nothing from

30(b)(6) Depo of James Casagrande
August 29, 2001

vol. 1
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 55 of 142
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

Page 165

[1] the golf course. I always understood that my stock
[2] in Last Minute Concessions would be used as
[3] collateral for these investors' loan into Last
[4] Minute Concessions which bought the stock in the
[5] golf course and the condo project.
[6]     **Q:** But Mr. Sears never said to you that
[7] in exchange for raising $2 million for the project
[8] that he wanted perhaps a finders fee?
[9]     **A:** No.
[10]    **Q:** Or a commission?
[11]    **A:** No.
[12]    **Q:** Or a stock interest in some other
[13] entity going forward?
[14]    **A:** No.
[15]    **Q:** Okay. Did you have any understanding
[16] whether Mr. Sears was out there trying to raise the
[17] money through an entity that he was going to
[18] participate in?
[19]    **A:** No.
[20]    **Q:** Mr. Snyder showed you earlier today a
[21] couple of documents that appear to be kind of drafts
[22] of possible agreements between Last Minute
[23] Concessions and a company called Coastal; do you
[24] recall those?

Page 166

[1]     **A:** I remember seeing them, yes.
[2]     **Q:** Do you have Exhibits 21 and 30 in
[3] front of you?
[4]     I believe you testified earlier you
[5] hadn't seen these documents before?
[6]     **A:** That's correct.
[7]     **Q:** Before today?
[8]     **A:** That's correct.
[9]     **Q:** Okay. Do they not appear to reflect
[10] Mr. Sears' — strike that.
[11]    Does it appear to you from the face
[12] of the documents themselves that Mr. Sears may have
[13] an interest in a company called Coastal or 2 Ocean
[14] Avenue, and I'll direct your attention to Exhibit 30
[15] where it appears that he's going to sign on behalf
[16] of 2 Ocean Avenue.
[17]    **MR. LESSER:** I'm going to object.
[18] The document speaks for itself.
[19]    **MR. HUNTINGTON:** I know. It's a
[20] foundation question.
[21]    **Q:** I know you haven't seen this before,
[22] but you agree with me that the document — according
[23] to the document at least Mr. Sears would be signing
[24] on behalf of 2 Ocean Avenue?

Page 167

[1]     **A:** It appears that way.
[2]     **Q:** Okay. Which according to the front
[3] of the Exhibit 30 is Coastal Investors doing
[4] business as 2 Ocean Avenue?
[5]     **A:** Right.
[6]     **Q:** Is that correct?
[7]     **A:** That's what the document appears,
[8] yes.
[9]     **Q:** Okay. Did Mr. Sears have any
[10] discussions with you about whether he was raising
[11] money that would be invested through a company in
[12] which he would have an interest?
[13]    **A:** No.
[14]    **Q:** Did he ever discuss with you that he
[15] was raising money that would be invested through a
[16] company called Coastal Investors?
[17]    **A:** I remember the name Coastal
[18] Investors, yes.
[19]    **Q:** And what do you remember about the
[20] name Coastal Investors?
[21]    **A:** I thought that Coastal Investors was
[22] the first and it was the long-term investor for the
[23] $2 million that Bob came up with initially.
[24]    **Q:** And was Mr. Sears your only source of

Page 168

[1] information about Coastal Investors?
[2]     **A:** Yes.
[3]     **Q:** And what did he tell you about
[4] Coastal Investors?
[5]     **A:** Nothing.
[6]     **Q:** Okay. Do you recall when he first
[7] mentioned to you that Coastal Investors might be
[8] investing in Last Minute Concessions?
[9]     **A:** It was well before permitting which
[10] was beginning of 2000. Sometime in '99. Probably
[11] early '99. Could be like that.
[12]    **Q:** When you had — in your first
[13] discussions with Mr. Sears about whether he could
[14] raise $2 million for Last Minute Concessions to
[15] invest in the Cold Spring project, did he say
[16] anything to you about where he thought he could get
[17] the money from?
[18]    **A:** Not really but he just expressed his
[19] confidence in being able to raise the money.
[20]    **Q:** Did he say anything to you about
[21] raising the money from his current advisory clients?
[22]    **A:** Nothing specific, no.
[23]    **Q:** Did you ever ask him why he was so
[24] confident that he could raise the $2 million?

Page 169

[1]    A: No, I didn't feel I needed to. He
[2] was a good friend. I trusted him. I had no reason
[3] to.
[4]    Q: It didn't matter to you where he
[5] raised the money; is that correct?
[6]    A: That's correct.
[7]    Q: Did you ever have any — strike
[8] that. While Mr. Sears was out trying to raise the
[9] $2 million for Last Minute Concessions, did you have
[10] any discussions with any of the three gentlemen from
[11] the Cold Spring companies, Mr. Waszkelewicz if I get
[12] that right, Mr. Marchand or Mr. Kramer, about what
[13] Mr. Sears was doing trying to raise the money?
[14]    A: No, other than he was — other than
[15] the statement he's raising money, no.
[16]    Q: From your conversations with them did
[17] it appear that they were talking to him directly
[18] about what he was doing?
[19]    A: No.
[20]    Q: Do you think as far as you know were
[21] you their only source of information about what he
[22] was up to raising the money?
[23]    A: I'd say yes. I don't know of any
[24] other conversation.

Page 170

[1]    Q: And did you say anything to them
[2] about where you thought he was trying to raise the
[3] money from?
[4]    A: I mentioned that it was I'm sure from
[5] numerous clients that he has or had; I assumed he
[6] has anyway.
[7]    Q: So you understood — isn't it true
[8] that at least one of the sources that Mr. Sears was
[9] hoping to tap for the $2 million was his existing
[10] advisory clients?
[11]    A: I'd have to say no because I don't
[12] know that for sure.
[13]    Q: As of the middle of 1999, did you
[14] have an understanding of how many advisory clients
[15] Mr. Sears had?
[16]    MR. LESSER: Can you indicate for
[17] the record how you're using the word advisory
[18] clients.
[19]    MR. HUNTINGTON: Maybe advisory —
[20] strike that.
[21]    Q: As of the middle of —
[22]    MR. HUNTINGTON: Thanks, Tom.
[23]    Q: As of the middle of 1999 what did you
[24] understand Mr. Sears' business to be?

Page 171

[1]    A: At our jointly used office?
[2]    Q: Right.
[3]    A: He did some tax returns. However, he
[4] had indicated numerous times that his main focus was
[5] investing clients' money.
[6]    Q: Okay. Did you — as of the middle of
[7] 1999 did you have any understanding of how many
[8] clients Mr. Sears was serving in that capacity?
[9]    A: Just guesses, you know. I mean he
[10] was pretty busy. I see a lot of people coming in
[11] and out. It would be a guess.
[12]    Q: Did he ever tell you how many clients
[13] he had?
[14]    A: No.
[15]    Q: Did he ever tell you how much money
[16] of his clients he was in some fashion managing for
[17] them?
[18]    A: No.
[19]    Q: Did you have any understanding of the
[20] scale of his advisory business?
[21]    A: It seemed to me that he was doing
[22] quite well, but like a dollar volume or something,
[23] no, no idea.
[24]    Q: In Exhibits 9 and 10, the Last Minute

Page 172

[1] Concessions agreements with Cold Spring Development
[2] and Cold Spring Golf Course, each agreement required
[3] a down payment or a deposit of $50,000; is that
[4] correct?
[5]    A: Yes.
[6]    Q: Did Last Minute Concessions pay the
[7] $50,000 that was due under each contract as a
[8] deposit?
[9]    A: Yes.
[10]    Q: Do you know where it got the money
[11] from?
[12]    A: No. No.
[13]    Q: Were you present when checks were
[14] paid over from Last Minute Concessions to somebody
[15] on behalf of Cold Spring Development or Cold Spring
[16] Golf Course?
[17]    A: No.
[18]    Q: And by checks I meant the two $50,000
[19] checks that would seem to be required for the two
[20] agreements?
[21]    A: I think it might have been one
[22] 100,000 but yes, but where that came from I'm not
[23] sure.
[24]    Q: At the time as of June of 1999 was

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 57 of 142

vol 1
pp. 1-219

Charles Schwab & Co., Inc.  v.
Sears, et al.

---

**Page 173**

[1] Mr. Sears responsible for finding the money that
[2] would be used for the down payment or the deposit I
[3] should say?
[4] **A:** Yes, because that was part of the two
[5] million.
[6] **Q:** Did he ever say anything to you
[7] about where the $100,000 for those two deposits had
[8] come from?
[9] **A:** Not that I remember.
[10] **Q:** Now, both agreements provide that
[11] once the stock subscription is executed, you and
[12] Mr. Sears would be appointed directors of the two
[13] companies; is that correct?
[14] **A:** Yes.
[15] **Q:** And did that actually happen?
[16] **A:** The actual appointing of us as
[17] directors I don't believe it ever was, no.
[18] **Q:** Have you ever attended a directors
[19] meeting of either company?
[20] **A:** Yes, I have, recently.
[21] **Q:** How many meetings?
[22] **A:** Formal meetings one or two.
[23] **Q:** Did you attend — strike that. When
[24] did those meetings take place?

---

**Page 174**

[1] **A:** I don't have exact dates. One was
[2] within a month where Ed, Mark, John and myself got
[3] together to discuss a possible sale that we were
[4] hoping to have happen.
[5] **Q:** Did you attend — the board meetings
[6] that you just referred to, did you attend them as a
[7] director of the companies?
[8] **A:** Yes.
[9] **Q:** Between the time when Last Minute
[10] Concessions paid the $2 million and the meetings
[11] that you just described, were there other meetings
[12] of the Board of Directors of the two companies?
[13] **A:** Not a formal meeting. No, there were
[14] times when two, three of us would be together but no
[15] formal meeting.
[16] **Q:** During that period from the time that
[17] Last Minute Concessions paid the $2 million until
[18] the formal meetings that you just described, did you
[19] consider yourself to be a director of the two
[20] companies?
[21] **A:** I did, yes.
[22] **Q:** As far as you can tell did
[23] Mr. Waszkelewicz, Mr. Kramer and Mr. Marchand also
[24] consider you a director of the two companies?

---

**Page 175**

[1] **A:** Considering they sent me notification
[2] of the last meeting, yes, I would say they also
[3] considered me a director.
[4] **Q:** Okay. During that same time period,
[5] did you consider Mr. Sears to be a director of the
[6] two companies?
[7] **A:** No.
[8] **Q:** As far as you can tell did
[9] Mr. Waszkelewicz, Mr. Kramer or Mr. Marchand
[10] consider Mr. Sears to be a director during any of
[11] that period from the payment of the two million
[12] until the formal meetings that you mentioned a few
[13] moments ago?
[14] **A:** I'd have to say no.
[15] **Q:** Can you tell me why you considered
[16] yourself a director but not Mr. Sears during the
[17] periods that we just talked about?
[18] **A:** Just from the daily interaction with
[19] all of my partners and the way we talked. I guess
[20] that's the only indication per se.
[21] **Q:** Well, as the documents reflect and as
[22] you testified a moment ago, upon payment of the
[23] money by Last Minute Concessions and upon receipt of
[24] the stock, Mr. Sears was supposed to become a

---

**Page 176**

[1] director; isn't that true?
[2] **A:** Yes.
[3] **Q:** Can you give me any reason why in
[4] your view that didn't happen?
[5] **A:** Well, as you've probably seen with
[6] much of all of the documentation of everything,
[7] many, many things weren't necessarily done.
[8] Everyone trusted everyone, that's the way I felt,
[9] and Ed and myself were so focused on getting this
[10] golf course built and off the ground and Mark Kramer
[11] moved down to Atlanta, Georgia and he was really out
[12] of the area and John Marchand was working in two
[13] different, you know, Boston and Hartford and they
[14] didn't really seem to, you know, be involved.
[15] Just things weren't done that
[16] probably should have been done.
[17] **Q:** So based on the way you concluded
[18] that answer, is it your view that Mr. Sears should
[19] have been treated as a director but for some reason
[20] he wasn't?
[21] **A:** Yes, he should have been.
[22] **Q:** Did you ever during the period from
[23] the payment of the $2 million until the filing of
[24] the two lawsuits that have led us here today did you

---

**Min-U-Script®**

Page 177

[1] have any discussions with Mr. Waszkelewicz,

[2] Mr. Kramer or Mr. Marchand about whether Mr. Sears

[3] was a director or was not a director of the two

[4] companies?

[5] A: No.

[6] Q: Did the subject of — during that

[7] same time period, did the subject of whether you

[8] were a director of the two companies ever come up in

[9] your discussions with those three gentlemen?

[10] A: No.

[11] Q: So all right. As far as you know

[12] have Cold Spring Development or Cold Spring Golf

[13] Course ever taken any formal action to remove

[14] Mr. Sears as a director?

[15] A: Not to my knowledge, no.

[16] Q: Can I ask you to take a look at

[17] Exhibit 23. It's the thick one with the clip on

[18] it.

[19] A: Mm-hmm.

[20] Q: And if you could flip through to tab

[21] 2A.

[22] A: Mm-hmm.

[23] Q: Why don't you start at the front,

[24] please. Okay. Is it correct that the documents

Page 178

[1] that are collected as tab 2A and it goes from page

[2] one, actually I'm not sure how many pages there are,

[3] but are all of those documents copies of bank

[4] statements for Last Minute Concessions' bank account

[5] at BankBoston which then became Fleet?

[6] A: One moment.

[7]   (Pause.)

[8] A: They appear to be.

[9] Q: And is it correct that these

[10] statements cover the opening of the account on or

[11] about February 10th of 2000 and running through the

[12] end of August of 2000?

[13] A: Yes.

[14] Q: And these statements were sent to

[15] Last Minute Concessions at the joint address on

[16] Hawley Street we talked about before?

[17] A: That's correct.

[18] Q: When it came in, did you take

[19] possession of these statements?

[20] A: Right away, no. They went on to my

[21] little mailbox area, but I probably didn't even look

[22] at them for sometimes months.

[23] Q: Okay. As of the time covered by

[24] these statements from February to August of 2000,

Page 179

[1] you were the person responsible for this Last Minute

[2] Concessions bank account; correct?

[3] A: Yes.

[4] Q: If the mail came in to the

[5] secretary, I forgot her name?

[6] A: Brenda.

[7] Q: Brenda, she'd hold these statements

[8] for you; is that correct?

[9] A: Yes, she'd put them on my desk or

[10] whatever.

[11] Q: You didn't necessarily look at them

[12] when they came in?

[13] A: Definitely not. That's for sure.

[14] Q: Okay. If you look at the first page

[15] down at the bottom, you'll see a reference to what

[16] appears to be a $500,000 wire transfer. Do you see

[17] that?

[18] A: Yes, I do.

[19] Q: And this particular transfer is from

[20] who?

[21] A: Mark Futter, Thomas Mark Futter.

[22] Q: Do you have any recollection of this

[23] transfer coming in to Last Minute Concessions?

[24] A: Yes.

Page 180

[1] Q: Do you recall how soon after it

[2] happened you learned about it?

[3] A: That one I think it was probably the

[4] day it came in.

[5] Q: Okay. Do you have Exhibit 11.

[6]   (Off the record.)

[7] Q: Mr. Casagrande, showing you again

[8] Exhibit 11 which is the register report for this

[9] same checking account.

[10] A: Yes.

[11] Q: I believe you testified that you

[12] prepared it?

[13] A: Yes.

[14] Q: How did you prepare it?

[15] A: I just asked the computer to print it

[16] out. Gave it the dates. It's a Quicken program.

[17] Gave it the, you know, from beginning to ending and

[18] I think this was in reference to what your office or

[19] Schwab's office asked for.

[20] Q: And how did the data get in your

[21] computer in the first place?

[22] A: I entered it.

[23] Q: What did you use to enter the data?

[24] A: Me manually.

30(b)(6) Depo of James Casagrande,
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 59 of 142

Vol. 1
pp. 1-219

Charles Schwab 1 & 2 Co., Inc.   v.
Sears, et al.

---

Page 181

[1] **Q:** That's in terms of labor. How about
[2] in terms of source of information? Were you looking
[3] at the bank statements that are in Exhibit 23 that
[4] you also have in front of you?
[5] **A:** Yes. This one I probably — I mean
[6] it varies but a lot of this was done other than the
[7] writing of the checks. If you disregard this for a
[8] minute and just use my checkbook and check register,
[9] that was with me pretty much at all times because
[10] there wasn't too many days that went by that I
[11] didn't sign checks.
[12]     This here actual inputting of the
[13] data into Quicken I'm not sure what date I did
[14] that. It might have been, you know, a month or two
[15] months later. I don't know.
[16] **Q:** When you testified earlier that you
[17] probably learned about the transfer from Mr. Futter,
[18] this $500,000 transfer, did you say shortly after it
[19] happened?
[20] **A:** I think I learned that day that a
[21] transfer came in. Whether it was known to me that a
[22] transfer from Mark Futter came in wasn't really
[23] accurate because monies were needed at that time to
[24] close on some land. I would call the bank to see if

Page 183

[1] reason to think that transfer was coming in?
[2] **A:** Yes, I thought it was going to be in
[3] that day.
[4] **Q:** And how did you know that?
[5] **A:** Bob Sears indicated that it should be
[6] there.
[7] **Q:** And what did he say? Did he call
[8] you?
[9] **A:** I either called him or he called me,
[10] I'm not sure.
[11] **Q:** And what did he tell you about the
[12] transfer?
[13] **A:** That a transfer of I'm assuming he
[14] said half a million dollars had come in or was
[15] coming in on the 22nd.
[16] **Q:** Did he say anything to you about
[17] where the money had come from?
[18] **A:** No, not at that time, no.
[19] **Q:** When — strike that. Do you recall
[20] when he first told you the source of this particular
[21] $500,000 transfer?
[22] **A:** It might have been later the next
[23] day, that week. It wasn't too long after that I
[24] learned that Mark Futter had given the money because

Page 182

[1] a transfer came in, any type of transfer. When it
[2] did, apparently it looks like even on that day I
[3] went and got a bank check or wrote a check for the
[4] purchase of some land.
[5] **Q:** Now, is it correct that each of the
[6] transfers in from the investors that you talked
[7] about earlier today are all recorded or reflected on
[8] Exhibit 11?
[9] **A:** They should be.
[10] **Q:** And how did you first learn about the
[11] wire transfers? It sounds like you didn't learn
[12] about them from reading the bank statements; those
[13] came in later. Did the bank call you?
[14] **A:** Most of the times I called the bank
[15] six, seven, ten times a day just seeing if the
[16] transfers had come in on that particular day.
[17] **Q:** Were you already expecting a
[18] particular transfer in and that led you to make the
[19] phone calls or were you calling every day no matter
[20] what?
[21] **A:** Are you talking with this first one?
[22] **Q:** I guess I was talking generally at
[23] the moment. It's probably not a good question.
[24] Let's start with the first one. Did you have some

Page 184

[1] Mark Futter and Bob Sears shortly thereafter getting
[2] the money made a trip up to the golf course, and
[3] that's when I gave him the tour as I said before.
[4] **Q:** I don't want to belabor this by
[5] asking you about each transfer so I'm trying to find
[6] out if there was a pattern.
[7]     There are perhaps somewhere around 20
[8] or more separate transfers that came in from these
[9] various investors. Was it generally the case that
[10] Mr. Sears would call you in advance and let you know
[11] that money was likely to be coming very soon?
[12] **A:** No, more the opposite that I would be
[13] calling him saying, you know, where's the rest of
[14] the $2 million. You know, we need to keep, you
[15] know, we have plenty of bills that we need to keep
[16] paying, closing on land. So probably me calling
[17] him.
[18] **Q:** And when you asked questions like
[19] that to Mr. Sears, what response did you get?
[20] **A:** Usually, you know, it would be
[21] either there's one coming in today for it should be
[22] X amount, you know, it should be there by now. You
[23] know, I'd call the bank, it's not there by now. I'd
[24] call later on. There's one pending to post. You

Charles Schwab & Co., Inc. vs.
Sears, et al.

Case 3:00-cv-30170-MAP    Document 44-1    Filed 10/31/02    Page 60 of 142

Vol. 1
pp. 1-219

30(b)(6) Depo. of James Casagrande
August 29, 2001

Page 185

[1] know, it varied but that's typical.

[2]   Q: Did Mr. Sears ever tell you before

[3] the money came in who in particular was going to be

[4] sending the money?

[5]   A: No.

[6]   Q: So you never knew the names of the

[7] investors before their money arrived?

[8]   A: That's correct.

[9]   Q: Was it generally the case that after

[10] the money arrived you had a discussion with

[11] Mr. Sears and learned who in particular had provided

[12] the money for a particular transfer?

[13]   A: No, for the most part other than for

[14] say Mark Futter, I wasn't really sure on any of the

[15] investors simply because I never really looked at

[16] these sheets here to verify. I didn't even realize

[17] that you get sent a thing that says who it's from.

[18] I didn't even know that, but then I don't know if

[19] it's — it could have even been as late as when the

[20] lawsuits were filed that I actually went back and

[21] saw who they were from. Certainly not on a regular

[22] basis.

[23]   Q: So Mr. Sears wasn't providing you

[24] with a list of where the money was coming from?

Page 187

[1]   Q: Did you understand the people who

[2] were on this list, the investors whose money is

[3] reflected on Exhibit 11, did you understand them to

[4] be the short-term investors that you referred to in

[5] your previous answer?

[6]   A: Once I saw who they were, yes, but as

[7] it was happening, I didn't know who was what,

[8] whether something is long, something is short.

[9]   Q: Well, Mr. Sears — during this period

[10] of time from February through July of 2000,

[11] Mr. Sears never told you he found a long-term

[12] investor, did he?

[13]   A: Not specifically, no.

[14]   Q: Not generally either, did he?

[15]   A: I don't believe so, no.

[16]   Q: So as far as you knew all the money

[17] that was coming in during this period was for

[18] short-term, as the term is being used here,

[19] short-term investors?

[20]   A: Correct.

[21]   Q: Down at the bottom of the Exhibit 11

[22] there's a deposit of $250,000 in the category or —

[23] strike that. The memo says unknown. Do you see

[24] that?

Page 186

[1]   A: No.

[2]   Q: And you weren't looking at the bank

[3] statements with an eye toward making a list yourself

[4] of where the money was coming from?

[5]   A: No. As I said I was just using my

[6] checkbook and check register of course.

[7]   Q: And I take it you — up to the moment

[8] when the first lawsuit was filed, had you seen any

[9] documents reflecting Last Minute Concessions'

[10] obligation to pay back any of these people?

[11]   A: No.

[12]   Q: Up until the time that you learned

[13] about the first lawsuit, did you have any discussion

[14] with Mr. Sears about any specific terms that he had

[15] negotiated with any of the investors?

[16]   A: Other than our terms that I knew from

[17] 8 to 12 percent, that was it and they were going to

[18] be — they were supposed to be long-term but then we

[19] discussed that he was having problems where this

[20] group backed out that was going to be the long-term

[21] and he was going to get these short-term investors

[22] that would be taken over paid by the once he

[23] acquired a long-term investor to take over the same

[24] amount of money.

Page 188

[1]   A: That's 11?

[2]   Q: Down at the very bottom the last item

[3] that's legible.

[4]   A: 250, yes.

[5]   Q: Do you see that deposit?

[6]   A: I do.

[7]   Q: Do you know who provided that

[8] $250,000?

[9]   A: I don't. I don't.

[10]   Q: If I represented to you that it was a

[11] $250,000 check from Mr. Futter, would that refresh

[12] your memory at all?

[13]   A: It very well could have been.

[14]   Q: If — strike that. If Last Minute

[15] Concessions received a check payable to itself, who

[16] was responsible for taking the check to the bank and

[17] making the deposit?

[18]   A: I was the only one that made deposits

[19] into Last Minute Concessions so I guess it would

[20] have been me.

[21]   Q: So it was probably you who deposited

[22] this check, but you don't remember who it was from?

[23]   A: If it was a check, which I'm taking

[24] your word for it, it would have been me that

Page 189

[1] deposited it.

[2] Q: Okay. I noticed at the top of the

[3] list Mr. Futter's transfer of 500,000 comes in on

[4] February 22nd. The next day there's a $440,000

[5] check in connection with the purchase of some land;

[6] do you see that?

[7] A: Yes, I do.

[8] Q: Was Cold Spring legally required to

[9] make a payment for the land at some point on or

[10] around February 22nd like — strike that. Maybe

[11] that's a bad question.

[12]     Was there any particular agreement

[13] which required Last Minute Concessions to make a

[14] payment of that amount around that time?

[15] A: That was the purchase of the largest

[16] parcel of land. Just needed to get working, you

[17] know, on the land to build the golf course.

[18] Q: Was there a purchase and sale

[19] agreement that had some deadline that was coming up

[20] or a closing that was scheduled do you know?

[21] A: There was a closing on the land, yes,

[22] scheduled. That's probably what that was for.

[23] Q: Did you have any discussions with

[24] Mr. Sears shortly before February 22nd that you got

Page 190

[1] a closing coming, we owe a lot of money, we need to

[2] get the money as quickly as possible, something to

[3] that effect?

[4] A: I might have. I honestly I don't

[5] remember.

[6] Q: Now, who was this particular land

[7] purchased from; do you recall that?

[8] A: Probably might have been Zarlan.

[9] Q: If I could ask you to look in the

[10] middle of the page there on March 31st there were

[11] two checks out, one for 440,000, one for 345,000 so

[12] 785,000 total for more purchases of land?

[13] A: Yes.

[14] Q: Okay. Was that also in connection

[15] with a closing on a separate transaction?

[16] A: I believe so.

[17] Q: And in the three days prior or March

[18] 29, March 30th and March 31st, there are a whole

[19] series of deposits from investors; do you see those?

[20] A: Yes.

[21] Q: The Wallaces, the Helterlines,

[22] Virginia Senders; do you see all those?

[23] A: Yes, I do.

[24] Q: I'll represent to you that they total

Page 191

[1] 675,000 so most of the money that was used on March

[2] 31st to buy the land.

[3]     Did you have any discussions with

[4] Mr. Sears just before March 31st about the need to

[5] come up with money for the closing of this other

[6] parcel of land?

[7] A: As I said before I had numerous

[8] discussions. I'm sure there were some near the

[9] 31st, yes.

[10] Q: You were aware that Last Minute

[11] Concessions or Cold Spring was going to have to pay

[12] a large amount of money for this closing and the

[13] company needed the money; correct?

[14] A: Yes. I don't know if it was on that

[15] particular day per se but, yes, I knew we still

[16] needed to purchase more land.

[17] Q: Do you recall having any

[18] conversations with Mr. Sears in the days shortly

[19] before March 31st in which he said that don't worry,

[20] I'll find the money for you so that you can complete

[21] that closing?

[22] A: He fully indicated right along that

[23] he was going to be able to come up with $2 million

[24] if that's what you mean.

Page 192

[1] Q: I guess I am asking if you recall any

[2] more specific conversations with Mr. Sears in

[3] connection with the specific need for that large

[4] amount of money on March 31st?

[5] A: Specifically, no.

[6] Q: Now, as Mr. Snyder went over with you

[7] earlier today, on June 2nd two checks go out for

[8] $142,000. This is the one that led to that problem

[9] with the bank checks?

[10] A: Yes.

[11] Q: And the same day or the day before

[12] somewhere slightly over that amount of money came in

[13] from several investors. Do you see those deposits?

[14] Mr. McLaughlin, the Helterlines?

[15] A: Yes.

[16] Q: Was the money that was paid on June

[17] 2nd something that was required by any particular

[18] contract or just they were demanding payment and you

[19] made the payment?

[20] A: Yes, they would — Tom Jepson would

[21] give us I believe they were weekly bills or biweekly

[22] bills and Four B Development it was like monthly

[23] bills so they were probably just the prior months'

[24] or weeks' bills.

---

Page 193

[1]     Q: Was there ever a point where during
[2] this period covered, the period for February through
[3] July, where Four B said we're not going to do any
[4] more work if we don't get paid on a certain date or
[5] by a certain date?
[6]     A: Yes, I would say that's true.
[7]     Q: Do you recall when that happened and
[8] what the date was approximately?
[9]     A: Not exactly but I know we were late
[10] paying him large sums of money so he may have made
[11] that comment but specifically date...
[12]     Q: Was there correspondence between the
[13] Cold Spring project and Four B where demands for
[14] payment or threats to stop work might be reflected
[15] in writing?
[16]     A: Not to my recollection.
[17]     Q: I won't go over these people name by
[18] name, but did you have any conversations with any of
[19] the investors whose deposits are reflected on
[20] Exhibit 11 before their transfers took place?
[21]     A: No.
[22]     Q: Have you ever had any conversations
[23] with any of those investors in which you discussed
[24] with them what Mr. Sears had said to them prior to

---

Page 194

[1] their investment taking place?
[2]     A: No. Could you explain that?
[3]     Q: It wasn't a very good question, I'm
[4] sorry. While Mr. Sears was out raising money from
[5] investors who are the people listed here, did you
[6] have any discussions with him about what he was
[7] telling the investors about the status of the golf
[8] course project?
[9]     A: I'm sure I did, yes.
[10]     Q: Did you do anything to make sure that
[11] what Mr. Sears was telling investors was accurate?
[12]     A: No. I trusted what he was
[13] representing to the investors accurate. I had
[14] no reason to doubt it wouldn't be.
[15]     Q: As far as you know did
[16] Mr. Waszkelewicz, Mr. Kramer or Mr. Marchand have
[17] any discussions with Mr. Sears during this time
[18] period as to what he was saying to the investors
[19] when he was trying to raise money for the project?
[20]     A: I don't believe so.
[21]     Q: With respect to Josephine Shaw, did
[22] you ever ask her to sign a letter that could be
[23] addressed to Prudential concerning her transfer of
[24] money from her account?

---

Page 195

[1]     A: No. I remember talking with Ms. Shaw
[2] just where Bob Sears asked me to go to her to track
[3] her down. Other than that, no.
[4]     Q: You never presented her with any
[5] documents that she was being asked to sign?
[6]     A: No.
[7]     Q: Do you know if Mr. Sears ever gave
[8] her any documents to sign?
[9]     A: I don't know.
[10]     Q: You mentioned earlier that you were
[11] expecting that Last Minute Concessions would receive
[12] its money out of the project as a percentage of any
[13] profits received by Cold Spring Development or Cold
[14] Spring Golf Course; is that correct?
[15]     A: That's correct.
[16]     Q: Is there anything in writing that as
[17] between Last Minute Concessions and the Cold Spring
[18] companies that concerned the payment of dividends
[19] from the Cold Spring companies to Last Minute
[20] Concessions?
[21]     A: No, other than these documents here.
[22]     Q: The two documents here you're
[23] referring to are Exhibits 9 and 10; is that right?
[24]     A: That's correct.

---

Page 196

[1]     Q: And those documents don't say
[2] anything about payments running from the Cold Spring
[3] companies to Last Minute Concessions, do they?
[4]     A: No.
[5]     Q: The only — under those documents the
[6] only thing that Last Minute Concessions is really
[7] getting is stock in each company; correct?
[8]     A: That's correct.
[9]     Q: So was there anything in writing with
[10] Mr. Waszkelewicz or Mr. Kramer or Mr. Marchand that
[11] provided for money to come from the Cold Spring
[12] companies to Last Minute Concessions?
[13]     A: No.
[14]     MR. HUNTINGTON: I think that any
[15] questions I have left are more appropriate for the
[16] witness in his individual capacity so I'm going to
[17] stop there.
[18]     Bob, do you want to?
[19]     MR. LAURIE: Yes, I just have a
[20] couple quick questions. I'll just yell. Just give
[21] me one second.
[22]
[23]         CROSS-EXAMINATION
[24]         BY MR. LAURIE:

---

30(b)(6) Depo of James Casagrande
August 29, 2001

vol. 1

Charles Schwab & Co., Inc. 'v.

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 63 of 142

Sears, et al.

Page 197

[1]   **Q:** Mr. Casagrande, my name is Robert
[2] Laurie and I'm counsel for Cold Spring Development
[3] and Cold Spring Golf. I just have a couple of quick
[4] questions to ask you.
[5]   Is it your testimony today that you
[6] had conversations with the principals of Cold Spring
[7] — when I mean the principals, Mr. Marchand, Mr.
[8] Kramer, Mr. Waszkelewicz — pertaining to how Bob
[9] Sears would generate the investment money?
[10]   **A:** Did I have conversations?
[11]   **Q:** Yes.
[12]   **A:** How we would do it, no, just that he
[13] was instructed by me being LMC, me being LMC, that
[14] he was the one to raise the money.
[15]   **Q:** Okay. Is it your testimony today
[16] that you were the principal source of information as
[17] opposed to Bob Sears as to how that money would be
[18] generated?
[19]   **A:** I guess I would be, yes.
[20]   **Q:** Is it your testimony today that you
[21] told the principals of Cold Spring that investment
[22] money would come from Bob Sears' clients?
[23]   **A:** That was one of my assumptions, yes.
[24]   **Q:** Is that an assumption or do you have

Page 198

[1] a specific recollection of telling the principals of
[2] Cold Spring that money would be coming from the
[3] clients of Bob Sears?
[4]   **A:** I guess what I meant was that if
[5] somebody is going to invest money that Bob Sears is
[6] raising for me, that they would indeed be a client
[7] of Bob Sears.
[8]   **Q:** Okay.
[9]   **A:** If that answers that.
[10]   **Q:** Let me just clarify. I'm referring
[11] to a specific line of questioning by my colleague as
[12] to advisory clients. Do you remember that line of
[13] questioning?
[14]   **A:** Yes, however, I don't know exactly
[15] what advisory clients is but...
[16]   **Q:** Did you have any conversations with
[17] the principals of Cold Spring as to the manner in
[18] which Bob Sears was to generate the investment
[19] income for LMC?
[20]   **A:** No. I guess I don't know what you
[21] mean by manner.
[22]   **Q:** Okay. Did you ever tell the
[23] principals of Cold Spring a sales pitch that Bob
[24] Sears was going to use to certain clients or

Page 199

[1] investors?
[2]   **A:** I didn't know what he was going to
[3] use, no. I know what I —
[4]   **MR. LESSER:** There's no question.
[5]   **MR. LAURIE:** I have no further
[6] questions.
[7]   **MR. SNYDER:** I have just a
[8] follow-up or two or four actually.
[9]   (Document marked for
[10] identification as Exhibit No. 31.)
[11]
[12]         **REDIRECT EXAMINATION**
[13]         **BY MR. SNYDER:**
[14]   **Q:** Mr. Casagrande, I'll show you what
[15] we've marked as Exhibit 31 and ask you if you
[16] recognize this as a stock certificate for the
[17] issuance of, and I don't how many shares we're
[18] talking about, 100 shares of Last Minute Concessions
[19] issued to Robert Sears?
[20]   **MR. LESSER:** I object. The
[21] document speaks for itself.
[22]   **Q:** Just identify it for the record. Do
[23] you recognize that as a stock certificate for 100
[24] shares of Last Minute Concessions issued to Robert

Page 200

[1] Sears?
[2]   **MR. LESSER:** Are you asking
[3] whether he's ever seen the document before?
[4]   **Q:** Okay. Have you ever seen this
[5] document before?
[6]   **A:** I don't know.
[7]   **Q:** All right. How about if I make this
[8] representation to you. This document was attached
[9] to the response of Last Minute Concessions, I'm
[10] sorry, to your response. We marked the whole thing
[11] when we do that. It was attached to your response
[12] to my client's request for production of documents
[13] in this case, Exhibit A.
[14]   **A:** Okay.
[15]   **Q:** Do you have any reason to believe
[16] that that document came from anywhere other than
[17] books and records of Last Minute Concessions, Inc.?
[18]   **A:** No.
[19]   **Q:** Okay. And getting to
[20] Mr. Huntington's line of inquiry, did you have any
[21] knowledge of any document providing for the transfer
[22] of these shares to you or to anyone else?
[23]   **A:** I think I've already answered that.
[24]   **Q:** The answer is no; right?

Page 201

[1] A: Correct.
[2] Q: Okay. Did Last Minute Concessions
[3] ever loan or commit to loan any money to Cold Spring
[4] Golf Course?
[5] A: Last Minute Concessions loan? No.
[6] Q: Did Last Minute Concessions ever loan
[7] or commit to loan any money to Cold Spring
[8] Development?
[9] A: No.
[10] Q: If you look at Exhibit 11 again,
[11] Mr. Huntington was asking you some questions about
[12] it, if you turn to the very last page.
[13] A: Last page?
[14] Q: You have total on this last page, the
[15] total inflows and total outflows; right?
[16] A: Yes.
[17] Q: And basically as I understand it the
[18] number of total outflows is just the total of all
[19] these numbers that appear on the previous two pages
[20] with minus signs in front of them in the column
[21] that's furthest to the right?
[22] A: That should be correct, yes.
[23] Q: Okay. And as I understand it we
[24] ought to factor out or subtract out for the number

Page 202

[1] of total outflows $142,000 which appears twice on
[2] page two for the reasons that you testified to
[3] earlier which I won't go into; is that right?
[4] A: That would be correct.
[5] Q: So as I do my quick math here, it
[6] looks like we're talking about a net outflow or real
[7] outflow if you will of $2,373,959; does that sound
[8] about right? Can — if we use that as a number,
[9] I'll represent to you that that is the number that
[10] you show there for total outflows less 142,000; does
[11] that make sense to do it that way?
[12] A: It does. However, it's factoring in
[13] some checks that have never cleared.
[14] Q: Okay. Which checks are those?
[15] A: There's a number of them. Check
[16] number 1042, check number 1036, check number 1055,
[17] 1056.
[18] Q: You better give those to me again.
[19] 1042?
[20] A: 1042. It looks like 1036 and then
[21] 1055, 1056, 1057; that looks to be it. Hang on,
[22] I'll check the previous page here. I think that's
[23] it.
[24] Q: And how are you able to tell that

Page 203

[1] those checks did not clear?
[2] A: In that column up at the top of the
[3] page C-L-R at the top of the heading there's no R in
[4] the column next to those.
[5] Q: I see. Okay. R means — R stands
[6] for what?
[7] A: I don't know. It's computer
[8] generated.
[9] Q: Okay. But it signifies that the
[10] check cleared through and showed up on the account
[11] statement as having been paid by the bank; is that
[12] correct?
[13] A: Yes.
[14] Q: Okay. Do you have — what I'm trying
[15] to do here is just get to a total number of
[16] outflow. Do you have a sense of the total of those
[17] five checks?
[18] A: Thirty something thousand it looks
[19] like. I don't have a calculator.
[20] Q: All right. Let's round it up to
[21] 40,000; okay?
[22] A: Sure.
[23] Q: Okay. Can we agree then that the
[24] amount that went out of the account and actually

Page 204

[1] went out by means of checks that were paid, bank
[2] checks that were paid for or wire transfers, if
[3] there were any, was something slightly in excess of
[4] 2.3 million?
[5] A: Seems to be accurate.
[6] Q: Okay. That's taking your 2.5 number
[7] and subtracting out the 142 and subtracting out
[8] 40,000 for checks that didn't clear, okay, 2.3
[9] million. So in round numbers here we're talking
[10] about $300,000 more than was provided for in the
[11] agreements Exhibit 9 and 10; correct?
[12] A: True. However, there's still
[13] another issue. There's a, I think you already
[14] mentioned it, doubling of the minus 12 and minus
[15] 130.
[16] Q: That's my 142.
[17] A: I'm sorry. Other than that, sorry.
[18] Q: Okay. So Last Minute Concessions
[19] paid to or for the benefit of the golf course
[20] project $300,000 more than was called for in
[21] Exhibits 8 and 9, the agreements?
[22] MR. HUNTINGTON: Nine and ten.
[23] Q: I'm sorry, 9 and 10, the agreements
[24] for stock; right?

30(b)(6) Depo of James Casagrande
August 29, 2001

vol. 1
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 65 of 142
pp. 1-219

Charles Schwab & Co., Inc. v.
Sears, et al.

Page 205

[1] **A:** That appears to be correct.

[2] **Q:** Okay. And why did Last Minute
Concessions do that?

[4] **A:** Last Minute Concessions per se did
[5] not do that. It did come through that account.
[6] However, once the total of the $2 million came in,
[7] we were still short, we being Cold Spring Golf
[8] Course, Cold Spring Development was still short
[9] money waiting on bank financing, and Bob Sears
[10] continued to raise money for us.

[11] **Q:** When you say "us," up to the two
[12] million he was raising it for you; right?

[13] **A:** Last Minute Concessions, yes.

[14] **Q:** Well, and Last Minute Concessions was
[15] you so he was raising $2 million for you, right, so
[16] I understand your testimony from this morning?

[17] **A:** Yes. If they're the same, if you're
[18] counting us as the same, yes.

[19] **Q:** All right. But now let me make sure
[20] I understand. You use the word us and you're
[21] referring to, as I understand it, in the raising of
[22] the 300,000 you're referring to us. Who's us?

[23] **A:** Ed, John, Mark and myself.

[24] **Q:** Okay. Individually or as Cold Spring

Page 206

[1] Golf Course, Inc. or Cold Spring Development? I'm
[2] just trying to understand who he was raising this
[3] $300,000 for?

[4] **A:** I would have to say the corporations.

[5] **Q:** Okay. What was it that Mr. Sears or
[6] his — well, what was it Mr. Sears was to get in
[7] return for raising the $300,000?

[8] **A:** Nothing.

[9] **Q:** Did you or any of those individuals
[10] you just listed who were principals in the Cold
[11] Spring companies have any agreement with Mr. Sears
[12] as to his raising this $300,000?

[13] **A:** No.

[14] **Q:** Was there any understanding or
[15] expectation that the $300,000 would be paid back?

[16] **A:** To be honest with you at the time we
[17] didn't know what the — we weren't paying attention
[18] to the number, but Ed and I were the only two there
[19] so we knew he was over the two million. I certainly
[20] assumed he would be paid back.

[21] **Q:** Did you or Ed Waszkelewicz ever talk
[22] to Mr. Sears about the fact that he was over the two
[23] million?

[24] **MR. LESSER:** I object to the

Page 207

[1] form. You can answer.

[2] **A:** I don't know that I can answer it.
[3] Might have. I don't know.

[4] **Q:** You don't have any recollection as
[5] you sit here today of your discussing that fact with
[6] Mr. Sears; is that correct?

[7] **A:** It wasn't really on my mind, no.
[8] Building the course was on my mind.

[9] **Q:** Whether or not it was on your mind,
[10] do you have any recollection of having spoken with
[11] Mr. Sears about the fact that he had done what he
[12] said he was going to do for you and raised the two
[13] million and now the money that was coming in was in
[14] excess of two million?

[15] **A:** Specifically, no, not that I
[16] remember.

[17] **Q:** To your understanding this $300,000
[18] that was — the additional 300,000 that came out of
[19] the Last Minute Concessions account, did that
[20] purchase either a debt or an equity interest in
[21] either of the Cold Spring companies?

[22] **MR. LESSER:** Objection to the
[23] form.

[24] **A:** It wasn't an equity position, and I

Page 208

[1] don't really — it was assumed that it would be paid
[2] back upon bank financing and it was just used to pay
[3] bills. I don't know what that constituted as.

[4] **Q:** Okay. Well, was this then a little
[5] different than the $2 million? You said it was
[6] going to be paid back upon bank financing. This was
[7] in expectation of that one or the other or both of
[8] the Cold Spring companies would obtain financing
[9] from the bank which would be used to pay back the
[10] $300,000?

[11] **A:** That was our intention.

[12] **Q:** Okay. So that was different than
[13] from the investors for the first two million who
[14] were going to be paid back from dividend cash flow
[15] from Cold Spring companies; correct?

[16] **A:** Correct.

[17] **Q:** All right. And again was any of
[18] this, any of the arrangements, expectations,
[19] assumptions with respect to the additional $300,000
[20] put in writing?

[21] **A:** No.

[22] **Q:** What Bank of Boston branch did you do
[23] business with in connection with the Last Minute
[24] Concessions account?

**Min-U-Script®**

Page 209

[1]    A: No specific branch. Ludlow.
[2]    Q: Okay. Well, you stated to
[3] Mr. Huntington in response to one of his questions
[4] that you were the one who did deposit any check that
[5] came in payable to Last Minute Concessions; correct?
[6]    A: Yes.
[7]    Q: Was there a particular branch that
[8] you did that?
[9]    A: If and when I did, it would probably
[10] have been at Ludlow. Again I don't know.
[11]    Q: Okay. Did you do it at the counter
[12] or did you do it through an ATM?
[13]    A: I'm sure I would have done --- I
[14] didn't do it through an ATM, not with those sized
[15] deposits that we would have gotten.
[16]    Q: Okay. Did you do business with the
[17] Ludlow branch of BankBoston in any other connection
[18] other than the Last Minute Concessions account?
[19]    A: Yes, most of my accounts are,
[20] actually all of my accounts, were with they're now
[21] Fleet/BankBoston.
[22]    Q: Okay. You're talking about your
[23] personal accounts?
[24]    A: That's correct.

Page 210

[1]    Q: And the account that you mentioned
[2] earlier as James Casagrande doing business as
[3] Westover Golf Course, was that with BankBoston?
[4]    A: Yes.
[5]    Q: At the Ludlow branch?
[6]    A: That's the one I usually used, yes.
[7]    Q: Okay. For how long would you say
[8] you'd been doing business with the Ludlow branch of
[9] BankBoston now Fleet?
[10]    A: I don't know; five, six years,
[11] something like that.
[12]    Q: In connection with Mr. Sears raising
[13] the $2 million for you, did you ever have any
[14] understanding that he would be raising that money
[15] from anyone other than his clients?
[16]    A: Did I? No.
[17]    Q: I think you told us earlier today
[18] that you indicated that the reason you thought that
[19] he could come up with that kind of money was that he
[20] was a financial advisor to a number of clients and
[21] that he was investing their money all the time and
[22] on that basis you thought that he could come up with
[23] money from them as investors; correct?
[24]    A: That's correct.

Page 211

[1]    Q: Okay. So you never had any
[2] expectation that he was going to go out and solicit
[3] people with whom he did not already do business to
[4] invest in a golf course or Last Minute Concessions;
[5] right?
[6]    A: That's fair to say.
[7]    Q: Okay. In connection with the land
[8] purchase closing Mr. Huntington asked you about, did
[9] Mr. Sears ever indicate that in order to come up
[10] with money, part of the $2 million, he would need to
[11] get money on a short-term or an interim basis?
[12]    A: Could you repeat that.
[13]    Q: In connection with any land purchase
[14] closing, did Mr. Sears ever indicate that he would
[15] need to obtain funds from one or more investors on a
[16] short-term or interim basis?
[17]    A: Not that I remember.
[18]    MR. SNYDER: I have nothing
[19] further. Thank you.
[20]
[21]        RECROSS-EXAMINATION
[22]    Q: I have two real quick questions I
[23] forgot to ask you. Exhibit 29 Mr. Snyder showed you
[24] earlier is a promissory note from Last Minute

Page 212

[1] Concessions, and I believe you testified that
[2] although that the signatures appear to be in your
[3] name, they aren't in fact your handwriting; is that
[4] correct?
[5]    A: They're definitely not my
[6] handwriting.
[7]    Q: Do you recognize the handwriting?
[8]    A: No.
[9]    Q: As of July, 1999 which appears to be
[10] the date on this document, was Mr. Sears authorized
[11] to put your signature on a document that would
[12] commit Last Minute Concessions?
[13]    A: No.
[14]    Q: At this time or --- strike that. Did
[15] you understand that Mr. Sears was out trying to
[16] raise money for Last Minute Concessions?
[17]    A: Yes.
[18]    Q: And if you raise the money, Last
[19] Minute Concessions was going to have to pay it back;
[20] correct?
[21]    A: Correct.
[22]    Q: How was Mr. Sears going to commit
[23] Last Minute Concessions in such an arrangement with
[24] an investor?

30(b)(6) Depo of James Casagrande
August 29, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 67 of 142

Vol. 1
pp. 1-219

Charles Schwab & Co., Inc.  v.
Sears, et al.

Page 213

[1]  **A:** I gave Bob Sears the authority to
[2] negotiate the terms between 8 and 12 percent, and
[3] upon him coming up with a successful investor, I
[4] assumed at the appropriate time that the
[5] documentation would be drawn up and I would sign
[6] it. I was the only one that could sign it.
[7]  **Q:** Okay. So you never gave Mr. Sears
[8] authority to commit Last Minute Concessions with his
[9] own signature?
[10]  **A:** No.
[11]  **Q:** During this period from June, '99
[12] forward?
[13]  **A:** At any time.
[14]  **Q:** At any time. Okay. Well, prior to
[15] the point that he surrendered his interest in the
[16] company, Mr. Sears could have signed on its behalf;
[17] correct?
[18]  **A:** With his signature, yes.
[19]  **Q:** After he surrendered his interest as
[20] you testified earlier, he could no longer commit the
[21] company through his own signature; correct?
[22]  **A:** That's correct.
[23]  **Q:** And unless you authorized him to and
[24] you said that he didn't?

Page 214

[1]  **A:** That's right.
[2]  **Q:** Okay. So you're saying at some
[3] point you assumed that he'd be bringing you
[4] paperwork to sign on behalf of Last Minute
[5] Concessions?
[6]  **A:** Sure.
[7]  **Q:** Okay. Did he ever do that?
[8]  **A:** No.
[9]  **Q:** Did you ever ask him why not?
[10]  **A:** I don't believe I did.
[11]  **Q:** As of July of 2000 he'd raised
[12] somewhere over $2.2 million that at least two
[13] million of it was going to have to get paid back by
[14] Last Minute Concessions; correct?
[15]  **A:** That's correct.
[16]  **Q:** And some of that had already been
[17] raised several months previously?
[18]  **A:** That's correct.
[19]  **Q:** But even then he had not brought you
[20] any paperwork to sign and you never asked him about
[21] it?
[22]  **A:** No.
[23]  **Q:** Okay.
[24]  **MR. SNYDER:** I actually am done

Page 215

[1] now. Thank you.
[2]  **MR. LAURIE:** One more.
[3]
[4]  **RECROSS-EXAMINATION**
[5]  **BY MR. LAURIE:**
[6]  **Q:** Did you specifically ask Bob Sears
[7] to continue raising money after the $2 million was
[8] generated?
[9]  **A:** I think Ed and myself did.
[10]  **Q:** Do you have a specific recollection
[11] of any conversations pertaining to that request?
[12]  **A:** No, not really, no.
[13]  **Q:** Do you recall upon what you base your
[14] answer that you think Ed asked him?
[15]  **A:** Because I was with Ed every day all
[16] day.
[17]  **Q:** Did Bob Sears ever tell you that Ed
[18] asked him?
[19]  **A:** No.
[20]  **Q:** Did you ever see or hear Ed ask him
[21] to generate the extra $300,000?
[22]  **A:** No, it's — I don't honestly remember
[23] asking him myself. I'm just, you know, I know we
[24] were short.

Page 216

[1]  **Q:** But is it fair to say that — let me
[2] rephrase that.
[3]  Do you have a specific recollection
[4] of Ed ever asking Bob Sears to generate $300,000
[5] extra?
[6]  **MR. SNYDER:** Objection to the
[7] form.
[8]  **Q:** You can answer the question.
[9]  **MR. SNYDER:** Objection. Just
[10] giving my objection for the record. Go ahead.
[11]  **A:** No.
[12]  **Q:** Okay. Do you have a specific
[13] recollection of anyone else asking Bob Sears to
[14] generate the $300,000?
[15]  **A:** No.
[16]  **MR. SNYDER:** Objection.
[17]  **Q:** Is there any documentation pertaining
[18] to that extra $300,000 in general?
[19]  **A:** Other than obvious amounts, you know,
[20] deposit amounts, no.
[21]  **Q:** There's no documentation saying that
[22] that money would go to pay certain bills or things
[23] such as that?
[24]  **A:** No.

Charles Schwab & Co., Inc. v.
Sears, et al.
vol. 1
30(b)(6) Depo of James Casagrande
Case 3:00-cv-30170-MAP    Document 44-15    Filed 10/31/02    Page 68 of 142    August 29, 2001

Page 217

[1] MR. LAURIE: No further
[2] questions.
[3] MR. SNYDER: I have one.
[4]
[5]             REDIRECT EXAMINATION
[6]             BY MR. SNYDER:
[7] Q: You mentioned a moment ago that you
[8] were with Ed Waszkelewicz every day all day. Was
[9] there a period of time in the first half of the year
[10] 2000 that Mr. Waszkelewicz went out of town for some
[11] extended period of time; a few weeks?
[12] A: A few weeks, no.
[13] Q: What would you say the longest
[14] period of time was in that first half of the year
[15] 2000 that Mr. Waszkelewicz was not, well, was not on
[16] the site, construction site, golf course?
[17] A: I have no idea. I'd be guessing.
[18] Q: Do you recall him ever being absent,
[19] out of state for more than a few days?
[20] A: I don't recall.
[21] Q: Okay.
[22] MR. SNYDER: Thank you.
[23] (Whereupon the deposition was
[24] concluded at 3:28 p.m.)

Page 218

[1]             CERTIFICATE
[2] I, JAMES CASAGRANDE, the within-named
[3] deponent, do hereby certify that I have read the
[4] foregoing transcript of my testimony, and further
[5] certify that said transcript is a true and accurate
[6] record of said testimony (with the exception of the
[7] following corrections listed below):
[8] Page    Line            Correction
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]       SWORN AND SUBSCRIBED TO BEFORE ME
[18] THIS _____ DAY OF _____, 2001.
[19] _____, Notary Public
[20] My commission expires:
[21]       Signed under the pains and penalties of
[22] perjury this _____ day of _____, 2001.
[23]
[24]       JAMES CASAGRANDE

Page 219

[1]             CERTIFICATE
[2]
[3] COMMONWEALTH OF MASSACHUSETTS
[4] PLYMOUTH, ss.
[5]
[6]       I, KAREN D. QUIGLEY, Certified
[7] Shorthand Reporter No. 125093, Registered Merit
[8] Reporter and Notary in and for the Commonwealth of
[9] Massachusetts, do hereby certify:
[10]       THAT JAMES CASAGRANDE, the witness
[11] whose deposition is hereinbefore set forth, was duly
[12] sworn by me and that such deposition is a true and
[13] accurate record to the best of my knowledge, skill
[14] and ability.
[15]       IN WITNESS WHEREOF, I have hereunto
[16] set my hand and Notarial seal this 15th day of
[17] September, 2001.
[18]
[19]
[20]
[21]             Notary Public, RMR
[22]
[23] My commission expires: March 7, 2008
[24]

E

# In The Matter Of:

*Charles Schwab & Co., Inc. v.*
*Sears, et al.*

---

*James Casagrande*
*August 29, 2001*

*vol. 1*
*pp. 1-44*

---

*Jones, Fritz & Sheehan*
*A LegaLink Company*
*210 South Street*
*11th Floor*
*Boston, MA   02111*
*(617) 542-0039   or   (800) 822-3376*

*Original File 0829JCAS.TXT, 44 Pages*
*Min-U-Script® File ID: 3884164023*

# Word Index included with this Min-U-Script®

Charles Schwab & Co., Inc. v.
Sears, et al.
Case 3:00-cv-30170-MAP   Document 42   Filed 10/31/02   Page 71 of 142
Vol. 1
pp. 1-44
James Casagrande
August 29, 2001

Page 3

[1]         Volume:  I
[2]         Pages:   1-44
[3]         Exhibits: 32
[4]      COMMONWEALTH OF MASSACHUSETTS
[5] SUFFOLK, ss.      SUPERIOR COURT DEPT. OF
[6]             THE TRIAL COURT
[7]             C.A. NO. 00-3807-E
[8]
[9] CHARLES SCHWAB & CO., INC.,
[10]        Plaintiff,
[11] vs.
[12] ROBERT C. SEARS; LAST MINUTE CONCESSIONS, INC.;
[13] COLD SPRING GOLF COURSE, INC.; JAMES CASAGRANDE;
[14] GERALD HERSH and SEARS, CASAGRANDE & HERSH,
[15]        Defendants
[16] PRUDENTIAL SECURITIES INCORPORATED,
[17]        Trustee and Reach and Apply
[18]        Defendant,
[19] and
[20] FLEET NATIONAL BANK and FLORENCE SAVINGS
[21] BANK,
[22]        Trustee Defendants.
[23]
[24]            AND

[1] APPEARANCES:
[2]      BINGHAM DANA LLP
[3]      (By John R. Snyder, Esquire)
[4]      150 Federal Street
[5]      Boston, Massachusetts 02110
[6]      617-951-8000
[7]      On behalf of Charles Schwab
[8]
[9]      LESSER, NEWMAN, SOUWEINE & NASSER, LLP
[10]     (By Thomas Lesser, Esquire)
[11]     39 Main Street, Suite I
[12]     Northampton, Massachusetts 01060-3132
[13]     413-584-7331
[14]     On behalf of James Casagrande and Last
[15]     Minute Concessions, Inc.
[16]
[17]     UNITED STATES SECURITIES AND EXCHANGE
[18]     COMMISSION
[19]     (By Frank C. Huntington, Esquire)
[20]     73 Tremont Street, Suite 600
[21]     Boston, Massachusetts 02108
[22]     617-424-5900
[23]     On behalf of the Securities and Exchange
[24]     Commission

Page 2

[1]      UNITED STATES DISTRICT COURT
[2]         DISTRICT OF MASSACHUSETTS
[3]
[4]
[5] SECURITIES AND EXCHANGE COMMISSION,
[6]         Plaintiff
[7] vs.          C.A. NO. 00-30170-FHF
[8] ROBERT C. SEARS,
[9]         Defendant,
[10] and
[11] LAST MINUTE CONCESSIONS INC., JAMES W.
[12] CASAGRANDE, COLD SPRING GOLF COURSE INC.,
[13] and COLD SPRING DEVELOPMENT INC.,
[14]        Relief Defendants.
[15]
[16]    DEPOSITION OF JAMES CASAGRANDE
[17]     Wednesday, August 29, 2001
[18]        3:40 p.m.
[19]     BINGHAM DANA LLP
[20]     150 Federal Street
[21]    Boston, Massachusetts 02110
[22]
[23]
[24]  Before: Karen D. Quigley, RPR/RMR

Page 4

[1] APPEARANCES(cont'd):
[2]
[3]      EDWARDS & ANGELL, LLP
[4]      (By Robert D. Laurie, Esquire)
[5]      101 Federal Street
[6]      Boston, Massachusetts 02110-1800
[7]      617-439-4444
[8]      On behalf of Cold Spring Development
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

James Casagrande       Vol. 1       Charles Schwab & Co., Inc.   v.

August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 72 of 142 Sears, et al.

---

**Page 5**

[1]        INDEX

[2]

[3] DEPOSITION OF:        PAGE

[4] JAMES CASAGRANDE

[5] BY MR. SNYDER        6

[6]

[7]        EXHIBITS

[8] NO.        PAGE

[9] 32    Resume        9

[10]

[11]

[12]

[13] * Original exhibits retained by Mr. Snyder.

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

---

**Page 6**

**PROCEEDINGS**

[2]

[3]     **MR. SNYDER:** We are now

[4] commencing the deposition of James Casagrande which

[5] is being taken pursuant to notice in the action

[6] entitled Charles Schwab and Company versus Sears and

[7] also pursuant to notice in the action entitled

[8] Securities and Exchange Commission versus Sears, et

[9] al.

[10]

[11]        **DIRECT EXAMINATION**

[12]        **BY MR. SNYDER:**

[13]     **Q:** And the first thing I want to do,

[14] Mr. Casagrande, is just remind you that you're under

[15] oath so we don't have to do that again; is that

[16] okay?

[17]     **A:** That's fine.

[18]     **Q:** And also what I'd like to ask you is

[19] can you agree that the answers that you gave

[20] previously today in the deposition you gave for Last

[21] Minute Concessions, Inc. would be the same if I were

[22] to ask them again in this deposition?

[23]     **A:** Absolutely.

[24]     **Q:** Actually I'm trying to avoid asking

---

**Page 7**

[1] them all over again, and if you can agree that you'd

[2] give the same answers again, I'll skip that

[3] exercise; is that okay?

[4]     **A:** That's fine.

[5]     **Q:** All right. I asked you before then

[6] your residence address. I'm not sure that I asked

[7] you how long you've been at that address?

[8]     **A:** Since July of — we bought the

[9] property in July of '96 I believe.

[10]     **Q:** Prior to that what was your address?

[11]     **A:** I was back at my parents' house in

[12] Easthampton, 17 Paul Street, P-A-U-L.

[13]     **Q:** And do you have any other residence

[14] or vacation home?

[15]     **A:** No.

[16]     **Q:** And you are married to Christine A.

[17] Casagrande?

[18]     **A:** That's right.

[19]     **Q:** Do you have a business card? That

[20] might save us some time as well.

[21]     **A:** I don't think I do but let's see.

[22]     (Pause.)

[23]     **A:** No, I don't. I have my PGA card.

[24]     **Q:** You don't want to give that up.

---

**Page 8**

[1]     **MR. LESSER:** An ATM card?

[2]     **A:** I got that too.

[3]     **Q:** Your business address is 17 Hawley

[4] Street in Northampton?

[5]     **A:** That's business, yes.

[6]     **Q:** Okay. And I think you may have said

[7] earlier but I've forgotten, for how long have you

[8] had 17 Hawley Street as a business address?

[9]     **A:** I think it was purchased about seven

[10] years, eight years ago, something like that.

[11]     **Q:** Okay. And do you have another

[12] business address?

[13]     **A:** Well, the golf course I guess.

[14]     **Q:** Which is Route 21 in Belchertown?

[15]     **A:** The actual physical address I think

[16] is 336 Chauncey Walker, C-H-A-U-N-C-E-Y, Walker

[17] Street in Belchertown, Mass.

[18]     **Q:** And at some point did you have a

[19] business address at the Westover Golf Course?

[20]     **A:** Yes.

[21]     **Q:** All right. You told us about that

[22] also. Let me do this by way of short-circuiting

[23] things here.

[24]     **MR. SNYDER:** Could you mark this

---

Page 9

[1] as the next exhibit, 32 I believe.
[2]    (Document marked for
[3] identification as Exhibit No. 32.)
[4]    Q: Mr. Casagrande, let me show you what
[5] we've marked as Exhibit 32. Is this your resume as
[6] of the spring of last year?
[7]    A: It looks to be.
[8]    Q: Apparently attached also as the third
[9] page a balance sheet of assets and liabilities which
[10] I'm not sure you would traditionally consider part
[11] of a resume, but at least the first two pages of
[12] this document are your resume as of the spring of
[13] last year?
[14]    A: It looks to be, yes.
[15]    Q: All right. And did you give this
[16] document resume and the third page balance sheet to
[17] Easthampton Savings Bank in the spring of last year?
[18]    A: I probably, yes, I might have. I
[19] don't know about the resume but probably they might
[20] have found that useful, yes.
[21]    Q: Okay. Well, let me just ask you then
[22] to take a quick look at tell me whether — I'm
[23] actually interested in the first two pages, but I
[24] guess I'll include the whole document. Is this

Page 10

[1] document accurate at least as of the spring of the
[2] year 2000?
[3]    MR. LESSER: Read it.
[4]    A: Yes, it's — I have glanced over it.
[5] It's not — I wouldn't call it entirely accurate. I
[6] see some things that...
[7]    Q: In what respects is it not accurate?
[8]    A: The first thing that comes to my eye
[9] is page two that says experience Sears, Casagrande &
[10] Hersh, it says partner in the firm. Legally that's
[11] not what we are, but on my resume that is the way I
[12] put it.
[13]    Q: In other words, what you're telling
[14] me is Sears, Casagrande & Hersh is not a
[15] partnership?
[16]    A: Correct. We don't operate or we're
[17] three sole proprietors that happen to share office
[18] space. Let me see if I see anything else.
[19]    (Pause.)
[20]    A: Last Minute Concessions would be the
[21] owner or president slash treasurer, but again this
[22] is I probably took a pretty old resume and just gave
[23] it to them.
[24]    Q: But what you're saying with respect

Page 11

[1] to that particular item is it should say in addition
[2] to owner, treasurer and clerk president?
[3]    A: True.
[4]    Q: For it to be accurate as of the
[5] spring of the year 2000; is that right?
[6]    A: Correct.
[7]    Q: Any other respects in which this is
[8] not accurate?
[9]    A: Let me read it verbatim if you can
[10] give me a minute.
[11]    Q: Okay.
[12]    (Pause.)
[13]    A: As far as the resume the rest I would
[14] say is accurate.
[15]    Q: Okay. And did you prepare this
[16] resume?
[17]    A: I'm sure I did. I don't know when
[18] but...
[19]    Q: Now, is there anything that's
[20] inaccurate on the balance sheet, the third page
[21] which says at the top that or indicates that it's as
[22] of December 31, 1999?
[23]    A: Are we saying is there anything as of
[24] today?

Page 12

[1]    Q: No, I'm saying was this document
[2] accurate as best as you can tell as of December 31,
[3] 1999?
[4]    A: Yes. There would be additional
[5] liability that I really didn't think of. Where it
[6] says second home, it's actually my mother's
[7] residence. It's on the same property. I owe her
[8] some money on that. What the exact number is I'm
[9] not exactly sure. It could be maybe it's 45,000.
[10] That's a guess but I do owe her some money.
[11]    Q: So that's something that should have
[12] appeared on the liability side?
[13]    A: Yes. The reason I guess it's not is
[14] it's kind of informal where I or I just forgot it,
[15] one or the other, I don't know but that should be on
[16] there.
[17]    Q: I think you were using the present
[18] tense but was that the case also as of December 31,
[19] 1999 that you owed your mother approximately $45,000
[20] with respect to that?
[21]    A: Add maybe 5,000.
[22]    Q: Okay. So somewhere between 45 and
[23] $50,000 as of December 31, 1999 owed to your mother
[24] with respect to the property that's described as

**Page 13**

[1] second home on the asset side?

[2]    A: Correct.

[3]    Q: Okay. That second home, in whose
[4] name is the title or in whose name was the title on
[5] December 31, 1999?

[6]    A: I think it's me.

[7]    Q: Okay. And that house is located
[8] adjacent to your home at 52 Amherst Road?

[9]    A: That's right.

[10]    Q: Okay. Anything else that's
[11] inaccurate in Exhibit 32?

[12]    A: Don't believe so, no.

[13]    Q: Okay. Anything that has been left
[14] out in terms of your formal education or employment?

[15]    (Pause.)

[16]    A: Not unless you want to go prior to
[17] Pine Grove Golf Course I would say that's or prior
[18] to actually Wethersfield, and that's 20 years ago so
[19] I think that's probably...

[20]    Q: And you went to Wethersfield Country
[21] Club even leaving American International College; is
[22] that correct?

[23]    A: No, I worked just previous to
[24] Wethersfield one or two years as an assistant for

**Page 14**

[1] the head pro at Veterans Golf Course.

[2]    Q: Where is that?

[3]    A: Springfield, Mass.

[4]    Q: And where did you attend high school?

[5]    A: Easthampton High School.

[6]    Q: When did you graduate?

[7]    A: '77. 1977.

[8]    Q: Have you ever served in the military?

[9]    A: No.

[10]    Q: Okay. Now, let me go back to Sears,
[11] Casagrande & Hersh. You told me a moment ago it's
[12] not a partnership. What is it?

[13]    A: It's three sole proprietors that
[14] operate under the same roof.

[15]    Q: Okay. And under that name Sears,
[16] Casagrande & Hersh?

[17]    A: That's the name on the window.

[18]    Q: Okay. When you say it's the name on
[19] the window, is that as you drive up to the building
[20] 17 Hawley Street does the name Sears, Casagrande &
[21] Hersh appear somewhere on the exterior of the
[22] building?

[23]    A: Yes.

[24]    Q: Does it also appear somewhere on the

**Page 15**

[1] interior of the building as you enter the space that
[2] you three occupy?

[3]    A: No.

[4]    Q: Has there ever been a letterhead or
[5] stationery with the name Sears, Casagrande & Hersh
[6] on it?

[7]    A: I don't think so; not solely anyway.

[8]    Q: I'm sorry, not solely, what do you
[9] mean by that?

[10]    A: I don't think there would have been
[11] any stationery just for that. There might have been
[12] Jim Casagrande or something like that. Possibly. I
[13] don't remember doing it but it's conceivable that
[14] maybe it was Sears, Casagrande & Hersh, Jim
[15] Casagrande. I don't remember that, no, not to my
[16] knowledge.

[17]    Q: Well, okay, that's my question was
[18] whether or not it had anything else on it, address,
[19] phone number, other than your three names, your
[20] name, anyone's name, was there ever any letterhead
[21] or stationery with the names Sears, Casagrande &
[22] Hersh?

[23]    A: Again I don't think so.

[24]    Q: Okay. Other than the sign on the

**Page 16**

[1] window and exterior of the building, has there ever
[2] been any other sign with the name Sears, Casagrande
[3] & Hersh?

[4]    A: No.

[5]    Q: Was there ever any telephone listing
[6] under the name Sears, Casagrande & Hersh?

[7]    A: There may have been. That probably
[8] is the way we're listed. Something I never really
[9] paid attention to.

[10]    Q: Was there ever any to your knowledge
[11] a telecopier number listing under the name Sears,
[12] Casagrande & Hersh?

[13]    A: Could have been. I didn't —
[14] something I wouldn't pay attention to.

[15]    Q: In the first half of year 2000 how
[16] many fax machines were there at the space that you
[17] and Messrs. Sears and Hersh occupied at 17 Hawley
[18] Street?

[19]    A: I think there's only one.

[20]    Q: All right. How many phone lines
[21] coming in were there?

[22]    A: I think there's three; three or four.

[23]    Q: Okay. Can you tell me any of those
[24] telephone numbers?

Charles Schwab & Co., Inc.    Case 3:00-cv-30170-MAP    Document 94-1    Filed 10/31/02    Page 75 of 142    James Casagrande
Sears, et al.                                                    Vol. 1                                                    August 29, 2001
                                                    pp. 1-44

---

Page 17

[1]    A: I can think of 584-2666 and I think
[2] our dedicated fax line is 585-8694 or something like
[3] that.
[4]    Q: Okay. And is there another telephone
[5] number other than 2666?
[6]    A: Well, I'm sure there is. What it is
[7] I don't know. The computer it's a computerized
[8] system. I don't know what it kicks to.
[9]    Q: Well, let me ask you this. If you
[10] want to give somebody a telephone number that they
[11] can use to reach you at the 17 Hawley Street
[12] offices, what number do you give? 584-2666?
[13]    A: Yes.
[14]    Q: Is there any other number that you
[15] can give?
[16]    A: Other than the fax, no.
[17]    Q: Okay. So what you're saying is if
[18] someone dials that number and there's already a call
[19] in process, it will switch you to another line but
[20] they're all with the same number; is that right?
[21]    A: I believe so.
[22]    Q: Okay. And that is the number that's
[23] listed under the name Sears, Casagrande & Hersh;
[24] correct?

---

Page 18

[1]    A: If it's listed as Sears, Casagrande &
[2] Hersh, yes, that's the number.
[3]    Q: Well, do you have any knowledge is it
[4] listed under any other name?
[5]    A: It could be under each of our
[6] individual names too. It's — I don't pay any
[7] attention to that.
[8]    Q: Okay. Have you separately or
[9] together with Mr. Sears, Mr. Hersh ever done any
[10] advertising for your services?
[11]    A: A long time ago, yes.
[12]    Q: When you say a long time ago, how
[13] long ago was that?
[14]    A: Probably ten years, something like
[15] that.
[16]    Q: Not since then?
[17]    A: No, unless they have on their own. I
[18] don't know.
[19]    Q: Have you either separately or
[20] together with Mr. Sears and Mr. Hersh ever purchased
[21] any promotional item such as a charitable event
[22] buying a page in a program, anything of that sort?
[23]    A: No.
[24]    Q: Now, the 17 Hawley Street offices as

---

Page 19

[1] I understand it are what you would call an office
[2] condominium; is that correct?
[3]    A: Yes.
[4]    Q: And you and Mr. Sears and Mr. Hersh
[5] have purchased that condominium; is that right?
[6]    A: Yes.
[7]    Q: And don't lease it?
[8]    A: No, we don't.
[9]    Q: And in what name is the title for
[10] that property?
[11]    A: Three separate, you know, Robert
[12] Sears, Jim Casagrande, Gerald Hersh.
[13]    Q: All three of you?
[14]    A: Yes.
[15]    Q: All right. And do any of you
[16] three -- strike that.
[17]    Is there any leased or rented
[18] equipment in the offices at 17 Hawley Street? I'm
[19] thinking about copy machines, fax machines?
[20]    A: I don't believe so. I think — not
[21] that I'm aware of unless Bob has leased something or
[22] Gerry has leased something. I don't believe so.
[23]    Q: Other than in this resume which we've
[24] marked as Exhibit 32, have you ever described

---

Page 20

[1] yourself as a partner in Sears, Casagrande & Hersh?
[2]    A: No, I don't think so.
[3]    Q: Have you ever described yourself as a
[4] partner of Robert Sears?
[5]    A: No.
[6]    Q: Have you ever described yourself as a
[7] partner of Mr. Hersh?
[8]    A: No.
[9]    Q: I'm sorry, Mr. Hersh's name is
[10] Gerald?
[11]    A: Gerry, Gerald.
[12]    Q: Okay.
[13]    MR. LESSER: Off the record.
[14]    (Off the record.)
[15] BY MR. SNYDER:
[16]    Q: To your knowledge has Mr. Sears or
[17] Mr. Hersh ever described themselves as a partner of
[18] yours?
[19]    A: Not to my knowledge.
[20]    Q: When did you cease being the golf pro
[21] at Westover Golf Club?
[22]    A: Let me look at my resume. Oh, it
[23] doesn't say.
[24]    Q: That's why I'm asking actually.

---

Page 21

[1] **A:** I would say the end of 2000. The end
[2] of — I'm sorry, it would be beginning of 2000. I'm
[3] thinking golf seasons here so... My contract I
[4] think ended in January or something like that of
[5] 2000, and that's when I knew that we were going to
[6] have the permits to build the golf course so that's
[7] when it officially would have been.
[8] **Q:** Did it unofficially end sometime
[9] prior to that?
[10] **A:** In my mind it did, yes.
[11] **Q:** All right. You continued to work at
[12] the Westover Golf Club up until January of 2000?
[13] **A:** That's right.
[14] **Q:** Okay. Other than the Cold Spring
[15] project, have you had any involvement in real estate
[16] development?
[17] **A:** No.
[18] **Q:** And other than in the SEC lawsuit
[19] against you concerning the Cold Spring project and
[20] in the lawsuit brought by Charles Schwab, have you
[21] ever been a party to a lawsuit or an arbitration?
[22] **A:** Yes, I guess, yes.
[23] **Q:** Okay. How many such lawsuits have
[24] you been a party to other than the SEC action and

Page 22

[1] Schwab's action?
[2] **A:** Just one.
[3] **Q:** What was the nature of that action?
[4] What did it involve?
[5] **A:** Perhaps Tom can say. Something to do
[6] with us being a partnership or something.
[7] **Q:** I'm afraid I can't put him under
[8] oath; I've got to ask you.
[9] **A:** That's my understanding of it put it
[10] that way.
[11] **MR. LESSER:** Off the record.
[12] (Off the record.)
[13] **BY MR. SNYDER:**
[14] **Q:** Mr. Casagrande, you heard your
[15] counsel describe the lawsuit in which you are named
[16] as a party defendant. Have you ever been named as a
[17] party, either plaintiff or defendant, in any other
[18] lawsuit other than that case and the Schwab and SEC
[19] actions?
[20] **A:** No.
[21] **Q:** Other than earlier today and in
[22] September, 2000 in the SEC lawsuit have you ever
[23] testified either in court or in an arbitration or in
[24] a deposition?

Page 23

[1] **A:** Yes, I did.
[2] **Q:** Okay. And tell me what did you
[3] testify about?
[4] **A:** When I was the assistant pro at
[5] Veterans Golf Course in Springfield, there was a
[6] fake lock box or night deposit box welded on to the
[7] outside of a bank, and it happened to be the bank I
[8] make nightly deposits when I was the assistant there
[9] along with numerous other businesses and basically I
[10] had to go in and testify that I had made the deposit
[11] and that was it.
[12] **Q:** This was back in early 80's?
[13] **A:** Yes.
[14] **Q:** Okay. Other than on that occasion
[15] and last September and today have you ever
[16] testified?
[17] **A:** No.
[18] **Q:** Have you done anything to prepare
[19] for your testimony as an individual beyond what
[20] you've testified to this morning about your
[21] preparation for your testimony on behalf of Last
[22] Minute Concessions?
[23] **A:** No.
[24] **Q:** Have you ever seen a transcript of

Page 24

[1] your September, 2000 deposition in the SEC
[2] proceeding?
[3] **A:** No, I don't believe that I did.
[4] **Q:** To your knowledge has anyone else
[5] seen the transcript of that deposition?
[6] **A:** Not to my knowledge, no.
[7] **Q:** How did you first meet Robert Sears?
[8] **A:** We both worked — I worked at a
[9] accounting office. I forget the name. I think it
[10] was Wallace Accountants or something. All we did
[11] was tax returns and that is where I met him. I came
[12] back from — I was there for about five, six years
[13] before him. I came back from my first marriage's
[14] honeymoon and he was sitting in my seat and I
[15] thought he was a client, and he introduced himself
[16] as a worker. That's where I met him.
[17] **Q:** Okay. So you were co-employees at —
[18] what was the name of the firm?
[19] **A:** I think it was Wallace Tax Service or
[20] something, Wallace Tax Service. I don't think it's
[21] on there.
[22] **Q:** Where does that fit in terms of the
[23] chronology here?
[24] **A:** I'd say '81 and before '82 and

Charles Schwab & Co. Inc. v.
Sears, et al.
Case 3:00-cv-30170-MAP   Document 42   Filed 10/31/02   Page 77 of 142
Vol. 1
pp. 1-44
James Casagrande
August 29, 2001

Page 25

[1] before. It had to be before '81 because — probably
[2] '80 and before. Probably about '74 on to '80,
[3] something like that.
[4]    **Q:** Before you graduated from high
[5] school?
[6]    **A:** It was so long ago I can't remember.
[7] Just after I graduated high school to prior to doing
[8] Sears, Casagrande & Hersh; how's that?
[9]    **Q:** Well, I haven't fixed Sears,
[10] Casagrande & Hersh yet.
[11]    **A:** Yes, okay.
[12]    **Q:** 1981 you say on your resume?
[13]    **A:** Yes.
[14]    **Q:** All right.
[15]    **A:** It might be late '80.
[16]    **Q:** So were you — sorry, what was the
[17] name of the firm again? Wallace?
[18]    **A:** I think it was Wallace Tax Service,
[19] something.
[20]    **Q:** Okay.
[21]    **A:** Something like that.
[22]    **Q:** And you were employed at the Wallace
[23] Tax Service while you were attending college at
[24] American International?

Page 26

[1]    **A:** Yes.
[2]    **Q:** All right. And was Mr. Sears at that
[3] point when you met him still in school?
[4]    **A:** I think so. I think he was going for
[5] a masters. I don't really remember. I think he
[6] might have been.
[7]    **Q:** All right. And you were both
[8] employed for some period of time together preparing
[9] tax returns for this tax service firm?
[10]    **A:** That's right.
[11]    **Q:** And for how long were you both there?
[12]    **A:** A couple years maybe.
[13]    **Q:** All right. And then you left and he
[14] left and formed Sears, Casagrande & Hersh; is that
[15] right?
[16]    **A:** Worked together under the same roof.
[17]    **Q:** Say again.
[18]    **A:** And worked under the same roof doing
[19] the same thing. We didn't formally.
[20]    **Q:** You and Mr. Sears left this firm, got
[21] together with Mr. Hersh and started sharing space?
[22]    **A:** Correct.
[23]    **Q:** How did Mr. Hersh get in the mix?
[24]    **A:** He worked at the same place.

Page 27

[1]    **Q:** All right. So you were all together
[2] at the tax service firm, you left and set up shop —
[3]    **A:** Mm-hmm.
[4]    **Q:** -- together?
[5]    **A:** That's right.
[6]    **Q:** And was that — that was not at 17
[7] Hawley Street?
[8]    **A:** No, that was — I don't know the
[9] actual street address anymore, but it was Route 9 in
[10] Hadley.
[11]    **Q:** Have you been involved in any
[12] businesses with Mr. Sears other than Last Minute
[13] Concessions and the space-sharing arrangement?
[14]    **A:** No.
[15]    **Q:** Other than the incidental chance
[16] encounters in the hallway and the reception area and
[17] the like, did you have any contact with any of
[18] Mr. Sears' clients?
[19]    **A:** No.
[20]    **Q:** Did you have any clients in common?
[21]    **A:** Yes.
[22]    **Q:** Were there some clients for which he
[23] provided one sort of service and you provided
[24] another?

Page 28

[1]    **A:** Yes.
[2]    **Q:** Would that be fair? How many such
[3] clients would you say there were?
[4]    **A:** Again a handful at best.
[5]    **Q:** Was one of those clients Josephine
[6] Shaw?
[7]    **A:** Yes.
[8]    **Q:** And you say a handful, is that less
[9] than a dozen?
[10]    **A:** I would think so, yes.
[11]    **Q:** Were any of those other clients that
[12] you had in common, did any of those other clients
[13] that you had in common transfer any funds to the
[14] Last Minute Concessions bank account?
[15]    **A:** No.
[16]    **Q:** Well, did you ever have any walk-in
[17] or call-in clients?
[18]    **A:** You mean did I accept walk-in
[19] clients?
[20]    **Q:** Sure. Someone that just showed up
[21] and said I want some tax services or some nature of
[22] services or called and said I see your listing
[23]    here —
[24]    **A:** No.

Page 29

[1]   **Q:** — in the phone book?

[2]   **A:** No, only we did like my clients might

[3] refer their cousin or friend or whatever to me. You

[4] know, that was really how we got most of our

[5] business.

[6]   **Q:** Okay. Well, I guess you're saying

[7] that's how you got all of your business. It was all

[8] of your business, let's talk about you, James

[9] Casagrande now, all of your business that you did at

[10] 17 Hawley Street resulted from personal contacts or

[11] referrals; is that correct?

[12]   **A:** Yes.

[13]   **Q:** It was never anybody who showed up at

[14] your doorstep and said I want my tax return

[15] prepared, I want some tax services; is that correct?

[16]   **A:** That would be fair to say, yes.

[17]   **Q:** Okay. Did you three Sears,

[18] Casagrande & Hersh have any arrangement for sharing

[19] the expenses of the office?

[20]   **A:** Well, we purchased the property each,

[21] you know, individually.

[22]   **Q:** How did you —

[23]   **A:** All of our —

[24]   **Q:** Go ahead.

Page 30

[1]   **A:** All of our individual equipment was

[2] purchased. You know, my computer was bought by

[3] myself and my desk and shelving and stuff like that

[4] was all purchased by myself. The copier I think we

[5] all chipped in on or something like that. There are

[6] some things like that, some supplies possibly.

[7]   **Q:** All right. Well, let me start with

[8] the real estate first. How did you divide up the

[9] purchase cost of the real estate?

[10]   **A:** A third, a third, a third.

[11]   **Q:** All right. Then how about — when I

[12] say expenses, I mean to include things like the

[13] electricity, the phone, the salary of your secretary

[14] or office manager, how is that divided?

[15]   **A:** The salary is all paid I believe it's

[16] Bob Sears. It shows how little I know on that.

[17]   **Q:** A hundred percent so far as you know

[18] paid by Robert Sears for the secretary and the

[19] office manager?

[20]   **A:** Yes.

[21]   **Q:** Okay. How about the phone and the

[22] lights?

[23]   **A:** The long distance we have on our

[24] phone system we have a code so we know who made the

Page 31

[1] long distance call so if it was me that made it, I

[2] pay it. The base phone I think we during tax season

[3] I think we split it. When I'm not there, which is

[4] most of the time, Gerry and Bob split it I guess. I

[5] don't know what happens when I'm not there. It's...

[6]   **Q:** Well, do you have any knowledge that

[7] you're splitting the base cost on the phone when

[8] you're not there; do you know?

[9]   **A:** No.

[10]   **Q:** Do you get any kind of a periodic

[11] accounting from anybody that shows what your

[12] contribution to the space's expenses is to be?

[13]   **A:** Yes, there is a — we have a monthly

[14] condo fee and stuff so there is monies each month

[15] that need to be put in.

[16]   **Q:** Lights, heat, that kind of thing?

[17]   **A:** Whatnot, yes.

[18]   **Q:** And how is that apportioned as

[19] between you and Mr. Sears and Mr. Hersh?

[20]   **A:** It really varies from item to item.

[21] Most — it's very heavily weighted towards Bob Sears

[22] and Gerry Hersh. I pay minor amounts because I'm

[23] not there. What the actual percentages are and how

[24] it's derived I couldn't tell you that formula.

Page 32

[1]   **Q:** Who — I understand you don't have

[2] any involvement in it. Who does? Who handles that?

[3]   **A:** I think Gerry Hersh might do that. I

[4] think that's all on his computer.

[5]   **Q:** Okay. Who pays the bills, the heat,

[6] the light, the condo fees, the phone?

[7]   **A:** My guess is Gerry Hersh. I don't

[8] know. It could be Bob Sears.

[9]   **Q:** How about the office manager?

[10]   **A:** Bob Sears definitely pays that.

[11]   **Q:** No, no. Might she be the person who

[12] pays the heat, the light, the phone?

[13]   **A:** No, I believe all she does is work

[14] specifically for Bob and do what he instructs her to

[15] do.

[16]   **Q:** Did you ever approach any of your

[17] clients or anyone else about investing in the golf

[18] course, the Cold Spring Golf Course project?

[19]   **A:** Did I, no.

[20]   **Q:** Did you ever approach anyone about

[21] transferring any funds to the Last Minute

[22] Concessions account?

[23]   **A:** No.

[24]   **Q:** Why?

Page 33

[1] **A:** I wouldn't even know how to go about
[2] it. That's not what I do.
[3] **Q:** All right. To your knowledge did
[4] Mr. Hersh have any involvement in approaching anyone
[5] about investing in the golf course project, the
[6] transferring funds to Last Minute Concessions
[7] account?
[8] **A:** No.
[9] **Q:** Did Mr. Sears on any other occasion
[10] other than in connection with this golf course
[11] project ask any of his clients to invest in an
[12] entity or project in which he was an associate?
[13] **A:** I have no idea.
[14] **Q:** When you had your discussions with
[15] him in 1999 about his raising this $2 million, did
[16] he indicate to you or did you have any knowledge of
[17] him having done anything like that in the past?
[18] **A:** Yes, I was aware that he did that for
[19] clients; you know, he invested money and found
[20] investments for people that were his clients, but I
[21] don't know who, what, when, where of anything. I
[22] just know that that's what he does.
[23] **Q:** Well, let me ask you what it is that
[24] you understand that he does. Is what he does to

Page 34

[1] invest or assist people in investing in stocks and
[2] bonds and mutual funds?
[3] **A:** That's certainly part of it, yes.
[4] **Q:** Do you also understand what he does
[5] to include soliciting people to invest in ventures
[6] with which he is associated?
[7] **A:** Again I don't know if they were any
[8] ventures that he was associated with. I don't know
[9] that.
[10] **Q:** As far as you know was this the first
[11] and only occasion on which Mr. Sears solicited his
[12] clients to invest in a venture in which he was
[13] associated?
[14] **MR. LESSER:** Object to the form.
[15] **Q:** This being the golf course project?
[16] **A:** Well, I don't feel that he was
[17] associated with it so I don't know how I can answer
[18] that.
[19] **Q:** Okay. So would it be your answer
[20] then that you're not aware of any occasion on which
[21] Mr. Sears solicited his clients to invest in a
[22] venture with which he was associated; is that fair
[23] then?
[24] **A:** I guess that would be correct.

Page 35

[1] **Q:** Okay. Now, at any point in the
[2] discussions with the people from Cold Spring,
[3] Marchand, Kramer and Waszkelewicz, was there any
[4] discussion of you or Mr. Sears investing your
[5] personal funds?
[6] **A:** Any discussion? No, I don't believe
[7] so.
[8] **Q:** Was there ever a point in time in
[9] which it was contemplated that either you or
[10] Mr. Sears would invest personal funds in the golf
[11] course project?
[12] **A:** No, other than — the only instance I
[13] can think of is the $3,000 that I loaned if you will
[14] from when I was at Westover. I don't know if that's
[15] what you're meaning by that.
[16] **Q:** Okay. And another instance would be
[17] the 21,000 that Mr. Sears loaned to the golf course
[18] project?
[19] **A:** But I thought your question was did
[20] we talk to Ed, John and Mark about that. At the
[21] time — if it was 21,000, at the time that that came
[22] in, I'd have to say I didn't even know what is Bob
[23] Sears' money. I just again I was not paying
[24] attention to who specifically deposited, you know,

Page 36

[1] who it was from at that time.
[2] **Q:** Okay. Let me ask you this. Prior
[3] to September of last year did you know that
[4] Mr. Sears had loaned $21,000 to the Cold Spring
[5] project? Let me go with that. I'll ask you two
[6] questions.
[7] Prior to September of last year did
[8] you know Mr. Sears had loaned $21,000 to the Cold
[9] Spring project?
[10] **A:** I would — prior to September I would
[11] have to say yes.
[12] **Q:** Okay. And how did you learn of that?
[13] **A:** He made me aware that one of the
[14] deposits that didn't have a tag to it if you will
[15] had come from him and, you know, then I looked at it
[16] and obviously then it was made to my attention that,
[17] you know, it wasn't a wire transfer or whatever.
[18] **Q:** When you say a deposit without a tag,
[19] what do you mean by that?
[20] **A:** Well, like it was a wire — the wire
[21] transfers have the tag on who it's from.
[22] **Q:** It had a name — did it have a name
[23] on it as to who it originated from?
[24] **A:** Right.

James Casagrande     Vol. 1     Charles Schwab & Co., Inc. v.

August 29, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 80 of 142 Sears, et al.

**Page 37**

[1] Q: Did the 21,000 come in by way of
[2] check or wire?
[3] A: Must have been check. I don't
believe it was wired.
[5] Q: And into what account did it come?
[6] A: I believe Last Minute Concessions.
[7] Q: Let's look at Exhibit 11 again. Can
[8] you show me on Exhibit 11 where that loan from
[9] Mr. Sears appears?
[10] A: Well, I see on 3-30 there's a $30,000
[11] deposit from Bob Sears.
[12] Q: Okay.
[13] A: Probably there.
[14] Q: Do you understand that to be a loan
[15] that Mr. Sears made to Last Minute Concessions?
[16] MR. LESSER: If you know.
[17] A: I don't know. That's again there was
[18] no paperwork, no documentation.
[19] Q: Let's go back then. You said at some
[20] point you became aware of this deposit that didn't
[21] have a tag. Is that the deposit you became aware
[22] of, $30,000?
[23] A: That's the only one that unless I go
[24] down through it.

**Page 38**

[1] MR. LESSER: Please don't
[2] speculate. Just tell him what you know.
[3] A: I guess I don't know.
[4] Q: All right. Mr. Sears loaned $21,000
[5] to Last Minute Concessions. I think we started on
[6] this when I asked you did you ever know prior to
[7] September, 2000 that he had done that. I think your
[8] answer was yes. So let me ask again.
[9] How did you know prior to September,
[10] 2000 that Mr. Sears had loaned $21,000 to Last
[11] Minute Concessions or the Cold Spring project?
[12] A: I guess I wouldn't have known whether
[13] it be a loan or investment. I guess I couldn't have
[14] actually classified that.
[15] Q: Did you know prior to September of
[16] 2000 that Mr. Sears had paid himself $21,000 out of
[17] the Last Minute Concessions account?
[18] A: What was the date you said?
[19] Q: Prior to September of 2000 did you
[20] know that he had paid himself $21,000?
[21] A: I didn't see that.
[22] Q: Looking at page two, it's the third
[23] entry there.
[24] A: I did see that check prior to

**Page 39**

[1] September, yes.
[2] Q: All right. And did you have any
[3] discussion with Mr. Sears about that check?
[4] A: I must have.
[5] Q: What do you recall about that
[6] conversation?
[7] A: Not much if anything. I really I
[8] just I questioned what that was and he probably —
[9] again it's conjecture. I don't really remember the
[10] conversation so I mean I don't want to ad lib to
[11] something I don't remember.
[12] Q: If you don't remember, you don't
[13] remember. I'm just asking what you remember about
[14] any conversation you may have had with Mr. Sears
[15] about Mr. Sears paying himself $21,000 out of the
[16] Last Minute Concessions account.
[17] A: I guess I don't remember specific
[18] anything about it.
[19] Q: All right. Let me ask you who loaned
[20] money to the Cold Spring project? We have Mr. Sears
[21] loaning $21,000 to either the Cold Spring project or
[22] Last Minute Concessions, we have Mr. Waszkelewicz
[23] loaning $78,000, we have Mr. Wildzumas loaning
[24] 38,000 and change. Were there any other loans to

**Page 40**

[1] the Cold Spring project which you are aware?
[2] A: Well, there were two $3,000 amounts.
[3] Q: I'm sorry, your 6,0000 interest.
[4] A: Yes. And I believe there was a small
[5] amount by Mark Kramer of which I don't know what it
[6] was, but I remember some talk on that and I believe
[7] there was some talk on John Marchand. Now, those
[8] may have been prior to me being involved with the
[9] project also. I don't know that.
[10] Q: Okay. Did you know Mr. Sears' wife,
[11] Cindy Lasser Sears? Do you know her?
[12] A: Yes.
[13] Q: And did Cindy Lasser Sears ever loan
[14] any money to the Cold Spring project?
[15] A: No.
[16] Q: Do you know an individual named
[17] Klaus, K-L-A-U-S, Peter?
[18] A: No.
[19] Q: Have you ever heard that name?
[20] A: Other than reading it in
[21] documentation that was sent by either you or SEC,
[22] no.
[23] Q: Okay. All right. So other than the
[24] people that we've now listed are you aware of anyone

Charles Schwab & Co. Inc. v.
Sears, et al.

Case 3:00-cv-30170-MAP    Document 42    Filed 10/31/02    Page 81 of 142

vol. 1
pp. 1-44

James Casagrande
August 29, 2001

**Page 41**

[1] else who loaned money to the Cold Spring project?
[2]   **A:** No, I don't believe so.
[3]   **Q:** Other than as I understand your
[4] testimony earlier today, it was your understanding
[5] that all the people we've been calling investors who
[6] transferred money to the Last Minute Concessions
[7] account were loaning money; is that correct?
[8]   **A:** They were loaning money to LMC.
[9]   **Q:** Okay. That's the distinction?
[10]   **A:** Yes.
[11]   **Q:** Okay. Are you aware of anyone other
[12] than possibly Robert Sears and those investors who
[13] transferred money into the Last Minute Concessions
[14] account who loaned money to Last Minute Concessions?
[15]   **A:** Would you repeat that again.
[16]   **Q:** Are you aware — I'm excluding Robert
[17] Sears and his $21,000. I'm excluding the investors
[18] who transferred money into the account as shown as
[19] Exhibit 11. Are you aware of anyone else who loaned
[20] money to Last Minute Concessions?
[21]   **A:** No.
[22]   **Q:** Did Cindy Lasser Sears ever loan any
[23] money to Last Minute Concessions?
[24]   **A:** No.

**Page 42**

[1]   **MR. SNYDER:** Mr. Lesser has
[2] expressed a desire to get on the road so we're going
[3] to break, and we'll talk tomorrow about scheduling
[4] completion of this.
[5]   **MR. LESSER:** I'll be in in the
[6] afternoon.
[7]
[8]   (Whereupon the deposition was
[9] suspended at 4:30 p.m.)
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

**Page 43**

[1]       CERTIFICATE
[2]       I, JAMES CASAGRANDE, the within-named
[3] deponent, do hereby certify that I have read the
[4] foregoing transcript of my testimony, and further
[5] certify that said transcript is a true and accurate
[6] record of said testimony (with the exception of the
[7] following corrections listed below):
[8] Page   Line       Correction
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]       SWORN AND SUBSCRIBED TO BEFORE ME
[18] THIS _____ DAY OF _____, 2001.
[19] _____, Notary Public
[20] My commission expires:
[21]       Signed under the pains and penalties of
[22] perjury this _____ day of _____, 2001.
[23]
[24]       JAMES CASAGRANDE

**Page 44**

[1]       CERTIFICATE
[2]
[3] COMMONWEALTH OF MASSACHUSETTS
[4] PLYMOUTH, ss.
[5]
[6]       I, KAREN D. QUIGLEY, Certified
[7] Shorthand Reporter No. 125093, Registered Merit
[8] Reporter and Notary in and for the Commonwealth of
[9] Massachusetts, do hereby certify:
[10]       THAT JAMES CASAGRANDE, the witness
[11] whose deposition is hereinbefore set forth, was duly
[12] sworn by me and that such deposition is a true and
[13] accurate record to the best of my knowledge, skill
[14] and ability.
[15]       IN WITNESS WHEREOF, I have hereunto
[16] set my hand and Notarial seal this 16th day of
[17] September, 2001.
[18]
[19]
[20]
[21]       Notary Public, RMR
[22]
[23] My commission expires: March 7, 2008
[24]

# In The Matter Of:

*Charles Schwab  &  Co., Inc.  v.*
*Sears, et al.*

---

*James Casagrande*
*September 26, 2001*

*vol. 2*
*pp. 45-156*

---

*Jones, Fritz & Sheehan*
*A LegaLink Company*
*210 South Street*
*11th Floor*
*Boston, MA  02111*
*(617) 542-0039   or   (800) 822-3376*

*Original File 0926CASA.TXT, 112 Pages*
*Min-U-Script® File ID: 3490970601*

# Word Index included with this Min-U-Script®

Page 45

[1]                     Volume: II
[2]                     Pages:   45-156
[3]                     Exhibits: 33-36
[4]          COMMONWEALTH OF MASSACHUSETTS
[5] Suffolk, ss.          Superior Court
[6]
[7] CHARLES SCHWAB & CO., INC.
[8]        Plaintiff,
[9]    v.          Civil Action
[10]               No. 00 3807-E
[11] ROBERT C. SEARS; LAST MINUTE CONCESSIONS,
[12] INC.; COLD SPRING GOLF COURSE, INC.; JAMES
[13] CASAGRANDE; GERALD HERSH and SEARS, CASAGRANDE &
[14] HERSH,
[15]        Defendants,
[16] - - - - - - - - - - - - - - X
[17]    (Caption continued on Page 2)
[18]    CONTINUED DEPOSITION of JAMES CASAGRANDE
[19]       Wednesday, September 26, 2001
[20]          9:56 a.m.
[21]       BINGHAM DANA, LLP
[22]       150 Federal Street
[23]       Boston, Massachusetts
[24]    Reporter: Ann M. Lasoskie, CSR/RPR

Page 46

[1] PRUDENTIAL SECURITIES INCORPORATED,
[2]        Trustee and Reach and Apply Defendant,
[3] and
[4] FLEET NATIONAL BANK and FLORENCE SAVINGS BANK,
[5]        Trustee Defendants.
[6]
[7]          - AND -
[8]       UNITED STATES DISTRICT COURT
[9]        DISTRICT OF MASSACHUSETTS
[10]
[11] SECURITIES AND EXCHANGE COMMISSION,
[12]        Plaintiff,
[13] v.
[14] ROBERT C. SEARS,          CA NO.
[15]     Defendant,     00-30170-FHF
[16] and
[17] LAST MINUTE CONCESSIONS, INC.; JAMES W.
[18] CASAGRANDE; COLD SPRING GOLF COURSE, INC.;
[19] and COLD SPRING DEVELOPMENT, INC.
[20]        Relief Defendants.
[21]
[22]
[23]
[24]

Page 47

[1] APPEARANCES:
[2]    BINGHAM DANA, LLP
[3]    By John R. Snyder, Esquire
[4]    150 Federal Street
[5]    25th Floor
[6]    Boston, Massachusetts 02110
[7]    617-951-8000
[8]    Counsel for the Plaintiff.
[9]
[10]    LESSER, NEWMAN, SOUWEINE & NASSER, LLP
[11]    By Thomas Lesser, Esquire
[12]    39 Main Street, Suite 1
[13]    Northampton, Massachusetts 01060
[14]    413-584-7331
[15]    Counsel for the Defendants, Last Minute
[16]    Concessions, and James Casagrande.
[17]
[18]    UNITED STATES SECURITIES AND EXCHANGE
[19]    COMMISSION
[20]    By Frank C. Huntington, Esquire
[21]    73 Tremont Street
[22]    Suite 600
[23]    Boston, Massachusetts 02108
[24]    617-424-5900

Page 48

[1] APPEARANCES: Continued
[2]
[3]    EDWARDS & ANGELL, LLP
[4]    By Robert D. Laurie, Esquire
[5]    101 Federal Street
[6]    Boston, Massachusetts 02110
[7]    617-439-4444
[8]    Counsel for the Defendant Cold Spring
[9]    Golf Course, Inc., and Cold Spring Development,
[10]    Inc.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

James Casagrande
September 26, 2001
Case 3:00-cv-30170-MAP   vol. 2   Document 44   Filed 10/31/02   Charles Schwab & Co., Inc.   v.
pp. 45-156                                                      Page 84 of 142   Sears, et al.

Page 49

[1]                INDEX
[2] Deposition of:  Direct Cross  Redirect  Recross
    JAMES CASAGRANDE
    By Mr. Snyder  50        152
[5] By Mr. Huntington  138
[6] By Mr. Laurie      150
[7]
[8]
[9]
[10]         EXHIBITS
[11]
[12] NO.                              PAGE
[13] 33  Last Minute Concessions Checking Account  76
[14] 34  Defendant James Casagrande's Response to  88
[15]     the Plaintiff's First Request for
[16]     Production of Documents
[17] 35  Message                       107
[18] 36  Message                       111
[19]
[20]
[21]
[22] *Original exhibits retained by Mr. Snyder
[23]
[24]

Page 50

**PROCEEDINGS**

[2]    JAMES CASAGRANDE,
[3] a witness called for examination by counsel for the
[4] Plaintiff, being first duly sworn, was further
[5] examined and testified as follows:
[6]
[7]            **DIRECT EXAMINATION**
[8]            **BY MR. SNYDER:**
[9]    **Q:** Mr. Casagrande, we greeted each other off
[10] the record, but just for the record, my name is John
[11] Snyder and I represent Charles Schwab & Co., in this
[12] action. This is a continuation of your deposition
[13] which we commenced on August 29. I would like that
[14] the same sort of ground rules to apply today as
[15] applied on the 29th of August.
[16]    That is, that I'd like you to be sure
[17] that you understand and hear the question before you
[18] answer the question. Okay?
[19]    **A:** Sure.
[20]    **Q:** And I also need to have, for the court
[21] reporter's benefit, an audible response in the
[22] nature of a yes or no or something else audible.
[23] Head shakes and uh-huhs are difficult for her to
[24] transcribe. Okay?

Page 51

[1]    **A:** Sure.
[2]    **Q:** If you want to break at any time, we can
[3] accommodate that. All I ask is I get an answer to a
[4] pending question. Okay?
[5]    **A:** Okay.
[6]    **Q:** Last time we were looking at some of the
[7] compilations of information about financial
[8] transactions, checks and wire transfers and the like
[9] and what I'd like to do is pick that up and show you
[10] a few that I don't think we've looked at yet
[11] starting at Exhibit 3. And my first question on
[12] that is going to be, do you recognize that document?
[13] Have you seen it before?
[14]    **A:** Yes.
[15]    **Q:** Did you prepare it?
[16]    **A:** Yes.
[17]    **Q:** And for what purpose did you prepare it?
[18]    **A:** For, I think it was in reference to these
[19] proceedings.
[20]    **Q:** When you say these proceedings —
[21]    **A:** I think this was requested by either the SEC
[22] or Schwab.
[23]    **Q:** I can represent to you that it wasn't
[24] requested by Schwab. Would that refresh your

Page 52

[1] recollection as to whether it was requested by the
[2] SEC?
[3]    **A:** Well, I guess, I don't know.
[4]    **Q:** Did you prepare it at or about the time that
[5] you first learned that Schwab and the SEC had
[6] commenced lawsuits in connection with the matter of
[7] the Cold Spring Golf Course?
[8]    **A:** I don't remember.
[9]    **Q:** When did you prepare it?
[10]    **A:** Well, it has a date of 3/23 on it.
[11]    **Q:** That's March 23 of the year 2001; is that
[12] when you prepared this document?
[13]    **MR. LESSER:** If you recall.
[14]    **A:** I don't recall.
[15]    **Q:** Do you know whether that number — you're
[16] referring to the date that's in the upper right-hand
[17] corner of the document on the first page?
[18]    **A:** That's right.
[19]    **Q:** To your knowledge, does that date reflect
[20] the date that the document was last revised or the
[21] date that it was printed?
[22]    **A:** Unsure. I don't know.
[23]    **Q:** How did you prepare this document then? Let
[24] me break it down. Did you prepare it on a personal

Page 53

[1] computer?
[2] A: Yes.
[3] Q: Was that a personal computer at your home?
[4] A: Yes.
[5] Q: And did you use any particular type of
[6] software program?
[7] A: I think it was Quicken.
[8] Q: Okay. Do you know when you use a document
[9] on Quicken whether the program as you use it
[10] automatically updates that date anytime you go into
[11] the document?
[12] A: I don't know.
[13] Q: So can you tell me what your best
[14] recollection is as to when you first prepared a
[15] document like this, any version of this document,
[16] was it in the year 2000 or the year 2001?
[17] A: I don't know.
[18] Q: Well, in any event, when you prepared this
[19] document in connection with this ongoing litigation,
[20] did you endeavor to be as accurate as you possibly
[21] could?
[22] A: Yes.
[23] Q: And what documents did you use as sources
[24] for the information that is reflected in this

Page 54

[1] Exhibit 3?
[2] A: Bank register, you know, bank receipts that
[3] we get back in the mail and the check register from
[4] the checkbook.
[5] Q: When you refer to the things that you get in
[6] the mail from the bank, are you referring to monthly
[7] account statements?
[8] A: Yes.
[9] Q: Did you also use any confirmations or other
[10] notices that you received from banks with respect to
[11] wire transfers?
[12] A: No.
[13] Q: So account statements and the check
[14] register, did you actually look at any of the checks
[15] when you were preparing this Exhibit 3?
[16] A: When I got the checks back, are you saying?
[17] Q: Well, when you were preparing this document,
[18] did you use any of the checks that you had received
[19] back from the bank that had been drawn on the
[20] account that is —
[21] A: I don't know.
[22] Q: — referred to here.
[23] A: I'm not sure.
[24] Q: What account does this document concern?

Page 55

[1] A: It looks — Cold Spring, golf course at Cold
[2] Spring.
[3] Q: That was an account with Fleet Bank?
[4] A: Yes.
[5] Q: And perhaps at one time Bank of Boston
[6] before Bank of Boston became part of Fleet?
[7] A: Yeah, it could have been.
[8] Q: And when you had prepared this document, who
[9] did you give it to?
[10] A: I don't know.
[11] Q: To your knowledge, was it provided to the
[12] SEC?
[13] A: Again, I don't know.
[14] Q: What did you do with the document after you
[15] had prepared it?
[16] A: Um, I don't believe I did anything with it.
[17] Q: How was it that you came to prepare it? You
[18] mentioned that you prepared it in connection with
[19] the litigation, but what in particular caused you to
[20] sit down and prepare this document?
[21] A: I honestly don't remember.
[22] Q: All right. When is the last time you saw
[23] this document or any version of it?
[24] A: I don't know.

Page 56

[1] Q: And you see at the top it says, Register
[2] Report, and then there are some dates, February 8,
[3] 2000 through March 23, 2001. Was it your intent in
[4] creating this document to include information with
[5] respect to this account from the time it was opened
[6] until the time that you prepared this register
[7] report?
[8] A: Yes.
[9] Q: Now, is Register Report, is that a title
[10] that comes from Quicken or is that a title that you
[11] came up with?
[12] A: It must be Quicken.
[13] Q: All right. Let me show you what we've
[14] previously marked as Exhibit 4. Does that document
[15] also concern the golf course at Cold Spring account
[16] with Fleet Bank?
[17] A: Yes.
[18] Q: And you see that document has in the upper
[19] right-hand corner the date March 20, 2001?
[20] A: Okay.
[21] Q: To your best recollection, did you prepare
[22] this document at or about March 20, 2001?
[23] A: Again, I'm not sure.
[24] Q: And this document runs for a different date

James Casagrande
September 26, 2001

vol. 2

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 86 of 142

Charles Schwab & Co., Inc.   v.
Sears, et, al.

pp. 45-156

Page 57

[1] range. Do you see that it's from —
[2] A: Yes, I see that.
[3] Q: February 9 through August 18 of the year
[4] 2000. What was your purpose in restricting this
[5] report to those dates?
[6] A: I have no idea.
[7] Q: As you prepared this in Quicken on your PC,
[8] are Exhibits 3 and 4 part of the same document or
[9] file?
[10] A: Yes.
[11] Q: So that Exhibit 3 would be essentially
[12] complete or the more complete document in that it
[13] runs through March 23, and Exhibit 4 is a subset of
[14] that document, if you will, or a portion of that
[15] document running only through August 18 of 2000; is
[16] that correct?
[17] A: It could be. I don't know.
[18] Q: You prepared Exhibit 4 as well?
[19] A: Yes.
[20] Q: And why did you prepare Exhibit 4?
[21] A: I don't know.
[22] Q: To whom did you provide Exhibit 4?
[23] A: Not sure.
[24] Q: Have you prepared any other versions of

Page 58

[1] Exhibit 3 or Exhibit 4 concerning the golf course at
[2] Cold Spring account?
[3] A: I don't know.
[4] Q: Is Exhibit 4 to the best of your knowledge
[5] accurate?
[6] A: I'm unsure, I guess, I'd have to answer.
[7] Q: Let me ask it this way. Sitting here today,
[8] do you believe Exhibit 3 or Exhibit 4 is inaccurate
[9] in any way?
[10] A: No, I don't believe so.
[11] Q: If you look at the bottom of Exhibit 3, it
[12] looks like there's a line cut off.
[13] A: Yes. -
[14] Q: Do you know at the very bottom there's a
[15] line that starts with 8/9/00. I guess that's a
[16] check number, right, 1048?
[17] A: Yes.
[18] Q: And then there's a line under that. And if
[19] you look at Exhibit 4, somebody has written in some
[20] information at the bottom of the first page on
[21] Exhibit 4; do you see that?
[22] A: Yes.
[23] Q: Is that your handwriting?
[24] A: Yes.

Page 59

[1] Q: Did you write in that handwriting to
[2] essentially replace the information that was in that
[3] line that was cut off either in the copying or the
[4] printing process?
[5] A: That's right.
[6] Q: Now, going back to Exhibit 3 for a moment,
[7] the last page of Exhibit 3. It has at the top the
[8] same date, March 23, 2001, but the title, Quick Zoom
[9] Report. What do you understand that to mean, Quick
[10] Zoom Report?
[11] A: I'm unsure.
[12] Q: Did you prepare this page, the third page of
[13] Exhibit 3?
[14] A: I think so.
[15] Q: And for what purpose did you prepare this?
[16] A: It looks to show the checks that were
[17] written to myself for payroll.
[18] Q: Okay. Not all the checks that were written
[19] to you, but just the checks that were written to you
[20] for payroll; is that right?
[21] A: That's what it looks like.
[22] Q: And had someone requested that you generate
[23] such a report showing all the checks that had been
[24] written to you for payroll?

Page 60

[1] A: I don't know.
[2] Q: Do you know why you prepared this?
[3] A: I'm unsure.
[4] Q: If you look at the top left-hand corner,
[5] there appear the words, LMC-Bank Cash CC Accounts.
[6] What does that mean?
[7] A: I'm unsure.
[8] Q: Did you provide those or input those words
[9] into this document, or is that something that was
[10] automatically generated by Quicken?
[11] A: I'm sure it was just generated. I wouldn't
[12] have done it.
[13] Q: LMC, does that refer to Last Minute
[14] Concessions?
[15] A: I'm sure it does.
[16] Q: CC Accounts, does that refer to country club
[17] accounts?
[18] A: I'm unsure.
[19] Q: Who would know, anyone other than yourself
[20] if I wanted to find out what those words meant?
[21] A: Maybe one of my partners. I'm not sure.
[22] Q: When you say your partners, who are you
[23] referring to?
[24] A: Ed Waszkelewicz, Mark Kramer, and John

Charles Schwab & Co., Inc. v.          vol. 2          James Casagrande
Sears, et al.          Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 87 of 142
                                       pp. 45-156                          September 26, 2001

Page 61

[1] Marchand.
[2] Q: When you say partners, do you understand
[3] that you and Kramer and Marchand and Waszkelewicz
[4] are members of a partnership?
[5] A: No.
[6] Q: How is it that you refer, in what sense do
[7] you refer to them as your partners?
[8] A: Partners in a business, it's a corporation,
[9] corporations.
[10] Q: What corporations are those or what business
[11] is that?
[12] A: Cold Spring Golf Course and Cold Spring
[13] Development.
[14] Q: You see the dates that are indicated under
[15] the title Quicken Zoom Report, February 1 through
[16] March 23, 2001. Have you received any payroll
[17] payments either before that date range or after that
[18] date range?
[19] A: No.
[20] Q: Have you received any other payments from
[21] any golf course at Cold Spring, Cold Spring
[22] Development, Cold Spring Golf Course, or Last Minute
[23] Concessions' account other than what is listed on
[24] this third page of Exhibit 3?

Page 62

[1] A: I don't believe so.
[2] Q: Well, you received some, I believe you told
[3] us last time that you received repayments of a loan
[4] or loans that you made in connection with the golf
[5] course, right?
[6] A: Yes, that's true.
[7] Q: Two, $3,000 payments?
[8] A: Yes.
[9] Q: We'll come back to that. Other than those
[10] payments and these payroll payments, have you
[11] received any payment from any of those entities?
[12] A: No.
[13] Q: Do you have any reason to believe that this
[14] report, the third page of Exhibit 3 is in any way
[15] inaccurate?
[16] A: No.
[17] Q: To whom was this report provided?
[18] A: I'm not sure.
[19] Q: I'll show you what we've previously marked
[20] as Exhibit 5. Do you recognize that?
[21] A: Yes.
[22] Q: Did you prepare it?
[23] A: I don't believe so.
[24] Q: Do you know who did?

Page 63

[1] A: Unsure.
[2] Q: Who would know who prepared this?
[3] A: One of my partners.
[4] Q: Talking again, Mr. Waszkelewicz —
[5] A: Yes.
[6] Q: — John Marchand, and Kramer?
[7] A: Yes.
[8] Q: And in what connection did you see this
[9] document?
[10] A: This looks to be the register compilation of
[11] the check register from the development account.
[12] Q: Have you reviewed this compilation prior to
[13] today?
[14] A: I've seen it before.
[15] Q: Where did you see it?
[16] A: I've seen the check register.
[17] Q: Do you refer to the check register, you're
[18] not referring to this document Exhibit 5; is that
[19] correct? You're referring to a different document?
[20] A: That's correct.
[21] Q: Where did you see this document, Exhibit 5?
[22] A: I don't remember.
[23] Q: What were the circumstances of your seeing
[24] this document?

Page 64

[1] A: I really don't remember.
[2] Q: Do you understand this document to concern
[3] an account with the SIS Bank?
[4] A: Yes, I believe so.
[5] Q: SIS Bank has subsequently been acquired by
[6] another bank, Mass. Bank or something like that, but
[7] anyway, the bank that was SIS Bank?
[8] A: Yes. That's where the account was.
[9] Q: And that's what this is about?
[10] A: Yes.
[11] Q: Do you see the handwriting in the upper
[12] right-hand corner of the first page of Exhibit 5?
[13] A: Yes.
[14] Q: Do you recognize that handwriting?
[15] A: Not sure, no.
[16] Q: Do you see in the upper left-hand corner
[17] there is a reference to operating account?
[18] A: Yes.
[19] Q: To your understanding, was this account at
[20] SIS Bank used as an operating account for the golf
[21] course project at some point?
[22] A: It was the original account, yes.
[23] Q: When you first got involved with the golf
[24] course project, this was the account, the bank

James Casagrande
September 26, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 88 of 142

vol. 2
pp. 45-156

Charles Schwab & Co., Inc.   v.
Sears, et al.

---

**Page 65**

[1] account that was used for the project, correct?

[2] **A:** Yes.

[3] **Q:** Was there any other account that the bank,

[4] the golf course project used at the time that you

[5] first became involved in the first half of '99?

[6] **A:** I'm unsure.

[7] **Q:** To your knowledge, do you know of any other

[8] account other than this one that this golf course

[9] project was using in the first half of '99?

[10] **A:** I'm unsure.

[11] **Q:** Let me show you Exhibit 6 and ask you if

[12] you've seen that before?

[13] **A:** It looks to be the same account.

[14] **Q:** Okay. Just a different date range?

[15] **A:** I'm unsure, I guess.

[16] **Q:** Well —

[17] **A:** It looks to start at a different date.

[18] **Q:** If you look at the top of Exhibit 5 it says

[19] that it runs from January 1, '99 to May 14, 2000,

[20] right?

[21] **A:** The handwriting it does, yes.

[22] **Q:** If you look at the document —

[23] **A:** Yes.

[24] **Q:** — can you satisfy yourself that it does

---

**Page 66**

[1] seem to run for that date range?

[2] **A:** Yes.

[3] **Q:** And Exhibit 6 says it runs from January 3,

[4] 2000 to September 1, 2000 and in fact runs for those

[5] dates, right?

[6] **A:** Yes.

[7] **Q:** So these two documents concern the same

[8] account with SIS Bank, but just covers different

[9] date ranges, correct?

[10] **A:** That's what it appears, yes.

[11] **Q:** Have you ever seen Exhibit 6 before?

[12] **A:** I'm unsure.

[13] **Q:** Have you ever seen any document in this

[14] format concerning the SIS Bank account?

[15] **A:** Could you say that again.

[16] **Q:** Have you seen any document, whether one or

[17] the other of these or some other version of one of

[18] these having to do with the SIS Bank account?

[19] **A:** I'm unsure.

[20] **Q:** Do you know whose handwriting appears at the

[21] top of Exhibit 6?

[22] **A:** Not positively, no.

[23] **Q:** Do you know, whether or not you're

[24] completely positive, do you have an opinion as to

---

**Page 67**

[1] whose handwriting that is?

[2] **A:** My guess would be Ed Waskelewicz.

[3] **Q:** Would the same be true with the respect to

[4] the handwriting at the top of Exhibit 5? That is, to

[5] the best of your information, that's Waszkelewicz's

[6] handwriting?

[7] **A:** Yes.

[8] **Q:** And to your knowledge, did Mr. Waszkelewicz,

[9] at least in, let's talk about 1999 now, did

[10] Mr. Waszkelewicz maintain the check register and

[11] write the checks on the SIS Bank account?

[12] **A:** I don't know.

[13] **Q:** Did you ever write any checks on the Cold

[14] Spring Development SIS Bank account?

[15] **A:** I believe I did.

[16] **Q:** And when did you first do that?

[17] **A:** I'm not sure.

[18] **Q:** Sometime in the year 2000?

[19] **A:** It could have been. I'm unsure.

[20] **Q:** Would it be at or about the time you became

[21] an employee of the golf course?

[22] **A:** I am unsure.

[23] **Q:** All right. Let me show you what we've

[24] marked as Exhibit 7 and ask if you recognize that?

---

**Page 68**

[1] **A:** Yes.

[2] **Q:** And what is that?

[3] **A:** Looks to be a copy of the check register for

[4] the same account SIS.

[5] **Q:** And do you recognize the handwriting?

[6] **A:** Looks to be Ed Waszkelewicz's.

[7] **Q:** I'd ask you to take a look through the

[8] document and tell me if you see any handwriting on

[9] this document that appears to you to be handwriting

[10] of someone other than Ed Waszkelewicz's.

[11] **A:** No.

[12] **Q:** Let me ask you to look in particular at the

[13] last page of that document. The first entry looks

[14] like it has a date of April 20, 1999 and the first

[15] line says Deposit, and next to it the word Loan. Do

[16] you recognize the word Loan, to be in someone's

[17] handwriting other than Mr. Waszkelewicz's?

[18] **A:** No.

[19] **Q:** And how about if you go about a third of the

[20] way down that page, the date of April 23, there

[21] appear the same words Deposit and Loan. Do you

[22] recognize the word Loan to be in anyone's

[23] handwriting other than Mr. Waszkelewicz's?

[24] **A:** I don't.

---

**Min-U-Script®**

Charles Schwab & Co., Inc. v.
Sears, et al.
Case 3:00-cv-30170-MAP    Document 44    Filed 10/31/02    Page 89 of 142
vol. 2
pp. 45-156
James Casagrande
September 26, 2001

Page 69

[1] Q: Have you seen this check register for the
[2] SIS Bank account prior to today?
[3] A: I'm sure I have.
[4] Q: When you were an employee of the golf course
[5] and writing checks on the SIS Bank account, did you
[6] have access to the check register for that account?
[7] A: I'm unsure.
[8] Q: How did you go about doing that then? How
[9] did you go about writing checks on the SIS Bank
[10] account?
[11] A: I guess I'm not following your question.
[12] Q: Well, describe to me at the time you were
[13] writing checks on the SIS Bank account how those
[14] checks were kept, where they were kept.
[15] A: Depending, it varied. Ed had the check
[16] register for most of the time. On occasion if he
[17] wasn't available or, you know, sometimes I had it,
[18] but generally Ed had it.
[19] Q: And the checks were kept with the check
[20] register, right?
[21] A: That's correct.
[22] Q: So the general procedure was whoever wrote a
[23] check would fill out the check register as to the
[24] check they had written; is that right?

Page 70

[1] A: That should have been the general procedure
[2] probably, yes.
[3] Q: Whether or not it was followed 100 percent
[4] all the time, that was the general procedure that
[5] was followed, correct? There might have been
[6] occasions on which someone didn't fill out the check
[7] register at the time they wrote the check, but in
[8] general that was what you and Mr. Waszkelewicz did,
[9] correct?
[10] A: I don't actually remember using this
[11] (indicating), but he may have. I don't know.
[12] Q: Let's go back to my original question then.
[13] When you wrote checks on the SIS Bank account, how
[14] did you go about doing that? Did you get the check
[15] register from Mr. Waszkelewicz or —
[16] A: It was probably on the site when I wrote the
[17] check.
[18] Q: When you say the site, it was on the site of
[19] the golf course project?
[20] A: Right.
[21] Q: And was there some sort of an office there?
[22] A: You can loosely call it that, yeah.
[23] Q: Describe what there was that we're loosely
[24] calling an office.

Page 71

[1] A: An old farmhouse that we used as kind of a
[2] construction office.
[3] Q: And you had in there various documents that
[4] concerned the project; would that be fair to say?
[5] A: Yeah, mostly blueprints.
[6] Q: And also the check register for the SIS Bank
[7] account, correct?
[8] A: On occasion, yes.
[9] Q: When the check register for that account
[10] wasn't in that project office, where was it?
[11] A: I'm unsure.
[12] Q: Was it sometimes at your home?
[13] A: I am unsure.
[14] Q: Was it sometimes at your office at 17 Hawley
[15] Street?
[16] A: I'm unsure.
[17] Q: Let me show you what we've marked as
[18] Exhibit 8 and ask you if you recognize that?
[19] A: No.
[20] Q: Does that appear to you to be another
[21] portion of the check register for the SIS Bank
[22] account for the golf course project?
[23] A: I am unsure. It appears to be, but I'm
[24] unsure.

Page 72

[1] Q: Let me ask you then to look at this document
[2] and tell me if you recognize any of the handwriting
[3] to be anyone's other than Mr. Waszkelewicz's?
[4] MR. LESSER: Assuming he recognizes it
[5] to be Mr. Waszkelewicz's.
[6] MR. SNYDER: Well, I'm not making that
[7] assumption. I'm asking if he recognizes handwriting
[8] of anyone other than Mr. Waszkelewicz is my
[9] question.
[10] MR. LESSER: Fair enough.
[11] A: Yes. These here, the last two pages of
[12] whatever is attached to Exhibit 8.
[13] Q: Whose handwriting do you recognize that to
[14] be?
[15] A: That's mine.
[16] Q: Is all the handwriting on those two pages
[17] yours?
[18] A: No.
[19] Q: Which of the handwriting is not yours?
[20] A: The second page, there's, it looks like
[21] check Nos. 466, 467, 471, 473, 474, 476, 477, 478.
[22] Q: And that is not your handwriting is what
[23] you're saying?
[24] A: Yes.

Case 3:00-cv-30170-MAP    Document 44    Filed 10/31/02    Page 90 of 142

---

**Page 73**

[1] **Q:** Do you know whose handwriting it is?

[2] **A:** It looks to be Ed Waszkelewicz's.

[3] **Q:** And how about over on the third page from
[4] the end, and at the bottom there, is any of that
[5] handwriting yours?

[6] **A:** Yeah. The check — I'm assuming this is the
[7] page you're on, 1427?

[8] **Q:** Yes.

[9] **A:** Where it says, the top of the heading, 4,
[10] where it says Golf Show, that looks to be my writing
[11] and probably the 321.50 is mine but I'm unsure.

[12] **Q:** How about any of the other handwriting on
[13] that page?

[14] **A:** I don't think so.

[15] **Q:** The handwriting in the remainder of the
[16] document other than what you've identified as yours,
[17] do you recognize that to be Ed Waszkelewicz's
[18] handwriting?

[19] **A:** That's what my guess would be, yes.

[20] **Q:** Well, is it more than a guess? Do you have
[21] a reason to believe that's Ed Waszkelewicz's
[22] handwriting based on your seeing his handwriting
[23] over the last couple of years?

[24] **A:** Yes. Although, it could have been John

---

**Page 74**

[1] Marchand and Mark Kramer's in there. I don't really
[2] say that I know what their handwriting looks like.

[3] **Q:** Anyone else that you think it would be
[4] possible wrote any of the handwriting on here that
[5] isn't yours?

[6] **A:** I don't know. I don't believe so.

[7] **Q:** All right. Let me show you what we looked
[8] at as Exhibit 11. I believe you testified that you
[9] prepared this?

[10] **A:** Yes.

[11] **Q:** And this document concerns the Last Minute
[12] Concessions' checking account with Fleet Bank; is
[13] that right?

[14] **A:** That's what it appears, yes.

[15] **Q:** Well, do you have any reason to believe that
[16] it concerns any account other than the Last Minute
[17] Concessions' checking account with Fleet Bank?

[18] **A:** Nope.

[19] **Q:** And why did you prepare this document?

[20] **A:** I'm not sure.

[21] **Q:** And to whom did you provide this document?

[22] **A:** I'm not sure.

[23] **Q:** And how did you come to choose the dates
[24] February 9 through August 18 of 2000?

---

**Page 75**

[1] **A:** I don't know.

[2] **Q:** Does the date August 18, 2000 have any
[3] significance to you in connection with the golf
[4] course project or Last Minute Concessions?

[5] **A:** No.

[6] **Q:** The reason I ask is this is the second
[7] document we've seen that used that as an end date.
[8] Do you recall that we looked at one earlier for the
[9] golf course account?

[10] **A:** Mm-hmm.

[11] **Q:** You need to say yes or no.

[12] **A:** Yes.

[13] **Q:** But that doesn't help you in terms of
[14] remembering what the significance of that date was?

[15] **A:** No.

[16] **Q:** And do you have any reason to believe that
[17] this Exhibit 11 is in any way inaccurate?

[18] **A:** No.

[19] **Q:** Now, you see this document is dated in the
[20] upper right-hand corner, October 6, 2000?

[21] **A:** Yes.

[22] **Q:** Would that be consistent with your
[23] recollection as to the latest date on which this
[24] document was created?

---

**Page 76**

[1] **A:** I have no idea.

[2] **Q:** In other words, it's possible that this
[3] document was created earlier than October 6, 2000
[4] and that that October 6 either represents the time
[5] that it was printed or last revised; is that fair to
[6] say?

[7] **A:** I guess I don't know how the program works,
[8] but...

[9] **Q:** Do you have any reason to believe that the
[10] program would backdate, so to speak, a document? In
[11] other words, that this document was created
[12] yesterday and somehow October 6 got on there?

[13] **A:** No.

[14] **Q:** Would you have any reason to backdate this
[15] document?

[16] **A:** No.

[17] **Q:** Now, in preparing this document, what
[18] documentation did you use as your sources?

[19] **A:** Monthly statements and probably the checks.
[20] Checks and I guess that would be it.

[21] **Q:** Okay. The monthly statements from the bank
[22] and checks that were written on the account?

[23] **A:** Yes.

[24]     (Exhibit 33 marked

---

Page 77

[1] for identification.)

[2] **Q:** Let me show you what we've marked as
[3] Exhibit 33 and ask you if you recognize that?

[4] **A:** No.

[5] **Q:** Have you ever seen that document before?

[6] **A:** I don't believe so.

[7] **Q:** That makes it easy. Do you have any
[8] recollection of ever creating a list of checks
[9] written on the Last Minute Concessions' account?
[10] Checks only and by that I mean to distinguish
[11] Exhibit 11 which includes checks, deposits, and
[12] other things, do you have any recollection of ever
[13] creating a list which just included checks written
[14] on the Last Minute Concessions' account?

[15] **A:** I'm not sure.

[16] **Q:** Did anyone else have access to the check
[17] register account statements for the returned checks
[18] for the Last Minute Concessions' account other than
[19] yourself?

[20] **A:** I don't believe so.

[21] **Q:** Now, last time you may remember we looked at
[22] a couple of checks that were signed by Mr. Sears
[23] drawn on the Last Minute Concessions' account. Do
[24] you recall that?

Page 78

[1] **A:** I do recall that, yes.

[2] **Q:** So for some period of time or at some time
[3] Mr. Sears had access to at least two checks on the
[4] Last Minute Concessions' account; is that correct?

[5] **A:** It appeared that way, yes.

[6] **Q:** But to your knowledge, did he ever have
[7] access to the account statements for the Last Minute
[8] Concessions' account?

[9] **A:** Have access to, I don't know.

[10] **Q:** Well, those statements were sent to — let
[11] me show you what we've marked as Exhibit 23, and
[12] that is a collection of documents provided to my
[13] colleague Mr. Weissmann by Mr. Lesser pertaining to
[14] the Cold Spring Fleet account. And the Last Minute
[15] Concessions Fleet account, item 2A is the Last
[16] Minute Concessions' account statements. I believe
[17] we looked at these last time.

[18] **A:** Yes.

[19] **Q:** Those were sent to 17 Hawley Street?

[20] **A:** That's correct.

[21] **Q:** And I believe you told us last time that the
[22] secretary or the assistant at 17 Hawley Street
[23] understood that those statements were to be
[24] delivered to you, correct?

Page 79

[1] **A:** To be put in my mail bin or whatever, yes.

[2] **Q:** So that when you came into the office, they
[3] would be there for you to receive?

[4] **A:** That's correct.

[5] **Q:** To your knowledge, were those statements or
[6] copies of those statements or duplicates of those
[7] statements ever provided to Mr. Sears?

[8] **A:** Not to my knowledge.

[9] **Q:** To your knowledge, were copies, duplicates
[10] of those statements ever provided to anyone other
[11] than yourself?

[12] **A:** Not to my knowledge.

[13] **Q:** To your knowledge, were copies of the checks
[14] drawn on the Last Minute Concessions' account, was
[15] the check register for the Last Minute Concessions'
[16] account ever provided to anyone other than yourself?

[17] **A:** And yourselves.

[18] **Q:** Okay. And then once the lawsuit started,
[19] copies were provided —

[20] **A:** I don't believe so, other than —

[21] **Q:** Other than the SEC and Charles Schwab?

[22] **A:** Yeah.

[23] **Q:** All right. On Exhibit 23, item 1B. Those
[24] are what appear to be checks drawn on the golf

Page 80

[1] course at Cold Spring Fleet bank account, correct?

[2] **A:** Yes.

[3] **Q:** Could I just ask you to look through those.
[4] I believe they are all signed with your name, but
[5] what I'd like you to do is tell me if any of those
[6] signatures in your name is not in fact your
[7] signature.

[8] (Pause.)

[9] **A:** They all appear to be my signature.

[10] **Q:** We'll do the same thing. Those were the
[11] checks that appear, Section 1B, just for the record,
[12] of Exhibit 23. And then I would ask you to do the
[13] same thing with respect to the checks that appear at
[14] Section 2C. Having recognized that in those checks
[15] there are two checks that are signed in the name of
[16] Robert Sears, what I'm asking is that other than
[17] those two checks signed in the name of Robert Sears,
[18] are all the other signatures that appear on those
[19] checks yours?

[20] **A:** Yes. Other than the two that apparently have
[21] Bob Sears' signature.

[22] **Q:** Other than the two that appear to be Bob
[23] Sears' signature, all the signatures are yours; is
[24] that correct?

James Casagrande  Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 92 of 142   Charles Schwab & Co., Inc.   v.
September 26, 2001                          vol. 2                                                    Sears, et al.
                                           pp. 45-156

Page 81

[1] **A:** Looks to be, yes.

[2] **Q:** I'm going to direct your attention to a portion of Exhibit 23, which is designated as Section 1C. Are those copies of the check register for the golf course at Cold Spring Fleet bank account?

[7] **A:** I think so.

[8] **Q:** Well, let me ask you this then. Look through Section 1C there and tell me if you see anyone's handwriting other than your own?

[11] **A:** No. I think this is actually LMC's.

[12] **Q:** Mr. Huntington has just pointed that this is the LMC account. I misspoke. I believe the cover letter, Mr. Lesser identifies this is as Cold Spring, but in fact it is Last Minute Concessions', right?

[17] **A:** I believe that is correct.

[18] **Q:** I made that note to myself right here. LMC check register, could you look through there and tell me if you see any handwriting in portion 1C of anyone other than yourself?

[22] **A:** Yes.

[23] **Q:** Okay. I think it would be helpful for the record if you could tell us what page you're on.

Page 82

[1] **A:** On 1C2. The one at the bottom, check No. 1006.

[3] **Q:** And that, as I remember, is one of the checks that has a signature in Mr. Sears' name; is that correct?

[6] **A:** I don't know.

[7] **Q:** I'll represent to you that it is.

[8] **A:** Okay.

[9] **Q:** Why don't we keep going then.

[10] **A:** Okay. That's it.

[11] **Q:** Okay. Other than that check 1006 that we identified on page 1C2, the remainder of the handwriting in this 1C portion of Exhibit 23 is your handwriting; is that correct?

[15] **A:** Yes.

[16] **Q:** Now, let me show you portion 1A of Exhibit 23. Those are the account statements for the golf course at Cold Spring Fleet bank account?

[19] **A:** Yes.

[20] **Q:** The address that appears is 52 Amherst Road in Pelham.

[22] **A:** Yes.

[23] **Q:** That's your home address, correct?

[24] **A:** Yes.

Page 83

[1] **Q:** To your knowledge, were any duplicate statements or copies of statements sent to anyone other than yourself?

[4] **A:** And who's in the room here.

[5] **Q:** Well, okay. All right. Let me be clearer. What my question goes to is, at the time that these account statements were sent out, these were for May of 2000. So sometime in early June when that account statement was sent out, to your knowledge was a duplicate statement sent to anywhere else?

[11] **A:** No duplicate statements.

[12] **Q:** Did you or anyone at your direction ever make copies of account statements for this account and provide them to anyone other than counsel and the SEC and Schwab when the lawsuits began?

[16] **A:** I'm unsure.

[17] **Q:** You were the only person with the signatory authority for this account, correct?

[19] **A:** I don't believe that's correct, no.

[20] **Q:** Who else had signatory?

[21] **A:** I think Ed Waszkelewicz.

[22] **Q:** Have you ever seen — we looked a moment ago at 1B and you identified your signature. You may recall that they were all signed by you; that's what

Page 84

[1] you told us a couple minutes ago, correct?

[2] **A:** Yes.

[3] **Q:** To your knowledge, did Mr. Waszkelewicz ever write a check on the golf course at Cold Spring Fleet bank account?

[6] **A:** I don't believe so.

[7] **Q:** And if I were to tell you that Fleet Bank has provided us an interrogatory response under oath stating that you were the only signatory for this account, would you have any reason to differ with Fleet on that point?

[12] **A:** Probably not.

[12] **Q:** Did anyone other than yourself, Mr. Sears, and Mr. Hersh have offices as 17 Hawley Street?

[15] **A:** Not to my knowledge.

[16] **Q:** 17 Hawley Street is an office condo, correct?

[18] **A:** Right.

[19] **Q:** But the building known at 17 Hawley Street, does it have any other space with a different address?

[22] **A:** No.

[23] **Q:** So the offices of yourself, Mr. Hersh, and Mr. Sears occupy the entirety of the building known

Page 85

[1] as 17 Hawley Street; is that correct?

[2]    A: Yes.

[3]    Q: And is there any indication on the door, on

[4] the outside of the building that Last Minute

[5] Concessions has offices or has there ever been any

[6] indication to that effect?

[7]    A: On the door or window, no.

[8]    Q: Is there a sign outside?

[9]    A: No. Other than the door and window.

[10]    Q: And what does it say on the door and window?

[11]    A: I think it says Sears, Casagrande and Hersh

[12] and our phone number.

[13]    Q: Ampersand or the word and?

[14]    A: I have no idea.

[15]    Q: Okay. So some form or another of Sears

[16] Casagrande and Hersh and maybe a phone number?

[17]    A: Yeah. I'm trying to think. I honestly

[18] don't know. I'm not sure. I don't look at it.

[19]    Q: But do you recall there being anything on

[20] the door or window other than Sears, Casagrande and

[21] Hersh and possibly a telephone number?

[22]    A: No.

[23]    Q: Did Last Minute Concessions ever have a

[24] telephone listing?

Page 86

[1]    A: I don't know.

[2]    Q: How about an e-mail address?

[3]    A: No, I don't believe so.

[4]    Q: Was there ever any stationery prepared, and

[5] by that I mean letterhead or envelopes or anything

[6] of the sort, with the name Last Minute Concessions?

[7]    A: I'm unsure.

[8]    Q: Did Last Minute Concessions file a tax

[9] return for the year 1998?

[10]    A: Yes, I believe so.

[11]    Q: In 1999 or 2000, did Last Minute Concessions

[12] have a fiscal year that differed from the calendar

[13] year?

[14]    A: No.

[15]    Q: Has Last Minute Concessions filed a tax

[16] return for 1999?

[17]    A: I'm actually unsure.

[18]    Q: At some point for some year Last Minute

[19] Concessions has filed a tax return, right?

[20]    A: Yes.

[21]    Q: And when that was done, who was responsible

[22] for seeing to the preparation of that tax return?

[23]    A: Prior, any ones that have been filed were

[24] Bob Sears. He filed them.

Page 87

[1]    Q: And what's your recollection as to which

[2] ones have been filed for what years?

[3]    A: I'm unsure. I really haven't paid any

[4] attention to it.

[5]    Q: So you don't know whether one has been filed

[6] for 1999; is that right?

[7]    A: That's correct.

[8]    Q: Do you know whether a tax return for Last

[9] Minute Concessions has been filed for the year 2000?

[10]    A: I don't believe so.

[11]    Q: To your understanding, is it your

[12] responsibility or Mr. Sears' responsibility to see

[13] to the filing of any tax return that might need to

[14] be filed for Last Minute Concessions for the year

[15] 2000?

[16]    A: My responsibility.

[17]    Q: And whose responsibility was it for the year

[18] 1999?

[19]    A: That would probably be me, too.

[20]    Q: Okay. After the Westover golf course

[21] concession ended for Last Minute Concessions, has

[22] Last Minute Concessions had any employees?

[23]    A: Since then, no.

[24]    Q: Let me show you what we've previously marked

Page 88

[1] as Exhibit 24 and ask you to take a look at

[2] Exhibits A and B to that document. I'll give you

[3] the question. The question is going to be, are you

[4] aware of any corporate records of Last Minute

[5] Concessions other than what appear in Exhibits A and

[6] B? And by corporate records, I mean incorporation

[7] documents, minutes of board meetings, shareholder

[8] meetings, and the like?

[9]    A: Maybe I have the wrong document. This says

[10] Cold Spring Golf Course.

[11]    Q: I'm sorry. I meant Cold Spring Golf Course.

[12] Are you aware of any corporate records of Cold

[13] Spring Golf Course, Inc., other than what appears in

[14] Exhibits A and B?

[15]    A: I'm unsure. Those are all corporate

[16] documents, but I don't know if there's anything not

[17] there.

[18]    Q: As you looked through those, did anything

[19] occur to you as being missing, not being there that

[20] you expect to be there?

[21]    A: I'm unsure.

[22]    MR. SNYDER: Can we mark that as

[23] Exhibit 34.

[24]    (Exhibit 34 marked

James Casagrande
September 26, 2001

vol. 2
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 94 of 142

Charles Schwab & Co., Inc.   v.
Sears, et al
pp. 45-156

Page 89

[1] for identification.)

[2]   Q: Let me show you Exhibit 34. Would you look
at Exhibit A there and my first question is, do you
recognize those as corporate records of Last Minute
[5] Concessions, Inc.?

[6]   A: Yes.

[7]   Q: And are you aware of any corporate records,
[8] that is, incorporation documents, shareholder
[9] meeting minutes, board of director meeting minutes,
[10] share certificates, other than what appear in
[11] Exhibit A?

[12]   A: I'm unsure.

[13]   Q: Well, as you sit here today, can you
[14] describe to me any corporate records of Last Minute
[15] Concessions which are not included? Is there any
[16] item that you can bring to my attention?

[17]   A: Off the top of my head, no. I don't know.
[18] I'd have to go back and see what all our records or
[19] what I have. I don't know.

[20]   Q: Did you at some point turn over or provide
[21] to your counsel all the corporate records that you
[22] had for the Last Minute Concessions, Inc.?

[23]   MR. LESSER: I object, but you can
[24] answer.

Page 90

[1]   A: Probably all I could find, yeah. I don't
[2] know.

[3]   Q: Now, let me ask you about Exhibit 5.
[4] Exhibit 5 on, the pages aren't numbered but the
[5] third page of Exhibit 5, about three-quarters of the
[6] way down with the date 6/18/99, there's a
[7] description, LMC Jim Casagrande, $25,000. Do you
[8] see that?

[9]   A: Yes.

[10]   Q: And did you in fact provide 25,000 to the
[11] golf course project or the golf course account in
[12] June of 1999?

[13]   A: Personally, no.

[14]   Q: Do you have any understanding as to how your
[15] name appears next to $25,000 and the date of June
[16] 1999 in this document concerning the Cold Spring SIS
[17] Bank account?

[18]   A: I don't know.

[19]   Q: Do you have any knowledge of $25,000 being
[20] provided to the golf course project in June of 1999
[21] and that $25,000 being in some manner associated
[22] with you?

[23]   A: I guess I'm not following quite the
[24] question. Do I remember the money coming in, or...

Page 91

[1]   Q: All right. Coming into the golf course
[2] project and being somehow associated with you,
[3] $25,000?

[4]   MR. LESSER: Him, individually?

[5]   Q: I think we established last time that LMC is
[6] you and you were LMC, right? It's your company,
[7] right? As of June 1999, it was your company?

[8]   A: Yes.

[9]   Q: But if you want me to broaden the
[10] question —

[11]   A: No. I just want to understand the
[12] question —

[13]   Q: Are you aware of $25,000 going into the golf
[14] course project in June of 1999 and that $25,000
[15] being in some way associated with you or Last Minute
[16] Concessions?

[17]   A: Any money that Last Minute Concessions
[18] received was a loan that I in turn put, you know,
[19] through LMC to the golf course. I don't know if I'm
[20] answering your question.

[21]   Q: Maybe you are but I just don't understand
[22] it. Let me try to understand first mechanically how
[23] this works. The Last Minute Concessions' bank
[24] account with Fleet Bank was not opened until the

Page 92

[1] year 2000, correct?

[2]   A: I believe so, yes.

[3]   Q: But was there prior to that time another
[4] Last Minute Concessions' account that was used, for
[5] instance, in connection with the Westover golf
[6] course concession?

[7]   A: Oh, yeah. Long ago.

[8]   Q: Did this $25,000 come into that account and
[9] then to the golf course?

[10]   A: No. That account would have been closed a
[11] long, long time ago.

[12]   Q: Tell me then what you remember about any
[13] $25,000, how that $25,000 was transferred to the
[14] golf course in June of 1999.

[15]   A: Specifics, I don't know. If you're asking
[16] who the money came from, I have no idea. This is, I
[17] guess, just crediting Last Minute Concessions or
[18] myself, however you want to look at it, for putting
[19] that money into the golf project.

[20]   Q: Let me make sure I understand. Do you have
[21] any recollection of $25,000 coming into the golf
[22] course in June of 1999?

[23]   MR. LESSER: As you sit here today.

[24]   A: No. I mean, specifically, no. I know

Charles Schwab & Co., Inc. v. James Casagrande
Sears, et al.

Case 3:00-cv-30170-MAP Document 42 Filed 10/31/02 Page 95 of 142
pp. 45-156

September 26, 2001

---

Page 93

[1] numerous monies came in. Specifically 25, no. It
[2] was a long time ago.
[3] Q: Do you have any recollection of $25,000
[4] being credited to your account or your name in
[5] connection with the golf course project in June of
[6] 1999?
[7] A: No. I don't want to guess at it, no.
[8] Q: Well, you see the next entry then is
[9] $100,000. Do you have a recollection of $100,000
[10] being credited to your account or your name in
[11] connection with the golf course project in June of
[12] 1999?
[13] A: I do remember $100,000. Whether it was in
[14] June or not, I'm not sure.
[15] Q: Where did the $100,000 come from?
[16] A: I don't know.
[17] Q: How did it appear?
[18] A: It was a loan to LMC which I have, to date I
[19] have never seen any documentation on anything so I
[20] don't know how it appeared.
[21] Q: Mechanically, did it arrive via wire
[22] transfer, check, cash?
[23] A: I don't, I don't know.
[24] Q: Did you have anything whatsoever to do with

Page 94

[1] that money, $100,000 going to the golf course in
[2] June of 1999?
[3] A: I, I don't really remember.
[4] Q: All right. Let me try one more question and
[5] move on. We looked last time at Exhibits 9 and 10
[6] which are the memoranda of understanding concerning
[7] the Cold Spring Development and Cold Spring Golf
[8] Course companies, correct?
[9] A: Yes.
[10] Q: And those documents each provide for the
[11] payment of a $50,000 deposit, correct?
[12] A: Yes.
[13] Q: To your understanding, were the $50,000
[14] deposits paid in respect to Last Minute Concessions'
[15] obligation under these memoranda of understanding?
[16] A: That's what I would have been referencing,
[17] yes.
[18] Q: That's the 100,000 we were just looking at?
[19] A: Yes.
[20] Q: In terms of where that money came from, how
[21] it was paid, you don't have any information?
[22] A: I don't remember, no.
[23] Q: Did you have any discussion with Mr. Sears
[24] about where that money was coming from?

Page 95

[1] A: No.
[2] Q: To your understanding, did Mr. Sears have
[3] any involvement in making that $100,000 — Strike
[4] that. To your understanding. Did Mr. Sears have
[5] any involvement in the $100,000 payment to the golf
[6] course?
[7] A: Yes. He would have been the one, yes.
[8] Q: What did he do?
[9] A: I have no idea.
[10] Q: Did you ever ask him?
[11] A: No.
[12] Q: At some point in 1999, did you have an
[13] understanding that Last Minute Concessions'
[14] obligation under those two agreements, Exhibits 9
[15] and 10, to pay two $50,000 deposits had been met?
[16] A: Yes.
[17] Q: And your understanding was that Mr. Sears
[18] had taken care of that?
[19] A: Yes.
[20] Q: And you did not ask him how he did that, you
[21] just knew that he had; is that right?
[22] A: As I previously told you, he was instructed
[23] by me and told me that he could come through with
[24] raising the amount of money that I needed to get

Page 96

[1] into the golf project. It was all going to be loans.
[2] And other than that, I don't know what he did.
[3] Q: When you say it was going to be loans, your
[4] understanding was that the money that was going to
[5] be paid in connection with Exhibits 9 and 10, none
[6] of that money was going to be Mr. Sears' personal
[7] funds; is that right?
[8] A: I have, I have no idea.
[9] Q: Well, your understanding was that he was
[10] going to get the money from various investors or
[11] lenders, correct?
[12] A: It was my understanding.
[13] Q: Now, Exhibit 5, flipping over to the next
[14] page which is the fourth page —
[15] A: Okay.
[16] Q: — of the document, about a third of the way
[17] down next to the date July 7, '99, check No. 1340,
[18] payable to you under accounts payable $25,000. Did
[19] you receive a check or other payments from the golf
[20] course in or about July 1999 in the amount of
[21] $25,000?
[22] A: If this is accurate, I'm sure I did I don't
[23] know. I don't really remember. That I personally?
[24] No.

James Casagrande
September 26, 2001

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 96 of 142

vol. 2
pp. 45-156

Charles Schwab & Co., Inc.   v.
Sears, et al.

**Page 97**

[1]  **Q:** What do you mean by you personally? As
[2] distinguished from you as Last Minute Concessions,
[3] is that the distinction you're making?
[4]  **A:** Well, I'm looking at the $25,000 deposit and
[5] the 25,000 coming back, maybe, I don't know what
[6] happened there. But maybe that's just the
[7] reimbursement of that. I don't really know.
[8]  **Q:** Do you have any recollection of Mr. Sears in
[9] addition to arranging for the payment of $100,000,
[10] arranging for the payment of a separate $25,000 in
[11] June or July of 1999?
[12]  **A:** No. It would have only been the 100,000. I
[13] don't know.
[14]  **Q:** So am I correct by way of summary to say
[15] that you have no recollection of $25,000 being paid
[16] out and no recollection of 25,000 coming back to
[17] you?
[18]  **A:** No. Not, no. I don't recall it. Because I
[19] know I didn't have it.
[20]  **Q:** You say you know you didn't have it?
[21]  **A:** Yes.
[22]  **Q:** In June of 1999, it's fair to say that you
[23] didn't have access to $25,000 in cash?
[24]  **A:** Oh, definitely not.

**Page 98**

[1]  **Q:** How much would you say you had access to at
[2] that time in terms of cash or cash equivalent,
[3] liquid investments?
[4]  **A:** Unsure back then. Very little.
[5]  **Q:** Less than $5,000?
[6]  **A:** I don't know. Not sure.
[7]  **Q:** Did you have any stock brokerage account,
[8] investment account?
[9]  **A:** Retirement account.
[10]  **Q:** Where was that held?
[11]  **A:** I think it was Schwab.
[12]  **Q:** Did you —
[13]  **A:** Or is Schwab.
[14]  **Q:** Did you use Mr. Sears in connection with
[15] that account?
[16]  **A:** Yes. He would have been the one that set it
[17] up, yes.
[18]  **Q:** Did you have any other investment accounts
[19] other than the IRA?
[20]  **A:** No.
[21]  **Q:** Did you or any members of your family use
[22] Mr. Sears as an investment adviser other than in
[23] connection with your IRA?
[24]  **A:** When you say my family, you mean me and my

**Page 99**

[1] wife? I don't know about the rest of my family.
[2]  **Q:** You, your wife, your parents, her parents,
[3] children's accounts, custodial accounts, anything of
[4] that nature.
[5]  **A:** I'm not sure. I think my wife had talked
[6] with Bob at one point about the same thing, a
[7] retirement account.
[8]  **Q:** Did she have an account with him at any
[9] point?
[10]  **A:** With him, no.
[11]  **Q:** Or did she have an account that he was the
[12] investment adviser or financial consultant at any
[13] point?
[14]  **A:** No.
[15]  **Q:** Have you ever had any custodial accounts for
[16] the benefit of your children?
[17]  **A:** I think I have a small account for my
[18] daughter right now.
[19]  **Q:** When was that account opened?
[20]  **A:** Well, she's only 21 months so it wasn't that
[21] long.
[22]  **Q:** The last year or so?
[23]  **A:** Something like that. She was alive, I know
[24] that.

**Page 100**

[1]  **Q:** Exhibit 5, if you would look at the last
[2] page. There's an entry about half of the way down
[3] with the date, March 16, 2000.
[4]  **A:** Okay.
[5]  **Q:** It says, Account Jim Casagrande?
[6]  **A:** Okay.
[7]  **Q:** Amount $50,000?
[8]  **A:** Yes.
[9]  **Q:** Do you recall in mid March of 2000, a
[10] $50,000 payment being made to the golf course
[11] account?
[12]  **A:** I have no way of remembering that
[13] specifically.
[14]  **Q:** If such a payment was made, what was the
[15] source?
[16]  **A:** I have no idea.
[17]  **Q:** Well, was any money paid in to the golf
[18] course project in the — I'm going to put aside
[19] these transactions we looked at a moment ago, the
[20] $25,000 and the 100,000, which apparently took place
[21] in 1999 and focus on the year 2000. Was any money
[22] paid to the golf course project for which you were
[23] associated, any money which you were associated paid
[24] to the golf course project in the year 2000 from

Page 101

[1] anywhere other than the Last Minute Concessions'
[2] account?
[3]    A: Not that I can remember, no.
[4]    Q: Did Mr. Sears or anyone else to your
[5] knowledge ever pay any money to the golf course
[6] project in the year 2000 other than through the Last
[7] Minute Concessions' account?
[8]    A: I'm not sure. I don't believe so.
[9]    Q: Exhibit 11. That is the register report for
[10] the Last Minute Concessions' account which you
[11] prepared, right?
[12]    A: Yes.
[13]    Q: If you could look there in mid March of 2000
[14] and see if you find any payment in the amount of
[15] $50,000.
[16]    A: Deposit or payment?
[17]    Q: Payment out.
[18]    A: There looks to be one on March 3.
[19]    Q: All right. If you look at Exhibit 5, the
[20] last page, do you have that still?
[21]    A: Yes.
[22]    Q: In the middle of the page, that appears to
[23] be the deposit that was made with your account name
[24] on March 7, right, 50,000, right?

Page 102

[1]    A: I see that, yes.
[2]    Q: Do you see another 50,000 coming out of the
[3] Last Minute Concessions' account in mid March that
[4] would correspond to this deposit in mid March?
[5]    A: No.
[6]    Q: Can you offer us any other information as to
[7] that $50,000 deposit and where it came from?
[8]    A: I'm unsure.
[9]    Q: Okay. Did Cindy Lasser Sears ever make a
[10] loan to you?
[11]    A: No.
[12]    Q: Have you ever heard of Huber, Hogan
[13] Consulting?
[14]    A: No.
[15]    Q: Have you ever heard of Russon Financial
[16] Services?
[17]    A: No.
[18]    Q: To your understanding, were any of the
[19] monies that were deposited to the Last Minute
[20] Concessions' account Robert Sears' personal funds?
[21]    A: I don't know.
[22]    Q: Do you know of any instance of any funds
[23] coming into the Last Minute Concessions' account
[24] being Robert Sears' personal funds?

Page 103

[1]    A: Again, I don't know.
[2]    Q: Your understanding was that he was obtaining
[3] these funds from his investors, correct?
[4]    A: Yes.
[5]    Q: And is the same true with respect to the
[6] $100,000 that was put up in 1999 with respect to the
[7] deposits? So as far as you know, that money came
[8] from one or more of Sears' investors, correct?
[9]    A: As far as I know, yes.
[10]    Q: In the year 2000, who to your understanding
[11] had authority to sign any binding obligation for
[12] Last Minute Concessions, Inc.?
[13]    A: Me.
[14]    Q: Anyone else?
[15]    A: No.
[16]    Q: Did Mr. Sears ever tell you that he had told
[17] any of his investors that they were purchasing bonds
[18] with the money that was transferred to Last Minute
[19] Concessions?
[20]    A: I don't have any knowledge of what he said
[21] to anybody.
[22]    Q: Did you ever ask him what he said to any of
[23] these investors about what they were investing in?
[24]    A: Not really.

Page 104

[1]    Q: Now, did Mr. Sears ever tell you in words or
[2] substance that he had caused any of the transfers to
[3] the Last Minute Concessions' account to occur
[4] without the authorization or consent of the owner of
[5] the funds?
[6]    A: No.
[7]    Q: Did anyone else ever tell you that, that he
[8] had done that?
[9]    A: No.
[10]    Q: When did you first suspect that some or all
[11] the funds transferred to the Last Minute
[12] Concessions' account was without authorization or
[13] consent by the owners of the funds?
[14]    A: When the lawsuit happened.
[15]    Q: That would be either the Schwab or the SEC?
[16]    A: Yes. I'm not sure which one was first.
[17]    Q: Your first suspicion was as a result of the
[18] allegations in either one or both of the lawsuits?
[19]    A: Yeah. That would lead me to suspect
[20] something, yes.
[21]    Q: But you had no suspicion to that effect
[22] prior to that time; is that what you're saying?
[23]    A: No. I was too busy trying to build a golf
[24] course.

James Casagrande
September 26, 2001

vol. 2
pp. 45-156

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 98 of 142

Charles Schwab & Co., Inc.   v.
Sears, et al.

Page 105

[1] Q: Did you ever contact or attempt to contact
[2] anyone at Charles Schwab & Co?
[3] A: Yes, once I believe I did.
[4] Q: And tell me the circumstances how you came
[5] to do that.
[6] A: Bob Sears called me and said that, you know,
[7] it would help if I clarified, I guess, where that
[8] money went that he had raised. I don't know that I
[9] ever talked with anybody specifically.
[10] Q: When Mr. Sears referred to that money, did
[11] you understand that to mean that the money had been
[12] transferred to the Last Minute Concessions' account?
[13] A: Yes.
[14] Q: And did he tell you why he wanted you to
[15] talk to someone at Charles Schwab about that?
[16] A: No, I don't believe so. Nothing
[17] specifically.
[18] Q: Did you have any understanding at that time
[19] as to why he wanted you to talk to Charles Schwab
[20] about that?
[21] A: I assumed there was a misunderstanding. I
[22] don't know.
[23] Q: Did you ask him?
[24] A: No.

Page 106

[1] Q: Had you ever talked with anyone at Charles
[2] Schwab before?
[3] A: No. Other than unless it was about my
[4] retirement account or something, no.
[5] Q: Did Mr. Sears ever ask you to do that
[6] before?
[7] A: No.
[8] Q: Did he say anything else about, for
[9] instance, what sort of information you should
[10] provide to Schwab?
[11] A: No.
[12] Q: Did he tell you who it was you should call?
[13] A: I don't remember.
[14] Q: Did he give you a name or a phone number?
[15] A: I believe he did. I don't remember who it
[16] was exactly. But I do remember a name, but I don't
[17] remember what it was.
[18] Q: And did you do as he requested?
[19] A: I made one phone call and then right after
[20] that I, that's when I thought there was a major
[21] problem and I called Tom.
[22] Q: Tell me, did you speak with someone at
[23] Schwab?
[24] A: I don't believe I did.

Page 107

[1] Q: Did you leave a message?
[2] A: I'm not sure.
[3] Q: And how long after you made this call to
[4] Schwab did you contact Mr. Lesser as you said?
[5] A: I don't know. I'm not sure in the exact
[6] time frame. Relatively soon afterward. I'm not
[7] sure how long.
[8] Q: You're talking about hours or maybe days?
[9] A: Yeah. Something like that.
[10] MR. LESSER: Is this a good time to take
[11] a short break, John?
[12] MR. SNYDER: Sure.
[13] (Break taken.)
[14] (Exhibit 35 marked
[15] for identification.)
[16] Q: Mr. Casagrande, when we broke we were
[17] talking about Mr. Sears' request that you contact
[18] Schwab. Do you recall whether at any point you left
[19] a voice mail message for anyone at Schwab?
[20] A: I don't remember, no.
[21] Q: Let me show you what we've marked as
[22] Exhibit 35 and ask you if you recognize that as a
[23] transcript of a message that you left for someone at
[24] Charles Schwab?

Page 108

[1] A: I assume that you know this, so I'll say
[2] yeah, that's probably it. I don't, I don't remember
[3] what I said specifically. I already said that.
[4] Q: All right. Do you have any reason to
[5] believe that this is not an accurate transcript of
[6] the message that you left at Charles Schwab other
[7] than I note there's a reference to Elton,
[8] Massachusetts which I suspect should have been
[9] Belchertown. Other than that, do you have any
[10] reason to believe that this is not an accurate
[11] transcription?
[12] A: Accurate transcription, it could be. I have
[13] no way of knowing. Reading it I would say it
[14] doesn't seem like I would have said that but, you
[15] know.
[16] Q: It didn't seem like you would have said
[17] what?
[18] A: I guess there's some issue with my partner
[19] in raising some money through Last Minute
[20] Concessions. I don't, if I said that I just
[21] misspoke, but other than that...
[22] Q: You're saying at the time you called Schwab
[23] you weren't aware of there being any issue with
[24] respect to Mr. Sears?

Charles Schwab, et al. v. Sears, et al.
Case 3:00-cv-90170-MAP   Document 44   Filed 10/31/02   Page 99 of 142
James Casagrande
pp. 45-156
September 26, 2001

Page 109

[1] A: He's not my partner is what I would...

[2] Q: Would you say that you would deny that you

[3] said any reference to your partner raising some

[4] money for Last Minute Concessions?

[5] A: No. I said that if I said that, I misspoke.

[6] I don't know whether I said that or not.

[7] Q: Okay. Do you have any reason to believe, my

[8] question is trying to establish whether you can tell

[9] us so far as you can recall, this is an accurate

[10] transcript of what you said in your message to

[11] Schwab?

[12] MR. LESSER: Asked and answered.

[13] A: How do I know? I don't remember. I didn't

[14] remember leaving a message so how can I tell you if

[15] this is accurate?

[16] Q: As you look at this, is there anything that

[17] you could point out that you can say that is not an

[18] accurate transcription of a message that you left at

[19] Charles Schwab?

[20] A: That seems like the same question to me.

[21] Q: All right. You have no reason to deny,

[22] though, that you did leave a message with Charles

[23] Schwab, right?

[24] A: I said that I may have, so...

Page 110

[1] Q: All right. You have a recollection that you

[2] were asked to call by Mr. Sears and that you did as

[3] he had requested, that you at least call, right?

[4] A: Right.

[5] Q: Not sure whether you in fact ever talked to

[6] anyone; is that right?

[7] A: That's correct.

[8] Q: But you have no reason to believe that you

[9] might not have left a voice mail message, correct?

[10] A: I might have.

[11] Q: Now, at the time that Mr. Sears asked you to

[12] make this call, did he indicate that Charles Schwab

[13] had some wrong information?

[14] A: I don't remember what, if anything, he

[15] specifically indicated.

[16] Q: You said that he asked you to clarify where

[17] the money went. Did he say that he wanted you to

[18] clarify where the money went because Charles Schwab

[19] was operating on some inaccurate information in that

[20] regard?

[21] A: I really don't remember what conversation I

[22] had with Bob Sears and what he said pertaining to

[23] doing this.

[24] Q: Okay. And did you at some point talk with

Page 111

[1] Mr. Sears again about this issue of your calling

[2] Charles Schwab?

[3] A: I think I, I did tell him that I called.

[4] Q: Okay. And did he at any point ask you to

[5] try again?

[6] A: I don't believe so.

[7] Q: Did you at some point try again?

[8] A: I, I don't believe so. I don't really

[9] remember.

[10] Q: Did anyone from Charles Schwab ever call you

[11] or attempt to call you?

[12] A: I'm not sure.

[13] Q: By that I mean to include your getting any

[14] kind of a message from your office or in an

[15] answering system from anyone at Charles Schwab?

[16] A: I really don't remember.

[17] (Exhibit 36 marked

[18] for identification.)

[19] Q: Let me show you what we've marked as

[20] Exhibit 36 and ask if you have any reason to believe

[21] that that is not an accurate transcription of a

[22] second message left at Charles Schwab by you?

[23] A: It very well could be. Again, I didn't, as

[24] I told you, I wasn't sure whether I left a message

Page 112

[1] or called once. I don't remember.

[2] Q: Looking at Exhibit 35, do you recall that

[3] the person that Mr. Sears had asked you to call was

[4] named Patrick Murphy?

[5] A: Must have been.

[6] Q: Okay. And do you recall there being any

[7] question or uncertainty in your mind as to whether

[8] your first message that you left had not actually

[9] been on Mr. Murphy's voice mailbox, if you will?

[10] A: Well, I'm reading by what it says here. I

[11] might have thought that I had the wrong number,

[12] so...

[13] Q: Okay. Do you have any reason to believe

[14] that the transcript in or that — Strike that. Do

[15] you have any reason to believe that Exhibit 36 is

[16] not an accurate transcript of a second message that

[17] you left Charles Schwab?

[18] A: Like I said, I don't remember even making

[19] one, so I don't know how to I answer that.

[20] Q: You don't have any basis for saying that

[21] anything in here is something that you could say

[22] with certainty you never said; is that right?

[23] A: I guess that would be true.

[24] Q: Okay. Now, you were at least at some point

James Casagrande
September 26, 2001

vol. 2
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 100 of 142

Charles Schwab & Co., Inc.  v.
pp. 45-156                    Sears, et al.

Page 113

[1] in the year 2000 an employee of Cold Spring Golf
[2] Course, Inc., right?

[3] A: Yes.

[4] Q: Were you ever an employee of Cold Spring
[5] Development, Inc.?

[6] A: No.

[7] Q: And were there to your knowledge ever any
[8] other employees of Cold Spring Golf Course?

[9] A: No.

[10] Q: And was there ever to your knowledge any
[11] employee of Cold Spring Development?

[12] A: Not to my knowledge, no.

[13] Q: And were you at any point an authorized
[14] signatory on the Cold Spring SIS bank account?

[15] A: I believe I was, yes.

[16] Q: And did that authorization occur at about
[17] the same time that you became an authorized
[18] signatory for the Cold Spring Fleet bank account?

[19] A: I'm unsure.

[20] Q: Well, in any event, at some point in the
[21] year 2000, you were an authorized signatory on both
[22] the Cold Spring Fleet account and the Cold Spring
[23] SIS bank account; is that right?

[24] A: I guess that's fair to say.

Page 114

[1] Q: And again, I'm referring to the SIS bank
[2] account, that bank has gone through a number of
[3] transformations but for shorthand we'll refer to it
[4] as SIS Bank.

[5] A: (Witness nods.)

[6] Q: Now, were you involved in attempting to get
[7] bank financing for the golf course project?

[8] A: Sure.

[9] Q: And what did you do in that regard?

[10] A: I had a contact at Easthampton Savings that
[11] we tried.

[12] Q: And that would be Mr. Lynch?

[13] A: Yes.

[14] Q: First name Michael?

[15] A: Yes.

[16] Q: And what did you do with respect to trying
[17] that contact?

[18] A: Set up an appointment and just went in and
[19] talked about the project.

[20] Q: Was there anyone attending that meeting
[21] other than yourself and Mr. Lynch?

[22] A: Yeah. I think Ed Waszkelewicz. I believe
[23] John Marchand. That's all that I remember.

[24] Q: And what did you or any of the other people

Page 115

[1] from the golf course project tell Mr. Lynch as to
[2] why you were looking for the financing, what the
[3] purpose of the loan would be?

[4] A: To complete the golf course.

[5] Q: Construction financing?

[6] A: Yes.

[7] Q: And was there any discussion with Mr. Lynch
[8] as to term, amount of time that you were looking for
[9] on this loan?

[10] A: I don't remember that. Or maybe I'm not
[11] understanding your question.

[12] Q: Let's not limit it to that meeting. In
[13] these discussions that were had with Easthampton
[14] Savings, was there ever any discussion of what the
[15] term of the length of time the loan would be
[16] outstanding?

[17] A: Yeah, I'm sure there was.

[18] Q: What was that discussion?

[19] A: I think it was, there was talk about
[20] construction financing, you know, carrying us
[21] through the building process and then it would turn
[22] into permanent financing. Your typical mortgage or
[23] whatever.

[24] Q: You weren't talking about having Easthampton

Page 116

[1] Savings Bank taken out as the financing bank when it
[2] became permanent financing. Their construction loan
[3] would be permanent financing; is that what you're
[4] saying?

[5] A: That was always my understanding.

[6] Q: When you say permanent financing, was the
[7] discussion to the effect that that financing would
[8] be of some indefinite term, a line of credit?

[9] A: No.

[10] Q: When was it anticipated then that financing
[11] would be paid off?

[12] A: The permanent — I don't remember if you're
[13] asking me how long the mortgage for the financing
[14] that we were looking for, how long the term was, I
[15] don't remember if we ever got to specifics on that.

[16] Q: Was there ever any discussion of the
[17] financing from Easthampton Savings Bank one of the
[18] purposes it would be used for would be to pay back
[19] the investors that Mr. Sears had brought in?

[20] A: No.

[21] Q: To your knowledge, did Mr. Sears ever have
[22] any discussions with anyone at Easthampton Savings
[23] Bank about this bank financing?

[24] A: I'm sure he did.

Page 117

[1]    Q: Were you ever present or participate in any
[2] of those discussions?

[3]    A: No.

[4]    Q: Did he ever meet in person with Mr. Lynch to
[5] your understanding?

[6]    A: I don't know.

[7]    Q: Did Mr. Sears or Mr. Lynch ever tell you
[8] what Mr. Sears told Mr. Lynch or anyone else at the
[9] bank?

[10]    A: No.

[11]    Q: What was the amount of financing that you
[12] were looking for?

[13]    A: Well, it was so long ago. I'd have to say I
[14] don't remember.

[15]    Q: These discussions with Easthampton Savings
[16] Bank continued even after the SEC lawsuit and the
[17] Schwab lawsuit were filed, right?

[18]    A: Yeah, sort of. There wasn't very much
[19] contact at least on my part.

[20]    Q: You were in touch with Easthampton Savings
[21] Bank asking if they would still consider making a
[22] loan to the project, correct, even after the lawsuit
[23] was filed, correct?

[24]    A: That's probably true.

Page 118

[1]    Q: If I tell you that the bank's records
[2] reflect that that's true, do you have any reason to
[3] dispute that?

[4]    A: No.

[5]    Q: And do you recall that the bank — Strike
[6] that for a moment. What did you tell the bank about
[7] you or Mr. Marchand or Mr. — Strike that again.

[8]    You, Mr. Marchand, Mr. Waszkelewicz were
[9] involved in discussions with the bank, the
[10] Easthampton Savings Bank about financing, correct?

[11]    A: Yes.

[12]    Q: And you understand that at some point
[13] Mr. Sears had one or more discussions with someone
[14] at Easthampton Savings Bank; is that's correct?

[15]    A: That's correct.

[16]    Q: Did anyone else on behalf of the golf course
[17] project to your knowledge have any discussions with
[18] Easthampton Savings Bank?

[19]    A: I'm unsure.

[20]    Q: At some point Country Bank for Savings was
[21] brought into the picture as a participant bank. Do
[22] you recall that?

[23]    A: Yes.

[24]    Q: Did anyone from the golf course on behalf

Page 119

[1] of the golf course have any discussions with anyone
[2] at Country Bank for Savings?

[3]    A: All the same people. I assume my partners
[4] Ed Waszkelewicz, myself, and John Marchand. I don't
[5] know if Mark Kramer did. I'm not sure.

[6]    Q: But you did in fact have some conversations
[7] with someone at Country Bank for Savings about the
[8] proposed financing?

[9]    A: Yes.

[10]    Q: Who was that?

[11]    A: Oh, boy. Paul Goncalves I think his name
[12] was.

[13]    Q: Do you know whether Mr. Sears ever had any
[14] communication with Mr. Goncalves about the
[15] financing?

[16]    A: I'm not sure.

[17]    Q: You had a prior relationship with
[18] Easthampton Savings Bank? And what I mean by prior,
[19] I mean prior to the time that you had the
[20] discussions about financing for the golf course, you
[21] had done business with that bank?

[22]    A: Yes.

[23]    Q: What was the nature of the business that you
[24] had done?

Page 120

[1]    A: My home mortgage, my equity line. I think
[2] when I was a kid I had some savings account there,
[3] that type of thing.

[4]    Q: Did either of these banks, Easthampton
[5] Savings Bank or Country Bank for Savings, have any
[6] interest in information, obtaining information about
[7] the investors that Mr. Sears was bringing to the
[8] project?

[9]    A: Bringing to Last Minute Concessions?

[10]    Q: Well, all right.

[11]    A: Yes.

[12]    Q: What did they want to know about them?

[13]    A: Basically, I think who they were.

[14]    Q: And what did you tell them about that?

[15]    A: I said, Talk to Bob Sears.

[16]    Q: Did you ever have any discussions with
[17] anyone from either of those banks about Coastal
[18] Investors?

[19]    A: Yes.

[20]    Q: Who did you have the discussion with?

[21]    A: Mike Lynch.

[22]    Q: What did you tell Mr. Lynch about Coastal
[23] Investors?

[24]    A: That Coastal Investors was going to be the

James Casagrande
September 26, 2001

vol. 2

Charles Schwab & Co., Inc. v.
Sears, et al.

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 102 of 142

pp. 45-156

Page 121

[1] people or group or whatever it was, I didn't even
[2] know what it was, but I was told that they were the
[3] ones that were making the loan to Last Minute
[4] Concessions who invested in the golf course
[5] corporation.
[6]    Q: Did you tell him anything else about Coastal
[7] Investors?
[8]    A: I didn't know anything else.
[9]    Q: Did you tell anyone from either of these
[10] banks anything about 2 Ocean Avenue, LLC?
[11]    A: I don't know.
[12]    Q: Sorry, you don't know or you didn't?
[13]    A: I don't believe I did.
[14]    Q: Did you know anything in the spring or
[15] summer of last year about 2 Coastal Investors?
[16]    A: No.
[17]    Q: I'm sorry, did you know anything in the
[18] spring or summer of the year 2000 about 2 Ocean
[19] Avenue, LLC?
[20]    A: I don't believe so, no.
[21]    Q: Now at some point, Easthampton Savings Bank
[22] in effect said that we can't take this matter any
[23] further. We can't proceed with this matter of your
[24] loan application any further until we receive

Page 122

[1] information on these investors; isn't that right?
[2]    A: That's correct.
[3]    Q: And did you at that point have any
[4] discussion with Mr. Sears about getting that
[5] information to the banks?
[6]    A: Yes. I told him he needed to do that.
[7]    Q: What did you say? Did you say anything else
[8] to him other than what you just said to him?
[9]    A: No, I don't think so.
[10]    Q: Did you ask him any questions about who are
[11] these people?
[12]    A: No.
[13]    Q: Did you ask him anything to the effect of
[14] what's taking so long to get this information?
[15]    A: No.
[16]    Q: Did you ever ask Mr. Sears that, anything to
[17] the effect of what's taking so long to get the
[18] information, why hasn't the information been
[19] provided to the bank?
[20]    A: I'm unsure.
[21]    Q: Well, at some point, the banks declined the
[22] request for a loan, right?
[23]    A: Yes.
[24]    Q: And at least one of the stated reasons that

Page 123

[1] they gave for doing that was that they had not been
[2] provided the information they had asked about
[3] Mr. Sears' investors?
[4]    A: That's correct.
[5]    Q: Did you at that point have any communication
[6] with Mr. Sears about getting that information to the
[7] banks?
[8]    A: No. Because at that point the lawsuits were
[9] already ongoing and I was working with my lawyer.
[10]    Q: Let me make sure I understand this. At the
[11] time the bank declined because they hadn't received
[12] the information, the lawsuits had already commenced?
[13]    A: To my knowledge.
[14]    Q: Would it be fair to say that at the time the
[15] banks declined to make the loan because they hadn't
[16] received the information you were aware that there
[17] was some problem with respect to these investors?
[18]    A: Well, yes, because we were, the lawsuits
[19] were ongoing at that point.
[20]    Q: To your knowledge, was any other bank other
[21] than Easthampton Savings Bank or Country Bank for
[22] Savings ever approached about providing either
[23] construction or permanent financing for the golf
[24] course project?

Page 124

[1]    A: Are you saying for the current shareholders
[2] because I know there's been some other entities that
[3] have tried to purchase. I don't know whether they
[4] have had contact.
[5]    Q: Well, let's break it down then. That's a
[6] good point. Prior to the time the lawsuits were
[7] filed, was any other bank approached about providing
[8] financing other than Easthampton Savings Bank and
[9] Country Bank for Savings?
[10]    A: Unsure. I don't know. Not by myself.
[11]    Q: Okay. And not by anyone else that you're
[12] aware of; is that fair to say?
[13]    A: I guess that would be fair to say, yes.
[14]    Q: So Easthampton Savings Bank and Country Bank
[15] for Savings was it, up until the time of the lawsuit
[16] in terms of trying to find financing?
[17]    A: Yes.
[18]    Q: Going back to June of '99 when you entered
[19] into these memoranda of understanding with the Cold
[20] Spring entities, at that time to your understanding
[21] was there any discussion of obtaining bank
[22] financing?
[23]    A: Between the shareholders, are you saying?
[24]    Q: Well, at that time you're discussing, or you

Page 125

[1] told us before you had some meetings with the
[2] principals, Waszkelewicz, Marchand, and Kramer, in
[3] which they provided information about the project,
[4] right?
[5]   A: Correct.
[6]   Q: And as part of that discussion leading up to
[7] these memoranda of understanding, was there any
[8] discussion of obtaining bank financing for the
[9] project?
[10]   A: I'm sure there was.
[11]   Q: What was your understanding in the summer of
[12] 1999 as to when that process was going to begin?
[13] That is, the process of obtaining bank financing.
[14]   A: Well, it was as soon as I guess the permit
[15] process ended because we hadn't purchased even the
[16] property at that point.
[17]   Q: So when the permit process was completed,
[18] that was sometime in January or February of 2000?
[19]   A: Yeah. I think that's when it was, yes.
[20]   Q: At or about that time, you and your partners
[21] commenced the process of talking to Easthampton
[22] Savings Bank; is that right?
[23]   A: Yeah. I think it was slightly before that
[24] but on or about, yes.

Page 126

[1]   Q: And to your recollection, none of you or
[2] your partners approached any other financial
[3] institutions other than Easthampton and Country
[4] Bank?
[5]   A: I don't remember, no. Not that I am aware
[6] of.
[7]   Q: Let me show you Exhibit 19. Do you recall
[8] receiving that letter sometime in 2000?
[9]   A: Do I recall it, not really, but — no, I
[10] don't really recall it.
[11]   Q: Well, how did you learn that the bank was
[12] going, Easthampton Savings Bank was going to decline
[13] the request for a loan? Was that by letter or by
[14] phone call or meeting?
[15]   A: The way I remember it is Ed Waszkelewicz and
[16] myself had a meeting at Country Bank in, I think
[17] it's Ware, Massachusetts but I'm not sure where
[18] their branch was. But it was with Mike Lynch and I
[19] think it's Paul or Phil Goncalves and they brought
[20] in during that meeting the, I'm guessing it was the
[21] president of the bank, and that's when we were told
[22] that they weren't interested in doing the loan.
[23]   Q: When you say the president of the bank, that
[24] would be the president of Country Bank for Savings?

Page 127

[1]   A: Right. I don't remember the name.
[2]   Q: At that time did they say why it was they
[3] weren't interested in doing the loan?
[4]   A: The lawsuit and the exposure that the bank
[5] would have because of it.
[6]   Q: Did you ever have any communication from
[7] anyone prior to the lawsuits being filed indicating
[8] that Easthampton Savings and Country Bank for
[9] Savings was going to decline the loan request?
[10]   A: I don't remember.
[11]   Q: And going back to this letter Exhibit 19, do
[12] you recall ever receiving that letter?
[13]   A: I really don't remember.
[14]   Q: So let me make sure I understand this. As
[15] of the time when you first learned of the SEC suit
[16] or the Schwab suit, whichever one you learned of
[17] first, as of that time, your understanding was that
[18] the loan request was still under consideration by
[19] Easthampton Savings Bank and Country Bank for
[20] Savings; is that correct?
[21]   A: Absolutely.
[22]   Q: And what was your understanding at that
[23] time, that is, at the time you first learned of
[24] either or both of the lawsuits as to the status of

Page 128

[1] Mr. Sears providing the information on investors to
[2] those banks?
[3]   A: What was the time frame you said there?
[4]   Q: At the time that you learned of the lawsuit,
[5] what was your understanding of Mr. Sears, the status
[6] of Mr. Sears providing that information on investors
[7] to the banks?
[8]   A: My understanding is that what he had
[9] provided wasn't sufficient.
[10]   Q: So your understanding was that that was
[11] still an outstanding request from the banks for
[12] information?
[13]   A: Correct.
[14]   Q: When did the meeting — you refer to a
[15] meeting, you, Mr. Lynch, Mr. Waszkelewicz, maybe
[16] Mr. Marchand. When did that meeting take place?
[17]   A: Again, I'm not sure when our initial meeting
[18] with the bank was.
[19]   Q: Let me tie it to something you mentioned
[20] before as the permitting process as kind of an event
[21] that was tied to this request for financing. Did
[22] that meeting take place before or after the
[23] permitting process had been completed?
[24]   A: I think it was slightly before.

James Casagrande
September 26, 2001

vol. 2

Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 104 of 142
pp. 45-156

Charles Schwab & Co., Inc.   v.
Sears, et al.

Page 129

[1] Q: And do you have a recollection as to when
[2] the permitting process was completed?
[3] A: I think it was the end, mid or end of
[4] January of 2000.
[5] Q: Because something else that was to occur
[6] when the permitting was completed was under the
[7] memoranda of understanding with Cold Spring
[8] Development and Cold Spring Golf Course, Last Minute
[9] Concessions had 30 days to come up with the
[10] $2 million, right?
[11] A: That's correct.
[12] Q: Was there ever any consideration or
[13] discussion of any of the bank financing being used
[14] as part of the Last Minute Concessions' payment on
[15] obligation? In other words, a piece or all of Last
[16] Minute Concessions' payment obligation being
[17] financed with this bank loan?
[18] A: No.
[19] Q: Other than Exhibits 9 and 10, I think I
[20] asked you this before, are you aware of there ever
[21] being any agreement between Last Minute Concessions
[22] and Cold Spring Golf Course or Cold Spring
[23] Development?
[24] A: I don't believe so. Not that I remember.

Page 131

[1] mean a statement of revenue and expenditures or a
[2] balance sheet in the nature of assets and
[3] liabilities ever been prepared for Last Minute
[4] Concessions?
[5] A: I don't know.
[6] Q: You're not aware of any?
[7] A: No.
[8] Q: And I take it you never prepared any; is
[9] that correct?
[10] A: I don't believe I did, no.
[11] Q: Have any financial statements, that is,
[12] statement of revenue and expenditures or assets and
[13] liabilities ever been prepared for Cold Spring Golf
[14] Course?
[15] A: I'm unsure.
[16] Q: To your knowledge, has any financial
[17] statement ever been prepared for Cold Spring
[18] Development, Inc.?
[19] A: I'm unsure.
[20] Q: Have you ever prepared any financial
[21] statements for Cold Spring Golf Course or Cold
[22] Spring Development?
[23] A: Other than what we've looked at here, I
[24] don't know if those are, you know, like just

Page 130

[1] Q: Are you aware of there ever being a —
[2] Exhibits 9 and 10 refer to your becoming an employee
[3] of Cold Spring Golf Course, right?
[4] A: I'm sure it does, yes.
[5] Q: To your knowledge, was there ever any other
[6] agreement that had to do with your becoming an
[7] employee of either Cold Spring Golf Course or Cold
[8] Spring Development?
[9] A: No, I don't believe so.
[10] Q: Other than Exhibits 9 and 10, have you ever
[11] had any agreement with Cold Spring Golf Course or
[12] Cold Spring Development concerning — well, period.
[13] A: No, I don't believe so.
[14] Q: And other than Exhibits 9 or 10, have you
[15] ever had any agreement with any of the principals of
[16] Cold Spring Golf Course or Cold Spring Development?
[17] That is, Messrs. Waszkelewicz, Marchand, and Kramer?
[18] A: Do I have any other agreement. There was a
[19] purchase of some shares from Mark Kramer that isn't
[20] covered in that.
[21] Q: Okay. I think you told us about that last
[22] time. Anything other than that?
[23] A: Not to my knowledge.
[24] Q: Have any financial statements, and by that I

Page 132

[1] basically the check registers and stuff, I don't
[2] believe so.
[3] Q: In your discussions with Easthampton Savings
[4] Bank or Country Bank for Savings, was there ever any
[5] mention of loans being made to the project by
[6] Mr. Waszkelewicz?
[7] A: In the conversations with the bank, did you
[8] say?
[9] Q: Correct. With either of the banks.
[10] A: I'm not sure.
[11] Q: Was there ever any discussion of loans being
[12] made to the project by Mr. Marchand?
[13] A: I'm not sure.
[14] Q: Was there ever any discussion of loans being
[15] made to the project by yourself?
[16] A: Again, I'm not sure.
[17] Q: To your knowledge, was either of the banks
[18] ever told that Coastal Investors was no longer
[19] involved, no longer a potential investor in the golf
[20] course project?
[21] A: Yes. I think that's accurate.
[22] Q: When was that, before or after the lawsuits?
[23] A: That would have been before.
[24] Q: And was that during the time that the bank

---

Page 133

[1] was asking for information on investors?

[2] A: I'm not sure. I, I think it was before.

[3] I'm not sure.

[4] Q: I'm sorry, it was before?

[5] A: The bank was asking.

[6] Q: So before the bank had requested information

[7] on these investors, they were told that Coastal

[8] Investors were no longer involved; is that your

[9] recollection?

[10] A: Yeah.

[11] Q: Has there been any communication with — let

[12] me step back. One of the things that was going on

[13] with the golf course was that members were being

[14] solicited, right, people —

[15] A: Yes.

[16] Q: — wanting to become members of the golf

[17] course?

[18] A: That's right.

[19] Q: And in fact, membership fees and

[20] applications were taken from a number of people,

[21] correct?

[22] A: Yes.

[23] Q: And has there been any communication with

[24] any of those people, that is, people who paid — am

---

Page 134

[1] I using the right term, membership fee?

[2] A: Yes.

[3] Q: They paid some money, what was that called?

[4] A: You buy a membership at the golf course.

[5] Q: And a number of people did that?

[6] A: Yes.

[7] Q: Has there been any communication with any of

[8] those people since the time of the lawsuits?

[9] A: Oh, I'm sure there has been, yes.

[10] Q: Who has handled that communication?

[11] A: Myself, Ed Waszkelewicz. I think it was

[12] probably just us two. I'm not sure if anyone else

[13] did.

[14] Q: What form of communication was that taken?

[15] A: Some phone calls, answering their phone

[16] calls or messages and we may have wrote a note out

[17] to all the members. I don't really recall.

[18] Q: When you say you may have written a note,

[19] what form may that have taken?

[20] A: Generated from a computer. I'm not

[21] following what you're saying. I'm not sure that we

[22] did that after the lawsuits or not. I know we had

[23] some kind of newsletters, if you will, that we had

[24] sent out to members prior to everything. I'm not

---

Page 135

[1] sure if we did that after.

[2] Q: How many newsletters would you say have been

[3] sent to members?

[4] A: One or two.

[5] Q: Prior to the time of the lawsuits?

[6] A: One or two.

[7] Q: And who composed those newsletters?

[8] A: Again, it would be myself and Ed.

[9] Q: And then has there been any written

[10] communication with any of these members since the

[11] time of the lawsuits?

[12] A: I don't know.

[13] Q: You don't recall writing or sending any

[14] written communication to any of the members since

[15] the time of the lawsuits?

[16] A: No, I don't recall it.

[17] Q: And do I recall correctly that you learned

[18] of the lawsuits when you learned that the project's

[19] bank account or accounts had been frozen?

[20] A: That's correct. I think I bounced a payroll

[21] check to myself, and I didn't understand why that

[22] happened.

[23] Q: And so what did you do when that checked

[24] bounced?

---

Page 136

[1] A: I called Fleet and then they informed me

[2] that there was a hold on the account. At first they

[3] didn't know why it happened and then I guess they

[4] looked further and found there was a hold on the

[5] account.

[6] Q: And to your knowledge, was that the first

[7] that any of you or your partners knew that there

[8] were lawsuits pending?

[9] A: I think so, yes.

[10] Q: Well, when you found out that information,

[11] were you in touch with Mr. Waszkelewicz and

[12] Mr. Marchand and Mr. Kramer?

[13] A: I think Ed was standing in front of me at

[14] the time.

[15] Q: And he didn't say anything to the effect of

[16] oh, I already knew about this. He was as surprised

[17] as you were; is that fair to say?

[18] A: Yeah, probably.

[19] Q: And did one or the other of you get in touch

[20] with Mr. Marchand and Mr. Kramer about the lawsuits?

[21] A: I'm sure.

[22] Q: And when you conveyed that news, did any of

[23] them indicate to you anything other than surprise?

[24] A: No.

---

James Casagrande, vol. 2    Charles Schwab & Co., Inc. v.
September 26, 2001   Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 106 of 142   Sears, et al.
pp. 43-156

Page 137

[1]   Q: Have you or Last Minute Concessions received
[2] any payment or anything of value from Cold Spring
[3] Golf Course or Cold Spring Development or any of its
[4] principals in return for the $2 million plus that
[5] Last Minute Concessions paid to or for the benefit
[6] of the golf course project?
[7]   A: Could you repeat that.
[8]   Q: Let me break that down. Last Minute
[9] Concessions has paid to or for the benefit of the
[10] golf course project over $2 million, right?
[11]   A: Correct.
[12]   Q: And have you or Last Minute Concessions
[13] received anything of value in return for that
[14] $2 million?
[15]   A: No. Stock?
[16]   Q: Well, that would be one option, yes. Have
[17] you received stock?
[18]   A: I'm unsure.
[19]   Q: Is it your understanding that pursuant to
[20] those memoranda of understanding that you or Last
[21] Minute Concessions is entitled to receive stock?
[22]   A: Yes.
[23]   Q: Have you spoken with anyone about your
[24] deposition other than your counsel since the last

Page 138

[1] session of your deposition?
[2]   A: No.
[3]   Q: I know you met with Mr. Lesser before we got
[4] underway this morning. Have you done anything else
[5] to prepare for your deposition today?
[6]   A: No.
[7]   Q: That's all I have. I'll pass the chair to
[8] either Mr. Huntington or Mr. Laurie.
[9]   MR. HUNTINGTON: Let's go off the
[10] record.
[11]   (Off the record.)
[12]
[13]       CROSS-EXAMINATION
[14]     BY MR. HUNTINGTON:
[15]   Q: Good morning, Mr. Casagrande. I'm Frank
[16] Huntington from the SEC. I'll try not to repeat
[17] earlier questions. You testified earlier about
[18] agreements in June of 1999 between Last Minute
[19] Concessions and the two Cold Spring companies. You
[20] recall that testimony?
[21]   A: Yes.
[22]   Q: As part of those agreements, Last Minute
[23] Concessions was required to come up with $2 million
[24] for the project; is that right?

Page 139

[1]   A: That's correct.
[2]   Q: At the time you were having those meetings
[3] with Mr. Waszkelewicz and Mr. Marchand and
[4] Mr. Kramer, how much money did you understand that
[5] the project was going to need overall in order to
[6] get up and running? And I'm talking in the spring of
[7] 1999 or June of 1999.
[8]   A: Is your question how much we needed to get
[9] the golf course operational or, because there's two
[10] different entities; one is condos and one is golf
[11] course.
[12]   Q: Right. There are two agreements between Last
[13] Minute Concessions and the Cold Spring companies?
[14]   A: Yes.
[15]   Q: So most of the money from Last Minute
[16] Concessions would go to the golf course, some was
[17] going to go to the condo project as at least it
[18] appears from the documents, correct?
[19]   A: Yes.
[20]   Q: Is that in fact how it was understood that
[21] the $2 million was going to be used?
[22]   A: You mean those dollar amounts?
[23]   Q: Yes.
[24]   A: No. I mean, it was, I think that's somewhat

Page 140

[1] of an arbitrary pick on our parts there. I don't
[2] know.
[3]   Q: As of June of 1999, did the project, and
[4] I'll use that term for both aspects of it, have any
[5] sources of outside funding?
[6]   A: In '99, other than my partners putting in
[7] some monies, no. There was no other funding that I
[8] was aware of.
[9]   Q: So other than capital contributions from
[10] Mr. Waszkelewicz or Mr. Marchand or Mr. Kramer, at
[11] that point in time there was no other source of
[12] money that you were aware of?
[13]   A: That's correct.
[14]   Q: Sitting there having your meetings in June
[15] of 1999, how much money did you think was needed to
[16] get the golf course up and running and the condo
[17] project up and running?
[18]   A: I think it was a little over $4 million. We
[19] were — but that included some infrastructure for
[20] the condos and so forth. Not just golf course.
[21]   Q: As of June of 1999, was the group actively
[22] looking for bank financing?
[23]   A: Actively, I'm unsure. I, I'd have to say
[24] I'm not sure.

Charles Sears, et al. 3:00-cv-80170-MAP Document 4-2 Filed 10/31/02 Page 107 of 142

Charles Sears, et al.
Sears, et al.

James Casagrande
pp. 45-156
September 26, 2001

Page 141

[1] **Q:** Okay. Well, as far as you know, as of June
[2] of 1999, was the only source of money to keep the
[3] project running the money that was coming from
[4] Mr. Marchand or Mr. Kramer or Mr. Waszkelewicz?
[5] **A:** Yes.
[6] **Q:** And then at some point, the Last Minute
[7] Concessions' money would arrive you hoped, correct?
[8] **A:** Correct.
[9] **Q:** But the project would also need some
[10] additional money later on?
[11] **A:** We all knew that, yes.
[12] **Q:** In the meetings that you had leading up to
[13] the June 1999 agreement, you and Mr. Sears had
[14] indicated that Last Minute Concessions would provide
[15] $2 million; is that correct?
[16] **A:** Yes.
[17] **Q:** During those meetings, was anything said how
[18] Last Minute Concessions was going to come up with $2
[19] million?
[20] **A:** That I was going to have Bob Sears raise the
[21] money and people loan to LMC and LMC would in turn,
[22] you know, put the money into the, we'll call
[23] projects.
[24] **Q:** And so prior to the signing of those

Page 142

[1] agreements in June of 1999, you and Mr. Sears told
[2] the other three gentlemen that the money would be
[3] coming from investors that Mr. Sears was going to
[4] find; is that correct?
[5] **A:** Yeah, that's fair to say.
[6] **Q:** During those meetings, did either you or
[7] Mr. Sears say anything about who those investors
[8] were going to be?
[9] **A:** No.
[10] **Q:** At that point in time, just talking yourself
[11] to Mr. Sears, did you ask him where are you going to
[12] find the investors for our $2 million?
[13] **A:** As a general question, he just said that he
[14] felt confident in doing it. And I knew that's what
[15] he did. Or at least I assumed that's what he did
[16] for a living, so...
[17] **Q:** Now, of course this particular raising money
[18] he wasn't doing it in return for any compensation;
[19] isn't that what you testified to earlier?
[20] **A:** Correct.
[21] **Q:** In the early part of the year 2000,
[22] Mr. Sears actually started raising some of the money
[23] from his clients?
[24] **A:** Did you say in the early part of 2000?

Page 143

[1] **Q:** Yes.
[2] **A:** Yes, that's correct.
[3] **Q:** And I apologize, I think we covered this
[4] before but I want to try to do it in a sequence.
[5] During the spring and summer of 2000 as the money
[6] was coming in, did you have any conversations with
[7] Mr. Sears about where he was getting the money?
[8] **A:** No.
[9] **Q:** During that same time period, do you recall
[10] any meeting of yourself, Mr. Sears, and any of the
[11] other three gentlemen, Mr. Waszkelewicz, Mr. Kramer,
[12] or Mr. Marchand?
[13] **A:** In 2000, no. I don't recall any.
[14] **Q:** You yourself had meetings with those three
[15] gentlemen about the status of the project during
[16] that period, right?
[17] **A:** Me, Ed, John, and Mark?
[18] **Q:** Yes.
[19] **A:** Yes. Oh, yeah. We had meetings now and
[20] then. I sat in on them virtually on a daily basis.
[21] **Q:** There's a lot of activity going on out on
[22] the golf course?
[23] **A:** Very much, yes.
[24] **Q:** Do you recall during that period in the

Page 144

[1] spring and summer 2000, any meetings that Mr. Sears
[2] also attended?
[3] **A:** No. I don't recall any, no.
[4] **Q:** Do you recall during that period, the spring
[5] and summer of 2000, do you recall any meetings with
[6] Mr. Waszkelewicz, Mr. Kramer, and Mr. Marchand that
[7] you attended where the subject of the money
[8] Mr. Sears was raising came up?
[9] **A:** I'm unsure. I'm unsure on that.
[10] **Q:** So $2 million comes in the door during a
[11] period of several months and nobody has any
[12] conversations about where it's coming from?
[13] **A:** I don't recall any.
[14] **Q:** During the spring and summer of 2000, did
[15] you have any discussions with Mr. Sears about how
[16] much time he was spending trying to raise the money?
[17] **A:** No.
[18] **Q:** Did you ever observe him trying to raise the
[19] money?
[20] **A:** No.
[21] **Q:** Never saw him on the phone with anyone in
[22] that office building that you share?
[23] **A:** No. He has a separate space and I was
[24] rarely in it anyways so, no.

---

**Page 145**

[1] Q: So sitting here today, do you have any idea
[2] how much time Mr. Sears spent trying to raise that
[3] money?
[4] A: No.
[5] Q: Now, I believe you testified a few moments
[6] ago you first became aware that there was a problem
[7] with how Mr. Sears raised the money when the Cold
[8] Spring account had been frozen and a payroll check
[9] bounced?
[10] A: That's correct.
[11] Q: When did you first find out what the nature
[12] of the problem was — Strike that. When did you
[13] first find out what had caused the Cold Spring
[14] account to be frozen?
[15] A: Well, it was either Fleet telling me that
[16] there was a hold and who the hold was from or
[17] actually receiving the — I'm not sure. Being
[18] served with the lawsuit, I don't know if that's the
[19] proper term, but one or probably one of those.
[20] Q: Were you served with papers for the lawsuit
[21] quite soon after learning that the account had been
[22] frozen?
[23] A: Yeah. I'm sure I was. I don't, I don't
[24] know what that time frame was.

---

**Page 146**

[1] Q: And sitting here today, you don't remember
[2] which was the first lawsuit, the SEC case or the
[3] Schwab case?
[4] A: No. I think I was told it was Schwab, but
[5] to be honest with you, it was, I was stunned enough.
[6] I wasn't really thinking which one came first.
[7] Q: When did you first find out the nature of
[8] the claims of the lawsuit; namely, that the lawsuit
[9] concerned the way Mr. Sears raised the money?
[10] A: In reading the documentation that was sent
[11] by either one or both of your agencies.
[12] Q: Did you call Mr. Sears at that point?
[13] A: At that point, I think I called Tom at that
[14] point. I'm sure I've talked to Bob Sears since
[15] then. I don't know if it was, I doubt it was right
[16] then. It was probably shortly thereafter.
[17] Q: Okay. Without wondering whether it was
[18] minutes, hours, did you speak to Mr. Sears about the
[19] lawsuit within a few days or a week or two of
[20] learning about the lawsuits?
[21] A: Probably, yeah, I'm sure.
[22] Q: What can you tell me about the first time
[23] you talked to him on that subject? Did you call him
[24] or did he call you?

---

**Page 147**

[1] A: I'm not sure. I probably called him. I
[2] don't really remember who called who, but I
[3] expressed extreme concern and what's going on. You
[4] know, I didn't understand any of it, you know.
[5] Q: Well, you say you didn't understand any of
[6] it. Did you read the complaint in the lawsuit?
[7] A: Yes, I did.
[8] Q: Did you understand that the complaint,
[9] whatever complaint it was, charged that Mr. Sears
[10] had forged people's signatures in order to get the
[11] money?
[12] A: I read that, yes.
[13] Q: So you understood that forged letters of
[14] authorization was part of the lawsuit?
[15] A: I did read that, yes.
[16] Q: Did you also understand that the lawsuit
[17] contained claims that Mr. Sears had misled some of
[18] his clients about where the money was going or his
[19] role in the project?
[20] A: I did read that, yes.
[21] Q: So you knew something about what the basis
[22] for the lawsuit was when you talked to Mr. Sears
[23] that first time, didn't you?
[24] A: Yes.

---

**Page 148**

[1] Q: Did you ask him whether any of it was true?
[2] A: I, I don't believe I did.
[3] Q: How long have you known Mr. Sears? At that
[4] point in time, how long had you known Mr. Sears?
[5] A: About, let's see. 12, 13 years, something
[6] like, In that ballpark.
[7] Q: And I believe you testified earlier he was
[8] the best man at your wedding?
[9] A: That's right.
[10] Q: And godfather of your daughter?
[11] A: Yes.
[12] Q: And if she's 21 months old, that was a
[13] fairly recent event at the time this was happening?
[14] A: Yeah, yeah. Day before Christmas.
[15] Q: And you testified earlier that you trusted
[16] him, Mr. Sears, didn't you?
[17] A: Yes, I did.
[18] Q: So you just received a complaint indicating
[19] that he may have raised $2 million in a fraudulent
[20] manner and you didn't ask him whether it was true?
[21] A: Ask him that, no. I don't believe I did.
[22] Because I had no reason to, if you'll excuse my
[23] expression, believe your claims. I know his
[24] character.

---

Page 149

[1]    **Q:** So you assumed that the lawsuit was
[2] inaccurate in whatever it was claiming?
[3]    **A:** For whatever reasons, yes.
[4]    **Q:** During that first conversation with
[5] Mr. Sears, did he say anything to you, whether or
[6] not you asked him, did he say anything about the
[7] truth of any of the allegations in the complaints?
[8]    **A:** No, I don't believe so.
[9]    **Q:** At any point between that first conversation
[10] and today, have you ever asked him whether any of
[11] the allegations in either of these complaints was
[12] true?
[13]    **A:** I've tried not to really talk on any,
[14] anything like that, no. I believe not.
[15]    **Q:** Why have you decided not to ask him that
[16] question?
[17]    **A:** I just didn't see where it was going to be
[18] in my best interest to know anything more than I
[19] know, which is not much.
[20]    **Q:** At any point from that first conversation to
[21] today, has Mr. Sears ever said anything to you about
[22] whether the allegations in either of the complaints
[23] are true or not?
[24]    **A:** No. Not — no.

Page 150

[1]    **Q:** Okay. I don't have any other questions.
[2]    **MR. LAURIE:** I actually have just a few.
[3]
[4]                    **CROSS-EXAMINATION**
[5]                    **BY MR. LAURIE:**
[6]    **Q:** You testified earlier that the
[7] representatives from Cold Spring, and by
[8] representatives, Mr. Marchand, Mr. Waszkelewicz, and
[9] Mr. Kramer, had an understanding that the money from
[10] LMC was coming from Bob Sears; is that correct?
[11]    **A:** Coming from?
[12]    **Q:** Well, that Bob Sears —
[13]    **A:** Investors that —
[14]    **Q:** That Bob Sears was raising that capital
[15] being invested?
[16]    **A:** That's correct.
[17]    **Q:** Is there any documentation that was given by
[18] you or Mr. Sears to any of the three representatives
[19] of Cold Spring that would indicate that Mr. Sears
[20] was going to be raising the capital for LMC?
[21]    **A:** No. There was no documentation.
[22]    **Q:** Is there any documentation which would
[23] suggest that the Cold Spring representatives had
[24] knowledge of where the money was coming from?

Page 151

[1]    **A:** No.
[2]    **Q:** Do you recall a specific meeting in which
[3] you or Mr. Sears were present and told that the
[4] three representatives of Cold Spring where Last
[5] Minute Concessions was going to obtain the capital?
[6]    **A:** Where specifically, no. Just that he was
[7] going to raise it.
[8]    **Q:** So just to clarify. It's your testimony
[9] today that the three representatives of Cold Spring,
[10] that you provided them with the information that
[11] Mr. Sears was just going to raise the capital that
[12] Last Minute Concessions was going to invest in the
[13] project?
[14]    **A:** They were all aware that he was raising the
[15] entire amount, yes.
[16]    **Q:** And as far as the specifics of how he was
[17] raising it, there was no information provided?
[18]    **A:** No.
[19]    **Q:** And there was no documentation whatsoever
[20] pertaining to that?
[21]    **A:** No.
[22]    **Q:** That's all I have.
[23]    **MR. SNYDER:** I just want to follow-up.
[24]    **MR. LESSER:** Could I have a short break?

Page 152

[1]    **MR. SNYDER:** Sure.
[2]    (Break taken.)
[3]
[4]                    **REDIRECT EXAMINATION**
[5]                    **BY MR. SNYDER:**
[6]    **Q:** Mr. Huntington was asking you about where
[7] matters stood in June of '99 and I want to follow-up
[8] on that. In June of 1999, did Mr. Waszkelewicz,
[9] Mr. Marchand, or Mr. Kramer ever indicate that there
[10] was a limit on how much money they could put into
[11] this project?
[12]    **A:** How much they could put into it, no, no.
[13]    **Q:** When they first talked to you about the
[14] project, though, it was, I take it, if not expressly
[15] stated, at least implicit in what they were saying
[16] that they did not have the financial resources or
[17] have access to financial resources to complete this
[18] project; is that right?
[19]    **A:** That's correct.
[20]    **Q:** That $4 million figure you gave us a moment
[21] ago, it was clear from your conversations with these
[22] three gentlemen they didn't have any way of getting
[23] all that money?
[24]    **A:** That's correct.

James Casagrande
September 26, 2001
Case 3:00-cv-30170-MAP   Document 44   Filed 10/31/02   Page 110 of 142
Vol. 2
pp. 45-156
Charles Schwab & Co., Inc.   v.
Sears, et al.

Page 153

[1]  **Q:** That would include that bank financing when
[2] they came to you whenever it was in 1999, and asked
[3] whether you wanted to get involved, they did not say
[4] anything to you to the effect that we could get this
[5] money from a bank, but we prefer to do it through
[6] investors or through you; is that fair to say? They
[7] didn't say anything of that sort?
[8]  **A:** Not that I remember, no.
[9]  **Q:** The thought was or what everybody
[10] contemplated was that some of the funds were going
[11] to be raised through Last Minute Concessions and
[12] then there would follow at some point some more
[13] funds to be raised by bank financing; is that right?
[14]  **A:** That's true.
[15]  **Q:** Did you ever indicate to any of these three
[16] gentlemen or to Mr. Sears any amount that you could
[17] contribute from your personal funds by way of
[18] investment in this project?
[19]  **A:** No. Other than saying I didn't have
[20] anything to really contribute.
[21]  **Q:** Okay. Did you say something to that effect,
[22] that you had nothing or a nominal amount that you
[23] could contribute?
[24]  **A:** I'm sure it came up, yes.

Page 154

[1]  **Q:** Thank you. That's all I have.
[2]  **MR. HUNTINGTON:** I'm done.
[3]  **MR. LAURIE:** I'm done, too.
[4]  (Whereupon the deposition
[5] concluded at 12:40 p.m.)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 155

[1]  CERTIFICATE
[2]  I, JAMES CASAGRANDE, do hereby certify
[3] that I have read the foregoing transcript of my
[4] testimony, and further certify that it is a true and
[5] accurate record of my testimony (with the exception
[6] of the corrections listed below):
[7] Page  Line      Correction
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]  Signed under the pains and penalties of perjury
[21] this ____ day of _____, 2001.
[22]
[23]      JAMES CASAGRANDE
[24]

Page 156

[1]  CERTIFICATE
[2] Commonwealth of Massachusetts
[3] Worcester, ss.
[4]
[5]  I, Ann M. Lasoskie, Registered Professional
[6] Reporter, CSR #1404F95 and Notary Public in and for
[7] the Commonwealth of Massachusetts, do hereby certify
[8] that, JAMES CASAGRANDE, the witness whose deposition
[9] is hereinbefore set forth, was duly sworn by me and
[10] that such deposition is a true record of the
[11] testimony given by the witness.
[12]  I further certify that I am neither related to
[13] or employed by any of the parties in or counsel to
[14] this action, nor am I financially interested in the
[15] outcome of this action.
[16]  In witness whereof, I have hereunto set my hand
[17] and seal this 3rd day of October, 2001.
[18]
[19]
[20]
[21]
[22]
[23]      My commission expires:
[24]      June 21, 2007

C

**9**

MEMORANDUM OF UNDERSTANDING TO PURCHASE SHARES IN
COLD SPRING GOLF COURSE, INC.

THIS AGREEMENT made this ____ day of June, 1999, by and among COLD SPRING GOLF COURSE,
INC., and EDWIN WASZKELEWICZ, MARK KRAMER, JOHN MARCHAND, and
LAST MINUTE CONCESSIONS, INC. (Individually sometimes also referred to as "Holder" and
collectively sometimes referred to as "Holders").

WHEREAS:

A.    A Massachusetts business corporation has been organized, capitalized and financed, and its
business affairs are to be conducted in accordance with and subject to the provisions of this Agreement; and

B.    Holders have agreed that their execution of this Agreement is in the best interests of the
Corporation and will serve to promote harmonious relationships among themselves with respect to the
conduct of the affairs of the Corporation.

C.    The Corporation has agreed to issue additional shares comprising a 51% ownership position to
LAST MINUTE CONCESSIONS for the consideration of $1,725,000.00, for capitalization.

I.    Organization, Capitalization and Financing

1.00    The Corporation is incorporated under the laws of the Commonwealth of Massachusetts, as COLD
SPRING GOLF COURSE, INC.

1.01    By-laws.  The by-laws have been adopted substantially in the form of Annex A attached hereto.

1.02    LAST MINUTE CONCESSIONS, INC. hereby subscribes for and agree to purchase 1117 shares
of the common stock of the corporation at the price of $ 1544.33  per share. Each holder individually
warrants and represents that such shares will be acquired for investment for his or her own account and not
with a view to distribution or resale.

1.03    The subscription must be exercised within 30 days of the final permitting of the golf course
project.  In no event shall the term of the subscription exceed 12 months after the date of execution of the
"Stock Purchase Agreement".  In no event does the subscription have to be exercised before May 1, 1999.

1.04    A deposit in the amount of $50,000 shall be required and it is mutually agreed that said deposit
may be used to pay cost incurred to achieve permitting. It is further agreed that a deposit in the amount of
$100,000 held by the Sellers attorney shall be used as collateral and will be pledged to cover this deposit in
the event permits are not granted..

1.05    The escrow payment shall be forfeited in the event that the Corporation does not receive the
balance due within the time period established in section 1.03.

1.06    Waszkelewicz, Marchand and Kramer represent and warrant that in the course of their services
provided thus far with respect to the Golf Course they have not violated any laws and they are not aware of
any actual or threatened claims, suits, actions, debts, damages, costs, losses, obligations, judgments,
charges and expenses relating to any violation of law or any civil suits in connection with the Golf Course.

1.07    The Waszkelewicz and Kramer shares will be voted together until the golf course has been in
operation for two years.

1.08    At closing, ownership of land shown as Parcels "A-1, 2, 3, 4 and 5" on a plan drawn by Sherman
and Woods, Land Surveyors and Engineers, entitled "Special Permit Plan" dated 7/9/98, shall be deeded to
COLDSPRING GOLF COURSE, INC.


PLAINTIFF'S
EXHIBIT
5/3/07

II       Corporate Management

2.00     Officers and Directors: John Marchand is President and a Director.  Mark Kramer is Treasurer and a Director.  Edwin Waszkelewicz is Clerk and a Director.  At the time of execution of the Stock subscription, James Casagrande and Robert C. Sears will be appointed as Directors and a shareholders meeting shall be held for the purpose of election of officers.

2.01     Voting Agreement: Each Holder agrees that so long as he shall remain a Holder, he shall vote his shares:  a) for the election of those persons named in section 2.00 as Officers and Directors of the Corporation and generally will so vote at Holders' and Directors' meetings as to carry out and make effective all the terms and provisions of this Agreement; and b) for the election of Directors and upon any other matter requiring action by the Holders of the Corporation, only as the Holders may agree unanimously, or failing such agreement, as shall be determined by arbitration under section 5.00.  Any Holder may by five days written notice to the other Holders demand such arbitration.  Pending such arbitration all shares subject to this Agreement shall be voted for appropriate adjournment of any meeting or other corporate proceeding to which the dispute relates, and after such arbitration, each of the Holders shall be conclusively deemed to have appointed, and hereby does appoint the successful party as his irrevocable proxy to vote his shares in accordance with the determination of the arbitrator.  In any action brought hereunder, the legal costs, the unsuccessful party shall pay including attorney's fees.

III      RESTRICTIONS ON TRANSFER, OPTIONS, PURCHASE OF SHARES

3.00     Restrictions on transfer: Each of the holders expressly agrees:

         (a)     Not to sell, transfer, pledge, assign or otherwise in any manner dispose of or encumber any shares of the Corporation at any time owned by him, unless and until he shall have first offered to sell such shares to Corporation, and thereafter to the other Holders at a price to be determined as provided in section 3.05.

         (b)     The foregoing restriction shall not apply in the case of transfers directly or indirectly to or for the benefit of another Holder, including for purposes of this section, a spouse or descendant of a Holder, provided that the transferee, if not already a party to this Agreement, shall become such.

         (c)     All share certificates issued by the Corporation shall be marked on the fact thereof:

         "Sale, transfer, pledge, assignment or encumbrance of these shares is restricted by the terms of Agreement of Incorporate which may be examined during normal business hours at the office of the Corporation"  "No dividends shall be paid on any shares sold, transferred, pledged, assigned or encumbered in breach of this Agreement"

         (d)     Unless the shares are sold or transferred to the Corporation or to other Holders, not to sell, transfer, pledge, assign or otherwise in any manner dispose of or encumber any shares of the Corporation until the Golf Course is fully operational and open for play as an 18 hole golf course.

         (e)     No transfer of any shares by any Holder shall be effective unless approved by any Lender who has made a loan to the Corporation pursuant to loan terms, which require approval of the transfer of any shares of the Corporation.

3.01     Options.  Successive options on the part of the Corporation and thereafter the other Holders to purchase all or any of the shares owned by the Holder referred to in (a), (b) or (c) of this section, as the case may be, at a price to be determined as provided in section 3.05 shall arise upon the happening of any one or more of the following events:

         (a)     Death of a Holder; or

        (b)      Receipt by Corporation of an offer to sell shares made pursuant to section 3.00.

3.02    Option Periods: An option arising under section 3.01 shall remain in force:

        (a)      For successive periods of 30 days following the receipt of the offer giving rise to the option, if the option arises under Subsection (b); or

        (b)      For successive periods of 60 days after the Corporation has received notice of the appointment of the personal representative of a deceased Holder, if the option arises under Subsection (a).

3.03    Notice of Option and Exercise.

        (a)      An offer to sell pursuant to Section 3.01 or a notice pursuant to Section 3.02(b) shall be in writing and given to the Corporation to each of the Holders in accordance with Section 4.02.  An offer to sell pursuant to Section 3.00 shall be accompanied by a copy of any bona fide offer relied upon by the offeror.

(b)     An option on the part of the Corporation or the Holders may be exercised within the period specified in Section 3.02 by the giving of notice of such exercise by the Corporation or the Holders, as the case may be, to the Holder whose shares are purchased or his personal representative as the case may be.

(c)     If no such notice of exercise be given within the time specified in Section 3.02 then the offeror or his personal representative, as the case may be, during the period of 90 days thereafter, transfer the shares as to which the option shall not have been exercised, free of the restrictions of Section 3.00, at a price not less than and on terms and conditions no more favorable than, those specified in any bona fide offer relied upon by such Holder.

3.04    Proportions of Exercise:  Holders who exercise any option to purchase given under this Agreement shall participate in any purchase in proportion to their holdings of the class of shares offered, unless some other proportion is agreed upon in writing by the purchasers.  A right to acquire shares pursuant to this Agreement may be transferred or assigned only to another Holder (as defined in Section 3.00(b).

3.05    Option Price:  In the event an option to purchase shares shall arise under Section 3.01 the option price of such shares shall be a price per share equal to that set forth in a bona fide written offer to purchase such shares received by the offeror or his personal representative, as the case may be, and submitted to the Corporation within five days after the date on which the option arose.

IV    TERMINATION NOTICES

4.00    This agreement shall also terminate upon the occurrence of any of the following events:

        (a)      Cessation of the Corporation's business;

        (b)      Bankruptcy, receivership or dissolution of the Corporation;

        (c)      Upon mutual agreement of the Holders of 100 percent of the shares of the Corporation subject to this Agreement;

        (d)      Whenever there is only one surviving Holder bound by the terms hereof.

        (e)      Upon 30 days notice by the Corporation of its intention to make a public offering of securities of the same class as those held subject to this Agreement; or

(f)      Upon five days notice by the Corporation that all of the Holders of record of shares entitled to vote thereon have approved a merger, consolidation, reorganization, or plan for liquidation, dissolution or sale of substantially all of the Corporation's assets.

4.01      Notices.  All notices, requests, demands and other communications relating to this Agreement or required or permitted hereunder shall be in writing and shall be deemed to have been duly give when received, if personally delivered or mailed, first class postage prepaid, addressed to the address of the party to whom such notice is directed as it appears on the records of the Corporation.

V.      SETTLEMENT OF DISPUTES

5.00      All disputes, differences and controversies arising in connection with the determination of book value or earnings per share shall be conclusively determined by the independent accountant then regularly reviewing the books of the Corporation.  All other disputes, differences and controversies, of any nature whatsoever, relating to or arising under or in connection with this Agreement shall be settled and finally determined by arbitration in the City of Springfield, Massachusetts, under the then existing Rules of the American Arbitration Association.

VI.      MISCELLANEOUS PROVISIONS

6.00      At the time construction of the golf course begins, James Casagrande shall be the employee Manager/Golf Professional of the golf course and receive a base compensation of $_____ plus normal fringe benefits and be eligible for annual merit increases.

6.02      Profit distributions shall be made from operating profits of the golf course, before the effect of any payments made to related parties, except those noted in section 6.00 or those agreed to in the approval of the annual budget or amendments thereto, and to cover tax liabilities.

6.03      The $1,725,000.00 will be used exclusively for the purpose of construction of the golf course and infrastructure to the clubhouse, including payments in section 6.00.

6.04      Persons Bound: This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, distributes successors and assigns, including any shareholders of the Corporation who may subsequently become parties by their signatures at the end hereof.

6.05      Choice of Law:  This Agreement shall be construed and enforced in accordance with and governed by the laws of the Commonwealth of Massachusetts.

6.06      Severability: If any provision of this Agreement or the application thereof to any person or circumstances is held invalid, the remainder of this Agreement and the application of such provision to any other persons and circumstances shall not be effected thereby.

6.07      Inconsistencies: If any provision of this Agreement is inconsistent with any provision of any prior document required or executed pursuant to this Agreement, the provisions of this Agreement shall be controlling and supersede such other document.

Executed as a sealed instrument this ____ day of June, 1999.

COLDSPRING GOLF COURSE, INC.

It's President or Clerk

LAST MINUTE CONCESSIONS, INC.

It's President or Clerk

MEMORANDUM OF UNDERSTANDING TO PURCHASE SHARES IN
COLDSPRING DEVLOPMENT INC.

THIS AGREEMENT made this _____ day of June, 1999, by and among COLD SPRING GOLF
DEVELOPMENT, INC., and EDWIN WASZKELEWICZ, MARK KRAMER, JOHN MARCHAND, and
LAST MINUTE CONCESSIONS,INC.  (Individually sometimes also referred to as "Holder" and
collectively sometimes referred to as "Holders").

WHEREAS:

A.      A Massachusetts business corporation has been organized, capitalized and financed, and its
business affairs are to be conducted in accordance with and subject to the provisions of this Agreement; and

B.       Holders have agreed that their execution of this Agreement is in the best interests of the
Corporation and will serve to promote harmonious relationships among themselves with respect to the
conduct of the affairs of the Corporation.

C.       The Corporation has agreed to issue shares comprising a 16% ownership position to LAST
MINUTE CONCESSIONS, INC. for the consideration of $275,000.00.

I.        Organization, Capitalization and Financing

1.00      The Corporation is incorporated under the laws of the Commonwealth of Massachusetts, as COLD
SPRING DEVELOPMENT, INC.

1.01      By-laws.  The by-laws have been adopted substantially in the form of Annex A attached hereto.

1.02      James Casagrande and Robert C. Sears hereby subscribe for 205 shares of the common stock of
the corporation at $1341.00 per share. Each holder individually warrants and represents that such shares
will be acquired for investment for his or her own account and not with a view to distribution or resale.

1.03      The subscription must be exercised within 30 days of the final permitting of the golf course
project. In no event shall the term of the subscription exceed 12 months after the date of execution of the
"Agreement". In no event does the subscription have to be exercised before August 1, 1999.

1.04      An escrow deposit in the amount of $50,000.00 shall be required and it is mutually agreed that
said deposit may be used to pay cost incurred to achieve permitting. It is further agreed that a deposit in the
amount of  $100,000 held by the Sellers attorney shall be used as collateral and will be pledged to cover
this deposit in the event permits are not granted.

1.05      The escrow payment shall be forfeited in the event that the balance due is not received by the
Corporation within the time period established in section 1.03.

1.06      Waszkelewicz, Marchand and Kramer represent and warrant that in the course of their services
provided thus far with respect to the Golf Course they have not violated any laws and they are not aware of
any actual or threatened claims, suits, actions, debts, damages, costs, losses, obligations, judgments,
charges and expenses relating to any violation of law or any civil suits in connection with the Golf Course.

1.07      The Waszkelewicz and Kramer shares will be voted together until the golf course has been in
operation for two years.

II       Corporate Management

2.00      Officers and Directors: John Marchand is Vice-President and a Director.  Mark Kramer is
Treasurer and a Director.  Edwin Waszkelewicz is President, Clerk and a Director.  At the time of closing
James Casagrande and Robert C. Sears shall be appointed as Directors.



PLAINTIFF'S
EXHIBIT
10 Waszkelewick
5/3/04

2.01     Voting Agreement: Each Holder agrees that so long as he shall remain a Holder, he shall vote his shares: a) for the election of those persons named in section 2.00 as Officers and Directors of the Corporation and generally will so vote at Holders' and Directors' meetings as to carry out and make effective all the terms and provisions of this Agreement; and b) for the election of Directors and upon any other matter requiring action by the Holders of the Corporation, only as the Holders may agree unanimously, or failing such agreement, as shall be determined by arbitration under section 5.00.  Any Holder may by five days written notice to the other Holders demand such arbitration.  Pending such arbitration all shares subject to this Agreement shall be voted for appropriate adjournment of any meeting or other corporate proceeding to which the dispute relates, and after such arbitration, each of the Holders shall be conclusively deemed to have appointed, and hereby does appoint the successful party as his irrevocable proxy to vote his shares in accordance with the determination of the arbitrator.  In any action brought hereunder, the legal costs, including attorney's fees, shall be paid by the unsuccessful party.

III        RESTRICTIONS ON TRANSFER, OPTIONS, PURCHASE OF SHARES

3.00 .    Restrictions on transfer:  Each of the holders expressly agrees:

        (a)        Not to sell, transfer, pledge, assign or otherwise in any manner dispose of or encumber any shares of the Corporation at any time owned by him, unless and until he shall have first offered to sell such shares to Corporation, and thereafter to the other Holders at a price to be determined as provided in section 3.05.

        (b)        The foregoing restriction shall not apply in the case of transfers directly or indirectly to or for the benefit of another Holder, including for purposes of this section, a spouse or descendant of a Holder, provided that the transferee, if not already a party to this Agreement, shall become such.

        (c)        All share certificates issued by the Corporation shall be marked on the fact thereof:

        "Sale, transfer, pledge, assignment or encumbrance of these shares is restricted by the terms of Agreement of Incorporate which may be examined during normal business hours at the office of the Corporation" "No dividends shall be paid on any shares sold, transferred, pledged, assigned or encumbered in breach of this Agreement"

        (d)        Unless the shares are sold or transferred to the Corporation or to other Holders, not to sell, transfer, pledge, assign or otherwise in any manner dispose of or encumber any shares of the Corporation until the Golf Course is fully operational and open for play as an 18 hole golf course.

        (e)        No transfer of any shares by any Holder shall be effective unless approved by any Lender who has made a loan to the Corporation pursuant to loan terms, which require approval of the transfer of any shares of the Corporation.

3.01     Options.  Successive options on the part of the Corporation and thereafter the other Holders to purchase all or any of the shares owned by the Holder referred to in (a), (b) or (c) of this section, as the case may be, at a price to be determined as provided in section 3.05 shall arise upon the happening of any one or more of the following events:

        (a)        death of a Holder; or

        (b)        receipt by Corporation of an offer to sell shares made pursuant to section 3.00.

3.02     Option Periods:  An option arising under section 3.01 shall remain in force:

        (a)        for successive periods of 30 days following the receipt of the offer giving rise to the option, if the option arises under Subsection (b); or

(b)      for successive periods of 60 days after the Corporation has received notice of the appointment of the personal representative of a deceased Holder, if the option arises under Subsection (a).

3.03    Notice of Option and Exercise.

(a)      An offer to sell pursuant to Section 3.01 or a notice pursuant to Section 3.02(b) shall be in writing and given to the Corporation to each of the Holders in accordance with Section 4.02. an offer to sell pursuant to Section 3.00 shall be accompanied by a copy of any bona fide offer relied upon by the offeror.

(b)      An option on the part of the Corporation or the Holders may be exercised within the period specified in Section 3.02 by the giving of notice of such exercise by the Corporation or the Holders, as the case may be, to the Holder whose shares are purchased or his personal representative as the case may be.

(c)      If no such notice of exercise be given within the time specified in Section 3.02 then the offeror or his personal representative, as the case may be, during the period of 90 days thereafter, transfer the shares as to which the option shall not have been exercised, free of the restrictions of Section 3.00, at a price not less than and on terms and conditions no more favorable than, those specified in any bona fide offer relied upon by such Holder.

3.04    Proportions of Exercise:  Holders who exercise any option to purchase given under this Agreement shall participate in any purchase in proportion to their holdings of the class of shares offered, unless some other proportion is agreed upon in writing by the purchasers.  A right to acquire shares pursuant to this Agreement may be transferred or assigned only to another Holder (as defined in Section 3.00(b).

3.05    Option Price:  In the event an option to purchase shares shall arise under Section 3.01 the option price of such shares shall be a price per share equal to that set forth in a bona fide written offer to purchase such shares received by the offeror or his personal representative, as the case may be, and submitted to the Corporation within five days after the date on which the option arose.

IV    TERMINATION NOTICES

4.00    This agreement shall also terminate upon the occurrence of any of the following events:

(a)      Cessation of the Corporation's business;

(b)      Bankruptcy, receivership or dissolution of the Corporation;

(c)      Upon mutual agreement of the Holders of 100 percent of the shares of the Corporation subject to this Agreement;

(d)      Whenever there is only one surviving Holder bound by the terms hereof.

(e)      Upon 30 days notice by the Corporation of its intention to make a public offering of securities of the same class as those held subject to this Agreement; or

(f)      Upon five days notice by the Corporation that all of the Holders of record of shares entitled to vote thereon have approved a merger, consolidation, reorganization, or plan for liquidation, dissolution or sale of substantially all of the Corporation's assets.

4.01    Notices. All notices, requests, demands and other communications relating to this Agreement or required or permitted hereunder shall be in writing and shall be deemed to have been duly give when received, if personally delivered or mailed, first class postage prepaid, addressed to the address of the party to whom such notice is directed as it appears on the records of the Corporation.

V.      SETTLEMENT OF DISPUTES

5.00    All disputes, differences and controversies arising in connection with the determination of book value or earnings per share shall be conclusively determined by the independent accountant then regularly reviewing the books of the Corporation. All other disputes, differences and controversies, of any nature whatsoever, relating to or arising under or in connection with this Agreement shall be settled and finally determined by arbitration in the City of Springfield, Massachusetts, under the then existing Rules of the American Arbitration Association.

VI.    MISCELLANEOUS PROVISIONS

6.00    At the time construction of the golf course begins, but no sooner than June 15, 1999, Edwin Waszkelewicz shall receive fees, Project Manager in the amount of .03% of construction cost relating to infrastructure and general construction of clubhouse and condo development. Responsibilities shall include, but are not limited to construction oversight, pre opening maintenance and pre opening marketing.

6.01    At the time construction of the golf course begins, but no sooner than June 15, 1999, James Casagrande shall be the employee Manager/Golf Professional of the golf course and receive a base compensation as agreed to in section 6.00 of Coldspring Golf Course Inc. document.

6.02    Profit distributions shall be made from operating profits of the condominium development, before the effect of any payments made to related parties, except those noted in section 6.01 or those agreed to in the approval of the annual budget or amendments thereto.

6.03    The $275,000.00 will be used exclusively for the purpose of land cost and infrastructure relating to the condominium development and including payments in section 6.00.

6.04    Persons Bound: This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, distributees successors and assigns, including any shareholders of the Corporation who may subsequently become parties by their signatures at the end hereof.

6.05    Choice of Law: This Agreement shall be construed and enforced in accordance with and governed by the laws of the Commonwealth of Massachusetts.

6.06    Severability: If any provision of this Agreement or the application thereof to any person or circumstances is held invalid, the remainder of this Agreement and the application of such provision to any other persons and circumstances shall not be effected thereby.

6.07    Inconsistencies: If any provision of this Agreement is inconsistent with any provision of any prior document required or executed pursuant to this Agreement, the provisions of this Agreement shall be controlling and supersede such other document.

Executed as a sealed instrument this _6_ day of June, 1999.


COLDSPRING DEVELOPMENT, INC.

It's President


LAST MINUTE CONCESSIONS, INC.

It's President/Clerk

LMC Checking

**Register Report**
2/9/00 Through 8/18/00



PLAINTIFF'S
EXHIBIT

10/6/00

Page 1

| Date | Num | Description | Memo | Category | Clr | Amount |
|------|-----|-------------|------|----------|-----|--------|
| | | BALANCE 2/8/00 | | | | |
| | | | | | | 0.00 |
| 2/9/00 | | Opening Balance | | [LMC Checking] | R | |
| 2/10/00 | DEP | | Opening deposit JC | Other Inc | R | 0.00 |
| 2/22/00 | DEP | | Marc Futter | Other Inc | R | 50.00 |
| 2/23/00 | 1001 | Cash | | Land | R | 500,000.00 |
| 2/23/00 | 1002 | Cold Spring Development | | Cold Spring Development | R | -440,022.12 |
| 2/29/00 | | Service Charge | | Bank Charge | R | -58,000.00 |
| 2/29/00 | 1003 | John Curry | | Land | R | -6.00 |
| 3/1/00 | | Service Charge | Returned Check | Bank Charge | R | -20,025.00 |
| 3/3/00 | 1005 | Cold Spring Development | | Cold Spring Development | R | -25.00 |
| 3/13/00 | | Service Charge | Returned Check | Bank Charge | R | -50,000.00 |
| 3/15/00 | DEP | | Steve McQueeny | Other Inc | R | -25.00 |
| 3/15/00 | | Credit Adjustment | Returned Check 1003 | Other Inc | R | 75,000.00 |
| 3/15/00 | 1006 | Commonwealth Of Mass. | | Tax:Other | R | 20,025.00 |
| 3/20/00 | 1007 | James Casagrande | Repayment of loan Amount | Misc | R | -456.00 |
| 3/20/00 | 1008 | Keith Morris | | Misc | R | -3,000.00 |
| 3/20/00 | 1009 | Ralph L. Leblanc | | Environmental Consult. | R | -6,000.00 |
| 3/29/00 | DEP | | Marc Futter | Architectic | R | -5,000.00 |
| 3/29/00 | DEP | Lyn Reale | | Other Inc | R | 50,000.00 |
| 3/29/00 | DEP | | Virginia Sanborn/ Maria Mc... | Other Inc | R | 75,000.00 |
| 3/30/00 | DEP | | Robert C Sears | Other Inc | R | 150,000.00 |
| 3/30/00 | DEP | | John Wallace | Other Inc | R | 30,000.00 |
| 3/30/00 | DEP | | Celeste Helterline | Other Inc | R | 50,000.00 |
| 3/30/00 | DEP | | Celeste Helterline | Other Inc | R | 24,984.86 |
| 3/30/00 | DEP | | Mark Helterline | Other Inc | R | 25,000.00 |
| 3/31/00 | DEP | | Virginia Senders | Other Inc | R | 25,000.00 |
| 3/31/00 | DEP | | Josephine Shaw | Other Inc | R | 120,000.00 |
| 3/31/00 | | Service Charge | | Other Inc | R | 225,000.00 |
| 3/31/00 | 1010 | Cash | partial purchase | Bank Charge | R | -54.00 |
| 3/31/00 | 1011 | Cash | partial | Land | R | -440,000.00 |
| 4/6/00 | DEP | | John Wallace | Land | R | -345,000.00 |
| 4/6/00 | DEP | | Steve McQueeny | Other Inc | R | 5,000.00 |
| 4/6/00 | DEP | | Celeste Helterline | Other Inc | R | 5,000.00 |
| 4/6/00 | DEP | | Lyn Reale | Other Inc | R | 12,000.00 |
| 4/7/00 | 1012 | Cash | Repay. of J. Wildzumas GC... | Other Inc | R | 15,000.00 |
| 4/8/00 | 1013 | **VOID**T. Jepson | | Misc | R | -38,144.82 |
| 4/12/00 | 1014 | **VOID**Four B's Develope... | | Land:Clearing | R | 0.00 |
| 4/17/00 | | Service Charge | Returned Check | Land:Course Buildout | R | 0.00 |
| 4/19/00 | DEP | | | Bank Charge | R | -25.00 |
| 4/19/00 | 1015 | Staples | Fax,phone, printer/copier | Other Inc | R | 16,803.00 |
| 4/19/00 | -1016 | T. Jepson | | Office Exp. | R | -241.48 |
| 4/19/00 | 1017 | **VOID**Ed Waszkelewicz | Reimbursement of loan | Land:Clearing | R | -16,500.00 |
| 4/19/00 | 1018 | Ed Waszkelewicz | Reimbursement of exp. | Misc | R | 0.00 |
| 4/20/00 | 1019 | Easthampton Savings Bank | | Misc | R | -164.78 |
| 4/21/00 | | Service Charge | Returned Check | Land:Appraisel | R | -3,000.00 |
| 4/21/00 | 1020 | Wildside Consulting | | Bank Charge | R | -25.00 |
| 4/21/00 | 1021 | Bill Brunelle | | Consulting | R | -6,531.25 |
| 4/25/00 | | Service Charge | | Land:Course Buildout | R | -4,500.00 |
| 4/26/00 | | Service Charge | Returned Check | Bank Charge | R | -50.00 |
| 4/27/00 | 1022 | T. Jepson | Returned Check | Bank Charge | R | -25.00 |
| 4/28/00 | | Service Charge | | Land:Clearing | R | -18,625.00 |
| 4/28/00 | 1023 | James Casagrande | Bal. of loan repaid | Bank Charge | R | -45.00 |
| 4/28/00 | 1024 | **VOID**Wildside Consulting | | Misc | R | -3,000.00 |
| 4/28/00 | 1025 S | Bankboston | Cover bad check #1016 | Consulting | R | 0.00 |
| | | | Four B's Development | Land:Clearing | R | -16,500.00 |
| 5/1/00 | | | Credit Adjustment | Land:Course Buildout | R | -153,438.61 |
| 5/1/00 | | Service Charge | Returned Check | Other Inc | R | 16,500.00 |
| 5/9/00 | | Service Charge | Returned Check | Bank Charge | R | -25.00 |
| 5/10/00 | DEP | | Unknown | Bank Charge | R | -25.00 |
| | | | | Other Inc | R | 250,000.00 |

LMC Checking

**Register Report**
2/9/00 Through 8/18/00

10/6/00

Page 2

| Date | Num | Description | Memo | Category | Clr | Amount |
|------|-----|-------------|------|----------|-----|--------|
| 5/12/00 | 1027 | Cash | Bank check for Fuss & O'Niell | Consulting | R | -34,893.62 |
| 5/15/00 | 1028 | McCormick-Allum | dep. heating and air. | Clubhouse Buildout | R | -5,000.00 |
| 5/16/00 | 1004 | Robert C. Sears | Repayment for loan | Misc | R | -21,000.00 |
| 5/23/00 | | Service Charge | Returned Check | Bank Charge | R | -25.00 |
| 5/23/00 | 1031 | The Golf Course At Cold Sp... | opening of Acct. | Misc | R | -25.00 |
| 5/24/00 | | Service Charge | Returned Check | Misc | R | -50.00 |
| 5/31/00 | | Service Charge | | Bank Charge | R | -25.00 |
| 6/1/00 | DEP | | | Bank Charge | R | -3.00 |
| 6/2/00 | DEP | | Robert McLaughlin | Other Inc | R | 75,000.00 |
| 6/2/00 | DEP | | Celeste Helterline | Other Inc | R | 10,000.00 |
| 6/2/00 | DEP | | Mark Helterline | Other Inc | R | 20,000.00 |
| 6/2/00 | DEP | | Ann Arnold | Other Inc | R | 20,083.31 |
| 6/2/00 | 1032 | **VOID**Sawtelle Bros. | Celeste Helterline | Other Inc | R | 30,000.00 |
| 6/2/00 | 1033 S | Cash | T.Jepson | Land:Irrigation | R | 0.00 |
| 6/3/00 | 1034 | The Golf Course At Cold Sp... | Four B's Development | Land:Clearing | R | -12,000.00 |
| 6/3/00 | 1035 | Cash | Transfer | Land:Course Buildout | R | -130,000.00 |
| 6/3/00 | 1036 | Wildside Consulting | bank checks | [GC@Cold Spring] | R | -5,000.00 |
| 6/5/00 | DEP | | | Land:Course Buildout | R | -63,005.33 |
| 6/5/00 | DEP | | Bank Check made out wron... | Consulting | | -3,000.00 |
| 6/5/00 | | | Bank check made out wron... | Other Inc | R | 12,000.00 |
| 6/5/00 | | | Unknown | Other Inc | R | 130,000.00 |
| 6/6/00 | DEP | | Unknown | Misc | R | -12,000.00 |
| 6/7/00 | | Service Charge | Roy Johnson | Misc | R | -130,000.00 |
| 6/9/00 | 1037 | The Golf Course At Cold Sp... | Returned Check | Other Inc | R | 70,000.00 |
| 6/12/00 | | Service Charge | Transfer | Bank Charge | R | -25.00 |
| 6/16/00 | 1038 | Golf Irrigation Services | Returned Check | [GC@Cold Spring] | R | -3,000.00 |
| 6/20/00 | | Service Charge | | Bank Charge | R | -25.00 |
| 6/20/00 | 1039 | Balboni Assoc. | Returned Check | Land:Irrigation | R | -6,900.00 |
| 6/22/00 | DEP | | | Bank Charge | R | -25.00 |
| 6/22/00 | DEP | | Paul Engel | Marketing | R | -2,100.00 |
| 6/22/00 | 1029 | **VOID**Contech | Roy Johnson | Other Inc | R | 30,000.00 |
| 6/22/00 | 1041 | The Golf Course At Cold Sp... | | Other Inc | R | 100,000.00 |
| 6/23/00 | | Sawtelle Bros. | Transfer | Land:Access Road | R | 0.00 |
| 6/23/00 | 1042 | Golf Irrigation Services | Replacement of 1032 | [GC@Cold Spring] | R | -5,000.00 |
| 6/27/00 | | Service Charge | | Land:Irrigation | R | -122,843.92 |
| 6/30/00 | | Service Charge | Returned Check | Land:Irrigation | R | -8,220.00 |
| 7/12/00 | DEP | | | Bank Charge | R | -25.00 |
| 7/14/00 | DEP | | Roy Johnson | Bank Charge | R | -70.00 |
| 7/14/00 | DEP | | Roy Johnson | Other Inc | R | 62,500.00 |
| 7/14/00 | DEP | | Roy Johnson | Other Inc | R | 90,000.00 |
| 7/14/00 | | Service Charge | Roy Johnson | Other Inc | R | 90,000.00 |
| 7/14/00 | 1043 | Bell Atlantic | | Other Inc | R | 90,000.00 |
| 7/14/00 | 1044 | Bell Atlantic | | Bank Charge | R | -36.00 |
| 7/14/00 | 1045 | Belchertown Glass | | Utilities:Telephone | R | -49.65 |
| 7/14/00 | 1046 | Waste Management | | Utilities:Telephone | R | -45.48 |
| 7/14/00 | 1047 | Cash | Trash Removal | Repairs | R | -46.28 |
| 7/14/00 | 1048 S | Cash | Four B's Development | Misc | R | -119.90 |
| | | | Four B's | Land:Course Buildout | R | -60,006.00 |
| 7/14/00 | 1049 | Cash | Golf Irrigation Services | Land:Course Buildout | R | -161,313.74 |
| 7/14/00 | 1050 | Fuss And O'Neill | Four B's Development | Land:Irrigation | R | -8,220.00 |
| 7/14/00 | 1051 | Sherman And Woods | | Land:Course Buildout | R | -20.00 |
| 7/14/00 | 1052 | Ed Waszkelewicz | | Consulting | R | -9,112.78 |
| 7/14/00 | 1053 | T. Jepson | partial repayment of loan | Consulting | R | -3,940.00 |
| 7/14/00 | 1054 | Postmaster Amherst | | Misc *Now ok Land* | R | -28,000.00 |
| 8/2/00 | 1055 | CRW | | Land:Clearing | R | -21,481.00 |
| 8/2/00 | 1056 | American Concrete | | Postage | R | -11.75 |
| 8/2/00 | 1057 | Golf Irrigation Services | | Land:Access Road | | -9,500.00 |
| 8/15/00 | | Service Charge | Returned Check | Land:Access Road | | -3,360.00 |
| | | | | Land:Irrigation | | -12,960.00 |
| | | | | Bank Charge | | -22.00 |

TOTAL 2/9/00 - 8/18/00

3,986.66

LMC Checking

## Register Report
2/9/00 Through 8/18/00

10/6/00

Page 3

| Date | Num | Description | Memo | Category | Clr | Amount |
|------|-----|-------------|------|----------|-----|--------|
| | BALANCE 8/18/00 | | | | | 3,986.66 |

**TOTAL INFLOWS**          2,519,946.17
**TOTAL OUTFLOWS**      -2,515,959.51

**NET TOTAL**      3,986.66

*Bob 2,341,421.11*

SCANNED

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2002 OCT 31  A 9 59

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>ROBERT C. SEARS, )<br><br>Defendant, )<br><br>and )<br><br>LAST MINUTE CONCESSIONS INC., )<br>JAMES W. CASAGRANDE, )<br>COLD SPRING GOLF COURSE INC. and )<br>COLD SPRING DEVELOPMENT INC., )<br><br>Relief Defendants. )<br>_____ ) | Civil Action No. 00-30170-FHF<br><br><br><br>DOCKETED |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT
AGAINST RELIEF DEFENDANTS**

Plaintiff Securities and Exchange Commission ("Commission") submits this

memorandum in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil

Procedure, for summary judgment against relief defendants Last Minute Concessions Inc.

("LMC"), James W. Casagrande ("Casagrande"), Cold Spring Golf Course Inc. ("CSG"), and

Cold Spring Development Inc. ("CSD").[1]

_____

[1] A default judgment against defendant Robert C. Sears ("Sears") was entered on
September 10, 2002. Summary judgment against the relief defendants will dispose of the
Commission's remaining claims in this action.

43

## INTRODUCTION

Sears was an investment adviser in Northampton, Massachusetts, who misappropriated nearly $2.3 million from nineteen of his clients by, in some instances, forging the clients' signatures on margin agreements and on letters of authorization to their brokerage firms and, in other instances, misrepresenting the purpose of the transfers and concealing his interest in the transactions. The clients' money was transferred to LMC, a corporation owned by Sears and Casagrande, which used the money to make a $2 million investment in the Cold Spring golf course and condominium project near Belchertown, Massachusetts, being developed by CSG and CSD. All the money from Sears' clients was either paid directly to CSG and CSD or used to pay the project's expenses on their behalf. The Commission seeks summary judgment against LMC, Casagrande, CSG and CSD because they were unjustly enriched by the nearly $2.3 million which they received from Sears' defrauded clients.

## STATEMENT OF UNDISPUTED FACTS[2]

### A.   **Background**

Sears operated an investment advisory business and income tax preparation business in Northampton, Massachusetts. [Facts, ¶1.]

Casagrande worked as a golf professional and also did business was a tax preparer in office space in Northampton that he shared with Sears. [*Id.*, ¶2.]

---

[2] The facts set forth below are based on the Commission's Statement of Undisputed Facts in Support of its Motion for Summary Judgment against Relief Defendants ("Facts, ¶__") submitted herewith.

LMC is a Massachusetts corporation organized by Sears and Casagrande in 1992, with its principal place of business in Northampton.  Between 1992 and 1998, LMC operated a food and beverage concession at the Westover Golf Course.  [*Id.*, ¶3.]  Casagrande testified that, at some point in 1999, Sears orally conveyed his interest in LMC to Casagrande, who was thereafter the sole officer, director and employee of LMC.  [*Id.*]

CSG and CSD are Massachusetts corporations organized in January 1999 for the purpose of building a golf course and condominium project near Belchertown, Massachusetts.  [*Id.*, ¶4.]

**B.     Sears Was Responsible for Raising $2 Million to Fund LMC's Investment in the Cold Spring Project**

In the spring of 1999, Casagrande introduced Sears to the principals of CSG and CSD, who were seeking investors for the Cold Spring project.  [Facts, ¶5.]

In June 1999, LMC entered into written agreements with CSG and CSD whereby LMC was to acquire a 51% interest in CSG for $1,725,00 and a 16% interest in CSD for $275,000, and Sears and Casagrande were to become directors of both companies.  [*Id.*, ¶6.]

When LMC entered into the agreements with CSG and CSD, LMC did not have the $2 million that it would be required to pay for equity interests in CSG and CSD.  Sears and Casagrande told the principals of CSG and CSD that Sears would raise the $2 million from outside investors.  As Casagrande put it, "He [Sears] was the one who was supposed to be raising the money."  [*Id.*, ¶7.]

In January 2000, CSG received the final permit necessary to allow construction to begin, thereby triggering LMC's obligation to pay $2 million to CSG and CSD.  [*Id.*, ¶8.]

3

**C.    Sears Fraudulently Obtained Nearly**
**$2.3 Million from His Clients**

Between February and July 2000, Sears caused nearly $2.3 million to be transferred from

the following clients to LMC:

| Client | Amount |
|---|---|
| Arnold, Ann | 20,000 |
| Engel, Paul & Deborah | 30,000 |
| Futter, Thomas | 800,000 |
| Helterline, Mark & Celeste | 146,985 |
| Johnson, Roy & Jeannie | 502,500 |
| McGovern, Marcia & Sanborn, Virginia | 150,000 |
| McLaughlin, Robert & Eleanor | 75,000 |
| McQueeney, Stephen & Claire | 80,000 |
| Reale, Lyn | 90,000 |
| Senders, Virginia | 120,000 |
| Shaw, Josephine | 225,000 |
| Wallace, John & Nan | 55,000 |
|  | **$2,294,485** |

To obtain the money, Sears:  (1) forged client signatures on numerous letters purporting to

authorize the transfer of funds from the clients' accounts to LMC; (2) forged client signatures on

several margin account agreements; (3) caused margin loans to be made in several client

accounts; and (4) induced several clients to invest in the Cold Spring project without disclosing

his personal interest in the project. [Facts, ¶¶9-20.]

**D.    The Money from Sears' Clients Went to LMC**

The money from Sears' clients was deposited into an account at BankBoston (later Fleet

Bank) which Casagrande had opened for LMC. [Facts, ¶¶21-22.]

4

During the spring and summer of 2000, Casagrande called Sears repeatedly to ask when LMC would be receiving any additional funds, because the Cold Spring project needed the money to pay its bills.  Sears assured Casagrande that additional funds would be received shortly and that he would come up with the full $2 million.  [*Id.*, ¶23.]

Casagrande and the principals of CSG and CSD were aware that Sears was obtaining the money from his advisory clients, but they did not ask Sears how he was raising the money and they did nothing to make sure that what Sears was telling investors about the Cold Spring project was accurate.  [*Id.*, ¶24.]

E.     **The Money from Sears' Clients Was Paid to CSG and CSD
       or Was Used to Pay the Cold Spring Project's Expenses**

The LMC account at BankBoston was used to make payments either directly to CSG and CSD or to pay expenses on their behalf.  Casagrande was responsible for deciding which expenses of CSG or CSD would be paid from the LMC account.  Indeed, most of the withdrawals from the LMC account were checks payable to CSG or CSD or checks or wire transfers to entities that had supplied goods or services to the Cold Spring project.  [Facts, ¶¶25-26.]

The three principals of CSG and CSD were aware that Casagrande was using the LMC account at BankBoston to pay expenses of the Cold Spring project.  [*Id.*, ¶27.]

LMC satisfied its obligation to pay $2 million to CSG and CSD through the payments from its account at BankBoston to CSG and CSD or to pay expenses of the Cold Spring project.  [*Id.*, ¶28.]

5

## ARGUMENT

I.    **The Commission May Obtain Disgorgement from
      Relief Defendants in Order to Prevent Unjust Enrichment**

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." SEC v. First City Financial Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). It has long been recognized that the "deterrent effect of SEC enforcement actions would be greatly undermined if securities law violators were not required to disgorge illicit profits." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1104 (2nd Cir. 1972).

It is also well established that the Commission may obtain disgorgement from third parties, known as relief defendants, who have been unjustly enriched by funds obtained from the victims of a defendant's misconduct. See, e.g., SEC v. Cavanagh, 155 F.3d 129, 136 (2nd Cir. 1998); SEC v. Colello, 139 F.2d 674, 677 (9th Cir. 1998). As the Ninth Circuit stated in Colello, "the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." 139 F.3d at 676. Thus, even though a relief defendant may not have committed a wrongful act, courts will order disgorgement from a relief defendant in order to prevent unjust enrichment and to enable the victims of the fraud to recover their money. See, e.g., SEC v. Antar, 120 F.Supp.2d 431, 447 (D.N.J. 2000), aff'd, 2002 WL 1774063 (3rd Cir. Aug. 2, 2002); SEC v. Better Life Club of America, Inc., 995 F.Supp. 167, 180 (D.D.C. 1998); SEC v. Glauberman, 1992 WL 175270, *1-2 (S.D.N.Y. July 16, 1992). Indeed, to order disgorgement, "[t]he court need find only that [the relief defendant] has no right to retain the funds illegally taken from the victims." SEC v. Colello, 139 F.3d at 679.

## II.   The Relief Defendants Should Be Ordered to Disgorge the $2.2 Million They Received from Sears' Defrauded Clients

The basis for disgorgement from the relief defendants is apparent. All the money from Sears' defrauded clients went straight into LMC's bank account. Casagrande, who controlled the account, used the money to make payments directly to CSG and CSD or to pay expenses of the Cold Spring project for the direct benefit of CSG and CSD. By using the clients' funds in this fashion, LMC satisfied its obligation under the agreements with CSG and CSD to pay $2 million in exchange for equity interests in both companies. Casagrande likewise benefitted since he claims to have been the sole officer, director and employee of LMC at the time.

The relief defendants are likely to claim that they did not know Sears was defrauding his clients, but their professions of ignorance actually confirm the true extent of their unjust enrichment. Casagrande and the principals of CSG and CSD were aware that Sears was obtaining the money from his advisory clients, but they did not ask Sears how he was raising the money and they did nothing to make sure that what Sears was telling investors about the Cold Spring project was accurate. [Facts, ¶24.] Instead, as Casagrande put it, "He [Sears] was the one who was supposed to be raising the money." [*Id.*, ¶7.] Because Casagrande and the principals of CSG and CSD gave Sears the job of raising funds for the Cold Spring project and did not concern themselves with how he did so, it is perfectly fair to require them to return the money, now that the true extent of Sears' misconduct has been exposed.

The undisputed facts thus demonstrate that LMC, Casagrande, CSG and CSD were unjustly enriched by the $2,294,485 that Sears misappropriated from his clients and that was used to fund the Cold Spring project. Accordingly, LMC, Casagrande, CSG and CSD should be held jointly and severally liable for disgorgement of that amount, with pre-judgment interest.

7

*See, e.g.,* SEC  v. First Jersey Securities, Inc., 101 F.3d 1450, 1475 (2nd Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) (court has discretion to hold parties jointly and severally liable for disgorgement); SEC v. Hughes Capital Corp., 917 F.Supp. 1080, 1088 (D.N.J. 1996) (joint and several liability appropriate for participants who acted "closely and collectively").

The Commission's standard practice is to seek pre-judgment interest on a defendant's disgorgement obligation calculated in the same manner that the Internal Revenue Service uses to calculate tax over-payments or under-payments.  Applying that method (which the Court adopted when entering the default judgment against Sears), the pre-judgment interest on the relief defendants' disgorgement obligation of $2,294,485, calculated from the filing of the Complaint on September 26, 2000 through October 31, 2002, would be $367,741, for a total disgorgement obligation of $2,662,226. [Huntington Decl., ¶2.]

## **CONCLUSION**

For the reasons set forth above, the Court should grant summary judgment against LMC,

Casagrande, CSG and CSD and should order them, jointly and severally, to pay disgorgement

plus pre-judgment interest in the total amount of $2,662,226.

Respectfully submitted,

JUAN MARCEL MARCELINO
DISTRICT ADMINISTRATOR

By: _____
Frank C. Huntington (Mass. Bar No. 544045)
Senior Trial Counsel

Ellen E. Bober (Mass. Bar No. 567598)
Enforcement Attorney

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 424-5900  ext. 201 (Huntington)
                ext. 608 (Bober)
(617) 424-5940 (fax)

Dated:  October 30, 2002

## CERTIFICATE OF SERVICE

I, Frank C. Huntington, certify that on October 30, 2002, a copy of the foregoing Plaintiff's Memorandum in Support of its Motion for Summary Judgment against Relief Defendants was sent by first-class mail to counsel of record as follows:

*Attorney for Defendant Robert Sears (limited appearance)*

Irving D. Labovitz, Esq.
One Financial Plaza
1350 Main Street, 15th Floor
Springfield, MA 01103
(413) 733-0600
(413) 732-5828 (fax)

*Attorney for Relief Defendants*
*James Casagrande and Last Minute Concessions, Inc.*

Thomas Lesser, Esq.
Lesser, Newman, Souweine & Nasser, LLP
39 Main St., Suite I
Northampton, MA 01060-3132
(413) 584-7331
(413) 586-7076 (fax)

*Attorneys for Relief Defendants*
*Cold Spring Golf Course, Inc. and Cold Spring Development, Inc.*

John A. Houlihan, Esq.
Robert D. Laurie, Esq.
Edwards & Angell, LLP
101 Federal Street
Boston, MA 02110
(617) 439-4444
(617) 439-4170 (fax)

Frank C. Huntington

10

## INTRODUCTION

Sears was an investment adviser in Northampton, Massachusetts, who misappropriated nearly $2.3 million from nineteen of his clients by, in some instances, forging the clients' signatures on margin agreements and on letters of authorization to their brokerage firms and, in other instances, misrepresenting the purpose of the transfers and concealing his interest in the transactions. The clients' money was transferred to LMC, a corporation owned by Sears and Casagrande, which used the money to make a $2 million investment in the Cold Spring golf course and condominium project near Belchertown, Massachusetts, being developed by CSG and CSD. All the money from Sears' clients was either paid directly to CSG and CSD or used to pay the project's expenses on their behalf. The Commission seeks summary judgment against LMC, Casagrande, CSG and CSD because they were unjustly enriched by the nearly $2.3 million which they received from Sears' defrauded clients.

## STATEMENT OF UNDISPUTED FACTS[2]

### A.   **Background**

Sears operated an investment advisory business and income tax preparation business in Northampton, Massachusetts. [Facts, ¶1.]

Casagrande worked as a golf professional and also did business was a tax preparer in office space in Northampton that he shared with Sears. [*Id.*, ¶2.]

---

[2] The facts set forth below are based on the Commission's Statement of Undisputed Facts in Support of its Motion for Summary Judgment against Relief Defendants ("Facts, ¶__") submitted herewith.

LMC is a Massachusetts corporation organized by Sears and Casagrande in 1992, with its principal place of business in Northampton.  Between 1992 and 1998, LMC operated a food and beverage concession at the Westover Golf Course.  [*Id.*, ¶3.]  Casagrande testified that, at some point in 1999, Sears orally conveyed his interest in LMC to Casagrande, who was thereafter the sole officer, director and employee of LMC.  [*Id.*]

CSG and CSD are Massachusetts corporations organized in January 1999 for the purpose of building a golf course and condominium project near Belchertown, Massachusetts.  [*Id.*, ¶4.]

**B.     Sears Was Responsible for Raising $2 Million to**
**Fund LMC's Investment in the Cold Spring Project**

In the spring of 1999, Casagrande introduced Sears to the principals of CSG and CSD, who were seeking investors for the Cold Spring project.  [Facts, ¶5.]

In June 1999, LMC entered into written agreements with CSG and CSD whereby LMC was to acquire a 51% interest in CSG for $1,725,00 and a 16% interest in CSD for $275,000, and Sears and Casagrande were to become directors of both companies.  [*Id.*, ¶6.]

When LMC entered into the agreements with CSG and CSD, LMC did not have the $2 million that it would be required to pay for equity interests in CSG and CSD.  Sears and Casagrande told the principals of CSG and CSD that Sears would raise the $2 million from outside investors.  As Casagrande put it, "He [Sears] was the one who was supposed to be raising the money."  [*Id.*, ¶7.]

In January 2000, CSG received the final permit necessary to allow construction to begin, thereby triggering LMC's obligation to pay $2 million to CSG and CSD.  [*Id.*, ¶8.]

3

C.    **Sears Fraudulently Obtained Nearly
      $2.3 Million from His Clients**

Between February and July 2000, Sears caused nearly $2.3 million to be transferred from

the following clients to LMC:

| *Client* | *Amount* |
|---|---|
| Arnold, Ann | 20,000 |
| Engel, Paul & Deborah | 30,000 |
| Futter, Thomas | 800,000 |
| Helterline, Mark & Celeste | 146,985 |
| Johnson, Roy & Jeannie | 502,500 |
| McGovern, Marcia & Sanborn, Virginia | 150,000 |
| McLaughlin, Robert & Eleanor | 75,000 |
| McQueeney, Stephen & Claire | 80,000 |
| Reale, Lyn | 90,000 |
| Senders, Virginia | 120,000 |
| Shaw, Josephine | 225,000 |
| Wallace, John & Nan | 55,000 |
| | **$2,294,485** |

To obtain the money, Sears:  (1) forged client signatures on numerous letters purporting to

authorize the transfer of funds from the clients' accounts to LMC; (2) forged client signatures on

several margin account agreements; (3) caused margin loans to be made in several client

accounts; and (4) induced several clients to invest in the Cold Spring project without disclosing

his personal interest in the project. [Facts, ¶¶9-20.]

D.    **The Money from Sears' Clients Went to LMC**

The money from Sears' clients was deposited into an account at BankBoston (later Fleet

Bank) which Casagrande had opened for LMC. [Facts, ¶¶21-22.]

4

During the spring and summer of 2000, Casagrande called Sears repeatedly to ask when LMC would be receiving any additional funds, because the Cold Spring project needed the money to pay its bills. Sears assured Casagrande that additional funds would be received shortly and that he would come up with the full $2 million. [*Id.*, ¶23.]

Casagrande and the principals of CSG and CSD were aware that Sears was obtaining the money from his advisory clients, but they did not ask Sears how he was raising the money and they did nothing to make sure that what Sears was telling investors about the Cold Spring project was accurate. [*Id.*, ¶24.]

E.     **The Money from Sears' Clients Was Paid to CSG and CSD
         or Was Used to Pay the Cold Spring Project's Expenses**

The LMC account at BankBoston was used to make payments either directly to CSG and CSD or to pay expenses on their behalf. Casagrande was responsible for deciding which expenses of CSG or CSD would be paid from the LMC account. Indeed, most of the withdrawals from the LMC account were checks payable to CSG or CSD or checks or wire transfers to entities that had supplied goods or services to the Cold Spring project. [Facts, ¶¶25-26.]

The three principals of CSG and CSD were aware that Casagrande was using the LMC account at BankBoston to pay expenses of the Cold Spring project. [*Id.*, ¶27.]

LMC satisfied its obligation to pay $2 million to CSG and CSD through the payments from its account at BankBoston to CSG and CSD or to pay expenses of the Cold Spring project. [*Id.*, ¶28.]

5

## ARGUMENT

I.   **The Commission May Obtain Disgorgement from
     Relief Defendants in Order to Prevent Unjust Enrichment**

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust

enrichment and to deter others from violating the securities laws." SEC v. First City Financial

Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). It has long been recognized that the "deterrent

effect of SEC enforcement actions would be greatly undermined if securities law violators were

not required to disgorge illicit profits." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082,

1104 (2nd Cir. 1972).

It is also well established that the Commission may obtain disgorgement from third

parties, known as relief defendants, who have been unjustly enriched by funds obtained from the

victims of a defendant's misconduct. See, e.g., SEC v. Cavanagh, 155 F.3d 129, 136 (2nd Cir.

1998); SEC v. Colello, 139 F.2d 674, 677 (9th Cir. 1998). As the Ninth Circuit stated in Colello,

"the broad equitable powers of the federal courts can be employed to recover ill gotten gains for

the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who

has received the proceeds after the wrong." 139 F.3d at 676. Thus, even though a relief

defendant may not have committed a wrongful act, courts will order disgorgement from a relief

defendant in order to prevent unjust enrichment and to enable the victims of the fraud to recover

their money. See, e.g., SEC v. Antar, 120 F.Supp.2d 431, 447 (D.N.J. 2000), aff'd, 2002 WL

1774063 (3rd Cir. Aug. 2, 2002); SEC v. Better Life Club of America, Inc., 995 F.Supp. 167, 180

(D.D.C. 1998); SEC v. Glauberman, 1992 WL 175270, *1-2 (S.D.N.Y. July 16, 1992). Indeed,

to order disgorgement, "[t]he court need find only that [the relief defendant] has no right to retain

the funds illegally taken from the victims." SEC v. Colello, 139 F.3d at 679.

## II. The Relief Defendants Should Be Ordered to Disgorge the $2.2 Million They Received from Sears' Defrauded Clients

The basis for disgorgement from the relief defendants is apparent. All the money from Sears' defrauded clients went straight into LMC's bank account. Casagrande, who controlled the account, used the money to make payments directly to CSG and CSD or to pay expenses of the Cold Spring project for the direct benefit of CSG and CSD. By using the clients' funds in this fashion, LMC satisfied its obligation under the agreements with CSG and CSD to pay $2 million in exchange for equity interests in both companies. Casagrande likewise benefitted since he claims to have been the sole officer, director and employee of LMC at the time.

The relief defendants are likely to claim that they did not know Sears was defrauding his clients, but their professions of ignorance actually confirm the true extent of their unjust enrichment. Casagrande and the principals of CSG and CSD were aware that Sears was obtaining the money from his advisory clients, but they did not ask Sears how he was raising the money and they did nothing to make sure that what Sears was telling investors about the Cold Spring project was accurate. [Facts, ¶24.] Instead, as Casagrande put it, "He [Sears] was the one who was supposed to be raising the money." [*Id.*, ¶7.] Because Casagrande and the principals of CSG and CSD gave Sears the job of raising funds for the Cold Spring project and did not concern themselves with how he did so, it is perfectly fair to require them to return the money, now that the true extent of Sears' misconduct has been exposed.

The undisputed facts thus demonstrate that LMC, Casagrande, CSG and CSD were unjustly enriched by the $2,294,485 that Sears misappropriated from his clients and that was used to fund the Cold Spring project. Accordingly, LMC, Casagrande, CSG and CSD should be held jointly and severally liable for disgorgement of that amount, with pre-judgment interest.

7

*See, e.g.*, <u>SEC v. First Jersey Securities, Inc.</u>, 101 F.3d 1450, 1475 (2nd Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) (court has discretion to hold parties jointly and severally liable for disgorgement); <u>SEC v. Hughes Capital Corp.</u>, 917 F.Supp. 1080, 1088 (D.N.J. 1996) (joint and several liability appropriate for participants who acted "closely and collectively").

The Commission's standard practice is to seek pre-judgment interest on a defendant's disgorgement obligation calculated in the same manner that the Internal Revenue Service uses to calculate tax over-payments or under-payments. Applying that method (which the Court adopted when entering the default judgment against Sears), the pre-judgment interest on the relief defendants' disgorgement obligation of $2,294,485, calculated from the filing of the Complaint on September 26, 2000 through October 31, 2002, would be $367,741, for a total disgorgement obligation of $2,662,226. [Huntington Decl., ¶2.]

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment against LMC,

Casagrande, CSG and CSD and should order them, jointly and severally, to pay disgorgement

plus pre-judgment interest in the total amount of $2,662,226.

Respectfully submitted,

JUAN MARCEL MARCELINO
DISTRICT ADMINISTRATOR

By:    _Frank C Huntington_

Frank C. Huntington (Mass. Bar No. 544045)
Senior Trial Counsel

Ellen E. Bober (Mass. Bar No. 567598)
Enforcement Attorney

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA 02108
(617) 424-5900  ext. 201 (Huntington)
                ext. 608 (Bober)
(617) 424-5940 (fax)

Dated:  October 30, 2002

## CERTIFICATE OF SERVICE

I, Frank C. Huntington, certify that on October 30, 2002, a copy of the foregoing Plaintiff's Memorandum in Support of its Motion for Summary Judgment against Relief Defendants was sent by first-class mail to counsel of record as follows:

*Attorney for Defendant Robert Sears (limited appearance)*

Irving D. Labovitz, Esq.
One Financial Plaza
1350 Main Street, 15th Floor
Springfield, MA  01103
(413) 733-0600
(413) 732-5828  (fax)

*Attorney for Relief Defendants*
*James Casagrande and Last Minute Concessions, Inc.*

Thomas Lesser, Esq.
Lesser, Newman, Souweine & Nasser, LLP
39 Main St., Suite I
Northampton, MA  01060-3132
(413) 584-7331
(413) 586-7076  (fax)

*Attorneys for Relief Defendants*
*Cold Spring Golf Course, Inc. and Cold Spring Development, Inc.*

John A. Houlihan, Esq.
Robert D. Laurie, Esq.
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444
(617) 439-4170  (fax)

Frank C. Huntington

10